1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

```
UNITED STATES OF AMERICA            )
                                    )
         vs.                        )          CASE NOS.
                                    )   4:18-CR-00274-LGW-BWC-3
HIGINIO PEREZ-BRAVO,                )
                                    )
_____Defendant._____)
```

JURY TRIAL
BEFORE THE HONORABLE LISA GODBEY WOOD
April 12, 2022; 9:00 a.m.
Brunswick, Georgia

APPEARANCES:

For the Government:          TANIA D. GROOVER, Esq.
                             CHRISTOPHER HOWARD, Esq.
                             U. S. Attorney's Office
                             P. O. Box 8970
                             Savannah, Georgia  31412
                             (912) 201-2552
                             tania.groover@usdoj.gov
                             christopher.howard@usdoj.gov


For the Defendant:           ROBERT P.  PHILLIPS, III, Esq.
                             Phillips, Carson & Phillips
                             420 West Broughton Street
                             2nd Floor
                             Savannah, Georgia 31401
                             (912) 232-0081
                             bplaw@msn.com


Reported by:                 Debbie Gilbert, RPR, CCR
                             Official Court Reporter
                             801 Gloucester Street
                             Post Office Box 1894
                             Brunswick, GA 31521-1894
                             (912) 262-2608 or (912) 266-6006
                             debra_gilbert@gas.uscourts.gov
                                    - - -

2

I N D E X

                                                    PAGE


Court's Initial Instructions                         136

OPENING STATEMENTS

   By Mr. Howard                                      147
   By Mr. Phillips                                    158

GOVERNMENT WITNESS

   MARIA MONTOYA
        Direct Examination By Ms. Groover             168
        Cross-Examination By Mr. Phillips             186

E X H I B I T S

| GOVERNMENT'S EXHIBITS | DESCRIPTION | I.D.'d | ADMITTED |
|---|---|---|---|
| 1 | Maps of Savannah Pines | 171 | 171 |
| 2 | Photographs of Eliud Montoya | 171 | 171 |
| 3 | Eliud Montoya's Naturalized US Citizenship Certificate | 171 | 171 |
| 4 | Photographs of Eliud Montoya's EEO Paperwork | 171 | 171 |
| 5 | Eliud Montoya's EEOC Paperwork | 171 | 171 |
| 6 | Wolf Tree Timesheet | 171 | 171 |
| 7 | Photograph of Pablo Rangel-Rubio | 171 | 171 |
| 8 | Photograph of Juan Rangel-Rubio | 171 | 171 |
| 9 | Wolf Tree Paychecks Deposited into Oscar Cruz Account and Summary | 171 | 171 |

| | | | |
|---|---|---|---|
| 10 | Eliud Montoya's April 2017 Complaint Letter | 171 | 171 |
| 11 | Oscar Cruz Plea Agreement | 171 | 171 |
| 12 | Joel Reyes Complaint Letter | 171 | 171 |
| 13 | Eliud Montoya's EEOC Intake Questionnaire | 171 | 171 |
| 14 | Eliud Montoya's Charge of Discrimination, 8/17/17 | 171 | 171 |
| 15 | Eliud Montoya's Supporting Documentation | 171 | 171 |
| 16 | EEOC Intake Notes | 171 | 171 |
| 17 | Notice of Charge of Discrimination | 171 | 171 |
| 18 | Map of Savannah Pines with Lots 59 and 130 | 171 | 171 |
| 19 | IBEW Surveillance Image, 8/19/17, of Toyota | 171 | 171 |
| 20 | Maps of Entrance to Savannah Pines Mobile Home Park | 171 | 171 |
| 21 | Map of Crime Scene | 171 | 171 |
| 22 | Crime Scene Photographs | 171 | 171 |
| 23 | Yellow Notebook Seized from Eliud Montoya's Vehicle | 171 | 171 |
| 24 | Photographs of Yellow Notebook | 171 | 171 |
| 25 | Photographs of Search of Rangel-Rubio's Compound | 171 | 171 |
| 26 | Photographs of Search of Juan Rangel-Rubio's Trailer | 171 | 171 |
| 27 | Photograph of Box of .22-Caliber Ammunition | 171 | 171 |
| 28 | Box of .22-Caliber Ammo | 171 | 171 |

4

| 29 | IBEW Surveillance Video, 8/18/2017 | 171 | 171 |
|----|------------------------------------|-----|-----|
| 30 | IBEW Surveillance Video, 8/19/2017 | 171 | 171 |
| 31 | $6,000 Check to Defendant | 171 | 171 |
| 32 | $20,000 Wire to Defendant | 171 | 171 |
| 33 | Photographs of Defendant's White 2007 Chevrolet Van | 171 | 171 |
| 34 | Photograph of Defendant's White 2006 Cadillac Escalade | 171 | 171 |
| 35 | SC DMV Record for Van | 171 | 171 |
| 36 | SC DMV Record for Escalade | 171 | 171 |
| 37 | Cell Phone Records for Pablo Rangel-Rubio and Juan Rangel-Rubio | 171 | 171 |
| 38 | Cell Phone Records of Defendant | 171 | 171 |
| 39 | Cell Phone Record of Juan Rangel-Rubio | 171 | 171 |
| 40 | Photographs of Eliud Montoya's Autopsy | 171 | 171 |
| 41 | Photographs of Gunshot Wounds | 171 | 171 |
| 42 | Photograph of .22 Metal Jacketed Bullet and Fragment. | 171 | 171 |
| 43 | .22 Metal Jacketed Bullet and Fragment | 171 | 171 |
| 44 | Photograph of .22 Metal Jacketed Bullet | 171 | 171 |
| 45 | .22 Metal Jacketed Bullet | 171 | 171 |

5

| 46 | Photograph of Metal Jacketed Bullet | 171 | 171 |
| 47 | Metal Jacketed Bullet | 171 | 171 |
| 48 | Photograph of .22 Metal Jacketed Bullet | 171 | 171 |
| 49 | .22 Metal Jacketed Bullet | 171 | 171 |
| 50 | Photograph of Metal Jacket Fragments | 171 | 171 |
| 51 | Metal Jacketed Fragments | 171 | 171 |
| 52 | Certified Death Certificate | 171 | 171 |
| 53 | Pablo Rangel-Rubio's Immigration and Alien File | 171 | 171 |
| 54 | Juan Rangel-Rubio's Immigration and Alien File | 171 | 171 |
| 55 | Defendant's Immigration and Alien File | 171 | 171 |
| 56 | Map of Pertinent 8/19/17 Locations for Defendant | 171 | 171 |
| 57 | Map of Pertinent 8/19/17 Locations for Defendant, Pablo and Juan Rangel-Rubio | 171 | 171 |
| 58 | Audio of Defendant's Interview, 7/30/18 | 171 | 171 |
| 59 | Transcript of Defendant's Interview, 7/30/18 | 171 | 171 |
| 60 | Chatham County Jail Call, 10/1/17 | 171 | 171 |
| 61 | Transcript of Chatham County Jail Call, 10/1/17 | 171 | 171 |
| 62 | Cellular Site Analysis Report | 171 | 171 |
| 63 | Pablo Rangel-Rubio's BOA Accounts, 2385, 8908, 2147 | 171 | 171 |

6

| 64 | Pablo Rangel-Rubio's BOA Account, 6341 | 171 | 171 |
| 65 | Pablo Rangel-Rubio's Wells Fargo Account | 171 | 171 |
| 66 | Summary of Deposits and Checks, Pablo Rangel-Rubio's Account | 171 | 171 |
| 67 | Juan Rangel-Rubio's BOA Accounts | 171 | 171 |
| 68 | Summary of Deposits into Juan Rangel-Rubio's Account | 171 | 171 |
| 69 | Summary of Deposits and Checks into Pablo and Juan Rangel-Rubio's Accounts | 171 | 171 |
| 70 | Defendant's Wells Fargo Account | 171 | 171 |
| 71 | Summary of Defendant's Bank Account | 171 | 171 |
| 72 | Pablo's Wolf Tree Truck GPS for 8/2, 8/18 and 8/19/17 | 171 | 171 |
| 73 | Screenshots of IBEW Surveillance Video, 8/18/17 | 171 | 171 |
| 74 | Summary of Defendant's Van and Escalade, 8/18/17 | 171 | 171 |
| 75 | Screenshots of IBEW Surveillance, 8/19/17 | 171 | 171 |
| 76 | Summary of Defendant's Van, 8/19/17 | 171 | 171 |
| 77 | Wolf Tree Employee File | 171 | 171 |
| 78 | Call Activity for 912-662-9133 | 171 | 171 |
| 79 | Call Activity, 8/18/17 for phones and locations | 171 | 171 |

| 80 | Call Activity for pertinent phones and location, 8/19/17 | 171 | 171 |
| 81 | McDonald's Surveillance Video, 8/19/17 | 171 | 171 |
| 82 | Image of Defendant's Van from McDonald's Surveillance Video | 171 | 171 |
| 83 | Photograph of Defendant | 171 | 171 |
| 84 | Record of $20,000 Wire from Pablo Rangel-Rubio to Defendant's Account | 171 | 171 |
| 85 | Summary of Call Frequency Chart | 171 | 171 |
| 86 | Chart of Pertinent Phone Numbers | 171 | 171 |

8

2                    P R O C E E D I N G S

3                (Call to order at 9:05 a.m.)

4          THE CLERK:  Ms. Giersberg and Mr. Zidovec, if you will

5    please come forward so I can swear you in before we begin.

6          (Interpreters Elizabeth Giersberg and Davor Zidovec were

7    sworn.)

8          THE CLERK:  Thank you, and we're ready to begin.  Are

9    y'all both ready?

10          INTERPRETER GIERSBERG:  Yes.

11          THE CLERK:  Good morning, ladies and gentlemen.

12          SPEAKER:  Good morning.

13          THE CLERK:  Before I begin can everyone hear me?

14          SPEAKER:  Yes.

15          THE CLERK:  If at any time you cannot hear me, if you

16    will please raise your hand.  I have a wireless mike that I can

17    use, but I prefer not to.

18          Before we begin I'm going to do a quick roll call.  As I

19    call your name, I will call your juror number, which is on the

20    sticker that you have.  As I call your name and your juror

21    number, if you will please just state "here."

22          Juror Number 1, John Adams.

23          PROSPECTIVE JUROR NUMBER 1:  Here.

24          THE CLERK:  Juror Number 2, Kevin Ankin.

25          PROSPECTIVE JUROR NUMBER 2:  Here.

9

```
1              THE CLERK:  Ankin?

2         PROSPECTIVE JUROR NUMBER 2:  Yes.

3              THE CLERK:  Juror Number 3, Rhonda Aviles.

4         PROSPECTIVE JUROR NUMBER 3:  Aviles, here.

5              THE CLERK:  Juror Number 4, Heather Beaston.

6         PROSPECTIVE JUROR NUMBER 4:  Here.

7              THE CLERK:  Juror Number 5, Roxanne Blakely.

8         PROSPECTIVE JUROR NUMBER 5:  Here.

9              THE CLERK:  Juror Number 6, Theodore Blocker.

10        PROSPECTIVE JUROR NUMBER 6:  Here.

11             THE CLERK:  Juror Number 7, Kody Bradley.

12        PROSPECTIVE JUROR NUMBER 7:  Here.

13             THE CLERK:  Juror Number 8, Samson Brantley.

14        PROSPECTIVE JUROR NUMBER 8:  Here.

15             THE CLERK:  Juror Number 9, Oscar Brazell, Jr.

16        PROSPECTIVE JUROR NUMBER 9:  Here.

17             THE CLERK:  Juror Number 10, Lee Brown.

18        PROSPECTIVE JUROR NUMBER 10:  Here.

19             THE CLERK:  Juror Number 11, Theodore Burnside.

20        PROSPECTIVE JUROR NUMBER 11:  Here.

21             THE CLERK:  Juror Number 12, Liczy Cano.

22        PROSPECTIVE JUROR NUMBER 12:  Here.

23             THE CLERK:  Juror Number 13, Gregory Carter, Jr.

24        PROSPECTIVE JUROR NUMBER 13:  Here.

25             THE CLERK:  Juror Number 14, Edgaris Casey.
```

1       PROSPECTIVE JUROR NUMBER 14:  Here.

2       THE CLERK:  Juror Number 15, Michael Castleberry.

3       PROSPECTIVE JUROR NUMBER 15:  Here.

4       THE CLERK:  Juror Number 16, Travis Colasurd.

5       PROSPECTIVE JUROR NUMBER 16:  Here.

6       THE CLERK:  Juror Number 17, Mark Cotter.

7       PROSPECTIVE JUROR NUMBER 17:  Here.

8       THE CLERK:  Juror Number 18, Patricia Courtney.

9       PROSPECTIVE JUROR NUMBER 18:  Here.

10      THE CLERK:  Juror Number 19, Michael Dennis.

11      PROSPECTIVE JUROR NUMBER 19:  Here.

12      THE CLERK:  Juror Number 20, Shirley Drury.

13      PROSPECTIVE JUROR NUMBER 20:  Drury, here.

14      THE CLERK:  Juror Number 21, Shelby Eason.

15      PROSPECTIVE JUROR NUMBER 21:  Here.

16      THE CLERK:  Juror Number 22, Rachel Egger.

17      PROSPECTIVE JUROR NUMBER 22:  Here.

18      THE CLERK:  Juror Number 23, Katie Ely.

19      PROSPECTIVE JUROR NUMBER 23:  Here.

20      THE CLERK:  Juror Number 24, Jason Ferguson.

21      PROSPECTIVE JUROR NUMBER 24:  Here.

22      THE CLERK:  Juror Number 25, John Fields, Jr.

23      PROSPECTIVE JUROR NUMBER 25:  Here.

24      THE CLERK:  Juror Number 26 Robert Glasscock.

25      PROSPECTIVE JUROR NUMBER 26:  Here.

11

1           THE CLERK:  Juror Number 27, Sydney Gramsch.

2           PROSPECTIVE JUROR NUMBER 27:  Here.

3           THE CLERK:  Juror Number 28, Carl Hickson.

4           PROSPECTIVE JUROR NUMBER 28:  Juror Number 28, Carl

5    Hickson.  Juror Number 28 is not present.

6           Juror Number 29, Wanda Holzendorf.  Juror Number 29,

7    Wanda Holzendorf.  Juror Number 29 is not present.

8           Is there anyone present whose name I did not call please

9    raise your hand?  Does anybody need their juror number again

10   please raise your hand?

11          Would all members of the jury panel please stand and

12   raise your right hand to be sworn.

13          (Prospective jurors sworn.)

14          THE CLERK:  Thank you.  You may be seated.  Is there

15   anyone for any reason who did not answer "I do" to the oath?

16   Please raise your hand.

17          I will now be asking a series of questions so please

18   listen carefully to each one of them.  If you have a positive

19   answer to any question, please raise your hand and the CSO will

20   come to you with the microphone.

21          Is there anyone who, for any reason, has an excuse as to

22   why they cannot serve during this term of court, please raise

23   your hand?  Did you raise your hand?

24          PROSPECTIVE JUROR NUMBER 20:  Kind of.

25          THE CLERK:  If you will hang on one second and I will

1  get you to answer.  If you will please just state your name and

2  your juror number.

3          PROSPECTIVE JUROR NUMBER 20:  Shirley Drury, Number 20.

4          THE CLERK:  What is your reason?

5          PROSPECTIVE JUROR NUMBER 20:  We're down to one vehicle

6  because our vehicle broke and my husband needs it for work.

7          THE CLERK:  So I'm going to have you actually come have

8  a seat in the top row of the jury box for me here.  We have one

9  more over here.

10          PROSPECTIVE JUROR NUMBER 18:  Patricia Courtney, Number

11  18.

12          THE CLERK:  Okay.

13          PROSPECTIVE JUROR NUMBER 18:  I have physical therapy

14  two days a week.  I don't know how long this is going to last.

15          THE CLERK:  Okay, so I'm also going to have you please

16  come have a seat in the jury box with her.  We had two more.

17          PROSPECTIVE JUROR NUMBER 4:  Heather Beaston, Number 4,

18  I will be out of the country in two weeks.

19          THE CLERK:  I will let you stay where you are.

20          PROSPECTIVE JUROR NUMBER 12:  Liczy Cano, Number 12.  I

21  have a baby at home and I don't know how long this is going to

22  last and he's breastfed.

23          THE CLERK:  I'll have you come have a seat with her.

24  Whoever is next, if you will state your name and juror number.

25          PROSPECTIVE JUROR NUMBER 25:  Yes, I'm John Fields.  I'm

1    Juror Number 25.  I am a local pastor.  I just got word just

2    yesterday that I have a terminal member of my church.

3            THE CLERK:  I will come have you have a seat with the

4    rest of this group here.

5            PROSPECTIVE JUROR NUMBER 14:  My name is Edgaris Casey,

6    Juror Number 14.  I'm going out of the country next Wednesday.

7            THE CLERK:  I'll have you stay where you are.

8            PROSPECTIVE JUROR NUMBER 8:  Yes, I'm Samson Brantley.

9    I'm Juror Number 8.  I have no driver's license and no vehicle

10   and it's hard for me, difficult for me to get back and forth.

11           THE CLERK:  If you will please come have a seat in the

12   jury box.  Anyone else?

13           Are each of you citizens of the United States?  If the

14   answer is no, please raise your hand.

15           Are each of you at least 18 years of age or older?  If

16   the answer is no, please raise your hand and these questions

17   also go for y'all, so if you have a positive answer.

18           Have each of you resided for a period of at least one

19   year within the following counties which comprise the Brunswick

20   Division for the Southern District of Georgia?  Those counties

21   are Appling, Camden, Glynn, Jeff Davis, Long, McIntosh, and

22   Wayne.  If the answer is no, please raise your hand.

23           Do any of you presently have any charge pending against

24   you or have you ever been convicted in any state or federal

25   court of record of a crime punishable by imprisonment for more

14

1    than one year?  If the answer is yes, please raise your hand.

2           Are each of you able to read, write and understand the

3    English language?  If the answer is no, please raise your hand.

4           Are any of you incapable by reason of physical or mental

5    infirmity to render satisfactory jury service at this time?  If

6    the answer is yes, please raise your hand.

7           Are any of you members of the fire or police department

8    of any state, district, territory, possession or subdivision

9    thereof?  If the answer is yes, please raise your hand.

10          Are any of you volunteer safety personnel who serve

11   without compensation as firefighters or members of a rescue

12   squad or ambulance crew for a public agency?  If the answer is

13   yes, please raise your hand.

14          Are any of you members in the active service with the

15   armed forces of the United States?  If the answer is yes, please

16   raise your hand.

17          Are any of you public officers in the executive,

18   legislative or judicial branches of the Government of the United

19   States or any state, district, territory or subdivision thereof

20   who are actively engaged in the performance official duties?  If

21   the answer is yes, please raise your hand, and, sir, if you will

22   please give us your name and your juror number.

23          PROSPECTIVE JUROR NUMBER 26:  Robert Glasscock, Number

24   26.  I'm currently employed by ICE under the executive branch.

25          THE CLERK:  Okay, thank you.

1      Sir, I will actually have you come have a seat with the

2  rest of the jury box members.

3      In just a few moments, the Judge is going to come out

4  and ask you an additional series of questions.  Each time she

5  does if you have a positive response to any question she asks

6  you'll do as you've done here.  You will raise your hand and

7  state your name and jury number.

8      (Honorable Lisa Godbey Wood enters the courtroom.)

9      THE COURT:  Good morning.

10      SPEAKERS:  Good morning.

11      THE COURT:  Ms. Sharp, call the case.

12      THE CLERK:  Case Number CR-4:18-274, United States of

13  America versus Higinio Perez-Bravo, Tania Groover, Christopher

14  Howard for the Government, Bobby Phillips for the Defense.

15      MS. GROOVER:  United States is ready to proceed, Your

16  Honor.

17      MR. PHILLIPS:  We are ready as well, Your Honor.

18      THE COURT:  Ms. Sharp, confirm that our interpreters

19  have taken the oath.

20      THE CLERK:  Yes, Your Honor, they have.

21      THE COURT:  Ladies and gentlemen, in just a few moments

22  I'm going to be asking you questions about your qualifications

23  to serve as jurors in this case.

24      This part of the case is known as the voir dire

25  examination.  Those are just old French words and what they mean

16

1   is speak the truth.  Each of you has just taken an oath in which

2   you promised to do that, to truthfully answer the questions that

3   are asked of you.  Please understand that these questions are

4   not designed to pry into your personal life.  Rather they are

5   designed to find what every person in our country is entitled to

6   and that's a fair and impartial jury to hear his or her case.

7        So the questions are designed to find out whether you

8   have some special knowledge or training that might influence the

9   way you view the issues in this case.  So they are geared to

10  finding any special knowledge or training that you might have.

11       In this case, we anticipate that the trial will last

12  approximately four days including today.  That is, we anticipate

13  that the trial will conclude on Friday.  Let me acknowledge

14  right up front how very important your service as citizens is to

15  us.

16       As you know, our country is still emerging somewhat from

17  the COVID pandemic that we went through.  There was a while

18  where we had to stop jury trials altogether and couldn't do

19  them.  Thankfully, we've been able to gear that back up.

20       So we value your service and your time, but we also

21  value your safety.  So each of you is invited, if you would

22  like, to wear a mask.  Those of you who are selected will be

23  given an amenities pack that has masks and hand wipes and

24  sanitizer and water and writing implements and paper and so

25  forth.

1          Also in a nod to the pandemic that we're emerging from,

2     we're spacing things differently and the flow is different.  You

3     see, ordinarily you would be packed shoulder to shoulder for

4     jury selection, but in order to enact some social distancing,

5     we're doing jury selection this morning in two phases.

6          Once we ask questions of you this morning, then we will

7     have another group that follows you at 11 o'clock, and then this

8     afternoon, the parties will make their strikes and have a number

9     of you who remain as jurors in this case.

10         As I say, we need you, and as a result, we respect your

11    health and your safety.  We also realize that your service here

12    this morning and if you are selected is just that.  It's public

13    service.  So we will not waste your time.  The parties and the

14    attorneys have worked diligently for many months to get the case

15    trial-ready in a smooth and orderly fashion so your service will

16    in no way be a waste of time.  The parties are entitled to a

17    thorough trial and they will receive it.

18         Now, jury service is rarely convenient.  To be honest,

19    most of the time it's downright inconvenient.  But it is an

20    important civil service that some of you may be asked to

21    perform.  As a result, only extreme hardship can justify an

22    excuse.

23         Now, Ms. Sharp, were there some that were seeking excuse

24    from service this morning?

25         THE CLERK:  Yes, Your Honor, we will start with Juror

18

1    Number 20.

2          THE COURT:  As your number is called, if you will come

3    to the podium and let me explore what is happening, so, Ms.

4    Sharp, call by name and number.

5          THE CLERK:  Juror Number 20, Shirley Drury.

6          THE COURT:  Ms. Drury, tell me your request for excuse.

7          PROSPECTIVE JUROR NUMBER 20:  Well, I would like to

8    perform my duty, but we're down to one vehicle and my husband

9    needs it for work.

10          THE COURT:  Ms. Drury, let me ask you to join your

11    colleagues.  If you are selected, I think accommodations can be

12    made.

13          PROSPECTIVE JUROR NUMBER 20:  That will be fine.

14          THE CLERK:  Juror Number 18, Patricia Courtney.

15          THE COURT:  Ms. Courtney, tell me what issue you have

16    this morning.

17          PROSPECTIVE JUROR NUMBER 18:  I have physical therapy

18    two days a week.

19          THE COURT:  And without going into great detail, tell me

20    the nature of your injury or what occasions your physical

21    therapy.

22          PROSPECTIVE JUROR NUMBER 18:  I have a frozen shoulder

23    and I have a hip that's not doing well.

24          THE COURT:  Did you have some surgery on your shoulder

25    in the past?

1          PROSPECTIVE JUROR NUMBER 18:  No.

2          THE COURT:  Just became frozen?  We're going to need a

3   hundred percent of your attention for a hundred percent of the

4   trial.  Given your constellation of health challenges, this is

5   not going to be the jury for you to sit on.

6          However, I am going to call you at some point in the

7   near future and hopefully you will have healed by then but I'm

8   going to excuse you from service this morning.

9          Thank you.

10          PROSPECTIVE JUROR NUMBER 18:  Thank you.

11          THE COURT:  Ms. Sharp.

12          THE CLERK:  Juror Number 12, Liczy Cano.

13          PROSPECTIVE JUROR NUMBER 12:  I have a baby at home.

14   He's strictly breastfed and I can't use a pump.  You say it will

15   last four days and I won't have a ride or a car to get here.

16          THE COURT:  Tell me how old your baby is.

17          PROSPECTIVE JUROR NUMBER 12:  He's eight months, and he

18   hasn't started solid foods that much because he's like gassy and

19   it hurts to use the restroom.

20          THE COURT:  But you exclusively breastfeed?

21          PROSPECTIVE JUROR NUMBER 12:  Yes, ma'am.

22          THE COURT:  I'm going to excuse you from service this

23   morning but I am going to call you back in about a year once

24   your baby is using solid foods.

25          PROSPECTIVE JUROR NUMBER 12:  Yes, ma'am.

20

1          THE CLERK:  Juror Number 25, John Fields, Jr.

2          THE COURT:  All right, and Mr. Fields, tell me what

3     issue you're struggling this with this morning.

4          PROSPECTIVE JUROR NUMBER 25:  This morning, well, first

5     of all, I'm a pastor, a local pastor in Brunswick, First Jordan

6     Grove Missionary Baptist Church.  I just received a phone call

7     on Sunday that one of my members is terminal.

8          He just been transferred from the hospital to a home

9     hospice and I spoke with her -- his wife yesterday and she said

10    the doctors have given up on him and that he could -- he could

11    be -- he could be dead in the next few days, and so I was asking

12    to be dismissed just to be released for the sake of the family.

13         THE COURT:  At this point I'm going to ask you to rejoin

14    your colleagues and we will go through some further questioning.

15    Thank you, Pastor Fields.

16         PROSPECTIVE JUROR NUMBER 25:  Yes, ma'am.

17         THE CLERK:  Juror Number 8, Samson Brantley.

18         THE COURT:  All right, Mr. Brantley, tell me what issue

19    you have this morning.

20         PROSPECTIVE JUROR NUMBER 8:  Well, I have no vehicle, no

21    license and it's very difficult for me to get back and forth.  I

22    stay over a hundred miles from here.

23         THE COURT:  And Mr. Brantley, let me ask you to rejoin

24    your colleagues.  If you are selected to serve, I think

25    accommodations can be made; understand?

21

1           PROSPECTIVE JUROR NUMBER 8:  Okay.

2           THE COURT:  So if you will rejoin your colleagues.

3    Thank you, sir.

4           THE CLERK:  Juror Number 26, Robert Glasscock.

5           THE COURT:  Mr. Glasscock, tell me your issue.

6           PROSPECTIVE JUROR NUMBER 26:  I had no issue.  I just

7    identified I'm currently employed by ICE and just brought that

8    to the attention, under the executive branch.

9           THE COURT:  Thank you, and you can rejoin your

10   colleagues.  Ms. Sharp, any --

11          THE CLERK:  Your Honor, there were two jurors who

12   indicated they were traveling within two weeks, and they are

13   still seated in the gallery.  That would be Juror Number 14,

14   Edgaris Casey, and Juror Number 4, Heather Beaston.

15          THE COURT:  We will be finished long before.

16          The procedure we're going to use is I will ask a series

17   of questions one at a time.  If you have a positive response

18   just raise your hand and the marshals will bring a microphone

19   around to you.  When they do, if you will stand and begin by

20   giving us your name and juror number and then proceed with your

21   answer.

22          Once all of the questions have been asked, we will break

23   and you will be excused until 2:30 this afternoon.  When you

24   return, there's a very short set of questions we will ask at

25   that point and then the lawyers will exercise what are called

1    preemptory strikes.

2         They are allowed to strike a certain number of you and

3    those who remain will be seated as the jury.  They will exercise

4    those strikes silently by walking a piece of paper back and

5    forth between counsel table.

6         Now, throughout the trial and the selection process,

7    you're going to see certain courthouse staff.  Let me go ahead

8    and identify who they are and what they do.  The lady seated to

9    my front left is Ms. Debbie Gilbert.  She's my court reporter.

10   It's her obligation to write down every word that's said in the

11   courtroom while we are in session.

12        The lady seated front to the right is my courtroom

13   deputy, Whitney Sharpe.  As you've seen, it's her duty to

14   administer oaths.  She also keeps track of evidence and keeps

15   the trial running smoothly.

16        The lady seated front and center is Ms. Kim Mixon.

17   She's also a courtroom deputy on staff here with the court.

18   She's going to be with us only during jury selection to help

19   with that process.

20        The gentlemen and lady seated to the right are law

21   clerks on staff with the court.  They are lawyers that help

22   resolve legal issues should they arise.

23        Finally very important to those of you who may be

24   selected to serve on the jury are the gentlemen in the blue

25   blazers and the gray slacks.  They are court security officers

1    with the United States Marshal Service.  Their military

2    background coupled with their law enforcement experience

3    combines to help to maintain perfect order at all times during

4    the courtroom.  They are important to you because, if you are

5    selected, they will be your conduit to The Court and they will

6    also be your contact for any kind of comfort need that you

7    should have in any way during your service.

8           We will begin with the questions.

9           As you've heard from the call of the case, this is the

10   case of the United States of America versus Higinio Perez-Bravo.

11   I'm going to read to you pertinent portions of the indictment

12   which sets forth the charge against this defendant.

13          Now the indictment is not considered as evidence.  It's

14   merely a formal accusation against this defendant.  You must not

15   consider it as evidence of the defendant's guilt nor must you be

16   influenced by the fact that this indictment has been filed

17   against this defendant.

18          Now, this indictment alleges that this defendant

19   conspired to commit murder for hire.  The indictment generally

20   alleges that beginning in or about May of 2017 and continuing

21   through on or about August 19th of 2017 in Chatham County and

22   Effingham County, Mr. Perez-Bravo is alleged to have knowingly

23   and willfully conspired with other persons to use or cause

24   another to use facilities of interstate commerce for the purpose

25   of murdering Eliud Montoya for money and the promise of money in

1 violation of the law of the United States and the State of

2 Georgia, which it alleges resulted in the death of Mr. Montoya.

3 It alleges that the object of the conspiracy was to kill Mr.

4 Montoya in exchange for money.

5       It alleges that it was part of the conspiracy that the

6 conspirators would use cellular telephones to communicate with

7 each other during the conspiracy.  It alleges that it was

8 further a part of the conspiracy that the conspirators would

9 conduct physical surveillance to identify Mr. Montoya's location

10 in order to kill him, and it was further part of the conspiracy

11 that the conspirators would pay other conspirators for their

12 role in killing Mr. Montoya.

13       It's further alleged that part of the conspiracy

14 involved the conspirators accepting money for their role in

15 killing Mr. Montoya.

16       Now the defendant has entered a plea of not guilty to

17 the indictment denying that he committed the offense alleged in

18 the indictment.

19       Now that you've heard a summary of the indictment, I

20 will begin with questions to you.  Again if you have a positive

21 response, just stand and raise your hand.

22       Do any of you know anything about this case already

23 either through your own personal knowledge or by learning about

24 it from others or seeing something about it in any form of

25 media?  Do any of you already know something about this case?

25

1        Now, in this case, the United States of America is

2   represented by Assistant United States Attorney Tania Groover

3   and Chris Howard.  Counsel, if you will both stand.  Are any of

4   you related by blood or marriage to any of those two attorneys?

5   Do any of you know them in any manner or had any dealings with

6   them whatsoever?

7        All right, Mr. Howard, you may have a seat, and Ms.

8   Groover, if you will identify the United States Attorney and

9   each of his assistants.

10       MS. GROOVER:  Thank you, Your Honor.  The United States

11   Attorney for the Southern District of Georgia is David Estes and

12   his assistants working in the Savannah office are Noah Abrams,

13   Joshua Bearden, Xavier Cunningham, Justin Davids, Greg Gilluly,

14   Jr., John Harper, III, Darron Hubbard, Matthew Josephson,

15   Kristen Kakascik, Jennifer Kirkland, Karl Knoche, Steven Lee,

16   Woelke Leithart, Marcella Mateo, Bradford Patrick, Frank

17   Pennington, Jonathan Porter, Mary Sue Robichaux, Timothy

18   Ruffini, Patrick Schwedler, Channell Singh, Jennifer Solari and

19   James Stuchell.

20       Assistants working out of our Augusta office include

21   Jason Blanchard, Jeremiah Johnson, Tara Lyons, Patricia Rhodes,

22   Jessica Rock, Jennifer Stanley, Shannon Statkus, Henry Syms and

23   Sierra Tyrrel.

24       THE COURT:  Thank you, Ms. Groover.

25       Ladies and gentlemen, are any of you related by blood or

1  marriage to the United States Attorney or any of his assistants?

2  Do any of you know those prosecutors in any fashion or had any

3  dealings with them whatsoever?

4          The defendant in this case is Mr. Higinio Perez-Bravo.

5  Mr. Perez-Bravo, if you will stand and face the potential

6  jurors.  Are any of you related by blood or marriage to Mr.

7  Perez-Bravo?  Do any of you know him in any capacity or have any

8  of you had any dealings with him?  Mr. Perez-Bravo, you may have

9  a seat.

10          Mr. Perez-Bravo is represented by Attorney Bobby

11  Phillips.  Mr. Phillips, if you will stand.  Are any of you

12  related by blood or marriage to Mr. Phillips?  Do any of you

13  know him in any capacity or had any dealings with him?

14          Mr. Phillips, are there any partners with whom you

15  practice in the Southern District of Georgia?

16          MR. PHILLIPS:  Yes, ma'am, my son, Jonathan Boone

17  Phillips, and John David Carson.  They are my partners.  We have

18  an associate, Michael McNamara.

19          THE COURT:  Ladies and gentlemen, are any of you related

20  by blood or marriage to any of Mr. Phillips' partners or

21  associates?  Do any of you know them in any capacity?

22          Ladies and gentlemen, are any of you related by blood or

23  marriage to a lawyer from Atlanta named John Martin?  Do any of

24  you, to your knowledge, know him in any capacity or had any

25  dealings with him?

27

1      Counsel for the United States will now introduce their
2  case agent and then call out the names of the witnesses whom you
3  may call during your case in chief.
4      MS. GROOVER:  Your Honor, seated to my right is Special
5  Agent Harley Snipes.  He is a special agent with Homeland
6  Security Investigations.
7      THE COURT:  Are any of you related by blood or marriage
8  to the special agent?  Do any of you know him in any capacity or
9  had any dealings with him?
10      Sir, you may have a seat, and, Ms. Groover, if you will
11  call the names of the witnesses.
12      MS. GROOVER:  Maria Montoya; Detective Sergeant Roberto
13  Rodriguez with the Garden City Police Department; Special Agent
14  Anthony Miranda with Homeland Security Investigations; Oscar
15  Cruz; Joel Reyes; Diego Torres; Gerardo Hernandez; Dr. Natasha
16  Grandhi with the GBI; Kevin Rippman with ATF; Chad Fitzgerald,
17  contract with the FBI; as well as Karen Hartley who is employed
18  at the US Attorney's Office.
19      THE COURT:  Thank you.  You may have a seat.  Marshal, I
20  think we have a response.
21      PROSPECTIVE JUROR NUMBER 26:  Yes, ma'am, I know the ATF
22  agent.  I'm also a retired ATF agent.
23      THE COURT:  Would that influence your decision in this
24  case in any way?
25      PROSPECTIVE JUROR NUMBER 26:  No.

28

1          THE COURT:  Would you be fair and impartial to both

2    sides despite your knowledge of those individuals?

3          PROSPECTIVE JUROR NUMBER 26:  Yeah.

4          THE COURT:  All right, thank you.  The defendant is not

5    required to produce any witnesses or any evidence whatsoever.

6    However, Mr. Phillips, if you are aware of any witnesses that

7    might be called whose names have not already been called if you

8    will stand and identify those.

9          MR. PHILLIPS:  Other than the defendant, Judge, I do not

10   anticipate any others.

11         THE COURT:  Ladies and gentlemen, do any of you have any

12   bias or prejudice either for or against the Government or the

13   defendant?  Do any of you have any physical challenge, be it

14   hearing, sight or otherwise which would render you incapable of

15   performing your duty as a juror in this case.

16         PROSPECTIVE JUROR NUMBER 22:  Kevin Ankin, 2.  I just --

17   I don't know if it's rendering me incapable but I can't hear

18   very well on the left side.  So like what he just said, I have

19   no idea what he just said.

20         THE COURT:  When you say "he" --

21         PROSPECTIVE JUROR NUMBER 22:  Oh, I don't remember --

22         THE COURT:  Mr. Phillips.

23         PROSPECTIVE JUROR NUMBER 22:  Mr. Phillips, yeah, what

24   he said to you recently, I don't know what he said so ...

25         THE COURT:  Let me ask you is there anything else that

1    we've said so far that I need to go back over.

2          PROSPECTIVE JUROR NUMBER 22:  No, as long as it is

3    directed I will be okay but if it's misdirected it's difficult.

4          THE COURT:  Just to let you know, he didn't have any

5    other witnesses to add.  You've just been handed some earbuds.

6    You're like me and have hearing challenge, and if you will put

7    those on and that will accentuate.  Do you hear even better now?

8          PROSPECTIVE JUROR NUMBER 22:  Yes, perfect.

9          THE COURT:  Nevertheless, as we go along, if there's

10   anything that you miss, bring it to my attention.

11         PROSPECTIVE JUROR NUMBER 22:  Okay.

12         THE COURT:  All right, thank you.  Anyone have any

13   hearing or other physical challenges?

14         PROSPECTIVE JUROR NUMBER 19:  I'm Juror Number 19 and I

15   have the same problem as that guy there.  I can hear it but I

16   cannot understand it.

17         THE COURT:  Let's bring our juror some earbuds.  And are

18   you, Mr. Dennis?

19         PROSPECTIVE JUROR NUMBER 19:  Yes, ma'am.

20         THE COURT:  Mr. Dennis, put those on and tell me if you

21   can hear more clearly.  It does not go across the top of your

22   head.  It hangs around your neck.

23         THE CLERK:  Flip it around so the numbers --

24         THE COURT:  All right, I think they have you set up.

25   Can you hear more clearly now?

30

1          PROSPECTIVE JUROR NUMBER 19:  Yes, ma'am.

2          THE COURT:  Is there any part that we need to repeat for

3    you?

4          PROSPECTIVE JUROR NUMBER 19:  No, ma'am.

5          THE COURT:  As I said to your colleague, if anything is

6    unclear just raise your hand and we will clarify it.

7          PROSPECTIVE JUROR NUMBER 19:  Okay, thank you.

8          THE COURT:  Do any of you have any religious or

9    spiritual beliefs that would impair your ability to sit in

10   judgment of the case?  Do any of you now or have you ever worked

11   for the United States Government including serving in the armed

12   services?

13         PROSPECTIVE JUROR NUMBER 13:  Greg Carter, Juror Number

14   13, I served in the United States Marine Corps from 2007 to '16.

15         THE COURT:  And what was your rank upon discharge?

16         PROSPECTIVE JUROR NUMBER 13:  Sergeant, E-5.

17         THE COURT:  Thank you for your service.

18         PROSPECTIVE JUROR NUMBER 25:  John Fields, Juror Number

19   25, I served in the navy, retired navy E-6.

20         THE COURT:  What years was your service?

21         PROSPECTIVE JUROR NUMBER 25:  1987 to 2007.

22         THE COURT:  Thank you for your service.

23         PROSPECTIVE JUROR NUMBER 10:  Lee Brown, Juror Number

24   10.  I'm currently a civilian government contractor with

25   Lockheed Martin on Kings Bay.

31

1          THE COURT:  And tell me what your particular role is

2     there.

3          PROSPECTIVE JUROR NUMBER 10:  I've got Level 3 security

4     clearance.  I build electronic packages for their nuclear

5     missiles.

6          THE COURT:  Thank you, sir.

7          PROSPECTIVE JUROR NUMBER 17:  Yes, ma'am, I served in

8     the navy from 1989 to 1993.  I'm Mark Cotter, Juror Number 17.

9     Also I'm an OR nurse.  I worked in the trauma center in Savannah

10    last night for 12 hours, so coming back at 2:30, if I seem a

11    little sleepy, it's no disrespect.

12         THE COURT:  We may have to get you some coffee.  Sir,

13    let me ask you, what was your rank upon discharge?

14         PROSPECTIVE JUROR NUMBER 17:  Petty officer third class.

15         THE COURT:  Thank you for your service.

16         PROSPECTIVE JUROR NUMBER 2:  I worked for the state

17    government.  I'm not sure if that applies but State of

18    Massachusetts.

19         THE COURT:  And you are Juror Number 2.

20         PROSPECTIVE JUROR NUMBER 2:  Yes.

21         THE COURT:  And what do you do for the state government?

22         PROSPECTIVE JUROR NUMBER 2:  It's former.  I used to

23    work in unemployment insurance office.  Also these don't work.

24         THE COURT:  It may be a battery issue.  Marshal, let's

25    go to the next person.

32

1        PROSPECTIVE JUROR NUMBER 26:  Robert Glasscock, Juror

2   26.  I'm a retired resident agent in charge with the Bureau of

3   Alcohol, Tobacco, Firearms and Explosives.  I'm currently

4   employed by Homeland Security as a lead law enforcement and a

5   use-of-force instructor at FLETC.

6        THE COURT:  When did your ATF stint end?

7        PROSPECTIVE JUROR NUMBER 26:  It will be six years -- I

8   will be retired six years August, I think, something.

9        THE COURT:  Did you go straight to FLETC from there?

10        PROSPECTIVE JUROR NUMBER 26:  Yes, I went to FLETC for

11   four years as a contractor as an instructor, and last year I got

12   hired by ICE as a lead firearms instructor and I've been with

13   them almost a year now.

14        THE COURT:  Thank you, sir.

15        PROSPECTIVE JUROR NUMBER 11:  I'm Theodore Burnside,

16   Juror Number 11.  I served in the United States Army for 20

17   years from May of '08 to December of -- I'm sorry, May of '88 to

18   December of '08 and I retired as a master sergeant.

19        THE COURT:  Thank you for your service.

20        PROSPECTIVE JUROR NUMBER 4:  Heather Beaston, Juror

21   Number 4, I served in the United States Navy from 2003 to 2004,

22   discharged as an E-4 and I'm also a government contractor for

23   White Oak as a IT service delivery program manager.

24        THE COURT:  Thank you for your service.

25        PROSPECTIVE JUROR NUMBER 15:  Michael Castleberry, Juror

33

1    Number 15.  I served in the United States Navy, 1979 to 2000,

2    retired.

3            THE COURT:  What was your rank upon discharge?

4            PROSPECTIVE JUROR NUMBER 15:  E-6, first class.

5            THE COURT:  Thank you for your service.

6            PROSPECTIVE JUROR NUMBER 21:  Shelby Eason, Juror Number

7    21.  I'm a government civilian employee at Kings Bay Naval Base.

8    I'm a cook in the kitchen at the child development center.

9            THE COURT:  Thank you, ma'am.

10           PROSPECTIVE JUROR NUMBER 21:  Thank you.

11           PROSPECTIVE JUROR NUMBER 24:  Jason Ferguson, Juror

12   Number 24.  I was in the US Navy from 1989 until 1992.  I was an

13   E-4 when I was discharged.

14           THE COURT:  Thank you, sir, for your service.

15           PROSPECTIVE JUROR NUMBER 16:  Juror Number 16.  I'm not

16   sure if this qualifies.  I am instructor at a state-affiliated

17   college.

18           THE COURT:  And what college is that?

19           PROSPECTIVE JUROR NUMBER 16:  Chattahoochee Tech.

20           THE COURT:  And what do you teach there?

21           PROSPECTIVE JUROR NUMBER 16:  Diesel equipment

22   technology.

23           THE COURT:  Thank you, sir.  Do any of you have

24   currently any litigation against the United States of America or

25   do any of you contemplate any in the near future?

34

1          Have any of you or your close family members been

2    employed in any capacity by any law enforcement agency?

3          PROSPECTIVE JUROR NUMBER 15:  Mike Castleberry, Juror

4    Number 15, my brother works Kings Bay Department of Defense.

5          THE COURT:  What does he do?

6          PROSPECTIVE JUROR NUMBER 15:  He's a police officer and

7    now training instructor.

8          PROSPECTIVE JUROR NUMBER 21:  Shelby Eason, Juror Number

9    21.  My father is currently active duty in the United States

10   Navy.

11         THE COURT:  All right, and where is he stationed?

12         PROSPECTIVE JUROR NUMBER 21:  Jacksonville, he runs an

13   air squadron.

14         THE COURT:  All right, thank you.

15         PROSPECTIVE JUROR NUMBER 22:  Rachel Egger, Juror Number

16   22.  My husband, he is currently serving part time with Darien

17   Police in Georgia.

18         THE COURT:  With the Darien Police?

19         PROSPECTIVE JUROR NUMBER 22:  Yes, ma'am.

20         THE COURT:  Is he a patrolman or what is his job?

21         PROSPECTIVE JUROR NUMBER 22:  So he's a full-time

22   pastor, but whenever they call him to come help serve with the

23   Darien officers he goes in.

24         THE COURT:  All right, thank you, ma'am.

25         PROSPECTIVE JUROR NUMBER 25:  John Fields, Juror Number

35

1   25, my wife works at the Federal Law Enforcement Training

2   Center, budget analyst.  I also work there as well, PSA.

3          THE COURT:  When you say PSA, a public --

4          PROSPECTIVE JUROR NUMBER:  Printing specialist, printing

5   specialist assistant.  That's what I do.  My wife works as a

6   budget analyst at FLETC as well.

7          THE COURT:  All right, thank you, sir.

8          PROSPECTIVE JUROR NUMBER 26:  Robert Glasscock, Juror

9   Number 26, my law enforcement career, I started with Secret

10  Service and went to ATF.  Of course, now I'm with Homeland

11  Security but I have numerous family members that are law

12  enforcement officers all over the country.

13         THE COURT:  Would the fact that you come from a family

14  that is law enforcement heavy cause you to favor one side over

15  the other?

16         PROSPECTIVE JUROR NUMBER 26:  No.

17         THE COURT:  Thank you, sir.

18         The next question that I have I'm going to take positive

19  responses here at sidebar, and when we get positive responses, I

20  will ask the attorneys to join me here.

21         My question is:  Have you or any close family member

22  ever been involved in a criminal matter, either as a victim or a

23  witness or a defendant?  So the question is:  Have you yourself

24  or any close family member ever been involved in a criminal

25  matter as either a victim or a witness or a defendant?  If you

36

1  have, raise your hand, and counsel, if you will join me at

2  sidebar.

3           (The following occurred at sidebar.)

4           THE COURT:  Everyone we have to speak right into this so

5  tell me your touch with the criminal justice system.

6           PROSPECTIVE JUROR NUMBER 2:  I just had an uncle who was

7  involved in a murder suicide.

8           THE COURT:  And when was that?

9           PROSPECTIVE JUROR NUMBER 2:  It was probably 20 years

10  ago.

11           THE COURT:  And where was it?

12           PROSPECTIVE JUROR NUMBER 2:  Rochester, New York.

13           THE COURT:  To your knowledge, was he treated fairly?

14           PROSPECTIVE JUROR NUMBER 2:  Well, he was the murder and

15  suicide guy.

16           THE COURT:  So he was one of the victims?

17           PROSPECTIVE JUROR NUMBER 2:  Yeah, he was the

18  perpetrator and victim, too, the murderer and suicide also.

19           THE COURT:  Did any civil action result from that?

20           PROSPECTIVE JUROR NUMBER 2:  Not that I'm aware of.

21           THE COURT:  Is there anything about that experience that

22  might color your view of this case?

23           PROSPECTIVE JUROR NUMBER 2:  No.

24           THE COURT:  Any questions?

25           MR. PHILLIPS:  No.

37

1          THE COURT:  All right, thank you, sir.  We have to speak

2    right into the sound so it's Juror Number 26.

3          PROSPECTIVE JUROR NUMBER 26:  Robert Glasscock.

4          THE COURT:  And tell us the touch with the criminal

5    justice system.

6          PROSPECTIVE JUROR NUMBER 26:  So in 2018, we had a

7    break-in at our house.  I had a gun and a bunch of jewelry

8    stolen.

9          When I was younger I had a very close cousin that was

10   killed in a drug deal, and that kind of pushed me into law

11   enforcement and then I've also had two close partners on the job

12   that were shot in the line of duty.

13         THE COURT:  Taking those in the order that you discussed

14   them, with regard to the 2018 break-in, was that here locally?

15         PROSPECTIVE JUROR NUMBER 26:  Yes.

16         THE COURT:  Was anyone ever caught for doing that?

17         PROSPECTIVE JUROR NUMBER 26:  Yes.

18         THE COURT:  Were they prosecuted?

19         PROSPECTIVE JUROR NUMBER 26:  Yes.

20         THE COURT:  Were you satisfied with the resolution?

21         PROSPECTIVE JUROR NUMBER 26:  Yes.

22         THE COURT:  The second incident involving the catalyst

23   for you going into law enforcement, how did that resolve?

24         PROSPECTIVE JUROR NUMBER 26:  They never, no one was

25   ever prosecuted or anything.  No one was ever caught.

38

1        THE COURT:  Would anything about that influence your

2   decision in this case?

3        PROSPECTIVE JUROR NUMBER 26:  No.  Just so you know,

4   I've worked these cases before.

5        THE COURT:  Where did that occur?

6        PROSPECTIVE JUROR NUMBER 26:  I've worked in Wilmington,

7   North Carolina.  Louisville, Kentucky.

8        THE COURT:  No, I mean, where did the incident occur?

9        PROSPECTIVE JUROR NUMBER 26:  Oh, California.

10       THE COURT:  And then the final, you mentioned some

11  partners that were shot in the line of duty.  Did they survive?

12       PROSPECTIVE JUROR NUMBER 26:  Yes.

13       THE COURT:  And were the perpetrators prosecuted?

14       PROSPECTIVE JUROR NUMBER 26:  No, they were killed.

15       THE COURT:  Would anything about that influence your

16  decision in this case?

17       PROSPECTIVE JUROR NUMBER 26:  I don't think so.

18       THE COURT:  Where did that occur?

19       PROSPECTIVE JUROR NUMBER 26:  Wilmington, North

20  Carolina.

21       THE COURT:  Questions?

22       MR. PHILLIPS:  No, ma'am.

23       THE COURT:  Thank you, sir.  Anyone else?

24       (The following occurred in open court.)

25       THE COURT:  Ladies and gentlemen, a juror selected to

1  sit on this case must be able to render a verdict solely on the

2  evidence presented at the trial and in the context of the law as

3  I deliver it to you in my instructions at the end of the case,

4  disregarding any other ideas, notions or beliefs about the law

5  that you may have encountered from outside sources.  Is there

6  anyone who would not be able to do that?

7          The Government has the burden to prove the defendant's

8  guilt beyond a reasonable doubt.  You see, there's a presumption

9  of innocence in criminal trials.  As the defendant sits here

10  now, he is presumed innocent.  That presumption follows him

11  throughout the trial.  Is there anyone who believes that the

12  defendant is guilty right now?  Is there anyone who would not

13  require the Government to comply with it burden of proof?

14          The indictment that I summarized for you when we began,

15  the indictment is not evidence.  Is there anyone who does not

16  understand that?

17          The law does not allow you to base your verdict on

18  emotions such as sympathy, prejudice, vengeance, fear or

19  hostility.  Is there anyone who would be unwilling or unable to

20  put emotions aside and render a verdict based solely on the

21  evidence presented in the context of the law that I give?

22          Our law provides that a defendant does not have to

23  testify in a criminal case.  After all, it is the Government's

24  burden to prove the defendant guilty of the charges that are

25  alleged in the indictment beyond a reasonable doubt.  The

40

1  defendant does not have to prove anything.  Is there anyone who

2  will not follow that principle of law?

3      Do any of you believe that a defendant's failure to

4  testify would be an indication of guilt?  Is there anyone who

5  would tend to believe the testimony of a government agent or

6  police officer over that of a private citizen simply because of

7  that witness' position?

8      I asked you before whether you knew the defendant, Mr.

9  Perez-Bravo.  To your knowledge, do any of you know any of his

10 relatives?  Do any of you to your knowledge know Pablo

11 Rangel-Rubio or Juan Rangel-Rubio?  Do any of you have any

12 association whatsoever with the Davey Tree Expert Company?  Do

13 any of you have any association whatsoever with Wolf Tree,

14 Incorporated?

15     I know one hand that is going to go up, but my next

16 question is:  Do any of you or your close friends or relatives

17 have any personal dealings with the United States Attorney's

18 Office, Homeland Security Investigations, Savannah Police

19 Department, Garden City Police Department, Georgia Bureau of

20 Investigations, the Bureau of Alcohol, Tobacco, Firearms and

21 Explosives or the United States Equal Employment Opportunity

22 Commission?

23     Do any of you have any dealings, and just for the

24 record, marshal, if you will take the --

25     PROSPECTIVE JUROR NUMBER 26:  Robert Glasscock, 26, I'm

41

1  employed by Homeland Security and also was previously employed

2  by Alcohol, Tobacco and Firearms and had numerous cases with the

3  United States Attorney's Office across the country.

4          THE COURT:  Have you ever had a case with the Southern

5  District of Georgia US Attorney's Office?

6          PROSPECTIVE JUROR NUMBER 26:  No.

7          THE COURT:  Thank you, sir.

8          Anyone else?  Have any of you formed any opinions about

9  federal, state or local law enforcement agents that might affect

10 your ability to be fair and impartial to both sides in this

11 case?

12         Have any of you at any time been treated unfairly by a

13 police officer or prosecutor or judge?  Have any of your close

14 family members, in your opinion, been treated unfairly by any

15 police officer or prosecutor or judge?

16         Are any of you fluent in the Spanish language?

17         PROSPECTIVE JUROR NUMBER 14:  Edgaris Casey, I'm Number

18 14.  I am from Puerto Rico.

19         THE COURT:  As a result, you're fluent in Spanish?

20         PROSPECTIVE JUROR NUMBER 14:  Spanish is my first

21 language, yes, ma'am.

22         THE COURT:  A juror selected to serve in this case will

23 receive instructions that there are interpreters that will be

24 working with certain parties and certain witnesses.  Jurors must

25 make their deliberations on the basis of the official

42

1    interpretation given in court.  Would you be able to do that?

2         PROSPECTIVE JUROR NUMBER 14:  Yes, ma'am.

3         THE COURT:  All right, thank you, ma'am.

4         Are any of you members of the National Rifle

5    Association?

6         PROSPECTIVE JUROR NUMBER 24:  Juror 24, Jason Ferguson.

7         THE COURT:  All right, thank you.

8         PROSPECTIVE JUROR NUMBER 6:  Theodore Blocker, Number 6.

9         THE COURT:  Thank you, sir.

10        PROSPECTIVE JUROR NUMBER 10:  Lee Brown, Number 10.

11        PROSPECTIVE JUROR NUMBER 26:  Robert Glasscock, 26.

12        THE COURT:  Thank you, sir.  Are any of you members or

13   supporters of the America First political movement or

14   organization?  Are any of you a member of any group or

15   organization which advocates for laws which would restrict the

16   immigration into the United States of persons from Mexico or

17   South or Central America?

18        Counsel, if you will come to sidebar briefly.

19        (The following occurred at sidebar.)

20        THE COURT:  When they return this afternoon, I am going

21   to ask the demographic questions that we always ask, but my

22   question to you at this point is:  Are there any other questions

23   or followup questions that you would like me to ask of this

24   group?  I think I asked everything that was requested.  All

25   right, thank you.

43

1           (The following occurred in open court.)

2           THE COURT:  All right, ladies and gentlemen, that

3    completes all of the questions that we have for you this

4    morning.  As I mentioned earlier, we're going to address a

5    separate group in just a little bit, and we're going to require

6    you to return at two o'clock, and at two o'clock, you will be

7    directed to a particular seat and we have just a few more

8    questions to address at that time, and at the end of those few

9    questions, then the lawyers will exercise their preemptory

10   strikes.

11          Now, I have some very important instructions to give you

12   that governs your conduct between now and two o'clock.  There's

13   four rules that I am going to give you that if you are selected

14   to serve you will hear me say so many times that you will be

15   able to say them yourself, and I repeat them not because I like

16   to hear myself say them but because they are so important and

17   they are these.

18          When you leave and are excused in just a moment, it is

19   important that you, Number 1, do not discuss the case, not with

20   anybody, not with each other, not with your friends and family

21   or coworkers.  Obviously when you go back to work or go home in

22   just a minute people are going to say, "Oh, what's the case

23   about?"

24          I instruct you to tell them only that it is a criminal

25   case and that it will be over approximately Friday, and when it

44

1    is, you can tell them all about it but not until it ends.  To do

2    otherwise and to say anything that you may have surmised during

3    jury selection invites whoever you're talking to to tell you

4    whatever they know about anything on the subject, and then all

5    of the hard work that we put in this morning goes out the

6    window, so only tell people it's a criminal case, it's going to

7    be over Friday and if you are selected you can tell them all

8    about it once the case is over.

9         Second, keep an open mind.  The case has not even begun.

10   Indeed, if you are selected to serve, I'm going to be

11   instructing you that it's important that you keep an open mind

12   throughout the entire case until the end when you retire to

13   deliberate with your fellow jurors, so, Number 2, keep an open

14   mind.

15        Number 3, don't read, watch, listen, hear anything in

16   any form of media about the case.  I never know what case the

17   media is going to focus on, but if they do on this one, I

18   specifically instruct you not to pay any attention to it

19   whatsoever.  Again the goal is to base the decision only on the

20   evidence presented here in this courtroom in the context of the

21   law as I give it.  So don't pay any attention to any media about

22   the case.

23        And finally don't do any independent research about the

24   case.  Don't look up any people, any witnesses, the defendant,

25   the attorneys.  Don't drive to where something is supposed to

45

1    have occurred.  When I say don't do any independent research, I

2    mean the old-fashioned kind like driving somewhere or looking at

3    something and, of course, I mean the common kind now.  Don't do

4    any online research about anything.  Again, you're to base your

5    decision only on the evidence that's presented here that's come

6    through the prisms of the rules of evidence.  To do otherwise

7    would be unfair to the parties.

8         When I say don't discuss the case with each other or

9    anybody else, I mean the old-fashioned way of discussing, face-

10   to-face communication, telephone.  Certainly don't discuss it

11   online through any Facebook or Snapchat or Instagram.  Don't

12   discuss it in any forum.  It would be unfair to the parties.

13        So with that, you will be excused until two o'clock for

14   that very brief set of questions.  Let's rise for these jurors.

15        And, marshal, if you will escort them out.  Thank you.

16        (The jury exits the courtroom.)

17        THE COURT:  Marshal, if you will pull that door and have

18   a seat.  I did ask them to return at 2:00 instead of 2:30.  2:30

19   was the original plan, but this morning went a little quicker

20   than I anticipated and hopefully the next session will, too, so

21   we will have everybody, we will have them return at two o'clock

22   and we will go from there.

23        There is one issue that I wanted to ask you about

24   because it will come up possibly during the preliminary

25   instructions, and that is with the actual offense charge for

46

1    conspiracy to commit murder for hire and I looked at the

2    competing suggestions and the cases that are out there in the

3    Eleventh Circuit and elsewhere, and after looking at that, it is

4    the Government's formulation that I think has it correct and so

5    that is what I'm going to be working with, but there is just one

6    word in it that I wanted some feedback on, so the Government's

7    request on the conspiracy to commit murder for hire has the

8    three elements, and within the first breaks down the three

9    elements of murder for hire, and as I say, I do anticipate using

10   that formulation, and I also anticipate using the language for

11   the second element, that the defendant knew of the agreement,

12   but it's the third element that I wanted to get input from both

13   of you on.

14         The third element currently suggested by the Government

15   says "Third, that the defendant intentionally joined the

16   conspiracy."

17         The indictment charges "knowingly and willfully" and I

18   am accustomed to "willfully" as opposed to "intentionally."  Why

19   would we not use that formulation so that it would say, "Third,

20   that the defendant willfully joined the conspiracy."  That is I

21   think what the Defense, more close to what the Defense asked,

22   too, with regard to that.

23         Ms. Groover, Mr. Howard, would that be acceptable?

24         MR. HOWARD:  Your Honor, to answer the question, I think

25   the reason why we didn't include "willfully" is because it's not

1   in the pattern jury instructions from which we derived those

2   elements and, too, I know that there's a separate instruction on

3   "knowingly," so I would have to sort of cross-reference that.

4          Obviously, when we are talking about "willfully," this

5   isn't, for instance, a tax case in which it's a known violation

6   of a legal duty, that sort of willfulness, and so I think we

7   certainly recognized it was charged in that manner but --

8          THE COURT:  Wait, when you say the pattern jury

9   instruction, of course, there is no pattern for conspiracy to

10  commit murder for hire but you're referring to what?

11         MR. HOWARD:  The pattern jury instructions for the

12  federal criminal cases.  If you look it's the citation, when we

13  look at the proposed elements, after that third element, we

14  cited to the pattern --

15         THE COURT:  South Carolina.

16         MR. HOWARD:  That's right, Your Honor.  Not the Eleventh

17  Circuit.

18         THE COURT:  None in the Eleventh Circuit.

19         MR. HOWARD:  Correct, Your Honor.

20         THE COURT:  All right.  What would be -- why is

21  "intentional" a better word to use than "willful"?  Just because

22  South Carolina used it?

23         MR. HOWARD:  No, Your Honor.  I think looking back and I

24  guess I would have to again cross-reference the proposed

25  instruction we had for that knowledge element.  So if Your Honor

48

1  can give me a minute to look back at that --

2     THE COURT:  Sure, and we're about to break for, our next

3  group doesn't come in until 11:00, and, Mr. Phillips, I would

4  invite your input on that as well.

5     MR. PHILLIPS:  I actually prefer the specific intent

6  instruction because his actions as will be established were

7  willful actions but --

8     THE COURT:  You would prefer "intentionally" as well?

9     MR. PHILLIPS:  Intent, yes, ma'am.

10     THE COURT:  We will leave it at that.  Both sides are

11  specifically asking for that language, and I do see that it was

12  utilized by the District of South Carolina, and it -- I

13  understand that formulation, and if both sides are requesting

14  it, then that is an easy call.

15     Counsel, we will be in recess until 11 o'clock and we

16  will do this once more.

17        (Recess from 10:24 a.m. to 11:30 a.m.)

18     THE CLERK:  Good morning, ladies and gentlemen.

19     SPEAKERS:  Good morning.

20     THE CLERK:  Thank you.  Can everyone hear me okay?

21  Everyone all the way to the back good?  If at any point you

22  cannot hear me if you will just raise your hand and let me know

23  and I will either speak louder or get a microphone.

24     The first thing I'm going to do is start by doing a roll

25  call and I'm going to call your juror number and your name.

49

1    Your number is what's on the sticker.  If you will please just

2    say "here."

3         So we're going to start with Juror Number 30, Adam

4    Jacobs, "here"?

5         PROSPECTIVE JUROR NUMBER 30:  Here.

6         THE CLERK:  Juror Number 31, Anthony Jones.

7         PROSPECTIVE JUROR NUMBER 31:  Here.

8         THE CLERK:  Juror Number 32, Stephanie Jordan.

9         PROSPECTIVE JUROR NUMBER 32:  Here.

10        THE CLERK:  Juror Number 33, Krista Longbottom.

11        PROSPECTIVE JUROR NUMBER 33:  Here.

12        THE CLERK:  Juror Number 34, Rosalind Lopez.

13        PROSPECTIVE JUROR NUMBER 34:  Here.

14        THE COURT:  Juror Number 35, Kathy Maynor.

15        PROSPECTIVE JUROR NUMBER 35:  Here.

16        THE CLERK:  Juror Number 37, Dorothy Meek.

17        PROSPECTIVE JUROR NUMBER 37:  Here.

18        THE CLERK:  Juror Number 39, Taylor Miller.

19        PROSPECTIVE JUROR NUMBER 39:  Here.

20        THE CLERK:  Juror Number 40, Edward Mosley, Jr.

21        PROSPECTIVE JUROR NUMBER 40:  Here.

22        THE CLERK:  Juror Number 42, Alissa Phillips.

23        PROSPECTIVE JUROR NUMBER 42:  Here.

24        THE CLERK:  Juror Number 43, Kim Pope.

25        PROSPECTIVE JUROR NUMBER 43:  Here.

50

1          THE CLERK:  Juror Number 45, Lucenda Redding.

2          PROSPECTIVE JUROR NUMBER 45:  Here.

3          THE CLERK:  Juror Number 46, James Reid.

4          PROSPECTIVE JUROR NUMBER 46:  Here.

5          THE CLERK:  Juror Number 47, Douglas Richard.

6          PROSPECTIVE JUROR NUMBER 47:  Here.

7          THE CLERK:  Juror Number 48, Amy Richardson.

8          PROSPECTIVE JUROR NUMBER 48:  Here.

9          THE CLERK:  Juror Number 49, Kevin Roberts.

10         PROSPECTIVE JUROR NUMBER 49:  Here.

11         THE CLERK:  Juror Number 50, Max Rogers.

12         PROSPECTIVE JUROR NUMBER 50:  Here.

13         THE CLERK:  Juror Number 51, Elizabeth Santiago.

14         PROSPECTIVE JUROR NUMBER 51:  Here.

15         THE CLERK:  Juror Number 52, Robert Shirah.

16         PROSPECTIVE JUROR NUMBER 52:  Here.

17         THE CLERK:  Juror Number 53, Rebecca Smith.

18         PROSPECTIVE JUROR NUMBER 53:  Here.

19         THE CLERK:  Juror Number 54, Vivian Spaulding.

20         PROSPECTIVE JUROR NUMBER 54:  Here.

21         THE CLERK:  Juror Number 55, Ricky Strickland.

22         PROSPECTIVE JUROR NUMBER 55:  Here.

23         THE CLERK:  Juror Number 56, Robert Styn.

24         PROSPECTIVE JUROR NUMBER 56:  Here.

25         THE CLERK:  Is that --

51

1          PROSPECTIVE JUROR NUMBER 56:  Styn.

2          THE CLERK:  Juror Number 57, Eric Travis.

3          PROSPECTIVE JUROR NUMBER 57:  Here.

4          THE CLERK:  Juror Number 58, Heather Turner.

5          PROSPECTIVE JUROR NUMBER 58:  Here.

6          THE CLERK:  Juror Number 59, Serena Vespini.

7          PROSPECTIVE JUROR NUMBER 59:  Here, Vespini.

8          THE CLERK:  Juror Number 60, is it Michaela Wilson?

9          PROSPECTIVE JUROR NUMBER 60:  Yes.

10          THE CLERK:  Juror Number 61, Nicole Wright.

11          PROSPECTIVE JUROR NUMBER 61:  Here.

12          THE CLERK:  Is there anyone present whose name or number

13  I did not call, please raise your hand?  Would all members of

14  the jury panel please stand and raise your right hand to be

15  sworn.

16          (Prospective jurors sworn.)

17          THE CLERK:  Thank you.  You may be seated.  Is there

18  anyone for any reason who did not answer "I do" to the oath,

19  please raise your hand?

20          I will now begin asking a series of questions so please

21  listen carefully to each of one of them.  If you have a positive

22  answer, please raise your hand and the CSO will come to you with

23  the microphone.

24          Is there anyone here who has an excuse as to why they

25  cannot serve during this term of court please raise your hand?

52

1   If you will please state your name and your juror number when

2   you answer the question.

3        PROSPECTIVE JUROR NUMBER 56:  My name is Lucenda

4   Redding.  My juror number is 45, and I would rather not because

5   my son has been deployed for seven months and he will be home in

6   couple of days and he will only be here for ten days, and then

7   he will remain deployed for the remainder of the year.

8        THE CLERK:  What I'm going to do is ask you to come have

9   a seat in the jury box, please.  Anybody else before we move on?

10       PROSPECTIVE JUROR NUMBER 58:  Hi, I --

11       THE CLERK:  Your name and your juror number.

12       PROSPECTIVE JUROR NUMBER 58:  Thank you.  Heather

13  Turner.  It's 58.  I'm worried, very, very, very worried,

14  anxious.  I get no compensation employment wise and I just also

15  listed someone's home on the market and I won't be able to show

16  it if I'm here.

17       THE CLERK:  I'm going to have you likewise come have a

18  seat.

19       Anyone else?  Are each of you citizens of the United

20  States?  If the answer is no, please raise your hand.

21       Are each of you 18 years of age or older?  If the answer

22  is no please, raise your hand.  Have each of you reside for a

23  period of at least one year within the following counties which

24  comprise the Brunswick Division for the Southern District of

25  Georgia?  Those counties are Appling, Camden, Glynn, Jeff Davis,

53

1  Long, McIntosh and Wayne.  If the answer is no, please raise

2  your hand.

3          Do any of you presently have any charge pending against

4  you or have you ever been convicted in any state or federal

5  court of record of a crime punishable by imprisonment for more

6  than one year?  If the answer is yes please raise your hand.

7  Are each of you able to read, write and understand the English

8  language?  If the answer is no, please raise your hand.

9          Are any of you incapable by reason of physical or mental

10  infirmity to render satisfactory jury service at this time?  If

11  the answer is yes, please raise your hand.  Are any of you

12  members of the fire or police department of any state, district,

13  territory, possession, or subdivision thereof?  If the answer is

14  yes, please raise your hand.

15          Are any of you volunteer safety personnel who serve

16  without compensation as firefighters or ambulance squad or

17  rescue squad for a public agency?  If the answer is yes, please

18  raise your hand.

19          Are any of you members in the active service with the

20  armed forces of the United States?  If the answer is yes, please

21  raise your hand.

22          Are any of you public officers in the executive,

23  legislative or judicial branches of the Government of the United

24  States or any state, district, territory, or possession or

25  subdivision thereof?  If the answer is yes, please raise your

54

1    hand.

2        So in just a few minutes, the Judge is going to come out

3    and ask you an additional series of questions.  Each time she

4    does if you have a positive answer to her question, please do as

5    you've done here and raise your hand and make sure you state

6    your juror number --

7        SPEAKER:  I can't hardly hear you because --

8        THE CLERK:  Do you need me to repeat anything I've just

9    said, any of my questions?

10       SPEAKER:  I'm good for now but I'm saying ...

11       THE CLERK:  I got you, okay.  If anyone is having

12   trouble hearing, please --

13       SPEAKER:  It's not I'm having trouble hearing but it's

14   muffled what you're saying.

15       THE CLERK:  If you'll put those in --

16       SPEAKER:  Is he recording?

17       THE CLERK:  No, he's an interpreter.

18       (Honorable Lisa Godbey Wood enters the courtroom.)

19       THE COURT:  Good morning.

20       SPEAKERS:  Good morning.

21       THE COURT:  Ms. Sharp, call the case.

22       THE CLERK:  Case Number CR-4:18-274, United States of

23   America versus Higinio Perez-Bravo, Tania Groover, Christopher

24   Howard for the Government, Bobby Phillips for the Defense.

25       MS. GROOVER:  United States is ready to proceed, Your

55

1    Honor.

2         MR. PHILLIPS:  We are ready as well.

3         THE COURT:  All right.  And Ms. Sharp, the interpreters

4    have taken the oath?

5         THE CLERK:  Yes, Your Honor, they have.

6         THE COURT:  Ladies and gentlemen, in just a few minutes

7    I'm going to be asking you questions about your qualifications

8    to serve as jurors in this case.

9         This part of the case is known as the voir dire

10   examination.  Those are just old French words and what they mean

11   is speak the truth.  Each of you has just taken an oath in which

12   you promised to do that, to truthfully answer the questions that

13   are put before you this morning.

14        Please understand that these questions are not posed to

15   you to pry into your personal life, snoop into your private

16   affairs.  Rather they are designed to find what every person in

17   our country is entitled to and that's a fair and impartial juror

18   to hear his or her case.  So the questions are designed to find

19   out if you have some personal knowledge or personal training or

20   experience that might influence the way that you interpret the

21   facts in the case.

22        Now, in this case we anticipate that the trial will last

23   until approximately Friday.  That is, we think it will be about

24   four days including this one.  Let me acknowledge right up front

25   how very important your service is.

56

1          As you might imagine, as our country is coming out of

2     this COVID situation, there was a time when we couldn't have

3     jury trials at all here, and we're glad to be resuming them.

4          We have concern for your safety, for your health and so

5     we've made some accommodations based on where we are right now

6     in the course of that disease.

7          Ordinarily, you would be packed in shoulder to shoulder

8     but we've divided jury selection up into segments today to allow

9     for some social distancing.

10          Those of you who are selected to serve will receive, for

11     want of a better phrase, an amenities pack that will have in it

12     hand sanitizer and wipes and your own writing implements and

13     papers and so forth.

14          Of course, you're invited to wear a mask, if you would

15     like, throughout this and every other portion of the trial.  In

16     addition to respecting your health and safety, we respect your

17     time.  We realize that your appearance today and if you are

18     selected for the trial is public service.  In acknowledgement of

19     that we will not waste your time.

20          The parties are entitled to a thorough trial and they

21     will receive it, but the parties and the attorneys have worked

22     for months getting the case prepared and ready to put before you

23     in an orderly, organized and efficient manner, and that's how we

24     will proceed.

25          Jury selection, truth is, rarely convenient.  And

57

1    actually it's downright inconvenient.  But it is an important

2    civic service that some of you may be asked to perform.

3           Now, Ms. Sharp, are there some seeking excuse?

4           THE CLERK:  Yes, Your Honor, there were two, Number 45

5    and Number 58.

6           THE COURT:  As your name and number is called, if you

7    will approach the podium.

8           THE CLERK:  Ms. Redding, Number 45.

9           PROSPECTIVE JUROR NUMBER 45:  You're not going to be

10   able to see me behind there.  I bet you're not going to be able

11   to see me.

12          THE COURT:  Right there, that podium.  I bet I can hear

13   you.  You can stand off to the side.  Marshal, if you will pull

14   that microphone down.  Ma'am, and your jury number is Number 45.

15          PROSPECTIVE JUROR NUMBER 45:  Yes, ma'am.

16          THE COURT:  Tell me your name.

17          PROSPECTIVE JUROR NUMBER 45:  My name is Lucenda

18   Redding.

19          THE COURT:  Tell me what your situation is.

20          PROSPECTIVE JUROR NUMBER 45:  My son is in the United

21   States Navy, and he's been deployed for seven months, and he is

22   scheduled to be home Friday morning and he will only be here

23   until the end of the month, and then he will be redeployed, so I

24   was worried that this might keep me from being able to spend

25   time with him.

58

1          THE COURT:  I will tell you, only the most compelling

2     reasons can justify excuse, but that is fairly compelling to

3     have a son who is serving in even greater capacity than jury

4     service in some ways, and as I understand what you're saying, he

5     will have a very limited time here before he redeploys, and so

6     what I'm going to do is have you not serve on this jury but I'm

7     going to call you very soon to serve on another jury;

8     understand?

9          PROSPECTIVE JUROR NUMBER 45:  Yes, ma'am.

10          THE COURT:  With that, then I will excuse you so that

11     you can be with your son because we do anticipate having some

12     court on Friday.

13          PROSPECTIVE JUROR NUMBER 45:  Thank you so very much.

14          THE COURT:  Ms. Sharp.

15          THE CLERK:  Juror Number 58, Heather Turner.

16          THE COURT:  And jury number is 58.  Tell me your name.

17          PROSPECTIVE JUROR NUMBER 58:  Heather Turner.

18          THE COURT:  Tell me what is your situation this morning.

19          PROSPECTIVE JUROR NUMBER 58:  Well, part of it is I'm a

20     realtor and I just listed a home but there's a another part I

21     would rather not say in front of anyone.

22          THE COURT:  If you would like to come to sidebar and I

23     will invite -- the attorneys need to come as well.

24          (The following occurred at sidebar.)

25          THE COURT:  We have to speak right into this.  Tell

59

1    me --

2         PROSPECTIVE JUROR NUMBER 46:  I have very bad anxiety.

3    I'm missing what I'm doing and this just has me -- I have had to

4    take extra medicine and I'm cloudy and everything.  I shouldn't

5    be here, so I don't think I should be deciding someone's fate.

6         THE COURT:  As I understand what you've said, you have

7    anxiety and you take medicine and you've taken some extra

8    medicine.

9         PROSPECTIVE JUROR NUMBER 46:  I take regular medicine

10   but I took some extra.

11        THE COURT:  Any objection to this juror being excused?

12        MR. HOWARD:  No, Your Honor.

13        THE COURT:  We will excuse you.  You may leave.

14        (The following occurred in open court.)

15        THE COURT:  The procedure that we will utilize this

16   morning is that I have a set of preliminary questions and I'm

17   going to ask if you have a response then raise your hand and the

18   marshals will bring the microphone to you.  When they do, if you

19   will stand and give us your name and jury number first and then

20   proceed to answer the question.

21        Once I go through all the questions that I have, I will

22   ask the attorneys to join me very briefly at sidebar to see if

23   there's any others that we need to ask.

24        At that point after all the questions are asked, we're

25   going to excuse you to get a bite of lunch and then you will

1    return here at two o'clock, and at two o'clock we have just a

2    few other questions that we will ask and then the attorneys will

3    be permitted to make their strikes.  Those are called preemptory

4    strikes.

5         They will do so silently by having a marshal walk a

6    piece of paper back and forth.  Once all the strikes are made,

7    those of you that remain will serve on the jury in this case.

8         Now there are certain courthouse personnel that you're

9    going to encounter during selection and if you are selected to

10   serve during the trial.  Let me go ahead and identify who they

11   are and what they do.

12        The lady seated to my front left is Debbie Gilbert.

13   She's the court reporter.  It's her job to write down every

14   single thing that's said in the courtroom while we're in

15   session.  The lady seated in front to my right is Ms. Whitney

16   Sharp.  She's my courtroom deputy, and as you've already seen,

17   it's her duty to administer oaths.  She keeps track of all the

18   exhibits and evidence and helps the trial run smoothly.  The

19   lady seated in and center is Ms. Kim Mixon.  She's also a

20   courtroom deputy but she will be here with us helping in jury

21   selection only.  The two gentlemen and the lady to my right are

22   law clerks on staff with the court.  They help me answer legal

23   questions should they arise during the course of proceedings.

24        Finally, very important to those of you who may be

25   selected to serve are the gentlemen in the blue blazers and the

1    gray slacks.  They are court security officers with the United

2    States Marshal Service, and their military background coupled

3    with their law enforcement experience combine to help them bring

4    perfect order to the courtroom at all times.

5           They are important to you because if you are selected to

6    serve they will be your point of contact for any comfort need

7    that might arise.  They will also be your conduit to The Court.

8    If there's any reason that you needed to get in touch with me

9    you would do so through the court security officers.

10          You've heard from the call of the case that this is the

11   case of United States of America versus Higinio Perez-Bravo.

12   I'm going to read to you relevant portions of the indictment

13   which sets forth the charges against Mr. Perez-Bravo.

14          Now the indictment is not considered as evidence.  It's

15   merely a formal accusation against the defendant.  You must not

16   to consider it as evidence of the defendant's guilt nor must you

17   be influenced by the fact that this indictment has been filed

18   against the defendant.

19          Now this indictment alleges that this defendant

20   conspired to commit murder for hire.  The indictment generally

21   alleges that on or about May of 2017 and continuing through

22   about August 19th of 2017 in Chatham County and Effingham

23   County, Mr. Perez-Bravo is alleged to have knowingly and

24   willfully conspired with other persons to use or cause another

25   to use facilities of interstate commerce for the purpose of

1   murdering Eliud Montoya for money and the promise of money in

2   violation of laws of the United States of America and the State

3   of Georgia.  It alleges that it resulted in the death of Mr.

4   Montoya.

5        The indictment further alleges that the object of the

6   conspiracy was to kill Mr. Montoya in exchange for money.  It

7   goes on to allege that a part of the conspiracy was for the

8   conspirators to use cellular telephones to communicate with each

9   other during the conspiracy.  It alleges that it was further

10  part of the conspiracy that the conspirators would conduct

11  physical surveillance to identify Mr. Montoya's location in

12  order to kill him.  Further it alleges that part of the

13  conspiracy was for the conspirators to pay other conspirators

14  for their role in killing Mr. Montoya and that it was further

15  part of the conspiracy that conspirators would accept money for

16  their role in killing Mr. Montoya.

17       Now the defendant has entered a plea of not guilty to

18  this indictment denying that he committed the offense alleged in

19  the indictment.

20       So now that you've heard a summary of the indictment, I

21  will begin to ask my questions and recall if you have a positive

22  response just raise your hand and wait for the microphone to be

23  brought to you, and at that point stand up and begin by giving

24  us your name and jury number, and my first question to you is:

25  Do any of you already know something about this case either

63

1    through your own personal experience or having discussed it with

2    someone or having learned about it in some form of media?  Do

3    any of you already know about this case?

4         The United States of America is represented by two

5    Assistant US Attorneys, Ms. Tania Groover and Mr. Chris Howard.

6    Counsel, if you two will stand.

7         Ladies and gentlemen, are any of you related by blood or

8    marriage to Ms. Groover or Mr. Howard?  Do any of you know them

9    in any capacity or have any dealings with them whatsoever?

10        Ms. Groover, if you will identify the United States

11   Attorney for the Southern District of Georgia and each his

12   assistants.

13        MS. GROOVER:  Your Honor, the United States Attorney for

14   the Southern District of Georgia is David Estes.  His assistants

15   working out of the Savannah office are Noah Abrams, Joshua

16   Bearden, Xavier Cunningham, Justin Davids, Greg Gilluly, Jr.,

17   John Harper III, Darron Hubbard, Matthew Josephson, Kristen

18   Kakascik, Jennifer Kirkland, Karl Knoche, Steven Lee, Woelke

19   Leithart, Marcela Mateo, Bradford Patrick, Frank Pennington,

20   Jonathan Porter, Mary Sue Robichaux, Timothy Ruffini, Patrick

21   Schwedler, Channell Singh, Jennifer Solari and James Stuchell,

22   and his assistants working out of Augusta are Jason Blanchard,

23   Jeremiah Johnson, Tara Lyons, Patricia Rhodes, Jessica Rock,

24   Jennifer Stanley, Shannon Statkus, Henry Syms and Sierra Tyrrel.

25        THE COURT:  Thank you, Ms. Groover.

1    Ladies and gentlemen, are any of you related by blood or

2   marriage to the United States Attorney or any of his assistants?

3   Do any of you know any of those prosecutors in any capacity or

4   have any dealings with them of any sort?

5    The defendant in this case is Mr. Higinio Perez-Bravo.

6   Mr. Perez-Bravo, if you will stand and turn around, please.  Are

7   any of you related by blood or marriage to Mr. Perez-Bravo?  Do

8   any of you know him in any capacity or have any dealings with

9   him?

10    All right, sir, you may have a seat.

11    Mr. Perez-Bravo is represented by Mr. Bobby Phillips.

12   Mr. Phillips, if you will stand.  Are any of you related by

13   blood or marriage to Mr. Bobby Phillips?  Do any of you know him

14   in any capacity or have any dealings with him whatsoever?  And

15   Mr. Phillips, if you will call out the names of the partners and

16   associates you practice with.

17    MR. PHILLIPS:  I have two partners, John Carson and my

18   son, Boone Phillips, and associate Michael McNamara, and they

19   all live in the Savannah area.

20    THE COURT:  You may have a seat.  Thank you.

21    Are any of you related by blood or marriage to any of

22   Mr. Phillips' partners or associates?  Do you know any of those

23   attorneys in any way or have any dealings with them of any sort?

24   Are any of you related by blood or marriage to a lawyer named

25   John Martin from Atlanta?  Do any of you know Mr. Martin in any

65

 1   capacity or have any dealings with him of any nature?  Ms.

 2   Groover, if you will stand and introduce your case agent and

 3   then identify all the witnesses who you may call during your

 4   case in chief.

 5       MS. GROOVER:  Seated at counsel is Special Agent Harley

 6   Snipes.  He is a federal agent with Homeland Security

 7   Investigations.  And we also anticipate later on joining us a

 8   paralegal in our office by the name of Vilmarie Alcaraz, who

 9   will be assisting with the exhibits in this case, Your Honor.

10       THE COURT:  Are any of you related by blood or marriage

11   to this special agent?  Do any of you know him in any capacity

12   or have any dealings with him?  All right, and Ms. Groover, you

13   may have a seat and if you will go through your witness list.

14       MS. GROOVER:  United States anticipates calling Maria

15   Montoya; Detective Sergeant Roberto Rodriguez with the Garden

16   City Police Department; Homeland Security Investigation Special

17   Agent Anthony Miranda; Oscar Cruz; Joel Reyes; Diego Torres;

18   Gerardo Hernandez; Dr. Natasha Grandhi with the Georgia Bureau

19   of Investigation; Kevin Rippman with Bureau of Alcohol, Tobacco,

20   Firearms and Explosives; Chad Fitzgerald with the FBI; and Karen

21   Hartley with the US Attorney's Office.

22       THE COURT:  Thank you, Ms. Groover.

23       Ladies and gentlemen, are any of you related by blood or

24   marriage to those potential government witnesses?  Do any of you

25   know them in any way or have any dealings with them?

66

1             The defendant is not -- oh, I'm sorry.  There is one.

2             PROSPECTIVE JUROR NUMBER 51:  Elizabeth Santiago.  One

3    of the names sounds familiar to me.

4             THE COURT:  And which name is that?

5             PROSPECTIVE JUROR NUMBER 51:  Antonio Miranda.

6             THE COURT:  Tell me what, the Tony Miranda that you

7    know, how do you know that person?

8             PROSPECTIVE JUROR NUMBER 51:  Homeland Security.

9             THE COURT:  Are you associated with Homeland Security?

10            PROSPECTIVE JUROR NUMBER 51:  I worked a case.  One of

11   my clients was associated with them.

12            THE COURT:  And tell me about your job.

13            PROSPECTIVE JUROR NUMBER 51:  I'm a victim's advocate.

14            THE COURT:  And for whom you do you work?

15            PROSPECTIVE JUROR NUMBER 51:  Glynn Community Crisis

16   Center.

17            THE COURT:  And tell me your name and juror number

18   again.

19            PROSPECTIVE JUROR NUMBER 51:  51, Elizabeth Santiago.

20            THE COURT:  Ms. Santiago, this case that this jury will

21   be hearing does allege conspiracy to commit murder for hire, and

22   is there anything about the nature of that charge that would

23   make it difficult for you to be fair and impartial to both

24   sides?

25            PROSPECTIVE JUROR NUMBER 51:  No.

67

1          THE COURT:  Would your belief that you may know Mr.

2   Miranda, would that in any way influence your decision in this

3   case?

4          PROSPECTIVE JUROR NUMBER 51:  No.

5          THE COURT:  Would you be fair and impartial to both

6   sides?

7          PROSPECTIVE JUROR NUMBER 51:  Yes.

8          THE COURT:  All right, thank you.

9          The defendant is not required to produce any witnesses

10  or any evidence whatsoever.  However, Mr. Phillips, if you are

11  aware of any witness who the defendant might call whose name has

12  not already been called.

13         MR. PHILLIPS:  I'm not, Judge, but I wanted to introduce

14  Catherine Vashon, who is my legal assistant in this case and she

15  serves as my translator as well.

16         THE COURT:  But no other witnesses to call out?

17         MR. PHILLIPS:  No, ma'am.  No, ma'am.

18         THE COURT:  Ladies and gentlemen, do any of you have any

19  bias or prejudice either for or against the Government or the

20  defendant?  Do any of you have any physical challenge, be it

21  hearing, sight or otherwise, that would impair your ability to

22  serve as a juror in this case?

23         Do any of you any religious or philosophical beliefs

24  that would impair your ability to sit in judgment in this case?

25  Do any of you currently have any litigation against the United

68

1    States of America or do any of you contemplate any such

2    litigation in the future?  Have any of you ever worked for the

3    United States of America including serving in the armed forces?

4         PROSPECTIVE JUROR NUMBER 49:  Juror Number 49.  My name

5    is Kevin Roberts and I work for the United States Postal

6    Service.

7         THE COURT:  Are you currently employed with the postal

8    service?

9         PROSPECTIVE JUROR NUMBER 49:  I am.

10        THE COURT:  What exactly do you do there?

11        PROSPECTIVE JUROR NUMBER 49:  I'm a rural carrier.

12        THE COURT:  Thank you, sir.

13        PROSPECTIVE JUROR NUMBER 32:  Stephanie Jordan, Juror

14   Number 32, I was in the United States Army for five years and

15   United States Army reserve for 15 years.

16        THE COURT:  Tell me about the years that you served.

17   What years were those?

18        PROSPECTIVE JUROR NUMBER 32:  I served from 1979 to

19   1999.

20        THE COURT:  And what was your rank upon discharge?

21        PROSPECTIVE JUROR NUMBER 32:  Sergeant first class.

22        THE COURT:  Thank you for your service.

23        PROSPECTIVE JUROR NUMBER 31:  Yes, I'm Juror 51 (sic).

24   My name is Anthony Jones.  I served from 1980 to 2010 in the US

25   Army and civil service.

1    THE COURT:  You served from 1980 until --

2    PROSPECTIVE JUROR NUMBER 31:  2010.

3    THE COURT:  And what was your rank upon discharge?

4    PROSPECTIVE JUROR NUMBER 31:  Sergeant first class.

5    PROSPECTIVE JUROR NUMBER 35:  Kathy Maynor, Juror Number

6    35.  I served US Army, 1983 to 1986, and currently work for the

7    Federal Law Enforcement Training Center.

8    THE COURT:  Beginning with your military service, what

9    branch did you say?

10    PROSPECTIVE JUROR NUMBER 35:  Army.

11    THE CLERK:  And what was your rank upon discharge?

12    PROSPECTIVE JUROR NUMBER35:  E-4, specialist.

13    THE COURT:  And now at the Federal Law Enforcement

14    Training Center, what do you do there?

15    PROSPECTIVE JUROR NUMBER 35:  Property management

16    specialist.

17    THE COURT:  Thank you for your service.

18    PROSPECTIVE JUROR NUMBER 57:  Eric Travis, Juror 57,

19    retired from the Federal Law Enforcement Training Center as an

20    IT specialist.

21    THE COURT:  And did you say an IT specialist?

22    PROSPECTIVE JUROR NUMBER 57:  Yes, ma'am.

23    THE COURT:  So you were dealing with technology and so

24    forth?

25    PROSPECTIVE JUROR NUMBER 57:  Yes.

70

1          THE COURT:  When did you retire?

2          PROSPECTIVE JUROR NUMBER 57:  September of 2020.

3          THE COURT:  Thank you, sir.

4          PROSPECTIVE JUROR NUMBER 43:  Juror Number 43.  The name

5    is Kim Pope.  I worked for the US Army War College and I'm

6    retired.

7          THE COURT:  What did you do there?

8          PROSPECTIVE JUROR NUMBER 43:  Budget analyst.

9          THE COURT:  Thank you.

10         PROSPECTIVE JUROR NUMBER 40:  Juror Number 40, Edward

11   Mosley, retired army, enlisted in 1982.  A break in service,

12   retired in 19 -- excuse me, 2013.

13         THE COURT:  And upon discharge what was your rank?

14         PROSPECTIVE JUROR NUMBER 40:  Sergeant first class.

15         THE COURT:  Thank you for your service.

16         Have you or any close member in your family received

17   training in law enforcement?

18         PROSPECTIVE JUROR NUMBER 60:  Michaela Wilson, Juror

19   Number 60.  I was in criminal justice classes high school before

20   I moved back down here to Georgia, and then I went through

21   college courses at Coastal Pines, so I have all the thoughts and

22   everything for there.  And I have an associate's degree in

23   criminal justice as well.

24         THE COURT:  Thank you, ma'am.

25         PROSPECTIVE JUROR NUMBER 52:  Robert Shirah, Juror

71

1    Number 52.  I had two sons that served in McIntosh County

2    Sheriff's Department, city police department and Jesup Police

3    Department.

4            THE CLERK:  Are they currently serving?

5            PROSPECTIVE JUROR NUMBER 52:  No, ma'am.

6            PROSPECTIVE JUROR NUMBER 42:  I'm Number 42, Alissa

7    Phillips.  My father was a federal agent with the department of

8    commerce and is now retired.

9            THE COURT:  When he was on active duty, where was he

10   located?

11           PROSPECTIVE JUROR NUMBER 42:  Mostly all over Florida

12   and then we moved here when I was probably in middle school

13   where he worked for FLETC.

14           THE COURT:  And do you recall approximately when he left

15   FLETC?

16           PROSPECTIVE JUROR NUMBER 42:  He's still out there some

17   doing -- I don't know.  It's kind of like substituting here and

18   there.  He kind of works in various departments, but he's

19   basically retired and going back out there to do some extra

20   stuff.

21           THE COURT:  And his name?

22           PROSPECTIVE JUROR NUMBER 42:  Richard Smith.

23           THE COURT:  Thank you, ma'am.

24           A juror selected to sit on this case must be able to

25   render a verdict solely on the evidence presented here at trial

1    in the context of the law that I will get to at the end of the

2    case, disregarding any ideas, notions or beliefs that you may

3    have gathered somewhere else outside the courtroom.  Is there

4    anyone who would not be able to do that?

5            The Government has the burden of proving the defendant's

6    guilt beyond a reasonable doubt.  You see, there's a presumption

7    of innocence in criminal trials.  As the defendant sits here

8    now, he is presumed innocent.  That presumption follows him

9    throughout the trial.

10           Is there anyone who believes that the defendant is

11   guilty right now?  Is there anyone who would not require the

12   Government to comply with its burden of proof?  The indictment

13   that I summarized for you earlier, the indictment is not

14   evidence.  Is there anybody who doesn't understand?

15           The law does not permit you to base your verdict on

16   emotions such as sympathy, prejudice, fear, vengeance or

17   hostility.  Is there anyone who would be unwilling or unable to

18   put emotions aside and base their verdict only on the facts as

19   presented here in court as evidence in the context of the law as

20   I deliver it?

21           Our law provides that a defendant does not have to

22   testify in a criminal case.  It is the Government's burden to

23   prove the defendant guilty of charges alleged in the indictment

24   beyond a reasonable doubt.  The defendant does not have to prove

25   anything.  Is there anyone who will not follow that principle of

73

1    law?

2         Does anyone believe that a defendant's failure to

3    testify would be an indication of his guilt?  Is there anyone

4    who would tend to believe the testimony of a government agent or

5    police officer over that of a private citizen simply because of

6    that witness' position?

7         If there are positive responses to this question, I'm

8    going to take them at sidebar.  Have any of you or a very close

9    family member ever been involved in a criminal matter as a

10   victim, witness or a defendant?  The question is:  Have any of

11   you or a close member in your family been involved in a criminal

12   matter as either a victim, a witness or a defendant?

13        And, counsel, if you will join me at sidebar and,

14   marshal, if you will one at a time.

15        (The following occurred at sidebar.)

16        THE COURT:  Yes, sir.

17        PROSPECTIVE JUROR NUMBER 50:  When I was 16 years old --

18        THE COURT:  Wait, let me tell you we've got to talk

19   really close to this.  So Juror Number 50?

20        PROSPECTIVE JUROR NUMBER 50:  Yes, ma'am.

21        THE COURT:  And Mr. Rogers.  Tell us what happened.

22        PROSPECTIVE JUROR NUMBER 50:  When I was 16 years old,

23   about six years ago, I was working at Winn-Dixie as a bagger,

24   and I was mugged with a knife in St. Marys, Georgia.

25        THE COURT:  Did they catch the perpetrator?

74

1          PROSPECTIVE JUROR NUMBER 50:  No.

2          THE COURT:  Did they cut you?

3          PROSPECTIVE JUROR NUMBER 50:  No.  He just threatened me

4    and said there's ten bucks.  He just threatened me and I just

5    gave him all I had, which was about 10 bucks, and he ran off and

6    called the cops.  They came and they --

7          THE COURT:  Couldn't find them.  Is there anything about

8    that experience that would influence your decision in this case

9    in any way?

10         PROSPECTIVE JUROR NUMBER 50:  I don't believe so.

11         THE COURT:  On your oath as a juror would it?

12         PROSPECTIVE JUROR NUMBER 50:  No.

13         THE COURT:  Would you be fair and impartial to both

14   sides?

15         PROSPECTIVE JUROR NUMBER 50:  Yes.

16         THE COURT:  Any questions?  No?  All right, thank you,

17   sir.

18         I see that you're Juror Number 37.  What is your name?

19         PROSPECTIVE JUROR NUMBER 37:  Dorothy Meek.

20         THE COURT:  Tell me your experience.

21         PROSPECTIVE JUROR NUMBER 37:  Most recent is I have a

22   grandson that was shot like three years.  He was 17.  Four years

23   in June.  Three of them are already in prison, but the actual

24   shooter is coming up in June, which I attend to give my daughter

25   support, and then with health issues, I have chronic pain, for

75

1    which I take pain killers, and they mess with your head.  And I

2    have severe anxiety.  Oh, I'm sorry, and I also have severe

3    anxiety from childhood abuse that I'm on medication for.

4            THE COURT:  This trial as you heard involves an

5    allegation of murder for hire.

6            PROSPECTIVE JUROR NUMBER 37:  Right.

7            THE COURT:  It sounds like this might not be the best

8    jury for you to serve on.  Is that right?

9            PROSPECTIVE JUROR NUMBER 37:  Yes.

10           THE COURT:  Any objection to excusing this juror?

11   Ma'am, I'm sorry, and you may be excused.

12           PROSPECTIVE JUROR NUMBER 37:  Which door do I go out?

13           THE COURT:  You can just go out that back door.

14           We have to speak right into this.  You're Juror 57.  And

15   remind me your name.

16           PROSPECTIVE JUROR NUMBER 57:  Eric Travis.

17           THE COURT:  Tell us about your experience.

18           PROSPECTIVE JUROR NUMBER 57:  Well, it's not experience.

19   I have a nephew, my brother's son, who was convicted of an

20   aggressive crime in San Antonio, Texas, and he is now serving

21   time.  But that would not prevent me from having a fair judgment

22   but I just didn't want to --

23           THE COURT:  Do you recall whether that was handled in

24   federal or state court?

25           PROSPECTIVE JUROR NUMBER 57:  I do not.  I do not.

1          THE COURT:  And the nature of the aggression, what did

2     they call it?  Was it assault or --

3          PROSPECTIVE JUROR NUMBER 57:  It was drug-related,

4     invading someone else's home.

5          THE COURT:  In your opinion, was he treated fairly?

6          PROSPECTIVE JUROR NUMBER 57:  Yes.

7          THE COURT:  Would anything about that experience

8     influence your decision in this case in any way?

9          PROSPECTIVE JUROR NUMBER 57:  No, ma'am.

10          THE COURT:  Any questions?

11          MS. GROOVER:  I'm sorry, I did not hear the relation.

12          PROSPECTIVE JUROR NUMBER 57:  My brother's son.

13          THE COURT:  All right, thank you, sir.

14          We have to talk really close into it.  You're Juror

15     Number 59.

16          PROSPECTIVE JUROR NUMBER 59:  Serene Vespini.

17          THE COURT:  And what is your name?

18          PROSPECTIVE JUROR NUMBER 59:  Serena Vespini.

19          THE COURT:  You're probably going to have to speak a

20     little louder.

21          PROSPECTIVE JUROR NUMBER 59:  Serena Vespini.

22          THE COURT:  Thank you.  So what are your experiences?

23          PROSPECTIVE JUROR NUMBER 59:  Several years back my

24     father had some incidents with a woman that he married.  My

25     father had a couple of incidents with a woman that he married.

77

1   It turned out that a judge got involved and we had to go to

2   court in Savannah, and I was a witness.

3         THE COURT:  Do you recall, was it federal court or state

4   court?

5         PROSPECTIVE JUROR NUMBER 59:  Honestly, I don't know.

6   I'm sorry.  It's been over 20 years and I didn't know if I

7   should say anything or not.

8         THE COURT:  Were you satisfied with the way it was

9   handled?

10        PROSPECTIVE JUROR NUMBER 59:  Well, I was a little

11  prejudiced because it was for my dad, but -- and I feel like --

12  but I feel like it worked out okay.

13        THE COURT:  Would anything about that incident influence

14  your decision in this case in any way?

15        PROSPECTIVE JUROR NUMBER 59:  I don't believe so.

16        THE COURT:  On your oath as a juror, would it?

17        PROSPECTIVE JUROR NUMBER 59:  I don't think so.

18        THE COURT:  Any questions?

19        MR. PHILLIPS:  No, ma'am.

20        THE COURT:  Thank you, ma'am.

21        And you're Juror Number 51.  And remind us your name.

22        PROSPECTIVE JUROR NUMBER 51:  Elizabeth Santiago.

23        THE COURT:  Ms. Santiago, what was your experience?

24        PROSPECTIVE JUROR NUMBER 51:  I witnessed as a child

25  someone being shot.

78

1          THE COURT:  Wait, as a child you witnessed someone being

2     shot?

3          PROSPECTIVE JUROR NUMBER 51:  Yeah, my stepfather.

4          THE COURT:  Your stepfather was shot?

5          PROSPECTIVE JUROR NUMBER 51:  Uh-huh.

6          THE COURT:  Was the perpetrator ever caught?

7          PROSPECTIVE JUROR NUMBER 51:  I don't know.  I can't

8     remember.

9          THE COURT:  This case involves allegations of a

10    conspiracy murder for hire.  Would that experience influence you

11    in any way?

12         PROSPECTIVE JUROR NUMBER 51:  I think it would bring

13    back the memory of it.

14         THE COURT:  All right, any other questions?  Any

15    objection to excusing Ms. Santiago?

16         MR. PHILLIPS:  Do you think the memory would cause you

17    to be a less effective juror and not be able to weigh the

18    evidence?

19         PROSPECTIVE JUROR NUMBER 51:  I would be less effective.

20         MS. GROOVER:  No questions and no objections.

21         THE COURT:  Any objections?

22         MR. PHILLIPS:  No.

23         THE COURT:  All right, I am going to excuse you, but I

24    appreciate your honesty and service.  It's understandable why

25    having witnessed that would make you an ineffective juror and I

79

1    appreciate your honesty and we will try to have you back for a

2    different kind of case and you can leave.  Yes, thank you.

3         We have to speak right into this.  You're Juror Number

4    46.  And tell us your name.

5         PROSPECTIVE JUROR NUMBER 46:  My name James Reid, III.

6         THE COURT:  And tell us your experience.

7         PROSPECTIVE JUROR NUMBER 46:  Okay, I do have a few

8    cousins that are currently in and out of jail, and we're very

9    close.  We were together at my grandma's house, things like

10   that, so I be like family members there.

11        THE COURT:  Where do you live?

12        PROSPECTIVE JUROR NUMBER 46:  I live here in Brunswick.

13        THE COURT:  And are they in Brunswick, too?

14        PROSPECTIVE JUROR NUMBER 46:  Yes.

15        THE CLERK:  Do you know if they have been prosecuted by

16   the federal government or was it state or what -- what's your

17   understanding?

18        PROSPECTIVE JUROR NUMBER 46:  I'm not entirely too sure.

19   I know last I heard was one of them is away now, but I'm not

20   sure.

21        THE COURT:  And do you know if he's housed in Jesup or

22   somewhere else?

23        PROSPECTIVE JUROR NUMBER 46:  I'm not entirely sure.

24        THE COURT:  What was the nature of what they were being

25   brought up for?

1          PROSPECTIVE JUROR NUMBER 46:  It was based off of drugs

2     and things of that nature but we are pretty close.

3          THE COURT:  Would anything about that experience

4     influence your decision in this case?

5          PROSPECTIVE JUROR NUMBER 46:  Truthfully I feel like I

6     don't want to be biased, but I feel like it might pull me in

7     that direction, just being honest.

8          THE COURT:  And that's what -- we're not looking for

9     something that sounds a particular way.  We just want your

10    honesty.  You feel like you would be sort of leaning toward one

11    side?

12         PROSPECTIVE JUROR NUMBER 46:  I feel like if it come

13    down to it, I feel like that could happen unintentionally, but I

14    just want to be honest as far as being --

15         THE COURT:  If I were to instruct you you can't let

16    things like that influence you and you have to be fair and

17    impartial to both sides, make your decision only on the

18    evidence.  On your oath as a juror, would you do that?

19         PROSPECTIVE JUROR NUMBER 46:  Like I said, I would try,

20    but I feel like unintentionally I may begin to be biased.

21         THE COURT:  If you were the parties picking the jury

22    today, would you feel good about picking someone with your

23    mindset?

24         PROSPECTIVE JUROR NUMBER 46:  Not really because I feel

25    like it's not a hundred percent if you're kind of unsure.

81

1          THE COURT:  Any questions of this juror?  Mr. Phillips?

2    Any objection to excusing this gentlemen?

3          MS. GROOVER:  No, Your Honor.

4          MR. PHILLIPS:  No more questions and no objection.

5          THE COURT:  No objection?

6          MR. PHILLIPS:  No, ma'am.

7          THE COURT:  We will have you back for a different kind

8    of case but you're excused today.  Thank you.

9          You are Juror Number 49.  We have to speak right into

10   this.  Tell me your name.

11         PROSPECTIVE JUROR NUMBER 49:  Kevin Roberts.

12         THE CLERK:  And tell me your experience.

13         PROSPECTIVE JUROR NUMBER 49:  I had a sister that was

14   killed 2007.  She was 13 years old.  Shot in the back of the

15   head.  Had a brother, pretty much he committed suicide almost

16   two years ago.  Almost after, he was scared he was going to be

17   indicted for homicide, he committed suicide.

18         THE COURT:  I'm sorry.  Where did all of that happen?

19         PROSPECTIVE JUROR NUMBER 49:  Both of them happened here

20   in Glynn County.

21         THE COURT:  In Glynn County?

22         PROSPECTIVE JUROR NUMBER 49:  Uh-huh.

23         THE COURT:  The person that shot the little girl, were

24   they apprehended?

25         PROSPECTIVE JUROR NUMBER 49:  Uh-huh.

1          THE COURT:  And were they prosecuted?

2          PROSPECTIVE JUROR NUMBER 49:  Uh-huh.

3          THE CLERK:  And convicted?

4          PROSPECTIVE JUROR NUMBER 49:  Uh-huh.

5          THE COURT:  Do you feel that was handled fairly?

6          PROSPECTIVE JUROR NUMBER 49:  I don't.

7          THE COURT:  What about it was -- he said no.  What

8   happened?

9          PROSPECTIVE JUROR NUMBER 49:  What happened was --

10          THE COURT:  I mean the unfair part.

11          PROSPECTIVE JUROR NUMBER 49:  Well, what happened, when

12   they got ready to go to trial, for whatever reason, the evidence

13   was solely based on -- the prosecution's evidence was solely

14   based on evidence of a homeless man, so when it come time to go

15   to trial, they couldn't find him, so they gave him a plea

16   bargain so it was kind of, you know --

17          THE COURT:  I see.

18          PROSPECTIVE JUROR NUMBER 49:  That's another kind of ...

19          THE COURT:  Would that experience influence your

20   decision in this case?

21          PROSPECTIVE JUROR NUMBER 49:  I don't know.  It's my

22   first time, being I really can't say a hundred percent one way

23   or another.  I mean, I don't think it would.

24          THE COURT:  On your oath as a juror, would it?

25          PROSPECTIVE JUROR NUMBER 49:  Like I said, I don't --

83

1    I'm human, so I don't think it would, you know.

2            THE COURT:  Any questions, Mr. Phillips?

3            MR. PHILLIPS:  No, Your Honor.

4            THE COURT:  Any questions, Ms. Groover?  All right,

5    thank you.

6            PROSPECTIVE JUROR NUMBER 49:  Thank you.

7            THE COURT:  Ma'am, and we have to speak right into this.

8    You're Juror Number 60.

9            PROSPECTIVE JUROR NUMBER 60:  Yes, ma'am.

10            THE COURT:  Your name?

11            PROSPECTIVE JUROR NUMBER 60:  Michaela Wilson.

12            THE COURT:  Tell me your experience, little bit louder.

13            PROSPECTIVE JUROR NUMBER 60:  There was two of them.

14    One, my best friend, up in Tennessee, she was like really close

15    to me.  She wasn't family but we always stayed together.  She

16    was walking home from -- walking home from school one day and

17    she was hit by a car and the car kept going, and I didn't get

18    the call until it was two days later and it hurt me real bad,

19    and then there was another time, my other best friend, she has

20    three little girls and she was in a bad accident not too long

21    ago and she lost her middle daughter, and her middle daughter

22    was 17 years old and like broke my heart really bad.  But that's

23    all.

24            THE COURT:  You look very distressed about it, and it

25    looks like you're crying.

84

1          PROSPECTIVE JUROR NUMBER 60:  Trying to hold --

2          THE COURT:  Would it be hard for you to serve on this

3   case?

4          PROSPECTIVE JUROR NUMBER 60:  It would.

5          THE COURT:  Any objection to excusing this juror?

6          MR. PHILLIPS:  No, ma'am.

7          MS. GROOVER:  No.

8          THE COURT:  I'm sorry, and thank you for your honesty,

9   and we will have you back some other day on some other kind of

10  case but you can be excused today.  All right, thank you.

11          (The following occurred in open court.)

12          THE COURT:  Ladies and gentlemen, I previously asked you

13  if you knew or were related to Mr. Perez-Bravo, the defendant in

14  the case.

15          I now want to ask if you know any of his relatives.  To

16  your knowledge, do you know anyone related to Mr. Perez-Bravo?

17  Are any of you familiar with Mr. Pablo Rangel-Rubio or Mr. Juan

18  Rangel-Rubio?  Are any of you associated in any way with the

19  Davey Tree Expert Company?  Are any of you associated in any way

20  with the Wolf Tree Company?  Wolf Tree, Incorporated is the

21  exact full name.

22          Have any of you or any of your close family members had

23  any dealings with the United States Attorney's Office, the

24  Homeland Security Investigations, the Savannah Police

25  Department, the Garden City Police Department, the Georgia

85

1    Bureau of Investigations, the Bureau of Alcohol, Tobacco,

2    Firearms and Explosives, or the US Equal Employment Opportunity

3    Commission, any of you or your close family members have any

4    exposure or association with any of those entities?

5              PROSPECTIVE JUROR NUMBER 30:  Juror 30, Adam Jacobs, my

6    sister is an attorney and she practices law up or has in

7    Effingham County.  I'm not sure what capacity.

8              THE COURT:  You're not real sure of the nature of her

9    practice?

10             PROSPECTIVE JUROR NUMBER 30:  Correct.

11             THE COURT:  What is her name?

12             PROSPECTIVE JUROR NUMBER 30:  Samantha Jacobs.

13             THE COURT:  Thank you, sir.

14             PROSPECTIVE JUROR NUMBER 30:  Yes, ma'am.

15             PROSPECTIVE JUROR NUMBER 42:  Number 42, Alissa

16   Phillips.  Like I said earlier, my dad was with the federal

17   government, and right after 911, he did work for the Department

18   of Homeland Security.  I'm not sure exactly what he was doing

19   specifically, but I know that he did do some of that and I think

20   he also did some stuff at the Air Marshal Service.

21             THE COURT:  Do you think that was here at FLETC or

22   somewhere else?

23             PROSPECTIVE JUROR NUMBER 42:  It may have been out of

24   the FLETC.  Like I said, I really can't tell you all the

25   details.

86

1          THE COURT:  Thank you, ma'am.

2          PROSPECTIVE JUROR NUMBER 40:  Just for clarification,

3   what do you mean by exposure?

4          THE COURT:  First let's get your name and juror number.

5          PROSPECTIVE JUROR NUMBER 40:  Juror Number 40.  Edward

6   Mosley.

7          THE COURT:  By "exposure, "I mean any form of

8   interaction with any of those organizations.

9          PROSPECTIVE JUROR NUMBER 40:  Yes.

10          THE COURT:  And which would those be?

11          PROSPECTIVE JUROR NUMBER 40:  Let's see, could you name

12   them again, please.

13          THE COURT:  The US Attorney's Office, the Homeland

14   Security Investigations, the Savannah Police Department, the

15   Garden City Police Department, the Georgia Bureau of

16   Investigation, the Bureau of Alcohol, Tobacco, Firearms and

17   Explosives, and the US Equal Employment Opportunity Commission.

18          PROSPECTIVE JUROR NUMBER 40:  Savannah Police and Garden

19   City.

20          THE COURT:  And in brief form, what was the nature of

21   the interaction with the Savannah Police Department.

22          PROSPECTIVE JUROR NUMBER 40:  I actually interact with

23   several jurisdictions every day working for the Georgia

24   Department of Transportation, respond to highway emergencies,

25   traffic accidents.

87

1        THE COURT:  And what is your exact title with GDOT?

2        PROSPECTIVE JUROR NUMBER 40:  I'm a coordinated highway

3    assistance program operator.

4        THE COURT:  Thank you, sir.  Anyone else interact with

5    any of those organizations?

6        Have any of you formed any opinions about federal, state

7    or local law enforcement agents that would affect your ability

8    to be fair and impartial in this case?  Are any of you fluent in

9    the Spanish language?  Are any of you members of the National

10   Rifle Association?  Are any of you members or supporters of the

11   America First political movement or organization?  Are any of

12   you a member of any group or organization which advocates for

13   laws which would restrict the immigration into the United States

14   of persons from Mexico or South or Central America?  Anyone

15   affiliated with an organization?

16       All right, counsel, at sidebar briefly.

17       (The following occurred at sidebar.)

18       THE COURT:  Any other questions I need to ask of the

19   group?

20       MR. HOWARD:  Your Honor, there was an additional

21   question that the Government proposed and that question was:

22   Have you or a family member had any legal training?  I don't

23   think we need to expand it to the family, but I think the

24   Government would request that you ask if anybody has had any

25   legal training.

88

1          THE COURT:  What I'm going to do with both that question

2   and the two paralegals that were introduced this morning, I'm

3   going to ask, when we return in the afternoon after we do the

4   draw, I'm going to ask all of them about the paralegals and

5   about any legal training.

6          MR. HOWARD:  Okay.

7          THE COURT:  All right.

8          (The following occurred in open court.)

9          THE COURT:  Ladies and gentlemen, that completes the

10  questions that we have to ask you at this session.  As I

11  indicated when we first began this morning, what we're going to

12  do at this point is excuse you until two o'clock, and so go have

13  lunch and then be here at two o'clock.  We have just one very

14  small round of questions to ask you and then after those are

15  asked, the attorneys will exercise their strikes and those of

16  you who remain will sit on the jury.

17         Now, as I excuse you until two o'clock, I have four very

18  important instructions to give you and those of you who are

19  selected to sit on the jury will hear me say these so many times

20  that you will be able to say them yourself.  I don't repeat them

21  because I like to hear myself say them.

22         I repeat them because they are so important, so

23  beginning now, I instruct you to do these four things.  Number

24  1, don't discuss the case, not with each other, not with your

25  family, not with friends.

1          Surely when we break for lunch and you reach out to your

2    coworkers, whatever, they are going to ask what is the case

3    about.  I instruct you specifically to tell them only that it is

4    a criminal case.  We anticipate that it will be over on Friday,

5    and once it's over, you can tell them all about it.  But to do

6    otherwise and to tell them the little that you know about it at

7    this point would invite them to say something back to you and

8    then all the hard work that we've put in this morning could go

9    out the window, so that's all you're to say on this break, that

10   it is a criminal case and you can talk about it once it's over.

11         Second, I instruct you to keep an open mind.  For

12   goodness' sake, the case hasn't even begun and I will be

13   instructing you to keep an open mind until the very end of the

14   case when you retire to deliberate with your fellow jurors, so

15   don't make up your mind.  Keep an open mind.

16         Third, don't read, listen, watch, hear anything in any

17   source of media about the case.  I never know what case is going

18   to be picked up.  If this is one of them, don't watch any form,

19   listen to any form, read any form of media about the case.

20   Important reason, and that's because the parties are counting on

21   you making your decision only on the evidence that's presented

22   here in the courtroom.

23         Fourth, don't do any independent research about the

24   case, not the old-fashioned kind by driving to where something

25   was supposed to have happened and not the more modern kind by

90

1  Googling people or terms or names.  Again, the parties are

2  counting on you basing your verdict on the evidence that makes

3  it through the rules of evidence.  To do otherwise would be

4  unfair.

5          To be clear, when I say don't talk about the case, I

6  mean the old-fashioned way of talking face to face or on the

7  phone and the newer form.  Don't Google it or don't put anything

8  on Facebook or Instagram or Snapchat or anything like that.  It

9  would be unfair to the parties to do so.

10          So with those instructions I can now excuse you until

11  two o'clock when we will meet again.  Let's rise for this jury.

12              (The jury exits the courtroom.)

13          THE COURT:  Marshal, if you will close that door.

14  Counsel, have a seat.

15          On the break if you will at some point give me the exact

16  name of each paralegal, and when we come back for the afternoon

17  session, I will qualify the jury for the paralegals.  I was also

18  asked to inquire of the panel members whether they received any

19  legal training and go through that, and so I will ask that as

20  well as the biographical questions that we ask at this point.

21          In just a moment Ms. Mixon and Ms. Sharp are going to

22  make the draws.  They will randomly draw 32 people.  When we

23  come back at two o'clock, those 32 will be seated here in the

24  courtroom.  The extra are going to go up to the third floor, and

25  they will be called down if we need them.

91

1    That way during your lunch break you can focus on the 32

2  that are likely to survive for your jury selection.

3    Two issues I wanted to flag for you for the break as far

4  as the portion of the indictment that we will eventually send

5  out with the jury when they retire to deliberate.  I have the

6  competing suggestions, and what I'm going to do is allow them to

7  have the entire indictment absent the special findings and

8  absent the forfeiture, so they will have the entire indictment,

9  and I know both the Government and the defendant will direct

10  them to the points that are pinpointed against this defendant.

11    The other issue I wanted to raise is, of course, I am

12  going to invoke the rule of sequestration after I give the

13  preliminary charge to the jury and before I call on you for

14  opening statements.  I understand that, one or maybe more victim

15  family members will be witnesses; is that correct?

16    MS. GROOVER:  One family member will be a witness, Your

17  Honor, and we have multiple four family members who will be

18  present to observe the proceedings.

19    THE COURT:  And one will be a witness?

20    MS. GROOVER:  Yes, Your Honor.

21    THE COURT:  So I think we start with the set point that

22  victims who are going to be testifying are allowed to remain in

23  the courtroom even if I invoke the rule unless I receive

24  evidence of a clear and convincing nature that their testimony

25  would be materially altered if the victim heard the other

92

1  testimony and is any side proposing that that standard is met?

2      MS. GROOVER:  Your Honor, if it helps to alleviate

3  issues with that, the Government is comfortable, but she will be

4  the very first witness.

5      THE COURT:  If you will at some point during the break

6  submit the names of the paralegals, and with that, Ms. Sharp

7  proceed with the selection, and, counsel, if you will listen

8  carefully to the 32 that are drawn.

9      And I want you to go ahead and be thinking, of course,

10 about your strikes during this break.

11     THE CLERK:  Juror Number 53, Rebecca Smith.  Juror

12 Number 13, Gregory Carter, Jr.  Juror Number 59, Serena Vespini.

13 Juror Number 6, Theodore Blocker.  Juror Number 52, Robert

14 Shirah.  Juror Number 10, Lee Brown.  Juror Number 23, Katie

15 Ely.  Juror Number 39, Taylor Miller.  Juror Number 31, Anthony

16 Jones.  Juror Number 57, Eric Travis.  Juror Number 2, Kevin

17 Ankin.  Juror Number 69, Nicole Wright.  Juror Number 35, Kathy

18 Maynor.  Juror Number 50, Max Rogers.  Juror Number 33, Krista

19 Longbottom.  Juror Number 5, Roxanne Blakely.  Juror Number 11,

20 Theodore Burnside.  Juror Number 21, Shelby Eason.  Juror Number

21 26, Robert Glasscock.  Juror Number 4, Heather Beaston.  Juror

22 Number 43, Kim Pope.  Juror Number 3, Rhonda Aviles.  Juror

23 Number 34, Rosalind Lopez.  Juror Number 30, Adam Jacobs.  Juror

24 Number 22, Rachel Egger.  Juror Number 15, Michael Castleberry.

25 Juror Number 56, Robert Styn.  Juror Number 7, Cody Bradley.

93

1    Juror Number 47, Douglas Richard.  Juror Number 42, Alissa

2    Phillips.  Juror Number 40, Edward Mosley.  Juror Number 1, John

3    Adams.

4            THE COURT:  Counsel, so it's five 'til 1:00 and the

5    jurors will return at 2:00, and Ms. Sharp will direct them

6    either to this courtroom or the next.  We will complete the

7    questioning and then we will jump into the strikes, so have

8    those planned during the break, and after we seat the jury,

9    depending on how long that is, we may take a brief break, swear

10   them in.  I will preliminarily charge them, invoke the rule and

11   turn to you for your opening statements.

12           We will be in recess until two o'clock.

13           (Recess from 12:57 p.m. to 2:09 p.m.).

14           THE COURT:  Welcome back, ladies and gentlemen.

15           As I said earlier today, we have just a few more

16   questions to go through with you.  The first set of questions I

17   have is directed to everybody, and as we did this morning, if

18   you have a positive response, just raise your hand and we will

19   get the microphone to you and give us your name and juror

20   number.

21           There are two more people that I need to ask you about.

22   There is one paralegal who will be sitting at the Government

23   table and one paralegal who will be sitting at the Defense

24   table.  Let me go ahead and introduce them and ask if you know

25   them.

94

1          Ms. Vilmarie Alcaraz, if you will stand very briefly.

2    Are any of you related by blood or marriage to Ms. Alcaraz?  Do

3    any of you know her or have any dealings with her?

4          And the paralegal who will be assisting the Defense is

5    Ms. Catherine -- do you say Vashon?

6          MS. VASHON:  Vashon.

7          THE COURT:  Vashon.  Are any of you related by blood or

8    marriage to Ms. Vashon?  Do any of you know her in any capacity

9    or have any dealings with her of any sort?

10         Do any of you have any legal training, any training in

11   the law?

12         I've asked you a number of questions today and I'm going

13   to wrap up the group questions with these three.

14         Having heard the questions that have been put to you by

15   me today, does any other reason suggest itself to you as to why

16   you could not sit on this jury and render a fair verdict based

17   on the evidence presented to you during the trial in the context

18   of the law as I deliver it?

19         Do any of you have any reason why you cannot give this

20   case your undivided attention and render a fair and impartial

21   verdict in the case?

22         Are there any of you who would not render a fair and

23   impartial verdict in the case?

24         At this point, Ms. Sharp is going to call your name one

25   at a time.  When your name is called, if you will stand and the

95

1    marshal will pass out a microphone to you and I will walk you

2    through the questions that you have on that sheet.

3            Ms. Sharp, let's begin.

4            THE CLERK:  Juror Number 53, Rebecca Smith.

5            THE COURT:  Ms. Smith, your full name?

6            PROSPECTIVE JUROR NUMBER 53:  Rebecca Rowell Smith.

7            THE COURT:  And where do you live?

8            PROSPECTIVE JUROR NUMBER 53:  Brunswick, Georgia.

9            THE COURT:  How long have you lived in Brunswick?

10           PROSPECTIVE JUROR NUMBER 53:  My current address, 22

11   years.

12           THE COURT:  What is your occupation?

13           PROSPECTIVE JUROR NUMBER 53:  Middle school principal

14   for the Glynn County School System.

15           THE COURT:  And which school is that?

16           PROSPECTIVE JUROR NUMBER 53:  Needwood Middle.

17           THE COURT:  Are you married?

18           PROSPECTIVE JUROR NUMBER 53:  I am.

19           THE COURT:  What does your husband do?

20           PROSPECTIVE JUROR NUMBER 53:  Teacher at Glynn Academy.

21           THE COURT:  What subject?

22           PROSPECTIVE JUROR NUMBER 53:  Art.

23           THE COURT:  Do you have children?

24           PROSPECTIVE JUROR NUMBER 53:  Two.

25           THE COURT:  How old?

96

1          PROSPECTIVE JUROR NUMBER 53:  17 and 21.

2          THE COURT:  Does the 21-year-old work outside the home?

3          PROSPECTIVE JUROR NUMBER 53:  He's a college student.

4          THE COURT:  Have you ever served in the military?

5          PROSPECTIVE JUROR NUMBER 53:  No, ma'am.

6          THE COURT:  Have you ever served on a jury before?

7          PROSPECTIVE JUROR NUMBER 53:  No, ma'am.

8          THE COURT:  And your level of education?

9          PROSPECTIVE JUROR NUMBER 53:  I have a specialist

10    degree.

11          THE COURT:  Thank you, ma'am.

12          THE CLERK:  Juror Number 13, Gregory Carter.

13          THE COURT:  Mr. Carter, your full name.

14          PROSPECTIVE JUROR NUMBER 13:  Gregory Carter, Jr.

15          THE COURT:  And where do you live?

16          PROSPECTIVE JUROR NUMBER 13:  I live in Baxley.

17          THE COURT:  How long?

18          PROSPECTIVE JUROR NUMBER 13:  About a month.

19          THE COURT:  And prior to living in Baxley, where did you

20    live?

21          PROSPECTIVE JUROR NUMBER 13:  Hazlehurst, Georgia.

22          THE COURT:  And how long did you live in Hazlehurst?

23          PROSPECTIVE JUROR NUMBER 13:  Past five years.

24          THE COURT:  What is your occupation?

25          PROSPECTIVE JUROR NUMBER 13:  I'm a metal fabricator.

97

1          THE COURT:  Are you married?

2          PROSPECTIVE JUROR NUMBER 13:  I'm separated.

3          THE COURT:  And the spouse from whom you're separated,

4     what is their occupation?

5          PROSPECTIVE JUROR NUMBER 13:  She is a Dollar Store

6     manager.

7          THE COURT:  Do you have children?

8          PROSPECTIVE JUROR NUMBER 13:  I do.

9          THE COURT:  How old?

10         PROSPECTIVE JUROR NUMBER 13:  I have a ten-year-old,

11    six-year-old and five-year-old.

12         THE COURT:  Have you ever served in the military?

13         PROSPECTIVE JUROR NUMBER 13:  Yes, ma'am.

14         THE COURT:  And remind us the branch.

15         PROSPECTIVE JUROR NUMBER 13:  Marine Corps.

16         THE COURT:  And your rank upon discharge.

17         PROSPECTIVE JUROR NUMBER 13:  Sergeant.

18         THE COURT:  Have you ever served on a jury before?

19         PROSPECTIVE JUROR NUMBER 13:  No, ma'am.

20         THE COURT:  And your level of education.

21         PROSPECTIVE JUROR NUMBER 13:  Associate's.

22         THE COURT:  Thank you, sir.

23         THE CLERK:  Juror Number 59, Serena Vespini.

24         THE COURT:  Ma'am, your full name.

25         PROSPECTIVE JUROR NUMBER 59:  Serena Marie Vespini.

98

1           THE COURT:  Where do you live?

2           PROSPECTIVE JUROR NUMBER 59:  In Brunswick.

3           THE COURT:  How long?

4           PROSPECTIVE JUROR NUMBER 59:  Since '94.

5           THE COURT:  And what is your occupation?

6           PROSPECTIVE JUROR NUMBER 59:  Currently work as a

7    secretary in an insurance office.

8           THE COURT:  A secretary in what sort of office?

9           PROSPECTIVE JUROR NUMBER 59:  In an insurance office.

10          THE COURT:  Are you married?

11          PROSPECTIVE JUROR NUMBER 59:  I'm single.

12          THE COURT:  Do you have any children?

13          PROSPECTIVE JUROR NUMBER 59:  I have one.

14          THE COURT:  And how old is that child?

15          PROSPECTIVE JUROR NUMBER 59:  He's 34.

16          THE COURT:  And what does he do?

17          PROSPECTIVE JUROR NUMBER 59:  He works at a body shop.

18          THE COURT:  Have you ever served in the military?

19          PROSPECTIVE JUROR NUMBER 59:  Have I?  Huh-uh.

20          THE COURT:  Have you ever served on a jury before?

21          PROSPECTIVE JUROR NUMBER 59:  No, ma'am.

22          THE COURT:  And your level of education?

23          PROSPECTIVE JUROR NUMBER 59:  High school.

24          THE COURT:  Thank you.

25          THE CLERK:  Juror Number 6, Theodore Blocker.

99

1    THE COURT:  Sir, your full name.

2    PROSPECTIVE JUROR NUMBER 6:  Theodore Charles Blocker.

3    THE COURT:  Where do you live?

4    PROSPECTIVE JUROR NUMBER 6:  Here in Brunswick.

5    THE COURT:  How long?

6    PROSPECTIVE JUROR NUMBER 6:  About 25 years.

7    THE COURT:  What's your occupation?

8    PROSPECTIVE JUROR NUMBER 6:  Carpenter.

9    THE COURT:  Are you married?

10   PROSPECTIVE JUROR NUMBER 6:  Yes, ma'am.

11   THE COURT:  And what does your spouse do?

12   PROSPECTIVE JUROR NUMBER 6:  She's a mechanic at BMW.

13   THE COURT:  Do you have children?

14   PROSPECTIVE JUROR NUMBER 6:  Just one.

15   THE COURT:  How old?

16   PROSPECTIVE JUROR NUMBER 6:  Seven.

17   THE COURT:  Have you ever served in the military?

18   PROSPECTIVE JUROR NUMBER 6:  No, ma'am.

19   THE COURT:  Have you ever served on a jury before?

20   PROSPECTIVE JUROR NUMBER 6:  No, ma'am.

21   THE COURT:  And your level of education.

22   PROSPECTIVE JUROR NUMBER 6:  High school.

23   THE COURT:  Thank you, sir.

24   THE CLERK:  Juror Number 52, Robert Shirah.

25   THE COURT:  Sir, your full name.

100

1          PROSPECTIVE JUROR NUMBER 52:  Robert Douglas Shirah.

2          THE COURT:  And where do you live?

3          PROSPECTIVE JUROR NUMBER 52:  Darien, Georgia.

4          THE COURT:  How long?

5          PROSPECTIVE JUROR NUMBER 52:  55 years.

6          THE COURT:  Are you married?

7          PROSPECTIVE JUROR NUMBER 52:  Yes, ma'am.

8          THE COURT:  What does your spouse do?

9          PROSPECTIVE JUROR NUMBER 52:  She's a bookkeeper at

10   McIntosh County courts.

11         THE COURT:  What do you do?  What is your occupation?

12         PROSPECTIVE JUROR NUMBER 52:  What do I -- I'm a bridge

13   constructer.

14         THE COURT:  Do you have any children?

15         PROSPECTIVE JUROR NUMBER 52:  Yes, ma'am.

16         THE COURT:  And how old are they?

17         PROSPECTIVE JUROR NUMBER 52:  38 and 34.

18         THE COURT:  And what are their occupations?

19         PROSPECTIVE JUROR NUMBER 52:  One is working with a turf

20   company down here in Brunswick, and one is currently unemployed,

21   battling kidney disease.

22         THE COURT:  And have you served in the military?

23         PROSPECTIVE JUROR NUMBER 52:  No, ma'am.

24         THE COURT:  Have you ever served on a jury before?

25         PROSPECTIVE JUROR NUMBER 52:  Yes, ma'am.

1          THE COURT:  And without telling me what the verdict, was

2    a verdict reached?

3          PROSPECTIVE JUROR NUMBER 52:  Yes, ma'am.

4          THE COURT:  And your level of education.

5          PROSPECTIVE JUROR NUMBER 52:  Senior, high school

6    graduate.

7          THE COURT:  Thank you, sir.

8          THE CLERK:  Juror Number 10, Lee Brown.

9          THE COURT:  Mr. Brown, your full name.

10         PROSPECTIVE JUROR NUMBER 10:  Lee Edward Brown.

11         THE COURT:  And where do you live?

12         PROSPECTIVE JUROR NUMBER 10:  Brunswick, Georgia.

13         THE COURT:  How long?

14         PROSPECTIVE JUROR NUMBER 10:  30 years.

15         THE COURT:  What is your occupation?

16         PROSPECTIVE JUROR NUMBER 10:  I'm a senior electronic

17   assembler.

18         THE COURT:  Are you married?

19         PROSPECTIVE JUROR NUMBER 10:  Yes.

20         THE COURT:  What does your spouse do?

21         PROSPECTIVE JUROR NUMBER 10:  She's a nurse at the

22   hospital.

23         THE COURT:  Do you have children?

24         PROSPECTIVE JUROR NUMBER 10:  I have four.

25         THE COURT:  How old?

1          PROSPECTIVE JUROR NUMBER 10:  20, 19, 11 and three.

2          THE COURT:  Do the older children work outside the home?

3          PROSPECTIVE JUROR NUMBER 10:  My 20-year-old, he's

4     special needs, and my 19-year-old works at Domino's.

5          THE COURT:  Have you served in the military?

6          PROSPECTIVE JUROR NUMBER 10:  I have not.

7          THE COURT:  Have you ever served on a jury before?

8          PROSPECTIVE JUROR NUMBER 10:  No, ma'am.

9          THE COURT:  And your level of education.

10          PROSPECTIVE JUROR NUMBER 10:  I got a career degree in

11     basic electronics.

12          THE COURT:  Thank you, sir.

13          THE CLERK:  Juror Number 23, Katie Ely.

14          THE COURT:  And is that how you say your last name?

15          PROSPECTIVE JUROR NUMBER 23:  Ely.

16          THE COURT:  Ms. Ely, your full name.

17          PROSPECTIVE JUROR NUMBER 23:  Katie Lorraine Ely.

18          THE COURT:  Where do you live?

19          PROSPECTIVE JUROR NUMBER 23:  Hazlehurst, Georgia.

20          THE COURT:  How long?

21          PROSPECTIVE JUROR NUMBER 23:  17 years.

22          THE COURT:  How long?

23          PROSPECTIVE JUROR NUMBER 23:  17 years.

24          THE COURT:  What is your occupation?

25          PROSPECTIVE JUROR NUMBER 23:  Bank teller.

103

1    THE COURT:  Are you married?

2    PROSPECTIVE JUROR NUMBER 23:  No.

3    THE COURT:  Do you have any children?

4    PROSPECTIVE JUROR NUMBER 23:  Yes, ma'am.

5    THE COURT:  How old?

6    PROSPECTIVE JUROR NUMBER 23:  Six, 12 and 16.

7    THE COURT:  Does the older child work outside the home?

8    PROSPECTIVE JUROR NUMBER 23:  No, ma'am.

9    THE COURT:  Have you ever served on a jury before?

10    PROSPECTIVE JUROR NUMBER 23:  No, ma'am.

11    THE COURT:  Have you ever served in the military before?

12    PROSPECTIVE JUROR NUMBER 23:  No, ma'am.

13    THE COURT:  And your level of education.

14    PROSPECTIVE JUROR NUMBER 23:  High school.

15    THE COURT:  Thank you, ma'am.

16    THE CLERK:  Juror Number 39, Taylor Miller.

17    THE COURT:  Ms. Miller, your full name.

18    PROSPECTIVE JUROR NUMBER 39:  Taylor Louise Miller.

19    THE COURT:  Where do you live?

20    PROSPECTIVE JUROR NUMBER 39:  Baxley.

21    THE COURT:  How long?

22    PROSPECTIVE JUROR NUMBER 39:  About five years.

23    THE COURT:  What is your occupation.

24    PROSPECTIVE JUROR NUMBER 39:  I'm a waitress at a

25    Japanese restaurant.

104

1       THE COURT:  Are you married?

2       PROSPECTIVE JUROR NUMBER 39:  I am not.

3       THE COURT:  Do you have any children?

4       PROSPECTIVE JUROR NUMBER 39:  I do not.

5       THE COURT:  Have you ever served in the military?

6       PROSPECTIVE JUROR NUMBER 39:  I have not.

7       THE COURT:  Ever served on a jury before?

8       PROSPECTIVE JUROR NUMBER 39:  No, ma'am.

9       THE COURT:  And your level of education?

10      PROSPECTIVE JUROR NUMBER 39:  High school.

11      THE COURT:  Thank you, ma'am.

12      THE CLERK:  Juror Number 31, Anthony Jones.

13      THE COURT:  Mr. Jones, your full name.

14      PROSPECTIVE JUROR NUMBER 31:  Anthony Leroy Jones.

15      THE COURT:  And where do you live?

16      PROSPECTIVE JUROR NUMBER 31:  McIntosh, Townsend,

17  Georgia.

18      THE COURT:  How long?  I'm sorry, you said McIntosh.

19      PROSPECTIVE JUROR NUMBER 31:  Townsend, Georgia, which

20  is in McIntosh.

21      THE COURT:  How long have you lived there?

22      PROSPECTIVE JUROR NUMBER 31:  Pretty much all my life

23  until I went in the military and came out.

24      THE COURT:  And approximately how long would that be?

25      PROSPECTIVE JUROR NUMBER 31:  Since 1990.

1          THE COURT:  All right.  And what is your occupation?

2          PROSPECTIVE JUROR NUMBER 31:  I'm retired from the

3   military.

4          THE COURT:  And remind us your branch.

5          PROSPECTIVE JUROR NUMBER 31:  Army.

6          THE COURT:  Have you ever served on a jury before?

7          PROSPECTIVE JUROR NUMBER 31:  Yes, I have.

8          THE COURT:  Without telling me what the verdict was, was

9   a verdict reached?

10          PROSPECTIVE JUROR NUMBER 31:  Yes.

11          THE COURT:  And your level of education.

12          PROSPECTIVE JUROR NUMBER 31:  A senior, high school.

13          THE COURT:  Thank you, sir.

14          THE CLERK:  Juror Number 57, Eric Travis.

15          THE COURT:  Sir, your full name.

16          PROSPECTIVE JUROR NUMBER 57:  Eric Craig Travis.

17          THE COURT:  Where do you live?

18          PROSPECTIVE JUROR NUMBER 57:  Woodbine, Georgia.

19          THE COURT:  How long?

20          PROSPECTIVE JUROR NUMBER 57:  21 years.

21          THE COURT:  And what is your occupation?

22          PROSPECTIVE JUROR NUMBER 57:  Retired federal service.

23          THE COURT:  And remind us the nature of that federal

24   service.

25          PROSPECTIVE JUROR NUMBER 57:  Information technology

106

 1    specialist.

 2            THE COURT:  Are you married?

 3            PROSPECTIVE JUROR NUMBER 57:  Yes, I am.

 4            THE COURT:  And what is your spouse's occupation?

 5            PROSPECTIVE JUROR NUMBER 57:  She's retired army as well

 6    as retired federal government.

 7            THE COURT:  And what was her role there?

 8            PROSPECTIVE JUROR NUMBER 57:  In government, she was an

 9    inspection analyst.

10            THE COURT:  Do you have any children?

11            PROSPECTIVE JUROR NUMBER 57:  Yeah, four.

12            THE COURT:  How old are they?

13            PROSPECTIVE JUROR NUMBER 57:  38, 34, 33 and 25.

14            THE COURT:  And what are their occupations?

15            PROSPECTIVE JUROR NUMBER 57:  One is a broadcast,

16    television broadcast for C-SPAN.  The other one is Amazon Prime

17    driver, waitress and then SeaPak and army reserve, the youngest.

18            THE COURT:  You've told us about your military service.

19            PROSPECTIVE JUROR NUMBER 57:  None, none for me.  My

20    wife is retired.

21            THE COURT:  Have you ever served on a jury before?

22            PROSPECTIVE JUROR NUMBER 57:  Yes, several.

23            THE COURT:  And without telling us what the verdict was,

24    was a verdict reached?

25            PROSPECTIVE JUROR NUMBER 57:  Yes, ma'am.

107

```
1          THE COURT:  And your level of education?

2          PROSPECTIVE JUROR NUMBER 57:  Master's degree.

3          THE COURT:  And what is your master's in?

4          PROSPECTIVE JUROR NUMBER 57:  Management.

5          THE CLERK:  Juror Number 2, Kevin Ankin.

6          THE COURT:  All right, sir, your full name.

7          PROSPECTIVE JUROR NUMBER 2:  Kevin James Ankin.

8          THE COURT:  And where do you live?

9          PROSPECTIVE JUROR NUMBER 2:  Kingsland, Georgia.

10          THE COURT:  How long?

11          PROSPECTIVE JUROR NUMBER 2:  Five years.

12          THE COURT:  And your occupation?

13          PROSPECTIVE JUROR NUMBER 2:  I'm a project manager.

14          THE COURT:  For what type of entity?

15          PROSPECTIVE JUROR NUMBER 2:  Technology, IT.

16          THE COURT:  Are you married?

17          PROSPECTIVE JUROR NUMBER 2:  Yes.

18          THE COURT:  What does your spouse do?

19          PROSPECTIVE JUROR NUMBER 2:  She's a business process

20    manager.

21          THE COURT:  Do you have children?

22          PROSPECTIVE JUROR NUMBER 2:  I have one child.

23          THE COURT:  How old?

24          PROSPECTIVE JUROR NUMBER 2:  Four.

25          THE COURT:  Did you ever serve in the military?
```

108

1          PROSPECTIVE JUROR NUMBER 2:  No, ma'am.

2          THE COURT:  Have you ever served on a jury before?

3          PROSPECTIVE JUROR NUMBER 2:  No, ma'am.

4          THE COURT:  And your level of education.

5          PROSPECTIVE JUROR NUMBER 2:  I was a dual bachelor's

6     degree.

7          THE COURT:  Thank you, sir.

8          THE CLERK:  Juror Number 61, Nicole Wright.

9          THE COURT:  Ms. Wright, your full name.

10         PROSPECTIVE JUROR NUMBER 61:  Nicole Nadine Wright.

11         THE COURT:  And where you do you live?

12         PROSPECTIVE JUROR NUMBER 61:  St. Marys.

13         THE COURT:  How long have you lived there?

14         PROSPECTIVE JUROR NUMBER 61:  Six years.

15         THE COURT:  And your occupation?

16         PROSPECTIVE JUROR NUMBER 61:  I'm unemployed, full-time

17    student.  I was a CNA.

18         THE COURT:  Are you married?

19         PROSPECTIVE JUROR NUMBER 61:  No.

20         THE COURT:  Do you have any children?

21         PROSPECTIVE JUROR NUMBER 61:  No.

22         THE COURT:  Have you ever served in the military?

23         PROSPECTIVE JUROR NUMBER 61:  No.

24         THE COURT:  Have you ever served on a jury before?

25         PROSPECTIVE JUROR NUMBER 61:  No.

109

1       THE COURT:  And your level of education.

2       PROSPECTIVE JUROR NUMBER 61:  High school.

3       THE COURT:  Thank you, ma'am.

4       THE CLERK:  Juror Number 35, Kathy Maynor.

5       THE COURT:  Ms. Maynor, what is your full name?

6       PROSPECTIVE JUROR NUMBER 35:  Kathy Marie Maynor.

7       THE COURT:  Where do you live?

8       PROSPECTIVE JUROR NUMBER 35:  Brunswick.

9       THE COURT:  How long?

10      PROSPECTIVE JUROR NUMBER 35:  16 years.

11      THE COURT:  What is your occupation?

12      PROSPECTIVE JUROR NUMBER 35:  Property disposal

13  specialist.

14      THE COURT:  Are you married?

15      PROSPECTIVE JUROR NUMBER 35:  Yes.

16      THE COURT:  What does your spouse do?

17      PROSPECTIVE JUROR NUMBER 35:  Retired truck driver.

18      THE COURT:  Do you have children?

19      PROSPECTIVE JUROR NUMBER 35:  No.

20      THE COURT:  Have you ever served in the military?

21      PROSPECTIVE JUROR NUMBER 35:  Yes, ma'am.

22      THE COURT:  And remind us your branch.

23      PROSPECTIVE JUROR NUMBER 35:  Army.

24      THE COURT:  Have you ever served on a jury before?

25      PROSPECTIVE JUROR NUMBER 35:  No, ma'am.

110

1          THE COURT:  And your level of education.

2          PROSPECTIVE JUROR NUMBER 35:  High school.

3          THE COURT:  Thank you, ma'am.

4          THE CLERK:  Juror Number 50, Max Rogers.

5          THE COURT:  And, marshal, if you will start getting the

6    microphone ready.  I think I can still hear this gentleman.

7    Give me your full name.

8          PROSPECTIVE JUROR NUMBER 50:  Max Sheridan Rogers.

9          THE COURT:  And where do you live?

10         PROSPECTIVE JUROR NUMBER 50:  St. Marys, Georgia.

11         THE COURT:  How long?

12         PROSPECTIVE JUROR NUMBER 50:  22 years.

13         THE COURT:  What's your occupation?

14         PROSPECTIVE JUROR NUMBER 50:  Civil estimator.

15         THE COURT:  Are you married?

16         PROSPECTIVE JUROR NUMBER 50:  No, ma'am.

17         THE COURT:  Do you have any children?

18         PROSPECTIVE JUROR NUMBER 50:  No, ma'am.

19         THE COURT:  Did you serve in the military?

20         PROSPECTIVE JUROR NUMBER 50:  No, ma'am.

21         THE COURT:  Have you ever served on a jury?

22         PROSPECTIVE JUROR NUMBER 50:  No, ma'am.

23         THE COURT:  And your level of education.

24         PROSPECTIVE JUROR NUMBER 50:  Associate's.

25         THE COURT:  Thank you, sir.

111

1          THE CLERK:  Juror Number 33, Krista Longbottom.

2          THE COURT:  Ma'am, your full name.

3          PROSPECTIVE JUROR NUMBER 33:  Krista Michelle

4     Longbottom.

5          THE COURT:  Where do you live?

6          PROSPECTIVE JUROR NUMBER 33:  Brunswick, Georgia.

7          THE COURT:  How long?

8          PROSPECTIVE JUROR NUMBER 33:  About 24 years.

9          THE COURT:  What is your occupation?

10          PROSPECTIVE JUROR NUMBER 33:  Night auditor at a beach

11     resort.

12          THE COURT:  Are you married?

13          PROSPECTIVE JUROR NUMBER 33:  No, ma'am.

14          THE COURT:  Do you have any children?

15          PROSPECTIVE JUROR NUMBER 33:  No, ma'am.

16          THE COURT:  Have you ever served in the military?

17          PROSPECTIVE JUROR NUMBER 33:  No, ma'am.

18          THE COURT:  Ever served on a jury before?

19          PROSPECTIVE JUROR NUMBER 33:  Yes, ma'am.

20          THE COURT:  Without telling me what the verdict was, was

21     a verdict reached?

22          PROSPECTIVE JUROR NUMBER 33:  Yes, ma'am.

23          THE COURT:  And your level of education.

24          PROSPECTIVE JUROR NUMBER 33:  High school.

25          THE COURT:  Thank you, ma'am.

1           THE CLERK:  Juror Number 5, Roxanne Blakely.

2           THE COURT:  Your full name?

3           PROSPECTIVE JUROR NUMBER 5:  Roxanne Renken Blakely.

4           THE COURT:  Where do you live?

5           PROSPECTIVE JUROR NUMBER 5:  Kingsland.

6           THE COURT:  How long?

7           PROSPECTIVE JUROR NUMBER 5:  30 years.

8           THE COURT:  What's your occupation?

9           PROSPECTIVE JUROR NUMBER 5:  Customer service with

10  Lowe's.

11          THE COURT:  Are you married?

12          PROSPECTIVE JUROR NUMBER 5:  Yes.

13          THE COURT:  And what is your spouse's occupation?

14          PROSPECTIVE JUROR NUMBER 5:  He's retired.

15          THE COURT:  What did he retire from?

16          PROSPECTIVE JUROR NUMBER 5:  Lockheed.

17          THE COURT:  What did he do there?

18          PROSPECTIVE JUROR NUMBER 5:  Engineer in the missile

19  area.

20          THE COURT:  Do you have children?

21          PROSPECTIVE JUROR NUMBER 5:  Yes.

22          THE COURT:  How old are they?

23          PROSPECTIVE JUROR NUMBER 5:  34 and 41.

24          THE COURT:  And what do they do?

25          PROSPECTIVE JUROR NUMBER 5:  Mortgage business

113

1    underwriter and medical sales.

2         THE COURT:  Have you ever served in the military?

3         PROSPECTIVE JUROR NUMBER 5:  No.

4         THE COURT:  Have you ever been on a jury before?

5         PROSPECTIVE JUROR NUMBER 5:  No.

6         THE COURT:  And your level of education.

7         PROSPECTIVE JUROR NUMBER 5:  I have an associate's

8    degree.

9         THE COURT:  Thank you, ma'am.

10        THE CLERK:  Juror Number 11, Theodore Burnside.

11        THE COURT:  Sir, your full name.

12        PROSPECTIVE JUROR NUMBER 11:  Theodore James Burnside.

13        THE COURT:  And where you do live?

14        PROSPECTIVE JUROR NUMBER 11:  Ludowici, Georgia.

15        THE COURT:  How long?

16        PROSPECTIVE JUROR NUMBER 11:  20 years.

17        THE COURT:  What is your occupation?

18        PROSPECTIVE JUROR NUMBER 11:  Retired from the army a

19   hundred percent disabled veteran.

20        THE COURT:  Are you married?

21        PROSPECTIVE JUROR NUMBER 11:  Yes, ma'am.

22        THE COURT:  What does your spouse do?

23        PROSPECTIVE JUROR NUMBER 11:  She's retired also from

24   Wal-Mart.

25        THE COURT:  Do you have any children?

114

1          PROSPECTIVE JUROR NUMBER 11:  Yes, ma'am.

2          THE COURT:  How old are they?

3          PROSPECTIVE JUROR NUMBER 11:  My daughter Taylor is 23.

4          THE COURT:  What does she do?

5          PROSPECTIVE JUROR NUMBER 11:  She works for a shed and

6    shelter company in Jesup.

7          THE COURT:  Have you ever served on a jury before?

8          PROSPECTIVE JUROR NUMBER 11:  No, ma'am.

9          THE COURT:  And your level of education.

10          PROSPECTIVE JUROR NUMBER 11:  Two years of college.

11          THE COURT:  Thank you, sir.

12          PROSPECTIVE JUROR NUMBER 11:  Thank you.

13          THE CLERK:  Juror Number 21, Shelby Eason.

14          THE COURT:  Ms. Eason, your full name.

15          PROSPECTIVE JUROR NUMBER 21:  Shelby Jean Eason.

16          THE COURT:  Where do you live?

17          PROSPECTIVE JUROR NUMBER 21:  Kingsland, Georgia.

18          THE COURT:  How long?

19          PROSPECTIVE JUROR NUMBER 21:  About eleven years.

20          THE COURT:  And your occupation?

21          PROSPECTIVE JUROR NUMBER 21:  I am a cook.

22          THE COURT:  Are you married?

23          PROSPECTIVE JUROR NUMBER 21:  No, ma'am.

24          THE COURT:  Do you have any children?

25          PROSPECTIVE JUROR NUMBER 21:  No, ma'am.

1        THE COURT:  Have you ever served in the military?

2        PROSPECTIVE JUROR NUMBER 21:  No, ma'am.

3        THE COURT:  Have you ever served on a jury before?

4        PROSPECTIVE JUROR NUMBER 21:  No, ma'am.

5        THE COURT:  And your level of education?

6        PROSPECTIVE JUROR NUMBER 21:  High school.

7        THE CLERK:  Juror Number 26, Robert Glasscock.

8        THE COURT:  Sir, your full name.

9        PROSPECTIVE JUROR NUMBER 26:  Robert Anthony Glasscock.

10       THE COURT:  Where do you live?

11       PROSPECTIVE JUROR NUMBER 26:  Here in Brunswick.

12       THE COURT:  How long?

13       PROSPECTIVE JUROR NUMBER 26:  Seven years.

14       THE COURT:  And your occupation?

15       PROSPECTIVE JUROR NUMBER 26:  Right now it's firearms

16  and use-of-force instructor.

17       THE COURT:  Are you married?

18       PROSPECTIVE JUROR NUMBER 26:  Yes.

19       THE COURT:  And what does your spouse do?

20       PROSPECTIVE JUROR NUMBER 26:  Accounting.

21       THE COURT:  Do you have children?

22       PROSPECTIVE JUROR NUMBER 26:  Yes, 30 and 28.

23       THE COURT:  What do they do?

24       PROSPECTIVE JUROR NUMBER 26:  Logistics and surgical

25  nurse.

116

1        THE COURT:  Have you ever served in the military?

2        PROSPECTIVE JUROR NUMBER 26:  No.

3        THE COURT:  Have you ever served on a jury before?

4        PROSPECTIVE JUROR NUMBER 26:  Yes.

5        THE COURT:  Without telling me what the verdict was, was

6   a verdict reached?

7        PROSPECTIVE JUROR NUMBER 26:  Yes.

8        THE COURT:  And your level of education.

9        PROSPECTIVE JUROR NUMBER 26:  BS.

10       THE COURT:  Thank you.

11       THE CLERK:  Juror Number 4, Heather Beaston.

12       THE COURT:  Ma'am, what is your full name.

13       PROSPECTIVE JUROR NUMBER 4:  Heather Marie Beaston.

14       THE COURT:  And where do you live?

15       PROSPECTIVE JUROR NUMBER 4:  Kingsland, Georgia.

16       THE COURT:  How long?

17       PROSPECTIVE JUROR NUMBER 4:  Five years.

18       THE COURT:  What is your occupation?

19       PROSPECTIVE JUROR NUMBER 4:  I'm a program manager.

20       THE COURT:  Are you married?

21       PROSPECTIVE JUROR NUMBER 4:  Yes.

22       THE COURT:  And what does your spouse do?

23       PROSPECTIVE JUROR NUMBER 4:  He's a security manager.

24       THE COURT:  Do you have children?

25       PROSPECTIVE JUROR NUMBER 4:  I do.

1           THE COURT:  How old?

2           PROSPECTIVE JUROR NUMBER 4:  11 and 10.

3           THE COURT:  Have you ever served in the military?

4           PROSPECTIVE JUROR NUMBER 4:  Yes, ma'am, United States

5   Navy, E-4.

6           THE COURT:  And have you ever served on a jury before?

7           PROSPECTIVE JUROR NUMBER 4:  No, ma'am.

8           THE COURT:  Your level of education.

9           PROSPECTIVE JUROR NUMBER 4:  Bachelor's.

10          THE COURT:  Thank you, ma'am.

11          THE CLERK:  Juror Number 43, Kim Pope.

12          THE COURT:  Ma'am, your full name.

13          PROSPECTIVE JUROR NUMBER 43:  My name is Kim Groller

14  Pope.

15          THE COURT:  Where do you live?

16          PROSPECTIVE JUROR NUMBER 43:  St. Marys.

17          THE COURT:  How long?

18          PROSPECTIVE JUROR NUMBER 43:  23 years.

19          THE COURT:  What is your occupation?

20          PROSPECTIVE JUROR NUMBER 43:  My occupation is a

21  merchandiser.

22          THE COURT:  Are you married?

23          PROSPECTIVE JUROR NUMBER 43:  I am married.

24          THE COURT:  What does your spouse do?

25          PROSPECTIVE JUROR NUMBER 43:  He's retired from the

```
1   federal government.
2         THE COURT:  What did he do there?
3         PROSPECTIVE JUROR NUMBER 43:  He was the recreation
4   director.
5         THE COURT:  At what kind of place?
6         PROSPECTIVE JUROR NUMBER 43:  What kind of place, did
7   you say?  All the federal facilities.  FLETC was the last one.
8         THE COURT:  All right.  Do you have children?
9         PROSPECTIVE JUROR NUMBER 43:  I do.  I have one.
10        THE COURT:  How old?
11        PROSPECTIVE JUROR NUMBER 43:  She is 23, and she's
12  currently a college student.
13        THE COURT:  Have you ever served in the military.
14        PROSPECTIVE JUROR NUMBER 43:  No, ma'am.
15        THE COURT:  Have you ever served on a jury before?
16        PROSPECTIVE JUROR NUMBER 43:  Yes, I have.
17        THE COURT:  Without telling me what the verdict was, was
18  a verdict reached?
19        PROSPECTIVE JUROR NUMBER 43:  Yes, it was.
20        THE COURT:  And your level of education.
21        PROSPECTIVE JUROR NUMBER 43:  High school.
22        THE COURT:  Thank you, ma'am.
23        THE CLERK:  Juror Number 3, Rhonda Aviles.
24        THE COURT:  All right, ma'am, your full name.
25        PROSPECTIVE JUROR NUMBER 3:  Rhonda Aviles.
```

119

```
 1          THE COURT:  Where do you live?

 2          PROSPECTIVE JUROR NUMBER 3:  Kingsland.

 3          THE COURT:  How long have you lived there?

 4          PROSPECTIVE JUROR NUMBER 3:  About 30 years.

 5          THE COURT:  What is your occupation?

 6          PROSPECTIVE JUROR NUMBER 3:  Medical insurance biller

 7   manager.

 8          THE COURT:  Are you married?

 9          PROSPECTIVE JUROR NUMBER 3:  Yes.

10          THE COURT:  And what does your spouse do?

11          PROSPECTIVE JUROR NUMBER 3:  He's retired.

12          THE COURT:  From?

13          PROSPECTIVE JUROR NUMBER 3:  US Navy and then from

14   Nassau County, Florida.

15          THE COURT:  What did he do with the county?

16          PROSPECTIVE JUROR NUMBER 3:  He was in the road and

17   bridge department.

18          THE COURT:  Do you have children?

19          PROSPECTIVE JUROR NUMBER 3:  Yes.

20          THE COURT:  And how old are they?

21          PROSPECTIVE JUROR NUMBER 3:  He's 40, and he works at

22   Kings Bay Naval Base, DOD.

23          THE COURT:  In what capacity?

24          PROSPECTIVE JUROR NUMBER 3:  I'm not really sure.  He

25   has a high security clearance.
```

1          THE COURT:  All right, have you ever served in the

2    military?

3          PROSPECTIVE JUROR NUMBER 3:  No.

4          THE COURT:  Have you ever served on a jury?

5          PROSPECTIVE JUROR NUMBER 3:  No.

6          THE COURT:  And your level of education.

7          PROSPECTIVE JUROR NUMBER 3:  High school.

8          THE COURT:  Thank you.

9          THE CLERK:  Juror Number 34, Rosalind Lopez.

10         PROSPECTIVE JUROR NUMBER 34:  Rosalind Patricia Lopez.

11         THE COURT:  Where do you live?

12         PROSPECTIVE JUROR NUMBER 34:  Kingsland.

13         THE COURT:  How long?

14         PROSPECTIVE JUROR NUMBER 34:  25 years.

15         THE COURT:  What's your occupation?

16         PROSPECTIVE JUROR NUMBER 34:  Accounts payable payroll

17    manager, director of Title III.

18         THE COURT:  Are you married?

19         PROSPECTIVE JUROR NUMBER 34:  No, divorced.

20         THE COURT:  What did your former spouse, what did he do?

21         PROSPECTIVE JUROR NUMBER 34:  United States Navy.

22         THE COURT:  Do you have children?

23         PROSPECTIVE JUROR NUMBER 34:  Yes, two, 28 and 25.

24         THE COURT:  What do they do?

25         PROSPECTIVE JUROR NUMBER 34:  One is a manager.  The

121

1     daughter is a manager.  The young man, he's a supervisor at the

2     gourmet and food services.

3              THE COURT:  Have you ever served in the military?

4              PROSPECTIVE JUROR NUMBER 34:  No.

5              THE COURT:  Have you ever served on a jury before?

6              PROSPECTIVE JUROR NUMBER 34:  No, ma'am.

7              THE COURT:  And your level of education.

8              PROSPECTIVE JUROR NUMBER 34:  Some college.

9              THE COURT:  Thank you, ma'am.

10             PROSPECTIVE JUROR NUMBER 34:  You're welcome.

11             THE CLERK:  Juror Number 30, Adam Jacobs.

12             THE COURT:  Sir, your full name.

13             PROSPECTIVE JUROR NUMBER 30:  Adam Hamilton Jacobs.

14             THE COURT:  Where do you live?

15             PROSPECTIVE JUROR NUMBER 30:  I live here in Brunswick.

16             THE COURT:  For how long?

17             PROSPECTIVE JUROR NUMBER 30:  Seven years.

18             THE COURT:  What is your occupation?

19             PROSPECTIVE JUROR NUMBER 30:  I teach preK.

20             THE COURT:  Are you married?

21             PROSPECTIVE JUROR NUMBER 30:  No, ma'am.

22             THE COURT:  Do you have any children?

23             PROSPECTIVE JUROR NUMBER 30:  I do not.

24             THE COURT:  Have you ever served in the military?

25             PROSPECTIVE JUROR NUMBER 30:  I have not, no, ma'am.

1          THE COURT:  Ever served on a jury?

2          PROSPECTIVE JUROR NUMBER 30:  No, ma'am.

3          THE COURT:  And your level of education.

4          PROSPECTIVE JUROR NUMBER 30:  Master's in education.

5          THE CLERK:  Juror Number 22, Rachel Egger.

6          THE COURT:  Ma'am, your full name.

7          PROSPECTIVE JUROR NUMBER 22:  Rachel Christine Rosa

8     Egger.

9          THE COURT:  Where do you live?

10          PROSPECTIVE JUROR NUMBER 22:  Townsend.

11          THE COURT:  How long?

12          PROSPECTIVE JUROR NUMBER 22:  Almost ten years.

13          THE COURT:  What is your occupation?

14          PROSPECTIVE JUROR NUMBER 22:  I'm an office manager for

15     an income tax office.

16          THE COURT:  Are you married?

17          PROSPECTIVE JUROR NUMBER 22:  Yes.

18          THE COURT:  And what does your spouse do?

19          PROSPECTIVE JUROR NUMBER 22:  He's a full-time pastor

20     and part-time police officer.

21          THE COURT:  Do you have children?

22          PROSPECTIVE JUROR NUMBER 22:  No.

23          THE COURT:  Have you ever served in the military?

24          PROSPECTIVE JUROR NUMBER 22:  No.

25          THE COURT:  Ever served on a jury?

123

1          PROSPECTIVE JUROR NUMBER 22:  No.

2          THE COURT:  And your level of education.

3          PROSPECTIVE JUROR NUMBER 22:  Bachelor's degree.

4          THE COURT:  Thank you, ma'am.

5          THE CLERK:  Juror Number 15, Michael Castleberry.

6          THE COURT:  Sir, your full name.

7          PROSPECTIVE JUROR NUMBER 15:  Michael Arthur

8    Castleberry.

9          THE COURT:  Where do you live?

10          PROSPECTIVE JUROR NUMBER 15:  Kingsland, Georgia.

11          THE COURT:  How long?

12          PROSPECTIVE JUROR NUMBER 15:  24 years.

13          THE COURT:  What is your occupation?

14          PROSPECTIVE JUROR NUMBER 15:  I work for a ship supply

15    company in Jacksonville, retired military.

16          THE COURT:  Are you married?

17          PROSPECTIVE JUROR NUMBER 15:  Yes.

18          THE COURT:  What does your spouse do?

19          PROSPECTIVE JUROR NUMBER 15:  She's a homemaker.

20          THE COURT:  Do you have children?

21          PROSPECTIVE JUROR NUMBER 15:  Yes, four.

22          THE COURT:  How old?

23          PROSPECTIVE JUROR NUMBER 15:  42, 40, 38, 36.

24          THE COURT:  What are their occupations?

25          PROSPECTIVE JUROR NUMBER 15:  A welder, assembly line

124

1    for Toyota, school teacher and US Navy.

2            THE COURT:  Have you ever served in the military?

3            PROSPECTIVE JUROR NUMBER 15:  Yes, US Navy, 20 years.

4            THE COURT:  Have you ever served on a jury?

5            PROSPECTIVE JUROR NUMBER 15:  No.

6            THE COURT:  And your level of education.

7            PROSPECTIVE JUROR NUMBER 15:  High school.

8            THE COURT:  Thank you, sir.

9            THE CLERK:  Juror Number 56, Robert Styn.

10           THE COURT:  Sir, your full name.

11           PROSPECTIVE JUROR NUMBER 56:  Robert August Styn, Jr.

12           THE COURT:  Where do you live?

13           PROSPECTIVE JUROR NUMBER 56:  Brunswick, Georgia.

14           THE COURT:  How long?

15           PROSPECTIVE JUROR NUMBER 56:  16 years.

16           THE COURT:  What is your occupation?

17           PROSPECTIVE JUROR NUMBER 56:  District manager for

18   Georgia Theatre Company.

19           THE COURT:  Are you married?

20           PROSPECTIVE JUROR NUMBER 56:  I am.

21           THE COURT:  And what does your spouse do?

22           PROSPECTIVE JUROR NUMBER 56:  She's a paraprofessional

23   for the Glynn County school board.

24           THE COURT:  What grades.

25           PROSPECTIVE JUROR NUMBER 56:  High school at Glynn

125

```
 1    Academy.
 2             THE COURT:  Do you have children?
 3             PROSPECTIVE JUROR NUMBER 56:  We have four.
 4             THE COURT:  How old?
 5             PROSPECTIVE JUROR NUMBER 56:  33, 29, 26 and 20 -- 20.
 6             THE COURT:  What are their occupations?
 7             PROSPECTIVE JUROR NUMBER 56:  Physical therapist,
 8    performer, stage performer at Dollywood, a server in a
 9    restaurant and a traveling musician.
10             THE COURT:  Have you ever served in the military?
11             PROSPECTIVE JUROR NUMBER 56:  I have not.
12             THE COURT:  Ever served on a jury?
13             PROSPECTIVE JUROR NUMBER 56:  I have not.
14             THE COURT:  And your level of education.
15             PROSPECTIVE JUROR NUMBER 56:  High school diploma.
16             THE COURT:  Thank you, sir.
17             THE CLERK:  Juror Number 7, Kody Bradley.
18             THE COURT:  Sir, your full name.
19             PROSPECTIVE JUROR NUMBER 7:  Kody Dalton Bradley.
20             THE COURT:  Where do you live?
21             PROSPECTIVE JUROR NUMBER 7:  Darien, Georgia.
22             THE COURT:  How long?
23             PROSPECTIVE JUROR NUMBER 7:  About ten years.
24             THE COURT:  What's your occupation?
25             PROSPECTIVE JUROR NUMBER 7:  Crane operator.
```

1           THE COURT:  Are you married?

2           PROSPECTIVE JUROR NUMBER 7:  Yes, ma'am.

3           THE COURT:  What does your spouse do?

4           PROSPECTIVE JUROR NUMBER 7:  A bank teller.

5           THE COURT:  Do you have children?

6           PROSPECTIVE JUROR NUMBER 7:  Yes, ma'am.

7           THE COURT:  How old?

8           PROSPECTIVE JUROR NUMBER 7:  One month.

9           THE COURT:  Oh, my goodness.  Have you ever served in

10    the military?

11          PROSPECTIVE JUROR NUMBER 7:  No, ma'am.

12          THE COURT:  Have you ever served on a jury before?

13          PROSPECTIVE JUROR NUMBER 7:  No, ma'am.

14          THE COURT:  And your level of education?

15          PROSPECTIVE JUROR NUMBER 7:  High school.

16          THE COURT:  Thank you, sir.

17          THE CLERK:  Juror Number 47, Douglas Richard.

18          THE COURT:  Sir, your full name.

19          PROSPECTIVE JUROR NUMBER 47:  Douglas Hall Richard.

20          THE COURT:  Where do you live?

21          PROSPECTIVE JUROR NUMBER 47:  St. Simons Island.

22          THE COURT:  How long?

23          PROSPECTIVE JUROR NUMBER 47:  Nine years.

24          THE COURT:  What is your occupation?

25          PROSPECTIVE JUROR NUMBER 47:  I'm retired.

127

1          THE COURT:  From?

2          PROSPECTIVE JUROR NUMBER 47:  I was an event

3    coordinator.

4          THE COURT:  Are you married?

5          PROSPECTIVE JUROR NUMBER 47:  Yes.

6          THE COURT:  And what does your spouse do?

7          PROSPECTIVE JUROR NUMBER 47:  My wife is an operating

8    room nurse at the hospital.

9          THE COURT:  Do you have children?

10          PROSPECTIVE JUROR NUMBER 47:  Yes.

11          This is cutting in and out.

12          THE COURT:  How old are your children?

13          PROSPECTIVE JUROR NUMBER 47:  32 and 34.

14          THE COURT:  What do they do?

15          PROSPECTIVE JUROR NUMBER 47:  One is a mechanical

16    engineer and the other is a registered nurse.

17          THE COURT:  Did you serve in the military?

18          PROSPECTIVE JUROR NUMBER 47:  No.

19          THE COURT:  Have you ever served on a jury before?

20          PROSPECTIVE JUROR NUMBER 47:  No.

21          THE COURT:  And your level of education.

22          PROSPECTIVE JUROR NUMBER 47:  Four years of college.

23          THE COURT:  Thank you, sir.

24          THE CLERK:  Juror Number 42, Alissa Phillips.

25          THE COURT:  Ms. Phillips, your full name.

128

1        PROSPECTIVE JUROR NUMBER 42:  Alissa Erin Phillips.

2        THE COURT:  Where do you live?

3        PROSPECTIVE JUROR NUMBER 42:  I live on St. Simons.

4        THE COURT:  How long?

5        PROSPECTIVE JUROR NUMBER 42:  Two years.

6        THE COURT:  What is your occupation?

7        PROSPECTIVE JUROR NUMBER 42:  Special education teacher.

8        THE COURT:  What level?

9        PROSPECTIVE JUROR NUMBER 42:  What level?  PreK age.

10       THE COURT:  Are you married?

11       PROSPECTIVE JUROR NUMBER 42:  Yes.

12       THE COURT:  What does your spouse do?

13       PROSPECTIVE JUROR NUMBER 42:  Financial planner.

14       THE COURT:  Do you have children?

15       PROSPECTIVE JUROR NUMBER 42:  Yes.

16       THE COURT:  And how old are they?

17       PROSPECTIVE JUROR NUMBER 42:  15 years old.

18       THE COURT:  Have you ever served in the military?

19       PROSPECTIVE JUROR NUMBER 42:  No, ma'am.

20       THE COURT:  Have you ever served on a jury before?

21       PROSPECTIVE JUROR NUMBER 42:  No, ma'am.

22       THE COURT:  And your level of education.

23       PROSPECTIVE JUROR NUMBER 42:  Bachelor's.

24       THE COURT:  Thank you, ma'am.

25       THE CLERK:  Juror Number 40, Edward Mosley.

1    THE COURT:  Sir, your full name.

2    PROSPECTIVE JUROR NUMBER 40:  Edward Eugene Mosley, Jr.

3    THE COURT:  And where do you live?

4    PROSPECTIVE JUROR NUMBER 40:  I live in Ludowici,

5  Georgia.

6    THE COURT:  How long?

7    PROSPECTIVE JUROR NUMBER 40:  About 11 years.

8    THE COURT:  What is your occupation?

9    PROSPECTIVE JUROR NUMBER 40:  I'm a highway assistant I

10  guess is the best description.

11    THE COURT:  Are you married?

12    PROSPECTIVE JUROR NUMBER 40:  Yes.

13    THE COURT:  And what does your spouse do?

14    PROSPECTIVE JUROR NUMBER 40:  Currently she doesn't do

15  anything.

16    THE COURT:  She might take issue with that, but ...

17    PROSPECTIVE JUROR NUMBER 40:  Homemaker I guess would

18  be --

19    THE COURT:  Did she ever work outside the home?

20    PROSPECTIVE JUROR NUMBER 40:  Yes.  She worked as a

21  chef.

22    THE COURT:  Do you have children?

23    PROSPECTIVE JUROR NUMBER 40:  Three, 40 years old, 38

24  and 36.

25    THE COURT:  And what are their occupations?

130

1           PROSPECTIVE JUROR NUMBER 40:  Contractor, diesel

2     mechanic and medical transcriptionist.

3           THE COURT:  Have you ever served in the military?

4           PROSPECTIVE JUROR NUMBER 40:  Yes.

5           THE COURT:  And remind us your branch.

6           PROSPECTIVE JUROR NUMBER 40:  Army.

7           THE COURT:  Have you ever served on a jury before?

8           PROSPECTIVE JUROR NUMBER 40:  Yes, two.

9           THE COURT:  In each case without telling us what the

10    verdict was, was a verdict reached?

11          PROSPECTIVE JUROR NUMBER 40:  A verdict was reached in

12    one but not the other.

13          THE COURT:  All right, and your level of education.

14          PROSPECTIVE JUROR NUMBER 40:  Two bachelor's degrees.

15          THE COURT:  And what were each in?

16          PROSPECTIVE JUROR NUMBER 40:  What's that?

17          THE COURT:  You have two degrees.

18          PROSPECTIVE JUROR NUMBER 40:  Oh, one in theology,

19    bachelor's degree in theology.  The other, a bachelor of science

20    of information technology.

21          THE COURT:  Thank you, sir.

22          THE CLERK:  Juror Number 1, John Adams.

23          THE COURT:  Sir, your full name.

24          PROSPECTIVE JUROR NUMBER 1:  It's John Michael Adams.

25          THE COURT:  Where do you live?

131

1          PROSPECTIVE JUROR NUMBER 1:  Brunswick, Georgia.

2          THE COURT:  How long?

3          PROSPECTIVE JUROR NUMBER 1:  55 years.

4          THE COURT:  What is your occupation?

5          PROSPECTIVE JUROR NUMBER 1:  Low voltage technician.

6          THE COURT:  Are you married?

7          PROSPECTIVE JUROR NUMBER 1:  Divorced.

8          THE COURT:  What does your former wife do?

9          PROSPECTIVE JUROR NUMBER 1:  Retail.

10         THE COURT:  Do you have children?

11         PROSPECTIVE JUROR NUMBER 1:  Yes, 30 and 28.

12         THE COURT:  What do they do?

13         PROSPECTIVE JUROR NUMBER 1:  One does retail.  The other

14  nothing.

15         THE COURT:  Have you ever served in the military?

16         PROSPECTIVE JUROR NUMBER 1:  No.

17         THE COURT:  Have you ever served on a jury before?

18         PROSPECTIVE JUROR NUMBER 1:  Yes.

19         THE COURT:  And without telling us what the verdict was,

20  was a verdict reached?

21         PROSPECTIVE JUROR NUMBER 1:  Yes.

22         THE COURT:  And your level of education.

23         PROSPECTIVE JUROR NUMBER 1:  High school.

24         THE COURT:  Thank you, sir.

25         Counsel, if you will come to sidebar briefly.

1          (The following occurred at sidebar.)

2          THE COURT:  Any other questions that you would like me

3     to ask either individually or the panel as a whole?

4          MR. HOWARD:  There's a followup question and this deals

5     specifically with Juror Number 11.  He indicated that his

6     daughter worked for a shed and shelter company.  I would just

7     like to get some clarification on what that is.  It's not clear

8     to me what that company is, sheds and shelters people?

9          THE COURT:  Or like a storage company?  Mr. Phillips,

10    anything?

11         (The following occurred in open court.)

12         THE COURT:  Just a very brief followup.  One of the

13    attorneys wanted me to ask, Juror Number 11, stand, and you had

14    let us know that I believe it's one of your children works at a

15    shed and shelter company, and they wanted to know exactly what

16    that is, Mr. Burnside.  What does that mean, a shed and shelter

17    company?

18         PROSPECTIVE JUROR NUMBER 11:  Like I said, they sell

19    sheds and carport shelters.  She's just a secretary there.

20         THE COURT:  I see.  So like you see these additional

21    areas that people have brought into their yard or something?

22         PROSPECTIVE JUROR NUMBER 11:  And they will put a

23    carport over or a shed.  She works for a company like that in

24    Jesup.

25         THE COURT:  All right, thank you.

1          Counsel, it's time to begin the selection process.  So,

2    marshal, if you will assist them.

3          Ladies and gentlemen as the parties complete the strike

4    process, I will go ahead and for the benefit of those of you who

5    are selected to serve just give you a preview of what you can

6    expect as far as logistics go.

7          We begin each trial day promptly at 9:00 a.m. and we go

8    until mid-morning, 10:15 or 10:30, take a brief 15-minute

9    comfort break and return to the courtroom and go until noon.

10         We break for about an hour for lunch.  You're free to

11   leave the courthouse, go wherever you want for lunch and then

12   return at 1:00 approximately and go until mid-afternoon, take a

13   brief comfort break and come back and resume.  We end each court

14   day at approximately five o'clock, 5:30, depending on where we

15   are in the natural break of a witness.

16         From time to time, those of you who are selected to

17   serve might encounter the parties or the attorneys in the

18   parking lot or on the elevator.  They won't speak to you.  It's

19   not because they are being rude.  It's just because I instruct

20   them not to speak to you.  We want to make sure that everybody

21   outside the courtroom knows what we know in it, and that is that

22   the rules of law will be applied.  We're going to follow all the

23   rules and we don't want anyone to get the wrong idea.  If they

24   were to see you talking to an attorney, even though it was just

25   about the weather or some sports event or something, they might

1    get the wrong idea, and so please don't think they are rude by

2    not talking to you.  It's just that I ask them to do that.

3        Those of you who are selected to serve, once we get

4    everyone situated and in place, we will take a brief break and

5    the marshal will take you back to your jury room.  There's

6    restrooms there and snacks and drinks.  We will break just for a

7    little bit and then come back, and then when we do come back, I

8    will begin by giving you preliminary instructions for your

9    behavior and for you to appreciate the course of the trial and

10   so forth, what's going on and when things will happen.  After

11   the preliminary instructions to the jury, I'm going to call on

12   the lawyers to make opening statements and then we will head

13   straight into the first witness, and we will no doubt reach the

14   first witness before the end of the day today.

15       THE CLERK:  Ladies and gentlemen, if you are seated

16   within the jury box, if you will just move to the back of the

17   courtroom.  You may sit or stand.

18       And ladies and gentlemen, as your name is called, please

19   come forward and have a seat in the jury box where the CSO

20   directs you.

21       Juror Number 53, Rebecca Smith.  Juror Number 13,

22   Gregory Carter.  Juror Number 59, Serena Vespini.  Juror Number

23   35, Kathy Maynor.  Juror Number 50, Max Rogers.  Juror Number

24   33, Krista Longbottom.  Juror Number 5, Roxanne Blakely.  Juror

25   Number 21, Shelby Eason.  Juror Number 4, Heather Beaston.

1   Juror Number 43, Kim Pope.   Juror Number 3, Rhonda Aviles.

2   Juror Number 34, Rosalind Lopez.   Juror Number 47, Douglas

3   Richard.   Juror Number 42, Alissa Phillips.

4        THE COURT:   Ladies and gentlemen, you have been selected

5   to serve as the jurors in the case of the United States of

6   America versus Perez-Bravo.

7        In just a few minutes, the marshal will escort you back

8   to your jury room for a brief break.  As I mentioned, you will

9   find snacks and restrooms and drinks in there.  Recall that

10  during this and every break you're not talk about the case with

11  each other.  You can talk about the weather and about sports but

12  just not about the case, not until the very end.  Remember,

13  don't make up your mind during this break.

14        When you return, Ms. Sharp may slightly alter where

15  you're seated, and once your seat is situated, then you will

16  remain in that seat for trial, and when you return, as I say, we

17  will begin with my preliminary instructions to you and then we

18  will hear opening statements from the attorneys and launch into

19  our first witness.

20        As for those jurors here whose names were not called to

21  go to the jury box, in just a moment when we break, I can excuse

22  you and I can excuse you with the sincere thanks of The Court

23  because you showed up timely and ready to serve.  This counts as

24  your federal jury service.  That means you will not called back

25  to federal court for at least two years.

1           Now, the state court is a different matter, it's a

2     different sovereign.  You may be called back there, but this

3     counts as your federal jury service.

4           Counsel, does this appear to be the jury as selected by

5     the attorneys?

6           MS. GROOVER:  Yes, Your Honor.

7           MR. PHILLIPS:  It does, Your Honor.

8           THE COURT:  Is there any reason it was not fairly and

9     impartially selected?

10          MS. GROOVER:  No, Your Honor.

11          MR. PHILLIPS:  No, ma'am.

12          THE COURT:  Then let's rise for this jury.  We will be

13     in recess until 3:15.

14          (The jury exits the courtroom.)

15          THE COURT:  All right counsel, 3:15.

16          (Recess from 2:58 p.m. to 3:26 p.m.)

17          THE COURT:  Let's bring in the jury.

18          (The jury enters the courtroom.)

19          THE COURT:  Members of the jury, if I could ask you to

20     remain standing, and Ms. Sharp, if you will administer the oath.

21          (Jury panel sworn.)

22          THE CLERK:  Thank you.

23          THE COURT:  Please have a seat.

24          Members of the jury, now that you've been sworn, I'm

25     going to give you some preliminary instructions that will guide

1    your participation in the trial.  At the end of the trial, I

2    will give you more detailed instructions.

3            It's going to be your duty to find from the evidence

4    what the facts are.  You and you alone are the judges of the

5    facts.  You will then apply those facts to the law as I give it

6    to you at the end of the case, and you must follow that law

7    whether you agree with it or not.

8            It's going to be your duty to decide what happened so

9    you can determine whether the defendant is guilty or not guilty

10    of the crime charged in the indictment.

11            Nothing I say or do during the course of the trial is

12    intended to indicate or should be taken by you as indicating

13    what your verdict should be.

14            Now the evidence from which you will find the facts will

15    consist of the testimony of witnesses.  It will consist of

16    documents and other things that are received into the record as

17    exhibits and any facts that the lawyers agree or stipulate to or

18    that The Court may instruct you to find.

19            As I've mentioned, the court reporter is making a

20    complete stenographic record of all that is said during the

21    course of the trial including the testimony of all of the

22    witnesses in case it should become necessary at a future date to

23    prepare a printed transcript of the proceedings.

24            Such transcripts however, if prepared at all, will not

25    be available in sufficient time nor sufficient format for you to

1    utilize during your consideration of the case, so you should not

2    expect to receive transcripts.

3         You will be required to rely upon your own individual

4    and collective memory concerning what the testimony was.  On the

5    other hand, any papers or other tangible exhibits that are

6    admitted into evidence during the course of the trial will be

7    available for you to study during your deliberations.

8         Those will be brought back to you in your jury room

9    during your deliberations.  As we go along during the trial, on

10   some occasions some of the exhibits will be put up on the large

11   screen for you or on your individual computer screens there in

12   the jury box or passed to you to handle on some occasions.

13   Don't be concerned if you don't see them all or hold them all

14   because, like I said, you will receive them in the jury room to

15   have during your deliberations.

16        Certain things are not evidence and must not be

17   considered by you in reaching your verdict.  I will go ahead and

18   list those for you.

19        First of all, statements, arguments, questions by the

20   lawyers are not evidence.  Second, objections to questions are

21   not evidence.  You see, lawyers have an obligation to their

22   client to make objections if they feel that evidence is being

23   offered for an improper purpose or against the Federal Rules of

24   Evidence.

25        They may from time to time make the objection.  Don't be

139

influenced by the objection itself.  If the objection is
sustained, just ignore the question, and we're going to move on
to a different one.  If the objection is overruled, then you
will treat the answer just like any other one.  We will hear the
answer and continue.

Now, if during the course of the trial, you're ever
instructed by me that some item of evidence is to be considered
by you for a limited purpose only, it's important that you
follow that instruction and consider that item or piece of
evidence only for that limited purpose that I give to you.

Obviously, testimony that I exclude or tell you to
disregard is not evidence and can't form the basis of your
deliberations or verdict.

Also, as you've already heard, anything that you may
have heard or learned outside the courtroom is not evidence.  It
must be disregarded.  You're to decide the case solely on the
evidence presented here in the courtroom.

During the course of the trial, I might occasionally ask
a question of a witness.  If I do, that doesn't indicate that I
have an opinion about that witness or about any fact in the
case.  Indeed, nothing I say or do should lead you to believe
that I have any opinion about the facts, nor should it be taken
by you as indicating what your verdict should be.  That's for
you alone to decide your verdict.

Occasionally, I might have to briefly interrupt the

1    proceedings to meet with the lawyers briefly over here, what we

2    call sidebar, to confer with them about the rules of law that

3    apply.

4            We've prepared, as I said, as much as possible to cut

5    down on those.  They still occasionally occur.  If at any time I

6    feel like they may be a long time there, then I will have you

7    placed back in the jury room, somewhere more comfortable.  We

8    don't anticipate that, but in case that happens, I will have you

9    put somewhere more comfortable.

10           Now, those of you who have watched TV and read books and

11   so forth know there are two kinds of evidence.  There's direct

12   evidence and there's circumstantial evidence.  Direct evidence

13   is direct proof of a fact, like an eyewitness.  Circumstantial

14   evidence is proof of facts from which you may infer or conclude

15   that other facts exist, and I will give you further instructions

16   on that at the end, but for now, I want you to keep in mind that

17   you may consider both kinds of evidence.  Both direct and

18   circumstantial are appropriate for you to consider.

19           It's going to be up to you to decide which witnesses to

20   believe, which witnesses not to believe and how much of any

21   witness' testimony to accept or reject, and I will give you

22   guidelines at the end for determining the credibility of

23   witnesses.

24           As you've heard, this is a criminal case.  There are

25   three basic rules about a criminal case that you must keep in

141

1    mind.

2          First of all, the defendant is presumed innocent until

3    proven guilty.  The indictment brought by the Government against

4    the defendant is only an accusation, nothing more.  It's not

5    proof of guilt or anything else.  The defendant therefore starts

6    out with a clean slate.  Second, the burden of proof is on the

7    Government until the very end of the case.  The defendant has no

8    burden to prove his own innocence or to present any evidence or

9    to testify.

10          Since the defendant has the right to remain silent and

11   may choose whether to testify, you cannot legally put any weight

12   on a defendant's choice not to testify.  It's not evidence.

13          Third, the Government must prove the defendant's guilt

14   beyond a reasonable doubt, and I will give you further

15   instructions on that later but keep in mind that the level of

16   proof required by the Government is high.

17          Now in this case, the defendant is charged with

18   conspiracy to commit murder for hire in violation of a federal

19   statute 18 USC Section 1958(a).  It's identified in the

20   indictment as Count 8.

21          I will give you detailed instructions on the law at the

22   end of the case and those instructions will control your

23   deliberations and decisions, but in order to help you follow the

24   evidence that you're going to hear in the trial, I want to give

25   you a summary of the elements of the offense that the Government

1    must prove to make its case.

2         So a defendant can be found guilty of conspiracy to

3    commit murder for hire only if all of the following facts are

4    proved beyond a reasonable doubt.  First, that two or more

5    persons conspired and agreed to achieve the unlawful purpose of

6    murder for hire.  A murder for hire occurs when someone uses or

7    causes another to use any facility of interstate commerce with

8    the intent that a murder be committed in violation of a State's

9    law and as consideration for the receipt of or as consideration

10   for a promise or an agreement to pay anything of pecuniary

11   value.  Second, that the defendant knew of the agreement, and

12   finally that the defendant intentionally joined the conspiracy.

13        Please understand that the defendant is on trial only

14   for the specific crime charged against him in the indictment,

15   that is, Count 8, conspiracy to commit murder for hire.  You're

16   here to determine from the evidence in this case whether this

17   defendant is guilty or not guilty of that one specific crime.

18        You must never consider punishment in any way to decide

19   whether the defendant is guilty or not guilty.  If you find the

20   defendant is guilty, the punishment is for me alone to decide

21   later.

22        You will also notice as we go along that some of the

23   people alleged to be involved in these events are not on trial

24   here this week.  That does not matter.  There is no requirement

25   that all members of an alleged conspiracy be tried together in

1    one single trial.

2         Now a few words about your conduct as jurors.  First, I

3    instruct you that during the trial you're not to discuss the

4    case with anyone or permit anyone to discuss it with you.  That

5    is, even among yourselves, don't discuss the case.  Instead talk

6    about baseball, talk about holidays, talk about anything, just

7    not the case.  Until you retire to your jury room at the very

8    end of the case to deliberate and reach a verdict, you simply

9    aren't to talk about the case.

10        When I say you're not permitted to talk about it, that

11   also means nothing on social media or any type of electronic, no

12   Facebook, Twitter, Snapchat, Instagram, anything of that sort,

13   and when we break tonight and you see other people not involved

14   in the case and they ask you what it's about, recall I instruct

15   you to say only it's a criminal case; we expect it to wrap up

16   sometime around Friday; and once it's over you can tell them all

17   about it.

18        Second, don't read or listen, watch, research anything

19   touching on the case in any way in any form of media.

20        Third, don't do any independent research about the case,

21   not the old-fashioned kind by driving out somewhere, not the

22   more modern way by Googling people or terms or witnesses,

23   anything of that nature.

24        Finally don't form an opinion.  Don't make up your mind.

25   Keep an open mind throughout the entire trial.  Our law requires

1    jurors to follow those instructions.  They are very important

2    and it is a foundation to help ensure a just and fair trial.

3          It's so important I want to tell you why we require

4    those things.  Our law doesn't permit jurors to talk with anyone

5    else about the case or permit others to talk to you about it

6    because only you are authorized to reach a verdict.  Only you

7    have been found to be fair.  Only you have taken an oath to be

8    fair.  No one else is so qualified.

9          Our law also does not permit jurors to talk among

10   themselves about the case because premature discussions could

11   lead to premature decisions and that would be unfair to all

12   concerned.

13         Our law doesn't permit you to, for example, visit a

14   place discussed in the testimony.  First, you can't be sure it's

15   in the same condition as it was at the relevant time.

16         Second, once you go to a place, you almost become a

17   witness yourself.  You may have a mistaken view of the scene and

18   neither party may have a chance to correct that mistaken view.

19   It's simply not fair.

20         Finally our law requests and demands that you not read

21   or listen to any news account of the case and you not do any

22   research on any fact or term or law or person because, again,

23   the only fair thing to do is to base your verdict on the

24   evidence that's brought here in the courtroom through the prism

25   of the rules of evidence of which the attorneys know that you're

1    considering.

2         You see, the law often uses words or phrases in very

3    particular special ways, and as you know, if you just get on the

4    Internet and start Googling, you can find almost anything and

5    whether it has any ground in the truth may not be, so the

6    lawyers are counting on you to use the appropriate terms in the

7    appropriate ways.

8         These rules are designed to help guarantee a fair trial,

9    and as I say, our law sets forth serious consequences if they

10   are not followed, and I trust that each of you understand that

11   and will follow the rules.

12        Now, as we go along, if you wish you may take notes to

13   help you remember what witnesses said and what the exhibits

14   were.  If you do take notes, please keep them to yourself until

15   you and your fellow jurors go to the jury room to decide the

16   case.  Don't let note-taking distract you so that you don't

17   appreciate the case as it actually happens.

18        When you leave the courtroom and leave your jury room at

19   night, leave your notes in the jury room.  The marshal will

20   secure them.

21        Whether or not you take notes, you should rely on your

22   own memory of what was said and what happened.  You see, notes

23   are there to assist your memory only.  They are not entitled to

24   any greater weight than your memory or recollection about the

25   testimony, and by all means, don't allow someone else to take

1    notes for you.  You see, we rely on the collective wisdom of all

2    of you, and to get that, everyone must remain alert.

3          So in just a moment, the trial will begin.  The

4    Government will make an opening statement, which is simply an

5    outline of what they believe the evidence will show.

6          Next, the defense attorney may but does not have to make

7    an opening statement.  Remember that opening statements are

8    neither evidence nor argument.  They are just designed to give

9    you a road map of what each side thinks the case will show.

10          After opening statements, the Government will present

11    their witnesses one at a time.  They will conduct a direct

12    examination of each.  After each direct examination, the Defense

13    will be given the opportunity to cross-examine the Government's

14    witness and then I allow brief redirect on the part of the

15    Government of their witnesses.

16          Following the Government's case, the defendant may if he

17    wishes but does not have to present witnesses.  The defense

18    attorney will do a direct examination of those.  The Government

19    can cross-examine those, and then I will allow brief redirect by

20    the Defense of any witnesses that they call.

21          After all the evidence is in, the attorneys will present

22    their closing arguments to you in which they summarize and

23    interpret the evidence as they see it for you.  Then I will

24    instruct you on the law, and at that point, you will retire to

25    your jury room to discuss the case and reach a verdict.

1          Counsel, I am going to invoke the rule of sequestration.

2     Are there some witnesses present now?

3          MS. GROOVER:  The only witness present is the first

4     witness that we previously discussed, Your Honor.

5          THE COURT:  And we will swear her in when you call her.

6     But I am invoking a rule which requires every witness except for

7     the case agent, the parties and the victims to be outside the

8     courtroom until they are called to the stand.

9          Indeed, until they are called to the stand they are not

10    to discuss the case with anyone.  They may discuss it with

11    attorneys for either side but not in the earshot or presence of

12    other witnesses.  Failure to follow the rule can result not only

13    in the exclusion of that witness but in a contempt-of-court

14    finding, and I charge each attorney with communicating that The

15    Court has invoked that rule of sequestration to each of your

16    witnesses.

17         With that, let me call on the United States for opening

18    statements, Mr. Howard.

19         MR. HOWARD:  Thank you, Your Honor.

20         Eliud Montoya was a United States citizen who was

21    murdered because he had the courage to speak out.  He saw his

22    colleagues being mistreated.  So instead of ignoring it, instead

23    of looking the other way, he spoke up.

24         He went to his company to complain.  He went to a

25    federal agency to complain.  He blew the whistle on a

1  multi-million dollar scheme of hiring and mistreating illegal

2  aliens.

3          And for that, this man, Eliud Montoya, was silenced,

4  shot through the mouth, silenced with bullet after bullet.  You

5  will hear how three men worked together in the planned,

6  calculated, coordinated assassination of Eliud Montoya.

7          Three men are responsible for his murder.  You will hear

8  about each of those three men, and you will decide the guilt of

9  one of them, the defendant, Higinio Perez-Bravo, who sits in

10  this courtroom today.

11          And you will hear about the other two men, Pablo

12  Rangel-Rubio and his brother, Juan Rangel-Rubio.  The

13  Rangel-Rubio brothers will have their fate decided in a

14  courtroom on a different date.  Each of those three men, working

15  together, had a role to play.

16          So let's talk about those three men.  You will hear that

17  Pablo was the one with the money.  His brother was the trigger

18  man, the one who fired bullet after bullet into Eliud Montoya,

19  and the defendant, the defendant was the get-away driver.

20          The defendant was the one who lent his vehicles to the

21  Rangel-Rubio brothers so they could search for Mr. Montoya, to

22  find him and to kill him and later the defendant himself drove

23  his vehicles to conduct surveillance of the victim.  And he did

24  all of that knowing that the Rangel-Rubio brothers intended to

25  eliminate, to kill Eliud Montoya, whom you will hear that Pablo

1    referred to as the problem employee.

2        And why?  Why did the defendant join in this partnership

3    in crime?  Money.  In this case, the evidence will show how

4    Eliud Montoya died.  It will show why he was murdered and it

5    will show the roles played by each of those three men

6    responsible.

7        So let's begin with how he died, and to do that, we will

8    start where Eliud Montoya's life ended.  Eliud Montoya's last

9    day on earth was August 19th, 2017.  It was a Saturday.  And

10   like most August days in south Georgia, it was pretty darn hot

11   already by midday.

12       Mr. Montoya lives in a mobile home with his wife and his

13   daughters.  The mobile home park where they lived had homes that

14   were close together, and there was just one long road, Village

15   Drive.  It was the only road in and out of that mobile home

16   park.

17       And you will hear that around 11:34 that morning, a

18   neighbor of Mr. Montoya's saw Mr. Montoya outside of his home at

19   59 Village Drive.  That's where Mr. Montoya lived.

20       And Mr. Montoya got into his car.  He drove down Village

21   Drive and he turned left onto Old Dean Forest Road.  There he

22   had his work truck parked.  It was a large tree service work

23   truck.  It was too large to park it next to his mobile home, so

24   he parked it in that quiet secluded road next to a wooded area.

25   It was a quiet place for him to keep that truck.

1        Mr. Montoya got out of his car and he went and he worked

2   on that truck.  The truck was, as usual, broken down.  He had a

3   lot of problems with that truck, and Mr. Montoya could often be

4   found out on that quiet road working on that truck.

5        And that's where he died, alone, unarmed on a quiet

6   secluded road with no one to help him, standing next to his work

7   truck.  It was the perfect place to commit a murder.

8        You see, Eliud Montoya was being watched.  He was being

9   watched that day, the day before, and even before that.  There's

10  no way that Eliud Montoya could have known that the defendant,

11  someone who he is unlikely to have ever met, had conducted

12  surveillance on him along with Juan Rangel-Rubio.

13       There is no way that Mr. Montoya could have known the

14  day before he died that the defendant and Juan were circling

15  that area near the mobile home park looking for Mr. Montoya,

16  driving in Defendant's vehicles, going back and forth.

17       There is no way that Mr. Montoya could have known that

18  on the day that he died that the defendant and Juan were again

19  circling that mobile home park in Defendant's vehicle, waiting

20  until the right time, waiting until Mr. Montoya got to that

21  quiet secluded road.

22       Then when the time was right, the defendant dropped Juan

23  off at a Pilot gas station that was nearby and you will hear the

24  defendant admit it.

25       Juan got out of Defendant's vehicle and he was carrying

1   a little black bag, a black bag that had a .22-caliber firearm

2   inside that was loaded with hollow point bullets.

3        Juan used that gun.  He used it to silence Eliud

4   Montoya.  He used it to silence that problem employee.  Juan

5   took out that gun and he fired at least five metal-jacketed

6   hollow point bullets that tore through the body of Eliud

7   Montoya, tore through his head.  You will see the bullets.

8        And after the murder, the defendant, acting as the

9   get-away driver, came back, picked up Juan, picked up that

10  murderer and drove him away, away from the crime scene, away

11  from the murder area all before the police could arrive.  That's

12  how Eliud Montoya died.  That's how he was silenced.

13       Let's talk about why he was murdered.  Eliud Montoya

14  spoke out.  He helped those who, because of their immigration

15  status, could not speak for themselves, Eliud Montoya, this

16  United States citizen.  You will hear that he worked for a tree

17  company called Wolf Tree.  It cut and trimmed trees.  It was

18  hard work.

19       In Savannah, that Savannah area, the employees were

20  supervised by none other than Pablo Rangel-Rubio.  Pablo, you

21  will hear, was an illegal alien from Mexico.  He hired and

22  arranged for other illegal aliens to work at Wolf Tree, working

23  under different names, working under the names of United States

24  citizens.

25       Among those who were working illegally was his brother

1    Juan and other family members of Pablo.  This was a very

2    profitable business for Pablo.  You see, he arranged not only to

3    be paid from the company for his own work, but he arranged for

4    all of those who were working illegally, he arranged for their

5    paychecks to come to him, too.

6          This was a scheme that netted him millions and millions

7    of dollars, enough more money to buy more than 26 acres of land

8    where he and his family, including his brother Juan, lived.

9          And those workers, those who were working illegally?

10   Well, you'll hear that they were regularly working 60 or more

11   hours a week, but they didn't get paid overtime, didn't get paid

12   vacation, didn't get paid holidays and sometimes they didn't get

13   fully paid at all because Pablo would pay them in cash or pay

14   them in a check in someone else's name, but who are they going

15   to complain to?  After all, Pablo was their supervisor.  After

16   all, speaking out meant exposing themselves because of their

17   immigration status.  They needed a voice.

18         Eliud Montoya spoke up.  You will hear in April of 2017

19   Mr. Montoya went to the company and he gave them a letter

20   complaining about Pablo Rangel-Rubio, complaining about Pablo's

21   mistreatment of his employees, complaining that Pablo was

22   retaliating against his workers, complaining that Pablo wasn't

23   fully paying his workers, complaining that Pablo was himself an

24   illegal alien hiring other illegal aliens including his own

25   family, and in the letter, Mr. Montoya warned he had already

1    gone to the Department of Labor to raise his complaints.

2         Mr. Montoya didn't submit this letter anonymously.  He

3    didn't try to hide who authored this letter.  The letter begins

4    "My name is Eliud Montoya," and it ends by providing his own

5    phone number.

6         And what does the company do with that letter

7    complaining against their own supervisor?  What does the company

8    do?  It gives that letter to Pablo Rangel-Rubio.  At that

9    moment, at that instant, Pablo is on notice.  He's on notice

10   that Eliud Montoya isn't afraid to speak up.  He's on notice

11   that Eliud Montoya isn't going to back down and he's on notice

12   that Eliud Montoya isn't going away.

13        And even after you will hear Pablo calls a meeting with

14   all of the Savannah area employees, including Mr. Montoya, and

15   even after Pablo has that letter read out loud to the employees

16   in front of Mr. Montoya, and even after Pablo holds the letter

17   up and makes it this clear this letter means nothing, even after

18   all of that, Eliud Montoya would not stop.

19        And that's a problem.  That's a big problem for Pablo

20   and Juan, the Rangel-Rubio brothers.  Think about all they had

21   to lose.  Their jobs, the jobs of their family members, possible

22   deportation for them and their family and losing all of that

23   money they had gained.  That's all they had to lose by Mr.

24   Montoya speaking up.

25        And that explains why the Rangel-Rubio brothers decided

1    to kill Eliud Montoya.  They saw his silence as their solution,

2    and to carry out that solution, they had a couple important

3    things.  Pablo had money.  Juan had a gun and the willingness to

4    use it, but you see, they didn't just want to commit the crime.

5    They wanted to get away with it.  They needed help because there

6    is no use in committing a crime if you are just going to get

7    caught, and after all, when Mr. Montoya would inevitably turn up

8    dead, who would be the first suspects?  The Rangel-Rubio

9    brothers.

10           They had the most to lose by Mr. Montoya speaking out.

11   They had the most to gain by shutting him up.  But you see, they

12   needed help because Pablo's truck, a work truck, had GPS

13   location that tracked the location of his truck, so if Pablo had

14   been at the scene of the murder, that would be easy for law

15   enforcement to find, and Juan, Juan had a large maroon truck,

16   not the type of vehicle, a vehicle that's easily identifiable,

17   not the type of vehicle that you want to be conducting

18   surveillance in a congested mobile home park, so they needed

19   someone who wasn't connected to the company.  They needed

20   someone who could be trusted.  They needed someone who had

21   vehicles that weren't connected to them.  Most of all, they

22   needed someone who could help them commit the crime and get away

23   with it, to create separation between them and the murder.

24           Which brings us to the defendant.  The defendant you

25   will hear did not work for Wolf Tree.  The defendant you will

155

1   hear was an illegal alien from Mexico like Pablo, and like his

2   brother Juan, someone to be trusted.

3       You will hear that the defendant knew Pablo, that he had

4   been to Pablo's house, that he had performed work.  You will

5   hear him describe that he had performed work at Pablo's house.

6   You will see the phone records showing calls between the

7   defendant and the Rangel-Rubio brothers, and importantly,

8   Defendant had two vehicles with out-of-state license plates, a

9   Cadillac Escalade and a white van, vehicles that could not be

10  traced back to the Rangel-Rubio brothers.

11      And you will hear that just days after Mr. Montoya gave

12  that letter to the company complaining about Pablo's

13  mistreatment, just days later, the defendant meets with Pablo.

14  Pablo gives the defendant a check for $6,000.00.  You will see

15  the check.  And what do they discuss?  The problem employee.

16  Eliud Montoya.

17      That discussion was not the only discussion that you

18  will hear about between the defendant and Pablo regarding Eliud

19  Montoya.  You will hear that law enforcement interviewed the

20  defendant and you will hear him admit that Pablo told him about

21  the plan to kill that problem employee.  You will hear him admit

22  that Pablo asked him for his help, that Pablo asked the

23  defendant to "Lend me the cars because I need to locate the guy

24  because we're looking for him to eliminate him."

25      At that moment, when Pablo asked him that, when Pablo

1    came to him with that request, seeking his help, the defendant

2    had a choice.  He could step in to this plan to eliminate this

3    problem employee.  He could take part in it.  He could join this

4    partnership in crime.  Or he could step back and say, "No, I

5    don't want any part of this."

6          The defendant made his choice.  Eliud Montoya is dead

7    because of it.  And why?  Why would the defendant choose to do

8    this?  Why would the defendant join in this plan?  After all,

9    Eliud Montoya didn't blow the whistle on him.  Eliud Montoya

10   didn't do anything to him?  Why?  $20,000.00.

11          $20,000.00 was wired directly from Pablo's bank account

12   into defendant's bank account, 20,000 reasons why, on top of the

13   $6,000.00 that he had already been paid from Pablo in the check.

14   What was the $20,000.00 for?  What was that payment for?

15          You will hear defendant admit to law enforcement not

16   only had Pablo told him about the plan to eliminate that problem

17   employee but Pablo told him the $20,000.00 was for the use of

18   his cars.

19          But this is not a case where the defendant just lent his

20   vehicles to Pablo and Juan and said, "Go do this."  That's not

21   this case.  Defendant did more.  He took an active role in this

22   plan.

23          You will see surveillance video.  You will see phone

24   location information from the day before the murder which will

25   show Juan in Defendant's Cadillac Escalade, which will show

1    defendant in his white van circling that area of the mobile home
2    park going back and forth, looking for Mr. Montoya, but they
3    didn't find him that day, Friday August 18th.
4          So they came back the next day, Saturday, August 19th.
5    And you will see the phone location information.  You will see
6    the surveillance video.  And you will hear about that day, that
7    day of Mr. Montoya's death, where Defendant started by him
8    getting in his van, going to a grocery store to pick up that
9    murderer Juan, picking up Juan and taking him early in the
10   morning where?  Of all places, back to that mobile home park,
11   where Defendant drove Juan circling the area, hour after hour
12   after hour, nearly four hours conducting surveillance, Defendant
13   driving his vehicle with Juan in the vehicle, waiting until the
14   time was right.
15         And then he dropped Juan off at that gas station.
16   Minutes later, after Juan had finished the job, after Juan had
17   finished Juan's job, Juan makes a phone call for Defendant,
18   calls Defendant, who comes back and picks him up.  After Eliud
19   Montoya had breathed his last breath, Defendant is the one who
20   drove his murderer away.
21         Where was Pablo during all of that?  Pablo wasn't there.
22   Pablo was miles and miles away, having separated between him and
23   that murder so that if anybody asked, he had an alibi.  He
24   wasn't there.  But he wanted Mr. Montoya dead and he was willing
25   to pay for it.

1       Each of those three men responsible for Eliud Montoya

2   murder had a role to play, Pablo the money, Juan the trigger man

3   and the defendant conducting surveillance, lending the vehicles

4   and acting as the get-away driver for Juan, the trigger man.

5       As a result of Defendant's choices, as a result of

6   Defendant's actions, he's charged in one count of conspiracy to

7   commit murder for hire.

8       The evidence will show that there was a plan to kill

9   Eliud Montoya.  The defendant knew about that plan to kill that

10  problem employee and the defendant chose to join that plan.

11      He didn't organize it.  He wasn't the mastermind and he

12  wasn't the trigger puller.  That wasn't his role.  But he joined

13  that plan, and he did it for money, which is why at the end of

14  this case, the Government will ask you to find, based on the

15  evidence, following the law that The Court gives you and

16  applying your common sense that the defendant is responsible for

17  his choices, responsible for his actions and that he's guilty of

18  the crime for which he's charged.

19      Thank you.

20      THE COURT:  Mr. Phillips, on behalf of the defendant.

21      MR. PHILLIPS:  Thank you, Your Honor.

22      Not only am I old but my sinuses are kicking up, so I'm

23  sorry.

24      My name is Bobby Phillips.  I'm an attorney from

25  Savannah and I was appointed to represent Mr. Higinio

1    Perez-Bravo and you're going to hear that he's a very simple

2    man, that he's been in country illegally for about 20 years,

3    that he has never had any trouble with the law, that he had for

4    the past eight or ten years worked for Lanier Home Management in

5    Chatham County and he was earning the last three or four of

6    those years up to $50,000.00 a year.

7         Now, during the voir dire you were asked about being

8    active in any group that was concerned with the immigration

9    problem that we have.  We do have an immigration problem, and

10   one of the problems that Mr. Perez-Bravo has, because he is

11   illegal, he can't get a driver's license.  He can't get a social

12   security number legally and he can't pay taxes because of that,

13   and you're going to hear that he hasn't paid taxes, but what

14   you're going to see and what the evidence is going to show that

15   there is -- that you'll get at the end of the trial a 27-page

16   indictment, and the indictment charges Pablo Rangel-Rubio, Juan

17   Rangel-Rubio and my client with a really mass conspiracy to

18   commit murder, well, a smaller conspiracy in terms of the

19   activity but the big conspiracy was what the Rubio brothers were

20   doing, specifically Pablo.

21        Pablo, in the indictment, it will tell you that he

22   netted over a period of time well over two and a half million

23   dollars, that his brother Juan had netted well over $500,000.00

24   and I don't think he gives you the exact periods of time, and

25   they were.

1          The evidence is going to show that they were taking

2    these illegal immigrants who come to Chatham County, and the

3    numbers -- you learn things when you get in the case -- the

4    numbers are really high for the number of immigrants in the

5    state of Georgia.  I think it was like 400,000 that are here

6    illegally, and you're going to hear that these people, when they

7    come, they get together and they live in the same areas.  They

8    mostly live in mobile homes and they have very close communities

9    and they don't do things like the rest of us who are legal do.

10          They do everything within their communities.  Pablo's

11    got a wife here.  They would go -- somehow they found out -- I'm

12    sorry.  Higinio has a wife here, and somehow they found out that

13    Pablo's wife sold chickens up in Effingham.

14          Pablo had used some of this money not too many years

15    before all this happened and the data come out to buy a what he

16    referred to as a compound where he housed a lot of these illegal

17    immigrants who were working for him who were not being paid for

18    their services.  I mean, it was almost like a captured

19    environment.  You come in.  It's like, literally like human

20    trafficking except what you're doing for these Mexicans is

21    you're paying them, working in pretty hard jobs 60 hours a week,

22    and you're paying them a small portion of what they really have

23    earned because they can't complain.  Just like Mr. Howard said,

24    they can't complain.  They have got nobody to complain to.

25          So Pablo has this spread, which my client calls a ranch

161

1    because he's from a poor part of Mexico right on the coast.

2    Chiapas, is that where he's from, Chiapas, and it's a high crime

3    area.

4         Mexico has a lot of crime, and a lot of the people who

5    try to escape that crime and make a better life come here, and

6    that's what Perez-Bravo was doing for the 20 years that he was

7    working until he goes up and he meets the Rangel-Rubio family,

8    and you will hear that he says nice things about Pablo's wife

9    Iris, the woman who was selling chickens to Higinio and his

10   wife.

11        So they get to talking and Pablo is handy.  I told you

12   he was making $50,000.00 a year at Lanier.  He could take a

13   house and he could make it a lot better.  He's a carpenter by

14   trade, a skill he's learned because he's not very well educated.

15   He's not very sophisticated.  He doesn't drive high-priced cars.

16   Every car that he had -- he actually had three at the time --

17   were old cars and he bought them in South Carolina because he

18   knew somebody there that he could buy them from and get a deal,

19   and Chatham County is just right across the river from South

20   Carolina, so it's not unusual for people to go to South Carolina

21   and buy vehicles and bring them back to Chatham County or Glynn

22   County.  You might go to -- Glynn County people might go down to

23   Jacksonville.  So having those tags on the car was not part of a

24   scheme.

25        And what you're going to find out is that Pablo wanted

1   to improve his property in Effingham County, and we're going to

2   show you photographs of the work that my client did and for

3   which he was paid.  He was paid one check for $6500.00, I

4   believe, $6,000.00, but that was on a total $9,500.00 payment.

5   Later on he was given a wire transfer of $20,000.00, but that

6   wire transfer was made on June 6th of 2017.

7        Now the murder -- and by the way, you know, it's most

8   unfortunate.  A lot of the evidence in this case is going to

9   come in without any objection and no contradiction.  We know

10  that Mr. Montoya was murdered.

11       We know that and we believe -- my client believes that

12  it probably was Juan who did it.  And we believe that it was

13  probably Pablo who ordered it, so we're not going to dispute

14  that.

15       But at the same time, my client was -- he's charged with

16  conspiring -- in fact, Mr. Howard said that they made -- they

17  had meetings.  You're not going to find very -- this started

18  back in April when Mr. Montoya began complaining and making

19  those written complaints and contacting the company, but you're

20  not going to hear of any real meetings between my client and the

21  Rangel-Rubio brothers in the early part of their plotting

22  because their plan -- you're going to have to read the

23  indictment to see -- they put these people in houses.  They gave

24  them false social security numbers, fake numbers.

25       I mean, I think Juan said he may have used three

163

1    different social security numbers.  They would apply for taxes.
2    They would get tax returns.  They had a scheme going on, but my
3    client wasn't involved in that.

4         But these guys, Juan and Pablo, particularly Pablo, he's
5    the planner.  He's the schemer.  They were making the money and,
6    yes, they wanted to get rid of Mr. Montoya and probably Juan
7    could not drive that orange truck anywhere.  There is no doubt
8    about that, and Pablo, who went down to the border when all of
9    this took place, I believe, he didn't want to be seen anyway, so
10   Pablo has got a friend.  He's got a worker who does work for him
11   whenever he calls him because that's what he does.  That's what
12   Higinio does.  "If you call me, I will do the work."

13        That's the way he was at Lanier.  That's the way he was
14   with Pablo and so he called him and said, "We want you to build
15   this facility at the ranch and we will pay you."

16        And part of the culture is, because these undocumented
17   workers, they get paid, the workers that he had working for him
18   they're not going to come in here and testify because they are
19   not here anymore.

20        He pays them; they work and they go.  That's what the
21   $20,000.00 was for.  And what you're also going to hear is he
22   made some admissions.  There were two primary investigators, one
23   was -- let's see.  Let me make sure I get the names right.  Tony
24   Miranda was one and there was another one, too, Mr. Rodriguez.

25        I think he's going to be here tomorrow, and they did a

1    number of different interviews with people.  And they got to a

2    point back in late August of 2017 they thought they had solved

3    this murder because they had somebody in a similar situation who

4    had received a large $15,000.00 payment, they thought.  They

5    could transfer, they tracked the money and they were convinced

6    that a man named Iner Lopez -- I don't know if he's coming in to

7    court to testify or not, but you'll hear about him, and they

8    interrogated him and they confronted him with the killing of Mr.

9    Montoya.

10           They were convinced that he did it, and that interview

11   took place on the first time on August the 20th of 2017 and then

12   there was a second interview on August 23rd, 2017 where Agent

13   Snipes and Agent Miranda interviewed him again and ultimately

14   they concluded that he was not the one, but the reason this is

15   important is because then they find out that my client received

16   a wire transfer of $20,000.00, "Aha, we've got him," and they

17   take him in for an interview and they keep him in that interview

18   room for four hours and 41 minutes, four hours and 41 minutes.

19           Now, we've been here -- some of y'all been here longer,

20   but the ones that came here later in the day have been here

21   about four hours and 41 minutes or more, and the initial part of

22   the interview, you're going to hear, he denied everything.

23           And eventually they start force-feeding him and he

24   starts making statements, and you're going to see it's not

25   exactly the way it's been outlined by the prosecution because

1    there was -- Pablo never told him we're going to kill anybody.

2    Juan never told him we're going to kill anybody.

3         They wanted, they probably wanted to use his vehicles

4    and they had a yes man that they could bring in and say, "Look,

5    we have this project that we want you to do," which is what they

6    told him because he had renovated mobile homes for Pablo before,

7    and he was told that there was a mobile home that they wanted

8    remodeled in Savannah Pines and want you to drive around and see

9    what we can do with it.

10         Eventually -- he tried to tell the story to the

11   investigators, but they had the story that they wanted him to

12   tell, and that's what he told at the end after four hours and 41

13   minutes, and I don't know how much of the -- the problem is it

14   was a video interview that the video runs out maybe about 45

15   minutes or so and the rest of it is audio and you're going to

16   see from the live testimony when we have the translations it's

17   very difficult to listen to live translations.  It's even more

18   painful to listen to the audio, but at some point you may have

19   to listen to it.  My client denies that he ever knew that Mr.

20   Montoya was going to be killed.

21         Now they did get him to say that he knew that Pablo had

22   a problem.  He knew that Pablo wanted to eliminate that problem

23   but that's a word that they used, "eliminate," is that yes, he

24   wanted to eliminate the problem and there are a lot of ways to

25   eliminate a problem.

1    My client never believed that they were going to kill

2  him, to kill Montoya.  He never believed that Juan had asked him

3  for a ride to take him over to Savannah Pines to kill Montoya,

4  and this is where your job, you've got to evaluate this

5  evidence.

6    You've got to listen to all the witnesses and you've got

7  to consider the level of understanding, their sophistication,

8  and that's a heavy burden.  And I really appreciate you doing

9  it.  And I just ask you to render a fair judgment once you've

10  heard the evidence.

11    Thank you very much.

12    THE COURT:  On behalf of the United States, call your

13  first witness.

14    MS. GROOVER:  Thank you.  The United States calls Maria

15  Montoya to the stand.

16    THE COURT:  Ms. Groover, is this a witness with whom

17  we're going to be utilizing an interpreter?

18    MS. GROOVER:  Yes, Your Honor, please.

19    MR. PHILLIPS:  May we approach, Your Honor?

20    THE COURT:  Yes.

21    (The following occurred at sidebar.)

22    MR. PHILLIPS:  I'm not the tallest person in the room

23  and that dadgum podium has got my --

24    THE COURT:  I thought you had obtained permission from

25  the courtroom deputy to move it to sit anywhere you need to.

167

1        MR. PHILLIPS:  Nobody told me.

2        THE COURT:  Oh, absolutely.  You sit anywhere you want

3   to.

4        (The following occurred in open court.)

5        THE COURT:  Ms. Sharp, go ahead and swear the witness

6   in.

7                        MARIA MONTOYA,

8   having been first duly sworn, was examined and testified

9   through the interpreter as follows:

10       THE CLERK:  Thank you.  You may be seated and if you

11  will please state your full name.

12       THE WITNESS:  My name is Maria Montoya.

13       THE COURT:  And Ms. Groover, before you begin, ladies

14  and gentlemen, we seek a fair trial for all concerned and a fair

15  presentation of the evidence regardless of what language a

16  particular witness speaks.  We're going to have an interpreter

17  assist us, and I want you to know in the beginning what the role

18  of the interpreter is.

19       Basically the interpreter is here only to help us

20  communicate.  The interpreters are not parties to the

21  proceeding.  They are neutral and are not working for either

22  side.  Treat the interpreter of the witness' testimony as if the

23  witness had spoken English directly to you.  Don't allow the

24  fact that testimony is given in a language other than English to

25  influence you in any way.

168

1        MR. PHILLIPS:  My client is not able to hear.  They have

2   turned off his --

3        THE COURT:  Where is the --

4        MR. PHILLIPS:  They can't hear.

5        THE COURT:  -- other interpreter?

6        MR. PHILLIPS:  They said the gallery can't hear either,

7   Judge.

8        THE COURT:  We need to have one person to translate --

9        INTERPRETER GIERSBERG:  One interpreter will interpret

10  for the witness and then the second interpreter will into the

11  transmitter for them to hear.

12       THE COURT:  Yes, for the defendant and for the gallery.

13       INTERPRETER GIERSBERG:  Yes, we will do that.

14       THE COURT:  Don't be influenced by the fact that an

15  interpreter is being used in your assessment of the evidence.

16  If any of you understand the native language of the witness,

17  disregard your interpretation and consider as evidence only what

18  is provided by the interpreter in English.

19       If you think the interpreter has made a mistake bring it

20  to my attention but you should make your deliberations on the

21  basis of the official interpretation.

22       With that Ms. Groover, you may proceed.

23                        DIRECT EXAMINATION

24  BY MS. GROOVER:

25  Q.   Thank you, Your Honor.

169

1           Good afternoon, Ms. Montoya.

2    A.     Good afternoon.

3    Q.     Tough day today?  Is it a tough day today?

4    A.     Yes.

5    Q.     Is Spanish your first language?

6    A.     Yes.

7    Q.     Do you also speak a little bit of English?

8    A.     Yes, a little bit.

9    Q.     Are you more comfortable proceeding in Spanish today with

10   the assistance of an interpreter?

11   A.     Yes.

12   Q.     Are you originally from Mexico, ma'am?

13   A.     Yes, I am from Mexico.

14   Q.     Were you born in Mexico?

15   A.     Yes, I was born in Mexico.

16   Q.     Are you a citizen of the country of Mexico?

17   A.     Yes.

18   Q.     And did you live in Mexico until approximately 2001 when

19   you came to America?

20   A.     That's correct.

21   Q.     And in 2001, did you have an opportunity to come to the

22   United States and enter on a work visa and allowed to lawfully

23   work in the United States?

24   A.     Yes.

25   Q.     And in 2010, did you become a permanent resident of the

170

1   United States of America?

2   A.    Yes, that's the way it was.

3   Q.    Is that also referred to as a green card?

4   A.    Yes.

5   Q.    And that green card or your permanent resident card, does

6   that allow you to permanently live in the United States and live

7   and work?

8   A.    Yes.

9   Q.    And where do you live at right now?

10  A.    Right now, I'm living in the 59 Village Drive, Garden

11  City, Georgia.

12  Q.    Is that also part of the Savannah Pines Mobile Home Park?

13  A.    Yes.

14  Q.    Is Garden City just slightly west of Savannah as you're

15  driving on I-16?

16  A.    Yes.  Yes, we take the Exit 116 the direction of Dean

17  Forest.

18  Q.    And were you living at 59 Village Drive back in 2017?

19  A.    Yes.

20  Q.    And can you just describe Savannah Pines Mobile Home Park.

21  Is it many trailers together in the neighborhood?

22  A.    Yes.  It's a parking place with a lot, very large.

23  Q.    And who all lives with you now?

24  A.    My two daughters and my mother-in-law.

25  Q.    Your daughters, is that Jaquelin and April?

171

1   A.    Yes.

2   Q.    And your mother-in-law, what's her name?

3   A.    Adelina Arcos.

4   Q.    And where was Jaquelin born?

5   A.    She was born in Mexico.

6   Q.    And where was April born?

7   A.    April was born here in Savannah.

8   Q.    Are you married, ma'am?

9   A.    Yes.

10  Q.    Who are you married to?

11  A.    With Eliud Montoya.

12  Q.    And was he killed on August the 19th of 2017?

13  A.    Yes.

14        MS. GROOVER:  Your Honor, I would like to bring up

15  Exhibit 2 for the witness, please.

16        THE CLERK:  Hold on just a moment, please.

17        MS. GROOVER:  Your Honor, at this time the United States

18  would move for the admission of its Exhibits 1 through 86.

19  Prior to today we have conferred with defense counsel and traded

20  exhibits and it's the Government's understanding there is no

21  objection.

22        THE COURT:  Any objection to the admission of

23  Government's Exhibits 1 through 86?

24        MR. PHILLIPS:  No, ma'am.

25        THE COURT:  Admitted without objection.

172

1      MS. GROOVER:  Permission to publish Exhibit 2 to the

2  jury, please.

3      THE COURT:  Proceed.

4      MS. GROOVER:  On your screen you should have a

5  photograph.

6      THE COURT:  Not just yet.

7      MS. GROOVER:  Your Honor, may I approach the witness?

8      THE COURT:  You may.

9  Q.    (By Ms. Groover)  I'm handing you what's been marked as

10 Exhibit 2.  Can you please take a look at Exhibit 2 and tell me

11 if you recognize that?

12 A.    Yes.

13 Q.    What do you recognize that to be a photograph of?

14 A.    It's my husband.

15 Q.    And Page 2 of Exhibit 2, who is depicted on Page 2?

16 A.    My husband.

17 Q.    And on Page 3, who is depicted on Page 3?

18 A.    My husband.

19 Q.    Is that a picture of him at work?

20 A.    Yes.

21 Q.    And on Page 4 of Exhibit 2, who are depicted on Page 4?

22 A.    My husband with his daughters.

23 Q.    Is that Jaquelin and April?

24 A.    Yes.

25 Q.    Was your husband born in Mexico?

1  A.    Yes.

2  Q.    And in 2009, did Mr. Montoya become a naturalized United

3  States citizen?

4  A.    Yes.

5        MS. GROOVER:  Your Honor, may I approach the witness?

6        THE COURT:  You may.

7  Q.    (By Ms. Groover)  I'm handing you what's been marked as

8  Government Exhibit 3.  Take a look at that, please, and tell me

9  if you recognize Exhibit 3.

10  A.    Yes.

11        MS. GROOVER:  Your Honor, may I inquire if the jurors

12  are able to see yet.

13        THE COURT:  I don't believe they are.  I don't believe

14  the feed is going through.  We do have our IT people who are

15  coming down to help if you want to continue publishing or

16  reviewing it with the witness, and as soon as they get that

17  fixed, you can publish it to the jury.

18        MS. GROOVER:  Thank you, Your Honor.  I appreciate that.

19        THE COURT:  Yes.

20  Q.    (By Ms. Groover)  Is Exhibit 3 the naturalized United

21  States certificate granting Mr. Montoya his citizenship of the

22  United States?

23  A.    Yes.

24  Q.    And at the time of his death, he had two minor children;

25  is that right?

174

1   A.    Yes.

2   Q.    You mentioned Jaquelin and April; correct?

3   A.    That's right.

4   Q.    In approximately 2016, did your husband petition from the

5   State of Georgia and obtain an order granting his paternity of

6   Jaquelin?

7   A.    Yes.

8   Q.    And so he assisted in his daughter Jaquelin becoming a

9   naturalized United States citizen?

10  A.    That's right.

11  Q.    How old was Jaquelin when her father died?

12  A.    She was 16.

13  Q.    And how old was April when her father died?

14  A.    Ten years.

15  Q.    What type of work did your husband do before he died?

16  What did he do for a living?

17  A.    They would cut trees.

18  Q.    Did he work for Wolf Tree?

19  A.    Yes.

20  Q.    Was he a driver and also a foreman of a crew for Wolf

21  Tree?

22  A.    Yes.

23  Q.    Did he also operate a bucket up in a tree truck to help

24  trim the trees around power lines?

25  A.    That's right.

175

1    Q.    And did he start working at Wolf Tree in about 2006?

2    A.    More or less.

3    Q.    And did he work there until he was killed?

4    A.    Yes.

5    Q.    Did he have a side business of his own?

6    A.    Yeah, sometimes he would work for his own in the same,

7    cutting, trimming trees.

8    Q.    He worked on the side trimming trees for people at times?

9    A.    Yes.

10   Q.    Did he also have like a tree and storm business, basically

11   cleaning up trees and branches after storms?

12   A.    Yes.

13   Q.    As part of that side business, did he own a large tree

14   truck that he used for his business?

15   A.    Yes, that's right.

16   Q.    Can you tell the jury about that truck?  What does it look

17   like?  Describe it for us, please?

18   A.    It's a large truck that has like something to grab in

19   color white.

20   Q.    A white and black large truck?

21   A.    Yes.

22        MS. GROOVER:  Your Honor, may I approach the witness?

23        THE COURT:  You may.  And Ms. Groover, if you would like

24   to utilize the ELMO, Ms. Sharp can help you set it up so the

25   jury can see the photographs.

176

1          THE CLERK:  I think we may be good electronically so we

2     can try that.

3          MS. GROOVER:  Your Honor, may we please approach for

4     sidebar?

5          THE COURT:  Yes.

6          (The following occurred at sidebar.)

7          MR. HOWARD:  I think the concern for the Government is

8     these exhibits are too important and this witness is too

9     important --

10         THE COURT:  Did you get them?  Are they working?

11         MS. GROOVER:  I don't think we've tried to put them up

12    yet.

13         THE COURT:  Let's try --

14         MR. HOWARD:  And I guess the request would be to --

15         THE COURT:  You can go back.

16         (The following occurred in open court.)

17    Q.   (By Ms. Groover)  Ms. Montoya, it's come to my attention

18    that the screen may be working now in front of you?

19         The Government would request to bring up Exhibit 2,

20    please.

21         THE COURT:  It's working, Ms. Groover.

22    Q.   (By Ms. Groover)  And is this a photo of your husband?

23    A.   Yes.

24    Q.   And Exhibit 2-2, who is this?

25    A.   My husband.

177

1    Q.    And 2-3?

2    A.    That's him next to the company truck.

3    Q.    And with a hard hat on at work?

4    A.    Yes.

5    Q.    And above the top of the picture, there's a white bucket.

6    Do you see that?

7    A.    Yes.

8    Q.    Is this an example of the type of truck he would get in to

9    ride the bucket up to the top of the power lines to access the

10   trees?

11   A.    Yes.

12   Q.    And Exhibit 2-4, please, tell us who are in this picture?

13   A.    My husband with his two daughters.

14   Q.    And the oldest is Jaquelin that he helped become a

15   naturalized United States citizen like himself?

16   A.    Yes.

17   Q.    And let's look at Exhibit 20-5, please.  Is this a Google

18   map image from 2016 about a year before your husband was killed

19   that captured your husband's tree truck that was parked on Old

20   Dean Forest Road just up the street from where you lived?

21   A.    Yes.

22   Q.    And you testified earlier that his truck was a large

23   black-and-white tree truck?  Is that the black-and-white tree

24   truck there?

25   A.    Yes.

178

1   Q.   Well, could he park that at your home at 59 Village Drive?

2   A.   No.  It's not allowed to have large trucks there.

3   Q.   So instead, did he park it off Old Dean Forest Road just

4   down the street from the entrance to your trailer park?

5   A.   Yes.

6   Q.   Before his death, what kind of car did he drive?

7   A.   A Honda.

8   Q.   What color was it?

9   A.   Gray.

10   Q.   I want to take you back now to August the 19th of 2017.

11   Do you remember that day?

12   A.   Yes.

13   Q.   Where did you work at that time?

14   A.   I was working at Chick-Fil-A.

15   Q.   Did you go to work that morning?

16   A.   Yes.

17   Q.   What time did you go to work that morning?

18   A.   It was about 6:00.

19   Q.   Six o'clock in the morning?

20   A.   5:30, 6:00.

21   Q.   What was your husband doing when you left?

22   A.   He was asleep.

23   Q.   Was that the last time you saw him alive?

24   A.   Yes.

25   Q.   And then you went to work?

179

1    A.    That's right.

2    Q.    While you were at work that day, did your manager tell you

3    that you needed to go home?

4    A.    Yes.  He called me on the phone and told me not to get

5    scared but there were policeman in my home and that I needed to

6    leave the work site and go home.

7    Q.    And did you go home?

8    A.    Yes.

9    Q.    Tell the jury what you saw on your way home?

10   A.    When I was getting in on that street, there were many

11   policemen.  I saw my brother-in-law standing there a little bit

12   ahead in the direction of Savannah, Savannah Pines.

13   Q.    Did you stop?

14   A.    No.

15   Q.    You were told to go straight home?

16   A.    Yes.

17   Q.    Tell us what happened when you got home.

18   A.    When I arrived at the home, a policeman was outside.  When

19   we got in, he told me that something had happened to my husband.

20   He told me that someone had killed him.

21   Q.    Did he ask you if you knew of anyone who would want to

22   harm him?

23   A.    Yes.

24   Q.    Do you remember what you said to him?

25   A.    I told him no.  But at that moment my mother-in-law began

1    to cry and she said, "They killed him; it was Pablo."

2    Q.    Did you provide any documentation that you had at the

3    house to help the detective with his investigation?

4    A.    Yes.  I went to a desk that is in the living room, and

5    there was an envelope with some documents.

6    Q.    Exhibit 4, please.  Do you recognize what's depicted on

7    the screen in front of you?

8    A.    Yes.

9    Q.    And what do you recognize that to be, ma'am?

10    A.    That is the envelope that I gave the detectives.

11            MS. GROOVER:  Your Honor, may I approach the witness?

12            THE COURT:  You may.

13    Q.    (By Ms. Groover) I'm handing you what's been marked as

14    Government Exhibit 5.  Please take a look at Exhibit 5 and tell

15    me if you recognize Exhibit 5.

16    A.    These are the documents I gave the detectives.

17    Q.    And do the documents generally include things like on Page

18    1 of Exhibit 5 a paycheck stub from Wolf Tree?

19    A.    Yes.

20    Q.    And as you scroll through Exhibit 5, does it also contain

21    documentation from a federal agency known as the United States

22    Equal Employment Opportunity Commission?

23    A.    Yes.

24    Q.    Does it also contain letters written by people that worked

25    with your husband?

1  A.    Yes.

2  Q.    Does it also contain a letter written by your husband?

3  A.    Yes.

4  Q.    And did you give these documents to assist the detective

5  in his investigation?

6  A.    Yes.

7  Q.    I'd like to pull up Exhibit 22-1, please.  Do you

8  recognize what's on the screen in front of you, ma'am?

9  A.    Yes.

10 Q.    And is this your husband's tree truck?

11 A.    Yes.

12 Q.    His personal tree-and-storm-business truck?

13 A.    Yes.

14 Q.    And do you recognize the gray or silver car that's in that

15 photograph as well?

16 A.    That was his car.

17 Q.    Exhibit 22-7.  Do you recognize anything in this

18 photograph, ma'am?

19 A.    His glasses and his phone.

20 Q.    Your husband's glasses and telephone?

21 A.    Yes.

22 Q.    In Exhibit 22-10, do you recognize this vehicle?

23 A.    His car.

24 Q.    And do you notice anything on the dashboard of his car?

25 A.    A notebook.

182

1    Q.    Exhibit 22-35.  Do you recognize this photograph?

2    A.    Yes.

3    Q.    And what do you recognize that's depicted in this

4    photograph, ma'am?

5    A.    Notebook is there, the keys.

6    Q.    That key, do you recognize that key at all, ma'am?

7    A.    Yes.

8    Q.    How do you recognize that tree?

9    A.    Because of the hook.

10   Q.    What is it about the hook that sticks out to you?

11   A.    I had put that hook on the key.

12   Q.    Turning to Page 22-36, please.  Is this a closeup view of

13   the notebook and key?

14   A.    Yes.

15   Q.    And 22-37, please.  Moving in closer to the key; is that

16   correct, ma'am?

17   A.    Yes.

18   Q.    Exhibit 22-38, please, do you recognize what's depicted in

19   this photograph?

20   A.    It's the interior of his car, steering wheel.

21   Q.    The inside of the Honda Civic?

22   A.    Yes.

23   Q.    And is the car key in the ignition?

24   A.    Yes.

25   Q.    And Exhibit 22-39, please.  Is this a piece of mail

183

1    addressed to you and your husband at 59 Village Drive?

2    A.    Yes.

3    Q.    And Exhibit 22-40.  Have you ever seen a yellow envelope

4    like this before?

5    A.    No.

6    Q.    Opening the envelope up on Exhibit 22-41, tell me if you

7    recognize anything inside that envelope?

8    A.    Yes, Jaquelin's citizenship.

9    Q.    This is what your husband was helping her to procure?

10   A.    He wanted to get her American passport.

11   Q.    And Exhibit 22-42, is this a photograph of looking inside

12   his car?

13   A.    Yes.

14   Q.    Is this one of his ID badges depicted in the photo?

15   A.    Yes.

16   Q.    And Exhibit 22-43, and then Exhibit 22-44, are these

17   closeup photographs of his identification badges?

18   A.    Yes, his ID to -- that allowed him to enter the port.

19   Q.    And Exhibit 22-45, do you recognize this, ma'am?

20   A.    Yes.

21   Q.    Is this another identification badge of your husband's?

22   A.    Yes, that's right.

23   Q.    Allowing him again to enter the Georgia Ports Authority?

24   A.    Yes.

25   Q.    Do you see the word "General" written on this badge?

184

1   A.   Yes.

2   Q.   Does that name ring any bell or sound familiar at all to

3   you?

4   A.   Yes.

5   Q.   Tell us about that?

6   A.   That was a pet name that his coworkers gave him because he

7   served in the Mexican military and I think he gained the rank of

8   general -- general rank.

9   Q.   Someone in control and in charge?

10  A.   Yes.

11  Q.   And Exhibit 22-46, can you please tell us if you recognize

12  this photograph.

13  A.   That's the interior of his car, his helmet, his sweater

14  and work utensils.

15  Q.   The helmet and things he would use for his job at Wolf

16  Tree?

17  A.   Yes.

18  Q.   And Exhibit 22-47, is this a photograph of tools in the

19  back of his car?

20  A.   Correct.

21  Q.   And 22-48, is this another photograph of some of the tools

22  in the back of his car?

23  A.   Yes.

24  Q.   And 22-49, another photograph of a tool in the back seat

25  of his car?

185

1    A.    Yes, correct.

2    Q.    And Exhibit 22-52, are they more tools that were in the

3    trunk of his car?

4    A.    Yes.

5    Q.    And those were all his tools?

6    A.    Yes.

7          MS. GROOVER:  Your Honor, may I approach the witness?

8          THE COURT:  You may.

9    Q.    (By Ms. Groover)  Ma'am, I'm handing you what's been

10   marked as Government Exhibit 23.  Please take a look at Exhibit

11   23 and tell me do you recognize that?

12   A.    Yes.

13   Q.    And what do you recognize that to be?

14   A.    This was a notebook in his car.

15   Q.    And did you used to buy these types of notebooks?

16   A.    No, I bought them.

17   Q.    You bought it?

18   A.    Yes.

19   Q.    Before your husband died, have you ever, did you ever know

20   a person by the name of Higinio Perez-Bravo?

21   A.    No.

22   Q.    And do you recognize the defendant who is sitting at the

23   table before today?

24   A.    No.

25          MS. GROOVER:  Thank you.  Your Honor, may I have just a

186

```
1    moment, please?
2            THE COURT:  Yes.
3            MS. GROOVER:  Your Honor, nothing further from this
4    witness.
5            THE COURT:  Cross-examination, Mr. Phillips.
6            MR. PHILLIPS:  Yes, ma'am, I do have some questions.
7                         CROSS-EXAMINATION
8    BY MR. PHILLIPS:
9    Q.   Ms. Montoya, I'm Bobby Phillips, and I'm Mr. Perez-Bravo's
10   attorney and I'm very sorry for your loss.
11   A.   Thank you.
12   Q.   It's my duty to represent Mr. Perez-Bravo and I just need
13   to ask you a few questions.
14   A.   Okay.
15   Q.   You never heard of Mr. Perez-Bravo before this case?
16   A.   No.
17   Q.   Did your husband ever talk to you about Pablo?
18   A.   No.
19   Q.   Did he ever talk to you about Juan?
20   A.   No.
21   Q.   He never told you that he was afraid of either one of
22   those people, Juan or Pablo?
23   A.   No.  He was very reserved in those -- in that kind of
24   thing.
25   Q.   So you had no idea how bad Juan and Pablo were at the
```

187

1    time?

2    A.    No.

3    Q.    How did your mother-in-law -- do you know how your

4    mother-in-law knew that Pablo might be involved?

5    A.    Because they knew him.

6    Q.    And your mother-in-law was your husband's mother?

7    A.    Yes.

8    Q.    And what was her name?

9    A.    Adelina Arcos.

10         MR. PHILLIPS:  Thank you very much.

11         THE COURT:  Any brief redirect?

12         MS. GROOVER:  No, Your Honor.

13         THE COURT:  Any objection to this witness being excused?

14         MS. GROOVER:  Not from the Government.

15         MR. PHILLIPS:  No, ma'am.

16         THE COURT:  Ma'am, you may step down.  Thank you.

17         All right, ladies and gentlemen of the jury, it is 5:15.

18    It's been a full day for all of you and so we will break now for

19    the evening.  As we break, remember that we will begin at nine

20    o'clock sharp tomorrow.

21         So arrive at the courthouse in time for you to find your

22    way back to your jury room in order for us to begin at 9:00 a.m.

23    Remember the familiar instructions as we leave tonight.  Don't

24    talk about the case.  Don't make up your mind.  Don't watch or

25    consume any media about the case and don't do any independent

188

1    research about the case.

2            Let's rise for this jury.

3            (The jury exits the courtroom.)

4            THE COURT:  Counsel, we will be in recess until nine

5    o'clock tomorrow.

6            (Proceeding concluded at 5:15 p.m.)

7                        CERTIFICATION

8

9        I certify that the foregoing is a true and correct

10   transcript of the stenographic record of the above-mentioned

11   matter.

12

13   *[signature]*

15   _____        05/02/2022

16   Debra Gilbert, Court Reporter           Date

17

18

19

20

21

22

23

24

25