189

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION


UNITED STATES OF AMERICA            )
                                    )
        vs.                         )          CASE NOS.
                                    )  4:18-CR-00274-LGW-BWC-3
HIGINIO PEREZ-BRAVO,                )
                                    )
_____Defendant._____ )



                      JURY TRIAL
        BEFORE THE HONORABLE LISA GODBEY WOOD
            April 13, 2022; 9:03 a.m.
               Brunswick, Georgia
APPEARANCES:

For the Government:        TANIA D. GROOVER, Esq.
                           CHRISTOPHER HOWARD, Esq.
                           U. S. Attorney's Office
                           P. O. Box 8970
                           Savannah, Georgia  31412
                           (912) 201-2552
                           tania.groover@usdoj.gov
                           christopher.howard@usdoj.gov



For the Defendant:         ROBERT P.  PHILLIPS, III, Esq.
                           Phillips, Carson & Phillips
                           420 West Broughton Street
                           2nd Floor
                           Savannah, Georgia 31401
                           (912) 232-0081
                           bplaw@msn.com


Reported by:               Debbie Gilbert, RPR, CCR
                           Official Court Reporter
                           801 Gloucester Street
                           Post Office Box 1894
                           Brunswick, GA 31521-1894
                           (912) 262-2608 or (912) 266-6006
                           debra_gilbert@gas.uscourts.gov
                             - - -

I N D E X

PAGE

OPENING STATEMENTS

GOVERNMENT WITNESSES

    DETECTIVE ROBERTO RODRIGUEZ
        Direct Examination By Ms. Groover      192
        Cross-Examination By Mr. Phillips      273
        Redirect Examination By Ms. Groover   280

    SPECIAL AGENT ANTHONY MIRANDA
        Direct Examination By Ms. Groover      282
        Cross-Examination By Mr. Phillips      370
        Redirect Examination By Ms. Groover   397

    GERARDO HERNANDEZ ANDRADE
        Direct Examination By Mr. Howard      399

    CHAD FITZGERALD
        Direct Examination By Mr. Howard      404

    OSCAR CRUZ
        Direct Examination By Mr. Howard      436

E X H I B I T

| DEFENDANT'S EXHIBITS | DESCRIPTION | I.D.'d | ADMITTED |
|---|---|---|---|
| 1 | Photograph | 276 | |
| 2 | Photograph | 276 | |
| 3 | Photograph | 276 | |
| 4 | Photograph | 276 | |
| 5 | Photograph | 276 | |
| 6 | Photograph | 276 | |

191

2                      P R O C E E D I N G S

3                  (Call to order at 9:03 a.m.)

4          THE COURT:  Very quickly, before we bring the jury in, I

5    did receive the United States' motion last night for access to

6    the defendant's CJA, and Mr. Phillips, if you will respond to

7    that tonight.  I take it it will not come up today.  We won't

8    get to the Defense's case, but I will look for a written

9    response from you tonight and then make a decision.

10         With that, let's bring in the jury.

11         (The jury enters the courtroom.)

12         THE COURT:  Good morning, members of the jury.  When we

13   broke last night, we were hearing from the prosecution.

14         Ms. Groover, Mr. Howard.

15         MS. GROOVER:  Thank you, Your Honor.  The Government

16   calls Detective Rodriguez to the stand.

17                      DETECTIVE ROBERTO RODRIGUEZ,

18   having been first duly sworn, was examined and testified as

19   follows:

20         THE CLERK:  Thank you.  Please be seated, and if you

21   will please state your full name, spell your last, state your

22   occupation and your business address.

23         THE WITNESS:  Roberto Rodriguez, R-o-d-r-i-g-u-e-z.  I

24   am a detective with the Garden City Police Department, and the

25   address is 100 Central Avenue, Garden City, Georgia 31405.

192

DIRECT EXAMINATION

BY MS. GROOVER:

Q.    Good morning, sir.

A.    Good morning.

Q.    You mentioned you're a detective with the Garden City
Police Department?

A.    Yes, ma'am.

Q.    How long have you been employed in this capacity?

A.    As a detective, for roughly nine or ten years.

Q.    What are your present duties, sir?

A.    I am a detective supervisor.  I supervise the
investigations division within the Garden City Police
Department.

Q.    Do your duties also include being a crime scene
investigator?

A.    It does, yes, ma'am.

Q.    And what does it mean to be a crime scene investigator?

A.    So I'm a certified crime scene technician, basically what
you see on television, CSI.  We process crime scenes,
fingerprints, blood scene reenactment, general items like that.

Q.    And can you explain to the jury how it is you preserve and
process crime scenes.

A.    We start off with photographs.  Photos is the most
important thing, and then we decide whether the crime scene
merits fingerprinting, gunshot residue, blood scene reenactment,

193

1    things of that nature.

2    Q.    And do your duties also include leading homicide

3    investigations?

4    A.    Yes, ma'am, it does.

5    Q.    And do you speak Spanish, sir?

6    A.    Yes, ma'am.

7    Q.    Are you fluent?

8    A.    Yes, ma'am.

9    Q.    Spanish your first language?

10   A.    Spanish at some point was my first language.  It's now

11   English and Spanish.  They are basically both my -- about the

12   same level.

13   Q.    And as part of your duties, you assist on almost every

14   case involving Spanish-speaking witnesses?

15   A.    Yes, ma'am, I do.

16   Q.    As a law enforcement officer with the Garden City Police

17   Department, are you also familiar with the Garden City area?

18   A.    Yes, ma'am, I am.

19   Q.    And were you employed in your present capacity on August

20   the 19th of 2017?

21   A.    I was, yes, ma'am.

22   Q.    And did you become involved in the investigation of the

23   death of Eliud Montoya, the victim in this case?

24   A.    Yes, ma'am.

25   Q.    And what date did you become involved in the

194

1    investigations of the death of Mr. Montoya?

2    A.    August the 19th.

3    Q.    At approximately what time?

4    A.    A little over one o'clock, about 1:30, I believe.

5    Q.    How is it that you became involved in the case?

6    A.    I was actually in Garden City.  It was a Saturday

7    afternoon.  I was actually investigating a separate homicide

8    which had occurred about 12 hours prior.  I was in that capacity

9    investigating that case when this investigation was brought

10   before us.

11   Q.    And how did you hear about the case?

12   A.    I was actually getting gas at the gas station, the Pilot

13   Travel Center, which is located at 1504 Dean Forest Road in

14   Garden City, Georgia.  It's less than I believe a block, block

15   and a half from where the actual crime scene occurred.

16        I witnessed a lot of police, ambulance, fire trucks

17   driving through the area, so I listened to the radio and I heard

18   there was a deceased male in the area.

19   Q.    And what area were you dispatched to?

20   A.    It was the Savannah -- in front of the Savannah Pines

21   Mobile Home Park, off of Airport Park Drive.

22        MS. GROOVER:  Now, I would like to turn your attention

23   to Exhibit 1, and, Your Honor, at this time, the Government

24   would request permission to publish the exhibits at ease to the

25   jury since they were all admitted.

195

1          THE COURT:   Proceed.

2          MS. GROOVER:   Thank you.

3   Q.   (By Ms. Groover)   Can we please pull up Page 1.  Tell us,

4   do you recognize this?  Is that on the screen in front of you,

5   sir?

6   A.   Yes, ma'am.

7   Q.   And is Page 1 just a photograph of where Garden City is

8   located in respect to Savannah?

9   A.   It's an aerial view, yes, ma'am.

10  Q.   Is the red dot approximately the location where Mr.

11  Montoya's body was located?

12  A.   Correct, yes, ma'am.

13  Q.   And Exhibit 1-2, what are we looking at in this

14  photograph, sir?

15  A.   That is a more I guess a satellite view.  That is a --

16  just a closer image of it.

17  Q.   Showing it in relation to I-16 and I-95, the intersection?

18  A.   Correct, yes, ma'am.

19  Q.   And Exhibit 1-3, can you explain to the jury what are we

20  looking at?

21  A.   That is more of a satellite view, more zoomed in of

22  Airport Park Drive and Village Drive where the crime scene is

23  located at.

24  Q.   Is Savannah Pines Mobile Home Park, how do you get to that

25  from I-16?

1    A.    So from I-16, you get off on Exit 160 and you travel I

2    believe it's going to be north on Highway 307, which is in

3    Garden City and make a right onto Airport Park Drive, which is

4    the very first -- it should be one past the Pilot Travel Center

5    is Airport Park Drive, and you make the first immediate

6    right-hand side onto Old Dean Forest Road.

7    Q.    And from this map -- it should be a touch screen -- can

8    you identify where you were located at the Pilot?

9    A.    Right there.  It's actually displayed as Mr. Fuel Travel

10    Center on the map here, but in 2017 it was considered the Pilot

11    Travel Center.  I was in that general area getting gas.

12    Q.    Now this photograph, an aerial view of the area, does it

13    look like this now, the overview near I-16?

14    A.    There have been some changes, but for the most part, it's

15    about the same.

16    Q.    Construction going on near I-16 and 307?

17    A.    Correct, yes, ma'am.

18    Q.    And were many of the trees, you know, demolished in that

19    construction process?

20    A.    Correct, yes, ma'am.

21    Q.    But at the time back on August the 19th of 2017, was it

22    fairly full of trees and brush?

23    A.    Correct, yes, ma'am.

24    Q.    Is this photograph Exhibit 1-3 a fair and accurate

25    depiction of what the overview of the area looked like on August

1   the 19th of 2017?

2   A.    Yes, ma'am.

3   Q.    And Exhibit 1-4, can you describe to the jury what we are

4   looking in Exhibit 1-4?

5   A.    This is an overview.  I believe the red dot would be the

6   residence of Mr. Montoya and then we have a picture of Old Dean

7   Forest Road where the crime scene occurred at.

8   Q.    Narrowing and even closer to the crime scene?

9   A.    Correct, yes, ma'am, more zoomed in.

10  Q.    And Exhibit 1-5, are we getting even closer into the crime

11  scene to look at the street view?

12  A.    Yes, ma'am.

13  Q.    Can you describe to the jury the intersection of Dean

14  Forest Road and Old Dean Forest Road as you came in to approach

15  Mr. Montoya?

16  A.    It is one of the weirdest intersections.  You actually

17  physically have to make an immediate right once you turn from

18  Dean Forest Road to Airport Park Drive onto Old Dean Forest

19  Road.  It is almost like you're doing like a complete U-turn and

20  going in the same direction.  You travel down that intersection

21  for a block or two until you get to where we located the

22  decedent.

23  Q.    Can you show with your touch screen on this Exhibit 1-5

24  that unusual intersection you were referring to?

25  A.    So this is Dean Forest Road.  You make a right and then

198

1  you do a complete U-turn right into -- oh, it just did crazy

2  stuff.

3  Q.    I will clear it and you can start over.

4        Now it's been cleared.  Can you please describe to the

5  jury this unusual U-turn?

6  A.    Yes, ma'am.  It's not letting me touch the screen.

7  Q.    Try it now, again, please, sir.

8  A.    No, ma'am.

9  Q.    But where you previously had that red line --

10 A.    It is an immediate U-turn you actually have to make to go

11 back towards the same direction on a different road.

12 Q.    Now going back to approximately 1:30 or so on August the

13 19th of 2017, when you heard the call for the non-responsive

14 body, what did you do, sir?

15 A.    I -- me being so close, I drove directly to the area and I

16 made contact with the on-duty supervisor and the first

17 responding officer.

18 Q.    When you arrived on scene, what did you observe?

19 A.    I observed that the sergeant on duty was putting yellow

20 crime scene type, which is consistent with a crime scene,

21 covering the exterior so nobody can go past a perimeter.  And I

22 observed a vehicle still running.  I observed the work truck,

23 and I observed the male lying supine, facing straight up into

24 the air with what appeared to be blood coming from his nose.

25 Q.    And did you notice any other vehicles besides the vehicle

199

1  you said that was running?

2  A.    There was a work truck, like a bucket truck or work truck

3  for tree-cutting.

4  Q.    And what did you do next?

5  A.    I started making phone calls.  After I examined the body

6  and first responders determined that the victim had at least

7  one, one penetration of bullet -- he had been shot one time -- I

8  started making phone calls to commanders and secondary and third

9  detectives to come in and help with the crime scene.

10 Q.    You indicated after you examined the body.  Describe to

11 the jury what you did when you saw the body.

12 A.    It was just a visual inspection.  Again, it's -- we got a

13 call of an unresponsive person, and when the officers and the --

14 were able to flip him over, they observed he had a -- some blood

15 coming out of his nose.

16       We also observed some -- some -- a single gunshot wound to

17 I believe his back, his back torso, which was a suspicious death

18 at this point.

19 Q.    You indicated the first responder had flipped him over.

20 Can you describe that process and why that would have happened?

21 A.    So when they got called to a non-responsive person, we are

22 first responders, so our first thing is to assess the scene,

23 make sure there is no hazards that would have caused him to have

24 fallen down and then you just check for signs of life, check for

25 pulse, breathing, but none was located at this time.

200

1   Q.    And so if a body is face down, would a first responder
2   turn the body over to assess vitals?
3   A.    Right, vitals, and to see if CPR or any other -- or remove
4   him from the area to see if there's a hazard, you know, things
5   like that.
6   Q.    Was it your understanding that was done in this case
7   before you arrived on scene?
8   A.    Yes, ma'am.
9   Q.    So when you arrived on scene, what position was the body
10  in?
11  A.    He was facing straight up into the air.
12  Q.    Having been first assessed by first responders?
13  A.    Correct.
14  Q.    You indicated you had observation, you observed some
15  wounds on the victim's body.  Did you observe any sort of --
16  well, let me ask a different question.  Are you familiar with
17  the term "defensive wounds"?
18  A.    Correct, ma'am.
19  Q.    And what does that mean?
20  A.    That's somebody that normally puts their hands up to avoid
21  strikes and things like that.
22  Q.    If someone was defending themselves at times, could you
23  observe wounds on their body to indicate that they were
24  defending themselves?
25  A.    Correct, yes, ma'am.

201

1  Q.    When you examined the body, did you examine the body for

2  any possible defensive wounds?

3  A.    At that time, until the coroner got there, not until the

4  coroner got there.  Then we began examining the body and there

5  was no defensive wounds on the body.

6  Q.    Okay.  And did you observe what the victim was wearing?

7  A.    I did, yes, ma'am.

8  Q.    What was he wearing?

9  A.    Some pajama pants, I believe he was wearing a shirt, and

10  he was wearing some flip-flop style shoes.

11  Q.    Shoes were still on his body?

12  A.    They were still on his body, yes, ma'am.

13  Q.    Do you remember what the weather was like that day?

14  A.    It was -- it got really, really hot and really muggy real

15  quick.  It was -- I believe the heat index was about 113 for the

16  day.

17  Q.    What did you do next?

18  A.    We, first thing I did was I called for other detectives to

19  come and assist.  It's customary for us, being a smaller agency,

20  three to four detectives working.  I contacted the entire

21  criminal investigation division to come in and assist.

22       It then -- Detective Reyes was on his way in so it took

23  him less than ten minutes to get to the scene.  I was the

24  dominant role, so I was the only detective there at the time so

25  I photographed the scene.  I tried to preserve any kind of

1  physical evidence I could find.  I tried to photograph the scene

2  until I had other detectives there, and then I was assigning a

3  detective a different role that needed to be done.

4  Q.  Can you just -- as you were photographing the scene and

5  documenting the scene, did it appear anything unusual about the

6  crime scene?

7  A.  It appeared that there was -- it was abnormal.  It didn't

8  appear to be a robbery.  It didn't appear -- it appeared to be

9  targeted is the only way that I can describe it as.  It was a

10  targeted incident.

11  Q.  And tell us why you observed that.

12  A.  The vehicle, the victim's vehicle was still running.  The

13  door was open with the music playing.  It appeared he was

14  working on a work truck.  His cell phone was still visibly --

15  you could see the phone from the truck, and I guess when he fell

16  face forward, it didn't appear like he had ran.  His flip-flop

17  shoes were still on his feet, properly displayed on his feet.

18  It didn't appear he tried to run.  It didn't appear he tried to

19  flee, and it appeared that the shot was from the back.

20  Q.  And did you begin, after photographing the scene, did you

21  begin processing the scene?

22  A.  I did not, no, ma'am.  At this point after I began taking

23  my overall photographs of the scene as well as of the victim, at

24  this point, other detectives had arrived on scene, specifically

25  Detective White and Detective Reyes.

203

1    Q.    And what did you do next?

2    A.    While I was -- while I was tasking them and notifying the

3    coroner, I was informed by one of the perimeter officers that

4    was manning the crime scene that there was a lady on scene that

5    wished to speak with me.

6    Q.    Did you speak with that lady?

7    A.    I did, yes, ma'am.

8    Q.    And who was that lady?

9    A.    The first person I spoke to was the decedent's sister.

10   Q.    What did you learn?

11   A.    She told me that she was -- she believed that that victim

12   was her brother.  She said that her mother was over near the

13   crime scene as well and I probably needed to speak to her

14   because she may have information for me.

15   Q.    Did she tell you her brother's name?

16   A.    She did.

17   Q.    What was his name?

18   A.    Eliud Montoya.

19   Q.    Did you speak with the mother then?

20   A.    I did, yes, ma'am.

21   Q.    What was the mother's name?

22   A.    I believe it was -- I don't recall off the top of my head

23   what the actual mother's name was, but I believe it was -- it

24   was the same last name.

25   Q.    What did she explain to you?

204

1   A.    She stated that she's pretty sure she knows who had her

2   son killed or who killed her son.

3   Q.    What exactly did she say?

4   A.    She said that her son had filed a grievance as well as an

5   EEOC complaint on Mr. Pablo Rangel, who was his boss, and the

6   complaint was filed just two days prior before he was killed.

7   Q.    Did she explain anything further about his job?

8   A.    She stated that he works as I guess a foreman cutting

9   trees down or he's a supervisor for a company called Wolf Tree

10  Services.

11  Q.    Did you learn that there were documentations at the

12  victim's home that may possibly assist in your investigation?

13  A.    Correct.  The mother did make mention that the victim, Mr.

14  Montoya's wife, would have some documents at the house that she

15  deemed were paramount to this investigation in reference to or

16  accusatory towards Mr. Pablo Rangel.

17  Q.    And as part of investigating and processing the scene, did

18  law enforcement agents run the tag of the vehicle that was

19  running?

20  A.    Yes, ma'am.  That's one of the first thing that was done.

21  The vehicle was still running.  We didn't know if that belonged

22  to a suspect, a witness, a victim.  So the sergeant on scene ran

23  the registration to that vehicle and that registration came back

24  to Mr. Eliud Montoya.

25  Q.    The same name provided by the apparent family members on

205

1    scene?

2    A.    Correct, yes, ma'am.

3    Q.    After you spoke with the victim's mother, what did you do

4    next, sir?

5    A.    I tasked -- knowing this new information has come to

6    light, I tasked the other two detectives with thoroughly

7    processing the crime scene while I went to I believe it was 59

8    Village Drive, which is where Mr. Montoya resides at, to make

9    contact with his wife.

10    Q.    And what happened when you made contact?

11    A.    She was not home.  We had to call her in.  She -- when we

12    called her in to -- from work, she -- we explained to her the

13    unfortunate passing of her husband.  She was very emotional.

14    She also provided intimate information as far as the EEOC and

15    the grievance that was filed for Mr. Pablo Rangel.  It was the

16    same exact information provided by his mother and Griselda with

17    the exception that she actually gave us a manila envelope, which

18    was -- I believe on the heading of the right-hand side said

19    "Equal Employment Opportunity Commission," also known as EEOC.

20    Q.    Direct your attention to Exhibit 4.  Do you recognize this

21    photograph, sir?

22    A.    I do, yes, ma'am.

23    Q.    And what do you recognize this to be?

24    A.    That is the manila envelope which was provided by Mrs.

25    Montoya.

206

1  Q.   And Exhibit 4-2, what are we looking at in this

2  photograph, sir?

3  A.   That is a check stub from Davey Tree Services, which was

4  located inside of -- that's the contents that was located inside

5  the manila envelope.

6       MS. GROOVER:  Your Honor, may I approach the witness?

7       THE COURT:  You may.

8  Q.   (By Ms. Groover)  Sir, I am handing the contents of

9  Exhibit 5.  Please take a look at Exhibit 5 and tell me if you

10  recognize that.

11  A.   I do, yes, ma'am.

12  Q.   And what do you recognize that to be?

13  A.   These were the contents inside of the manila envelope

14  which was provided by Mrs. Montoya.

15  Q.   So the first page, Exhibit 5-1, what does this appear to

16  be to you, sir?

17  A.   It appears to be a check stub for Mr. Montoya.

18  Q.   Exhibit 5-2 scrolling through 5-8.

19  A.   These are all documentation from the Equal Employment

20  Opportunity Commission.

21  Q.   Documents indicating that a charge or something had been

22  filed with the --

23  A.   Correct, correct, and the next available steps.

24  Q.   And Exhibit 5-9, was this document also part of the

25  paperwork provided by Mrs. Montoya?

207

1    A.    Yes, ma'am, it was.

2    Q.    What does this appear to be to you, sir?

3    A.    It appears to be an affidavit or complaint in reference to

4    Mr. Pablo Rangel, I guess, extorting illegal aliens working for

5    the company.

6    Q.    Appeared to be written by an individual by the name of

7    Joel Reyes?

8    A.    Correct, yes, ma'am.

9    Q.    And notarized by Eliud Montoya?

10   A.    Correct.

11   Q.    The decedent?

12   A.    Correct.

13   Q.    And Exhibit 5-10, 11 and 12, scrolling through, what do

14   those pages appear to be to you, sir?

15   A.    One of them is an Immediate Medcare for Abercorn for an

16   exam, a Level 2 exam.  The other two items appear to be for

17   paycheck stubs for a Mr. Juan Ramirez.

18   Q.    And Exhibit 5-13, what does this paperwork appear to you,

19   sir?

20   A.    It's another affidavit where it is providing information

21   for possible extortion by Mr. Juan Ramirez signed by Mr. Juan

22   Ramirez and notarized by Mr. Eliud Montoya.

23   Q.    You indicated extortion by Juan Ramirez, that he was

24   extorting someone?

25   A.    That he was being extorted.  He was being a victim of I

208

1   guess a scam that Mr. Pablo Rangel was doing.

2   Q.    And Exhibit 5-14, what do you recognize this piece of

3   paper to be, sir?

4   A.    It is another affidavit by another employee, Mr. Ruben

5   Ramirez Hernandez.  It appeared to be signed by him as well as

6   notified by Mr. Eliud Montoya.

7   Q.    And Exhibit 5-15 appear to be another letter from a Joel

8   Reyes?

9   A.    Correct, yes, ma'am.

10  Q.    Again, notarized by the victim, Mr. Montoya?

11  A.    Yes, ma'am.

12  Q.    And Exhibit 5-16 through 17, what does that document

13  appear to be, sir?

14  A.    This is a letter written by Mr. Montoya, Mr. Eliud

15  Montoya, and it is signed by him as well.  It's an outline of

16  what he has noticed going on by Mr. Rangel to the illegal aliens

17  working for the business.

18  Q.    And did you have an opportunity to read and review these

19  documents quickly while you were processing your scene and

20  investigating this homicide?

21  A.    I did, yes, ma'am.

22  Q.    And so without going into all the details, what did you

23  take these documents to mean at the time when you received them

24  and quickly reviewed them?

25  A.    I felt like from what I could read it was definitely a

209

 1    wage garnishment.  It appeared that the illegal aliens were

 2    working under an alias.  They were provided social security

 3    numbers where they can ascertain paycheck stubs, paychecks, and

 4    in turn Mr. Montoya would pay the employees in cash rather than

 5    with the actual physical check themselves.  I'm sorry, Mr.

 6    Rangel would pay them in cash rather than with an actual check

 7    stub.

 8    Q.    And some of the letters were written by individuals who

 9    were setting forth that they were illegal aliens?

10    A.    Yes.

11    Q.    Unlawfully present in the United States?

12    A.    Yes.

13    Q.    And the letter apparently written by Mr. Montoya was

14    explaining what had happened to them?

15    A.    Correct, yes, ma'am.

16    Q.    Were all the letters signed by the apparent individuals

17    identified in the letters?

18    A.    From what we could tell at that time, yes, ma'am, they

19    appeared to be signed by them.

20    Q.    And some of them even notarized by Mr. Montoya?

21    A.    Correct.

22    Q.    And did the individuals provide their contact information?

23    A.    Every letter I believe had a telephone number associated

24    to it, yes, ma'am.

25    Q.    After having received this paperwork, what did you do

210

1    next, sir?

2    A.    We -- there was the vehicle that was still running.  We

3    knew that it belonged to Mr. Montoya.  So for forensics

4    purposes -- and it was really hot outside; we had been outside

5    for several hours at this point -- I asked Ms. Montoya for

6    consent to search the vehicle and if we could search it at our

7    office because it's more of an enclosed garage.  A lot of our

8    guys were hot, so we decided to take it back over there and

9    process the vehicle at our office.

10   Q.    And while processing the vehicle, did you observe anything

11   of interest to you?

12   A.    Yes, ma'am.  There was a yellow composition notebook which

13   was on the front dash of the vehicle.

14   Q.    Exhibit 24, please, do you recognize that, what's depicted

15   in Exhibit 24?

16   A.    I do, yes, ma'am.

17   Q.    What does that appear to be?

18   A.    That was the yellow composition that was located inside

19   Mr. Montoya's vehicle.

20        MS. GROOVER:  Your Honor, may I approach the witness?

21        THE COURT:  You may, and, Ms. Groover, you may have

22   standing permission to do so.

23        MS. GROOVER:  Thank you, Your Honor.

24        THE COURT:  Yes.

25   Q.    (By Ms. Groover)  Sir, I'm handing you what has been

211

1    marked as Government's Exhibit 23.  Can you take a look and

2    tell me if you recognize that, sir?

3    A.    I do.

4    Q.    What is that?

5    A.    That is the composition notebook located inside of Mr.

6    Montoya's vehicle.

7    Q.    And did you review that notebook and open it up for its

8    contents?

9    A.    I did, yes, ma'am.

10   Q.    And in Exhibit 24-2, was there anything inside that

11   composition notebook that caught your attention?

12   A.    Yes, ma'am.

13   Q.    What was exactly was that?

14   A.    Directly in the middle of the notebook was a handwritten

15   letter that was left.

16   Q.    And in general, are we looking at a photograph of that

17   handwritten letter on the screen?

18   A.    Yes, ma'am, we are.

19   Q.    In Exhibit 24-2?

20   A.    Yes, ma'am.

21   Q.    What does it say?

22   A.    It says, "Discharged by X" -- it's got a line through it

23   so nothing has been written -- "for three days for not signing

24   the safe practice violation that wasn't true; they are always

25   watching me because of a complaint I put in on ways that they

212

1   let a foreman" -- and the "foreman" is underlined -- "treat

2   their employees."

3   Q.   What did you do with this information?

4   A.   This is -- now validates the documentation we received

5   from the manila envelope.  It appears to be the same information

6   so I wanted to find out who the foreman was.

7   Q.   And what did you do next, sir?

8   A.   We came, I began doing what we refer to as victimology,

9   which is, victimology, we try to decipher the victim's life and

10  find out the who, the what, the when, the where, the why anybody

11  would want to kill him.

12       So we break down his life from beginning to end and try to

13  find out if there's any listed police reports, any issues with

14  the family, issues with work, which we had at this point.

15  Q.   And did you do this after you finished processing the

16  crime scene, collecting evidence from the family and then went

17  back to your office to do that?

18  A.   Yes, ma'am.

19  Q.   And you did indicate that you took some photographs at the

20  crime scene?

21  A.   We did, yes, ma'am.

22  Q.   And then other individuals took photographs but you also

23  observed?

24  A.   Yes, ma'am.

25       MS. GROOVER:  Your Honor, at this time we would like to

213

1    review Exhibit 22 but before we pull it on the screen would like

2    to note it does contain some graphic images of the crime scene

3    and so we wold ask not only permission to publish this to the

4    jury but would also note for the record that this may be a good

5    time for any members in the gallery who may not wish to view

6    these pictures who may want to step outside.

7            THE COURT:  Ladies and gentlemen, if there's anyone so

8    inclined, feel free to step out for this portion.

9            Proceed.

10           MS. GROOVER:  Thank you.

11   Q.    (By Ms. Groover)  Exhibit 22-1, can you -- we're going to

12   go through -- like to go through each photograph and have you

13   describe for the jury what are we looking at in each photograph,

14   so let's begin with 22-1.

15   A.    This is the view of the crime scene from when you first

16   drive down Old Dean Forest Road.  That was the vehicle that was

17   registered to Mr. Montoya that was still running, that silver

18   Honda, and that was the work truck, the tree truck he appeared

19   to be working with.

20   Q.    And is this the view that you had when you pulled in and

21   they were still putting up the crime scene tape?

22   A.    Yes, ma'am.

23   Q.    Exhibit 22-2.

24   A.    That is just a closer view of the Honda and the work truck

25   itself.

214

1    Q.    And Exhibit 22-3 and 4 and 5 if we could just scroll

2    through those and if you could narrate in general.

3    A.    It's just more of a zoomed-in image of the actual work

4    truck and the vehicle, trying to get the actual I believe the

5    vehicle's registration or tag in a picture.

6    Q.    Now focusing on Exhibit 22-6, what are we looking at here?

7    A.    This is the -- the -- we have the hood of the truck that's

8    open.  That is the actual truck itself that it appeared to be --

9    to be what the victim was working on.  The hood was open and the

10   doors were also open on the vehicle as well.

11   Q.    Now, at the bottom of the white door that is open, is

12   there a little ledge?

13   A.    Yes, ma'am, there is.

14   Q.    Did you notice anything sitting on that ledge?

15   A.    Yes, ma'am.

16   Q.    Exhibit 22-7?

17   A.    It appears to be a -- that is the victim's cell phone and

18   his glasses.  They were still left on the ledge on the vehicle.

19   Q.    And Exhibit 22-8, you described the point of view we're

20   looking at here?

21   A.    Now trying to go full circle around the crime scene, this

22   is the outer perimeter toward the south end.  That is an

23   overview of the Honda itself, getting closer to where the

24   decedent lied at.

25   Q.    And can you see in this picture whether or not the door is

215

1  open on the Honda?

2  A.    The door is ajar in this picture.  It's actually all the

3  way open.

4  Q.    It's the driver's door?

5  A.    Correct.

6  Q.    And Exhibit 22-9?

7  A.    That's the registration of the vehicle as well as just

8  another view of the driver's door just being completely open.

9  Q.    Exhibit 22-10.

10  A.    That is now -- on the driver's side of the vehicle, the

11  vehicle is still open and there's the yellow composition

12  notebook that we just read out loud.

13  Q.    So this is looking at the front view of the Honda Civic?

14  A.    Correct, yes, ma'am.

15  Q.    That was running with the door open?

16  A.    Yes, ma'am.

17  Q.    Exhibit 22-11.  Closer --

18  A.    Closer view of the composition notebook.

19  Q.    Exhibit 22-12, what are we looking at here, sir?

20  A.    That is the vehicle, showing the driver door is open, and

21  the door was open and there's items still, the keys to the work

22  truck appear to be sitting on the driver's seat as well.

23  Q.    Exhibit 22-13?

24  A.    That's a closer view of the actual keys to the work truck,

25  the tree -- the tree-cutting work truck, when I describe work

216

1    truck.

2    Q.    And again, did you find that unusual that the car was

3    running and there were keys left behind?

4    A.    Correct, yes, ma'am.

5    Q.    Now, Exhibit 22-14, in this photograph do you see the

6    body?

7    A.    Yes, ma'am.

8    Q.    Can you describe how it was when you arrived?

9    A.    This is exactly how I found the body.  He was facing up.

10    He was facing up in the air.  This was done so by our patrol

11    officers so he was facing up.  His shirt was raised up at this

12    point, and that's where we observed the single -- I believe

13    single gunshot.  He was lying to the right of the truck.

14    Q.    And Exhibit 22-15, describe what we are looking at in this

15    photograph, please.

16    A.    That is just a closer view of where the victim laid at as

17    well you can see that the flip-flop style shoes are still

18    attached to his feet.

19    Q.    And Exhibit 22-16?

20    A.    Just an overview.  I'm showing that he was -- it appeared

21    if you stand him up straight he would have been right there at

22    the engine compartment of that vehicle.

23    Q.    Now, from this point of view of this photograph, can you

24    see down to where the perspective would have been of someone

25    standing behind the tree truck working on the truck?

217

1   A.    Correct.

2   Q.    Does there appear to be the trees and brush and debris all

3   around?

4   A.    Correct.  That is a heavily dense wooded area.

5   Q.    Not a lot of exposure?

6   A.    Absolutely none, in that -- in that area, no, ma'am.

7   Q.    Secluded?

8   A.    Correct.

9   Q.    In Exhibit 22-17, what are we looking at in this

10  photograph, sir?

11  A.    That is showing the victim's flip-flops are still attached

12  to his feet as well as that appeared that was a tarp that he was

13  using that he was placing his items to and from that area.

14  Q.    And Exhibit 22-18?

15  A.    That's a closer view of his flip-flops still attached to

16  his feet.

17  Q.    Based on your training and experience, if someone were

18  involved in a struggle or trying to defend themselves wearing

19  these types of shoes, would they have stayed on their feet?

20  A.    No, ma'am, that's the first thing that normally gets

21  removed is flip-flop style shoes.

22  Q.    Would you find that unusual that his shoes with this style

23  remained on his feet?

24  A.    Correct, it was highly unusual.

25  Q.    Exhibit 22-19, can you describe what we're looking at?

218

1    A.    That is the view that we believe that the victim was

2    standing at working on his actual work truck.

3    Q.    With the front of the hood opened up?

4    A.    Correct.

5    Q.    And from this point of view, do you see in the front of

6    the truck in the bottom left screen of the photograph a view of

7    the Honda Civic?

8    A.    We do.

9    Q.    And did the positioning of these vehicles also block the

10   view of someone who would have been passing by this exact spot?

11   A.    Correct.

12   Q.    In Exhibit 22-20, what are we looking at in this

13   photograph?

14   A.    That is some more, that is just showing how dense the area

15   is with foliage and the grass growing, the tree coverage and

16   then some more of the work truck itself.

17   Q.    And Exhibit 22-21?

18   A.    Just some debris and then that is just showing how thick

19   the area is in that area as well.

20   Q.    And Exhibit 22-22?

21   A.    That's a view from the other side, just showing how

22   secluded this area really is without -- how dense and how thick

23   the woods are towards the right of where the victim lied.

24   Q.    So this would be viewing the opposite direction from the

25   point of view from behind the truck from the previous

219

1  photographs?

2  A.    Correct, this is facing -- from the back of the truck

3  facing towards the front.

4  Q.    Actually facing toward the southern direction?

5  A.    Correct, to the south, the south.

6  Q.    And Exhibit 22-23, what is depicted in this photograph,

7  sir?

8  A.    That's the victim where he lied, a -- an overall of the

9  upper torso of the victim.

10  Q.    Now you indicated that you were -- the first responders

11  had turned the body over --

12  A.    Correct.

13  Q.    -- to see any signs of life?

14  A.    Correct.

15  Q.    Were you able to determine where he had originally laid

16  before first responders?

17  A.    Correct.  In the grassy area to the right of his hand,

18  there was some blood on the grass, so that's where he laid and

19  they just flipped him over from that direction.

20  Q.    Exhibit 22-24, can you describe what we are looking at in

21  this photograph, sir?

22  A.    That is a closeup of the blood on the ground from where it

23  appeared the victim had fallen face first.

24  Q.    That's where he would have laid?

25  A.    Correct.

220

1   Q.    Upon hitting the ground?

2   A.    Correct.

3   Q.    Exhibit 22-25 and 22-26, if we can scroll through those

4   photographs and what are we looking at in these two photographs?

5   A.    That's his -- I belive his right hand.  I believe he had a

6   wound on his right hand.  That's a closeup.  It's -- it appeared

7   to be a -- what I would describe as a graze on his hand where a

8   bullet had struck his hand, one of the rounds.

9   Q.    Exhibit 22-27, what is depicted in this photograph, sir?

10  A.    A screwdriver.

11  Q.    Where was the screwdriver laying in relation to Mr.

12  Montoya?

13  A.    In close proximity to where he was -- where he fell and

14  lied on.

15  Q.    What, if anything, did it indicate to you?

16  A.    It further validated the fact he was working on his

17  vehicle.

18  Q.    Believe he had that in his hand?

19  A.    Correct, when he fell.

20       MS. GROOVER:  Now, Your Honor, I would just note for

21  purposes of anyone in the gallery and for the record that the

22  next few photographs are more graphic.

23       THE COURT:  Proceed.

24  Q.    (By Ms. Groover)  Exhibit 22-28, please, what are we

25  looking at in this photograph?

221

1   A.    This is an impact wound of the decedent's, the victim's,

2   the left side of his head.  It appeared to be an entry wound of

3   a bullet hole.

4   Q.    Gunshot wound to the head?

5   A.    Correct.

6   Q.    Exhibit 22-29?

7   A.    That was of his face where it appeared he had fallen down

8   and broken his nose as well as some swelling above his right

9   eye.

10  Q.    At the time that's what you believed you were looking at?

11  A.    Correct.  I thought that it was going to be -- originally

12  thought it was a physical assault, but we later proved it was

13  not a physical assault.

14  Q.    Did you later learn through the entire investigation that

15  it was a gunshot wound to the face?

16  A.    Yes, ma'am.

17  Q.    Exhibit 22-30?

18  A.    That is a gunshot wound to his back.

19  Q.    His shoulder area?

20  A.    His left shoulder.

21  Q.    And Exhibit 22-31?

22  A.    Those are two -- what appeared to be two different bullet

23  holes to his back, two gunshot wounds to his back.

24  Q.    And Exhibit 22-32?

25  A.    That is his right finger where it appeared -- what I

222

1    thought it was a graze at the time.

2    Q.    A gunshot wound?

3    A.    Correct, yes, ma'am.

4    Q.    Now moving back into the Garden City to process the

5    vehicle, direct your attention to Exhibit 22-33.

6    A.    That is the vehicle with a yellow crime scene tape so the

7    vehicle doesn't get tampered with.

8    Q.    Exhibit 22-34?

9    A.    That is the vehicle at the Garden City Police Department

10   with crime scene tape around it so it does not get tampered

11   with.

12   Q.    It had now been moved from the crime scene outside indoors

13   for processing?

14   A.    Correct, yes, ma'am.

15   Q.    And Exhibit 22-35, 36, 37, if we could scroll through

16   those and just explain to the jury what we're looking at.

17   A.    That's the inside of the vehicle.  It looked like the

18   composition had fallen from the tow from one location to

19   another.

20   Q.    And Exhibit --

21   A.    That's the key to the truck, sitting on the driver's seat,

22   closeup of the key.

23   Q.    It had not been moved?

24   A.    No, ma'am.

25   Q.    From when you moved the vehicle?

223

1   A.    It's the same, correct.

2   Q.    And Exhibit 22-38, what is depicted in this photograph,

3   sir?

4   A.    That is the key still in the ignition of the vehicle.

5   Q.    And was that key in the vehicle at the initial crime

6   scene?

7   A.    It was, yes, ma'am.

8   Q.    And Exhibit 22-39, what are we looking at in this

9   photograph, sir?

10  A.    That is a letter that was located inside the vehicle

11  addressed to Mr. Eliud Montoya and his wife.

12  Q.    And Exhibit 22-40, what is depicted in this photograph?

13  A.    It is a yellow envelope that was located inside the

14  vehicle.  I believe it had some passport information inside.

15  Q.    Exhibit 22-41, is that the contents of the inside of the

16  envelope?

17  A.    Yes, ma'am, that is the contents of the inside of the

18  envelope.

19  Q.    Valuable identification documents?

20  A.    Correct, yes, ma'am.

21  Q.    Such as, what are depicted in this?

22  A.    Social security card, US citizenship and then what

23  appeared to be a passport application to the left.

24  Q.    And did this appear to be a family member to the victim?

25  A.    I believe it was his daughter's.

224

1    Q.    And scrolling through Exhibits 22-42 through 22-45, can

2    you narrate generally what is depicted in these photographs?

3    A.    Yes, ma'am.  This is a picture from the outside at the

4    rear glass.  That's showing Mr. Montoya's transportation worker

5    identification card.  That's to go to and from the ports, the

6    Georgia Ports Authority.  That's a closeup of that

7    identification card.  That's an overall view from the front now.

8    The back is a Georgia Ports Authority identification for Mr.

9    Montoya as well.

10   Q.    Now, this indicates -- not only had Mr. Montoya's name but

11   it also has the name "General" written on the badge?

12   A.    Correct.

13   Q.    Did you learn anything about Mr. Montoya in respect to

14   this word "General" throughout this investigation?

15   A.    That was his nickname.  He was referred to as the general.

16   Q.    By whom?

17   A.    The employees of the business.

18   Q.    His colleagues that he worked with?

19   A.    Correct, the employees from Wolf Tree.

20   Q.    And Exhibit 22-46?

21   A.    That is the back seat of the vehicle.  It's just an

22   overall showing the items and the contents that were located

23   inside the vehicle.

24   Q.    Including his work hard hat?

25   A.    His hard hat, appeared to be some traffic cones,

225

1    reflective vest.

2    Q.    Exhibit -- I apologize, continue.

3    A.    No, it appeared to be some work item underneath that as

4    well from what I can tell.

5    Q.    Exhibit 22-47?

6    A.    That is a -- what appears to be a Stihl chainsaw.

7    Q.    A valuable item?

8    A.    Very valuable.

9    Q.    And you know that from your training and experience --

10   A.    Yes, ma'am.

11   Q.    -- or personal?

12   A.    Personal and training.  We deal -- also part of my job

13   duty is to deal with property theft, so we deal with a lot of

14   property theft in Garden City, and Stihl is one of the higher-

15   end brand of items for commercial grade.

16   Q.    Based on your training and experience, is it common for

17   people to burglarize tools and then pawn them for money?

18   A.    Correct, yes, ma'am.

19   Q.    These valuable tools were still in the vehicle?

20   A.    Correct, yes, ma'am.

21   Q.    Exhibit 22-48 and 22-49 and 50, scrolling through those

22   three photographs, what in general are we looking at?

23   A.    There is on the picture before me, I believe 49, there is

24   a traffic cone.  The Stihl is now upset and there was an object

25   underneath that red shirt in the back seat.  That is now

226

1    underneath the -- behind the driver's seat is a Stihl blower,

2    another very expensive item.

3    Q.    Another tool?

4    A.    Correct.

5    Q.    And Exhibit 22-51?

6    A.    That's just an overall view of the two items located in

7    the back seat, the Stihl blower and the Stihl chainsaw.

8    Q.    I believe that was 22-50 you just narrated, so moving on

9    to 22-51, what is depicted in this photograph?

10   A.    That's just an overall view of the Stihl blower outside

11   the vehicle.

12   Q.    Finally Exhibit 22-52, what is depicted in this

13   photograph, sir?

14   A.    That is -- once we opened the trunk, this is what we saw

15   on the inside, so more high-dollar items, which we believed were

16   high-dollar items that were located in the trunk and were not

17   disturbed or messed with and not stolen.

18   Q.    Before we reviewed the photographs, you indicated that

19   your next step in the investigation was to go back to your

20   office and begin a victimology type of research?

21   A.    Correct, yes, ma'am.

22   Q.    Can you explain that process again for the jury?

23   A.    So we ran the victim's information through every possible

24   reporting database that we have, which we do have an array of

25   reporting databases.  We were trying to find out if our victim,

227

1    Mr. Montoya, had been the primary aggressor or victim in any

2    crime in Garden City and/or our neighboring municipalities, the

3    City of Savannah, Chatham County, Bloomingdale.  We were having

4    a hard time getting -- we gathered pertinent information as far

5    as name, date of birth, previous addresses, but nothing where he

6    was listed as a victim or an offender.  The only other item that

7    we had was those letters or those affidavits that were provided

8    in the EEOC complaint, so I started making those phone calls to

9    the individuals listed in the complaints.

10   Q.    And who did you speak with next?

11   A.    I believe the person I spoke to was Mr. Joel Reyes.

12   Q.    An apparent author of one of the letters that you received

13   from Mr. Montoya, excuse me, Mrs. Montoya?

14   A.    Correct, yes, ma'am.

15   Q.    In general, what did you learn from Mr. Reyes?

16   A.    I called him on the number listed on the actual affidavit

17   itself, and I asked him if he could come by the Garden City

18   Police Department to speak to me.  I didn't give him specifics

19   as to what I was investigating.  I just informed him that I

20   needed to speak to him.

21   Q.    And did he come?

22   A.    Within minutes, yes, ma'am.

23   Q.    What happened?

24   A.    We did a recorded interview at the Garden City Police

25   Department, which all interviews are audio- and video-recorded

228

1    and spoke with Mr. Reyes and we asked him specific questions

2    just surrounding Mr. Eliud Montoya is who we started with.

3    Q.    What did you learn?

4    A.    We asked him if had any -- Mr. Montoya had any issues with

5    any of the employees in the business and he said, "Yes, he did;

6    he had problems with Mr. Pablo Rangel," who was identified as

7    his foreman at that time.

8    Q.    Did he indicate -- did you ask him about where his foreman

9    or where his Pablo Rangel-Rubio lived?

10   A.    I did, yes, ma'am.

11   Q.    What did he explain?

12   A.    He said he lived in Effingham County.  His exact words he

13   used, he lives in a farm.  It's a rather large compound in

14   Effingham County.

15   Q.    Did he describe it further at that time?

16   A.    I don't remember off the top of my head the specifics.  He

17   just said on the property they had chickens.  There was a lot of

18   people that lived on the property as far as campers and trailers

19   and family that lived on the property itself.

20   Q.    Family of the foreman, Pablo Rangel-Rubio?

21   A.    Correct, yes, ma'am.

22   Q.    Did you explain to Mr. Reyes that Mr. Montoya was dead?

23   A.    I did, yes, ma'am.

24   Q.    And what was his response?

25   A.    He did not appear surprised, and I asked him.  I

229

1    specifically asked him, "Do you think that Mr. Rangel, Mr. Pablo

2    Rangel, could have killed him," and his response was "I don't

3    think he could have killed him but I think he could have gotten

4    somebody to kill him."

5    Q.    Did you learn information -- did you gather further

6    information about where Pablo Rangel-Rubio lived?

7    A.    I did, yes, ma'am.

8    Q.    And describe that location for the jury.

9    A.    So postinterview with Mr. Reyes, we now have a potential

10   person of interest who we're looking at, so I began compiling

11   any documentation I could on Mr. Rangel.

12        We were given his telephone number, and I ran his number

13   through our local reporting databases again, comparing it to the

14   local municipalities around here, and specifically we ran that

15   number through what we call in Chatham County is Phoenix.

16        Phoenix is our local booking database.  Whenever somebody

17   gets arrested, they get processed, and part of their process,

18   they have to provide an address, telephone number, emergency

19   contact and their information.

20        When I ran his telephone number through that database,

21   I returned -- it returned he was listed as an emergency contact

22   for two different people.

23   Q.    And did they provide a phone number?

24   A.    They did.

25   Q.    And generally do you recall what phone number that was?

230

1   A.    I believe it was 31 -- area code (912) 313-6350.

2   Q.    Did you learn any other information about his residence,

3   his being Pablo Rangel-Rubio?

4   A.    Yes, ma'am.  We also ran that telephone number through our

5   database and it returned to an address on -- I believe it was

6   off of Milton Rahn Road in Effingham County.

7   Q.    And did you learn about the description of this property?

8   A.    Yes, ma'am, we did.

9   Q.    And describe it for the jury, please.

10  A.    I contacted the Effingham County Sheriff's Department in

11  reference specifically to this because, it being their

12  jurisdiction, they would have more information to this property

13  than I could.

14        I called them on specifics as to the property and they --

15  they determined, they advised -- said they could only identify

16  it as a compound.  They said there is only one way in and one

17  way out, and it is extremely dense around the areas, but it's

18  clear cut in certain parts, specifically where the houses are.

19  They said that there was a newer dwelling, a modular home, that

20  was put on there, as well as multiple campers and trailers and

21  things on the property itself.

22  Q.    Did you obtain a search warrant to search Pablo

23  Rangel-Rubio 's residence?

24  A.    I did, yes, ma'am.

25  Q.    The 275 Milton Rahn Road in Effingham County in Rincon,

231

1   Georgia?

2   A.    I did, yes, ma'am.

3   Q.    And when did you, at what date did you obtain that search

4   warrant?

5   A.    It was the following day after the homicide occurred.  I

6   believe it was August the 20th.

7   Q.    And did you participate in executing the search warrant?

8   A.    I did, yes, ma'am.

9   Q.    Did you gather other agencies to assist you with that

10  process?

11  A.    I did, yes, ma'am.

12  Q.    And why did you do that?

13  A.    It was multiple things.  The information we got was there

14  was going to be an array of people at the residence.  We knew

15  that we were dealing with what appeared to be extortion or human

16  trafficking for work labor, so we knew that we had to get some

17  federal entity, especially since EEOC is involved, so we

18  contacted Homeland Security, who investigates these kind of

19  cases.

20  Q.    So Homeland Security assisted in the execution of the

21  search warrant?

22  A.    Yes, ma'am.  Effingham County, because it was their

23  jurisdiction, we utilized them as far as a -- as a take -- what

24  we refer to as a takedown team or the people executing the

25  actual search warrant.

232

1  Q.   And when you say "executing the search warrant," describe

2  that process for the jury.  What does that mean exactly?

3  A.   It's a long process that goes into it.  You have to get

4  the actual -- I guess the layout of the property.  Effingham

5  County had that, and then we actually had to have teams.

6      We break them down into teams, who is doing what and who

7  is going where.  This being multiple dwellings on the actual

8  properties, we could not go to one residence without going to

9  the same, to another residence simultaneously for fear of

10 fleeing, items being discarded.

11     So we gave specific jobs for different people.  We had

12 people specifically for interpreting purposes.  We had -- we had

13 a base camp where -- because it was hot, we had certain people

14 that were going to stand by for EMS, for water, for food,

15 restroom breaks, so we had certain areas and certain stages we

16 put people.

17 Q.   And we talked about you obtained a search warrant.  Did

18 you have to go to court or a judge to get permission to go in

19 and search?

20 A.   I did, yes, ma'am.

21 Q.   And that was a state search warrant?

22 A.   It was a state search warrant through Effingham County.

23 Q.   And what happened when you executed the search warrant?

24 A.   We executed the search warrant.  There was -- when we

25 first got onto the property, we turned down the driveway.  There

1  was a -- I think it was a burgundy truck that was leaving.

2  Effingham County sheriff deputies were tasked with initiating a

3  traffic stop on that vehicle because part of the scope of the

4  search warrant was all items and vehicles and people located on

5  the actual property itself.  They initiated a traffic stop on

6  that vehicle and told the driver and passenger to turn around

7  and come back to the search warrant.

8      Other officers went to the -- went to each respective

9  residence and executed their search warrant.

10 Q.    Direct your attention, did you learn the identity of the

11 person that was leaving as you-all were entering the location to

12 search?

13 A.    I did, yes, ma'am.

14 Q.    And what was that individual's name?

15 A.    His name was Juan Rangel and he is the brother to Mr.

16 Pablo Rangel.

17 Q.    Exhibit 8, who is depicted in Exhibit 8, sir?

18 A.    That is Mr. Juan Rangel, the person driving the vehicle

19 that was leaving the area.

20 Q.    Okay.  And what happened next, sir?

21 A.    He was stopped.  He was brought back before our base camp

22 where HSI was running everybody's information, and my detective,

23 my Spanish-speaking detective was also standing by in the area

24 assisting in the talking to people and seeing who lives where,

25 where -- what belongs to who and then just making sure that

234

1   everybody was okay.

2   Q.    And approximately how many people did you learn were

3   either living there or present at 275 Milton Rahn Road when you

4   executed the search warrant?

5   A.    Specific, I don't know the number.  It was several young

6   ladies on the property.  I believe it was four adult males on

7   the property and several juvenile children, I believe upwards of

8   five kids on the property.

9   Q.    And what was your job, sir?

10  A.    I processed every item of evidence.  When the officers

11  went in there, their sole job was to remove everybody out of the

12  house, secure the scene.  I photographed every residence before

13  the search warrant began.  Once the residence was photographed,

14  overall photographs, the search was to be done by Garden City

15  officers.

16        When an item of notoriety was located, they did not touch

17  it.  They called me.  I photographed it and I collected every

18  piece of item that left that residence.

19  Q.    As part of the authority that you were granted by a state

20  judge to enter the property and search it, were you also granted

21  permission to seize certain types of items?

22  A.    Yes, ma'am, I was.

23  Q.    And did those items include documents related to work?

24  A.    Correct.

25  Q.    Cell phones, firearms and ammunition?

235

1   A.    Correct, yes, ma'am.

2   Q.    So are these generally the types of items you're looking

3   for?

4   A.    Correct.

5   Q.    So what happens next, sir?

6   A.    We began searching -- we began, we try to do a very

7   methodical, Mr. Juan -- Effingham County was able to take two

8   males into custody near a tree, which is located near multiple

9   campers.  The target or our person of interest, Mr. Pablo

10  Rangel, was taken into custody in that area over there.

11  Q.    Briefly, approximately how many dwellings or trailers are

12  located on this property?

13  A.    If I can remember, it was -- it was north of three, I

14  think between three and five total.

15  Q.    Can you describe in general terms the house, the dwelling?

16  What did they look like?

17  A.    One of them was a -- was later determined to be a Pablo's

18  house.  It was a newer model.  Everything appeared brand-new

19  inside the residence like it was recently built.  There was a

20  trailer that I remember that belonged to Jonathan Rangel.  It

21  was a white -- I believe it was a white camper or base camper

22  with white trim.

23        There was a detached pull-behind camper that somebody was

24  living out of.  I believe that residence was being lived in by

25  Mr. Juan Rangel, and I believe that there was another camper as

236

1    well on the property.

2    Q.    And you mentioned the name Jonathan Rangel.  Was that a

3    relative of Pablo Rangel-Rubio?

4    A.    It's his brother, yes, ma'am.

5    Q.    And Juan Rangel-Rubio, you said -- I'm sorry, who did you

6    say Jonathan was?

7    A.    Jonathan would be Juan's son.  He also had a room inside

8    that property, inside one of the trailers.

9    Q.    So you were able to confirm that not only Pablo lived

10   there, but his brother Juan and his brother Juan's son Jonathan?

11   A.    And an employee, another employee lived on the property.

12   Q.    Multiple people and multiple family members --

13   A.    Correct.

14   Q.    -- of Pablo?

15   A.    Yes, ma'am.  Correct.

16   Q.    How many number of vehicles on the property did you

17   observe?

18   A.    I don't remember the specifics, but it was north of I

19   believe five vehicles on the property.

20   Q.    Did you locate a vehicle that you later determined to be

21   Pablo's work Wolf Tree truck?

22   A.    I did, yes, ma'am.

23   Q.    Later on in your investigation did you learn that this

24   truck had GPS associated with it?

25   A.    I did, yes, ma'am.

237

1   Q.    So the company could monitor its employees?

2   A.    Correct.

3   Q.    Did you locate a vehicle that you later determined to be

4   Juan's vehicle?

5   A.    I did, yes, ma'am.

6   Q.    And describe that vehicle for us.

7   A.    It was a pickup truck, and that was the vehicle that he

8   was driving when he was stopped by Effingham County.

9   Q.    What color was that vehicle again?

10  A.    I believe it was maroon or burgundy.  It was -- it

11  was what I would describe either dark brown or light purple or

12  dark purple.

13  Q.    And you indicated you located Pablo on the property?

14  A.    Yes, ma'am.

15  Q.    And he had lived there, and was -- Juan was apprehended?

16  A.    He was, yes, ma'am.

17  Q.    And was Pablo arrested as well?

18  A.    Yes, ma'am.  They were detained at this moment just

19  pending the outcome of the search warrant.

20  Q.    Okay.  And upon searching the different dwellings and

21  vehicles on the property, did you seize cell phones that you

22  determined to belong to Pablo and a cell phone that you

23  determined to belong to Juan?

24  A.    Yes, ma'am.  A search of Pablo, when he was taken into

25  custody, was done by me, and on his person he had a cell phone

238

1    on him.  When Juan was stopped, there was a phone inside the

2    vehicle that was seized by Effingham County Captain Rick Daly

3    and Corporal Bradley with Effingham County and those cell phones

4    were turned over to me as well.

5    Q.    And were photographs taken of the search when you searched

6    Pablo's and Juan's homes at 275 Milton Rahn Road?

7    A.    Yes, ma'am, they were.

8    Q.    If we could pull up Exhibit 25, please, and tell us what

9    we're looking at, Exhibit 25?

10   A.    That appears to be Mr. Pablo Rangel's residence.  That is

11   Garden City police to the right.  That is Effingham County

12   sheriff's deputy in the middle, and then that was people that

13   were located in the residence.  They were allowed to sit -- it

14   got really hot during the execution of search warrant.

15        There was an oscillating fan that was rotating over there

16   which was significantly cooler in that area, so we had the

17   people at -- from -- the males sit in that area.

18   Q.    And Exhibit 25-2, what is depicted in this photograph,

19   sir?

20   A.    That is going to be, appears to be the living room or the

21   office of Mr. Pablo Rangel.

22   Q.    And Exhibit 25-3.

23   A.    That is, appears to be social security card and I believe

24   two separate identification cards as well as a printer and some

25   more documentation.

239

1    Q.    And Exhibit 25-4?

2    A.    That is some more documentation, some letters.  I believe

3    some of that was business-related material for Wolf Tree

4    Services.

5    Q.    And in Exhibit 25-6 and then 25-7 and 25-8, if you could

6    scroll through those, please, and what are we looking at in

7    those photographs, sir?

8    A.    That is a -- I believe a New York identification card, a

9    Georgia driver's license and social security card.

10   Q.    Exhibit 25-9 is also paperwork found in the defendant's

11   home?

12   A.    Yes, ma'am.

13   Q.    Paperwork related to what, sir?

14   A.    This is insurance information, liability insurance for Mr.

15   Pablo Rangel.

16   Q.    And Exhibit 25-10, what is depicted in this photograph,

17   sir?

18   A.    They appear to be time sheets from employees for the

19   business of Wolf Tree Services.

20   Q.    Located in Pablo's home?

21   A.    Correct, in that same cluster of documentation in his

22   office.

23   Q.    And Exhibit 25-11, what is depicted here, sir?

24   A.    That is a -- looks like it's a deposit, a direct deposit

25   form for a -- looks like a Maria Vega with a check stub.

240

1   Q.   And Exhibit 25-12, is this a better view of that document,
2   sir?
3   A.   Yes, it's an aerial view.  It looks like it's a direct
4   deposit form for the business of Wolf Tree.
5   Q.   And Exhibit 5-13, what is depicted in this photograph,
6   sir?
7   A.   That is two of the -- I guess the lots, one is a trailer
8   and the other one is a camper.  We were -- some of the area that
9   we searched.
10  Q.   And Exhibit 25-14, what is depicted here, sir?
11  A.   That is one -- the camper, the photo you just showed, it's
12  the camper to the left.
13  Q.   And 25-15?
14  A.   That's just us leading into the residence.  We normally do
15  this during every search warrant.  So we're taking a picture as
16  we enter into that residence.
17  Q.   So examples of some of the trailers and campers that were
18  located on the property?
19  A.   Correct.
20  Q.   And Exhibit 25-16, what is depicted in this photograph,
21  sir?
22  A.   That was the vehicle that Mr. Juan Rangel was stopped in
23  driving as he was trying to leave the property.
24  Q.   And his cell phone was located on the dash of this
25  vehicle?

241

1   A.    Yes, ma'am.

2   Q.    In front of him as he was driving?

3   A.    Correct.

4   Q.    As part of your authority under your search warrant, did

5   you seize that cell phone as well as the cell phone belonging to

6   Pablo, as well as the paperwork and various firearms and

7   ammunition?

8   A.    I did, yes, ma'am.

9   Q.    Exhibit 26, what is depicted in Exhibit 26?

10  A.    That is -- that is a homemade porch leading into the

11  camper that belonged to Mr. Juan Rangel.

12  Q.    Juan's house?

13  A.    Correct, yes, ma'am.

14  Q.    And Exhibit 26-2, what are we looking at in Exhibit 26-2?

15  A.    That is the entryway, again the homemade front porch

16  leading into the camper, just a closer overall view.

17  Q.    For Juan Rangel-Rubio?

18  A.    For Juan Rangel-Rubio's residence, yes, ma'am.

19  Q.    Pablo's brother?

20  A.    Pablo's brother.

21  Q.    Exhibit 26-3, what is depicted in this photograph, sir?

22  A.    That is from the front door of the Juan's residence

23  looking into the actual property itself, the camper.

24  Q.    Going through the front door and then Exhibit 26-4, what

25  is depicted in this photograph?

242

1   A.    That is a closeup of -- from the same doorway, just

2   slightly canted towards the right, that is, I guess, the oven.

3   It's what appears to be his kitchen area inside of Juan's

4   camper.

5   Q.    What else is depicted in the middle there, TV?

6   A.    Television.

7   Q.    And then a little fridge on the left?

8   A.    Correct.

9   Q.    And Exhibit 25 -- excuse me, 26-5, what is depicted in

10  this photograph, sir?

11  A.    We have appears to be his sleeping arrangements.  The oven

12  is open with a firearm and some ammunition as well as on the

13  right-hand side is an AR15-style rifle.

14  Q.    This is basically the inside view of Juan Rangel-Rubio's

15  camper or home?

16  A.    Correct.  This is basically, when you walk into the front

17  door, you just turn towards the right and this is what you see.

18  It's a very, very small camper.  It couldn't for more than 12

19  feet long.

20  Q.    And Exhibit 26-6, what is depicted in this photograph?

21  A.    That is a view from the oven with the oven door open.

22  Again, we have a firearm.  We have some shell casings as well or

23  some -- some ammunition and it looks to be a gun holster is

24  still inside the oven.

25  Q.    And Exhibit 26-7, what is depicted on Page 7 of Exhibit

243

1    26?

2    A.    That is an overview from above of the firearm and the

3    ammunition located inside the oven.

4    Q.    Exhibit 27, do you recognize what is depicted in this

5    photograph, sir?

6    A.    I do, yes, ma'am.

7    Q.    What is it?

8    A.    That is the ammunition, the .22 hollow point that were

9    taken from inside of that oven.

10   Q.    And going back to Exhibit 26-7, if we could zoom in to the

11   ammunition depicted in the photograph, sir, can you identify, if

12   the touch screen is working, the .22 hollow point ammunition?

13   A.    It's not working but it's the -- I guess it's a total of

14   five .22-caliber boxes.  It would be the one in the middle, the

15   smallest of all the boxes.  It says CCI22WMRHP on it.

16   Q.    Did that catch your attention, sir?

17   A.    At this point, it did -- all the ammunition at this point

18   caught my attention.  It appeared when the victim was shot it

19   was going to be a smaller caliber that was used, so at the time

20   all of this .22-caliber ammunition to me was -- was paramount.

21   Q.    Sir, I'm handing you what's been marked as Government's

22   Exhibit 28.  Take a look at Exhibit 28 and please tell me if you

23   recognize that?

24   A.    I do, yes, ma'am.

25   Q.    What do you recognize that to be?

244

1    A.    That is the .22 WMR hollow point rounds that were seized

2    from inside the oven of Juan Rangel's residence.

3    Q.    Now, did you have an opportunity to speak with Pablo

4    Rangel-Rubio after you executed a search warrant at his house?

5    A.    I did, yes, ma'am.

6    Q.    And prior to speaking with him, did you advise him of his

7    constitutional right, his Miranda warnings?

8    A.    I did, yes, ma'am.

9    Q.    Did he agree to speak with you?

10   A.    He did.

11   Q.    And did he explain that he was an illegal alien?

12   A.    Correct.

13   Q.    And did you ask him where he was at the day and time of

14   the murder of Mr. Montoya?

15   A.    He was in Brunswick, Georgia.

16   Q.    Did you have a chance to speak with Juan Rangel-Rubio?

17   A.    I did, yes, ma'am.

18   Q.    And after you executed the search warrant and prior to

19   speaking with him, did you advise him of his constitutional

20   rights, his Miranda warnings?

21   A.    I did, yes, ma'am.

22   Q.    Did he agree to speak with you?

23   A.    He did.

24   Q.    Did he explain that he was also an illegal alien?

25   A.    He did.

245

1   Q.    Did you ask him where he was at the day and time of Mr.

2   Montoya's murder?

3   A.    I did.

4   Q.    What did he tell you?

5   A.    He was working, I believe he was in Rincon, Georgia,

6   working.

7   Q.    Working for Wolf Tree?

8   A.    Wolf Tree with two other individuals.

9   Q.    After you searched their residence and spoke with them,

10  did Pablo and Juan, were they arrested for being illegal aliens

11  in possession of firearms and ammunition after the execution of

12  the search warrant?

13  A.    They were, yes, ma'am.

14  Q.    And although they were arrested at that time on those

15  charges, did your homicide investigation remain ongoing?

16  A.    It did, yes, ma'am.

17  Q.    Now because of the ammunition that you located in Juan's

18  trailer, did he also become a suspect in this case for you?

19  A.    He did, yes, ma'am.

20  Q.    And after you searched 275 Milton Rahn Road and arrested

21  suspects Pablo and Juan, what did you do next?

22  A.    We, after everybody was interviewed, we took a second to

23  calm down.  This was a rapidly-evolving situation.  I sat down

24  with Special Agent Tony Miranda at the time, and we decided what

25  our next steps in this case should be.

246

1    We determined that we needed to speak to -- still more

2    people we needed to speak to, specifically people listed on the

3    affidavit as well as test-fire every one these firearms that

4    were seized from inside the residence.

5    Q.   As part of the homicide investigation and any crime, do

6    you canvass the area?

7    A.   We do, yes, ma'am.  We go back to where the actual

8    incident occurred at.

9    Q.   What does that mean, to canvass the area?  Describe that

10   for the jury.

11   A.   We go to the area where the incident occurred and we try

12   to talk to any potential witnesses that may have seen or heard

13   anything and we try to find, if we can find any footprints and

14   we try to find -- this being a general area with multiple

15   businesses, we try to ascertain all relevant video surveillance

16   footage from the area, so we knock and talk with every business

17   out there trying to see if their video system could have

18   captured something.

19   Q.   You also knock on doors and see if anybody saw or heard

20   anything?

21   A.   We do, yes, ma'am.

22   Q.   And did you do both of those things in this case?

23   A.   We did.

24   Q.   Did you find anyone that saw anything?

25   A.   We did not see anybody that saw anything, no, ma'am.

247

1  Q.    Did you find anybody that heard anything?

2  A.    We did, yes, ma'am.

3  Q.    And describe that for the jury, please.

4  A.    Directly in front of where the scene occurred, there is a

5  church.  They were in the process of moving in.  That pastor

6  heard what he can only describe as a hammer hitting a nail

7  multiple times.  He didn't think anything of it, but he did give

8  us a rough estimate of what time he thinks he heard it.

9  Q.    And approximately what time did he believe he heard it?

10  A.    I don't remember the specifics but it was between 11:00

11  and 1:00.

12  Q.    Direct your attention to Exhibit 21.  Is this an overview

13  map of the area where Mr. Montoya was found?

14  A.    It is, yes, ma'am.

15  Q.    And can you identify, there are some pins on this map.  Do

16  you see some yellow pins and red pins?

17  A.    I do, yes, ma'am.

18  Q.    Can you describe for the jury those locations?

19  A.    The orange -- the orange pin or the red pin, that is where

20  Mr. Montoya was killed.  The yellow pin where it says 59 Village

21  Drive, that was Mr. Montoya's residence at the time and the

22  yellow pin being the Pilot gas station was where I was at when I

23  went to the scene.

24  Q.    The yellow pin at the Pilot is at the bottom left

25  corner --

248

1    A.    Correct.

2    Q.    -- of the map, and is there another pin depicted at the

3    top of the map?

4    A.    Yes, ma'am, there is, at the very top near the

5    intersection of Dean Forest Road and Airport Park Drive.  That

6    is International Brothers of Electrical Workers, IBEW.

7    Q.    Now, looking at this overview of the crime scene, can you

8    describe for the jury the different locations you went to.

9    Well, let me back up and ask you a different question.

10         You indicated there was a pastor that thought he heard

11   something.

12   A.    Yes, ma'am.

13   Q.    Can you describe where that pastor was located on August

14   the 19th of 2017 when he heard the pings?

15   A.    Directly in front of where that red pin is at is -- it

16   appears to be almost like red shingled roof.  Directly in front

17   of it, that's where he was at when he heard the hammer noise.

18   Q.    And that -- he believed that was between 11:00 and 1:00

19   p.m.?

20   A.    As far as I can remember, yes, ma'am.

21   Q.    From an overview of this area, can you describe for the

22   jury the different locations you went to to determine if there

23   was any surveillance video?

24   A.    We went to every single property on Old Dean Forest Road.

25   We started from Airport Park Drive and worked our way all the

249

1   way down to the dead end of Old Dean Forest Road.  It dead-ends

2   in a wooded area right before I-16.

3   Q.    You indicated Airport Park Drive.  Can you describe for

4   the jury where that road is at?

5   A.    When you're going to Dean Forest Road and you make that

6   first immediate right from Old Dean Forest Road, that yellow

7   line that was created was Dean Forest Road.

8   Q.    So my touch screen appears to be working?

9   A.    Okay.

10  Q.    Is this Old --

11  A.    That is Airport Park Drive, yes, ma'am.

12  Q.    And is this yellow line I'm making now, is this Dean

13  Forest Road?

14  A.    That is Dean Forest Road, yes, ma'am.

15  Q.    So where the two yellow lines are intersecting, is that

16  the intersection of Airport Road and Dean Forest Road?

17  A.    Correct.

18  Q.    Dean Forest Road is also known as Georgia Route 307?

19  A.    307, yes, ma'am.

20  Q.    And is I-16 where I'm drawing the third yellow line?

21  A.    Yes, ma'am, Interstate 16 westbound.

22  Q.    And as I'm drawing this unusual U-turn as you said, is

23  this making a U-turn from Dean Forest Road onto Old Dean Forest

24  Road?

25  A.    That is the U-turn from Dean Forest Road to Airport Park

250

1   Drive back onto Old Dean Forest Road.

2   Q.    And from making that U-turn from Dean Forest Road to Old

3   Dean Forest Road, are there any businesses in that area that you

4   contacted to see if they had any surveillance videos?

5   A.    Yes, ma'am.

6   Q.    What was that, sir?

7   A.    It was where the yellow pin is up on top.  It's the IBEW.

8   Q.    Did you determine that they had surveillance footage

9   that --

10  A.    That captured the entire intersection, yes, ma'am.

11  Q.    And did you then secure the surveillance footage for the

12  time for August the 19th of 2017?

13  A.    Yes, ma'am.

14  Q.    And did you also pull it for the day before, too?

15  A.    Yes, we did.

16  Q.    August the 18th, 2017?

17  A.    Yes, ma'am, we did.

18  Q.    Now along this route from the unusual U-turn to where Mr.

19  Montoya was shot and killed, are there any other locations that

20  you looked at to see if there was any surveillance footage?

21  A.    We did, yes, ma'am.  Again we went to every business.  We

22  spoke to the pastor.  He had no cameras.  We spoke to the Pilot

23  gas station.  Their cameras are specifically for internal loss

24  so nothing that would have captured anything on actual Old Dean

25  Forest Road.

251

1          There are some trucking yards in that area but there is

2     absolutely nothing that would have been facing towards this

3     general area.  Everything is more for monetary and internal

4     loss.

5     Q.    The Pilot down at the bottom left, the yellow pin where

6     you were originally located when the call came out --

7     A.    Yes, ma'am.

8     Q.    -- when Mr. Montoya was killed, did you see if they had

9     any surveillance video?

10    A.    We did, yes, ma'am.

11    Q.    And you indicated it captured what direction?

12    A.    The video, it's capturing, again, it's only internal loss,

13    and there is a slight path that leads from that wooded area

14    directly to the north of it.  That path, there is a path right

15    there and it captures just the -- what I would describe as a cut

16    from -- leading to that wooded area to I guess the Shell gas

17    station, which is directly next-door.

18    Q.    So the line that I drew on that while you were speaking,

19    that would be the path that the surveillance video captured?

20    A.    Correct, yes, ma'am.

21    Q.    Capturing the activity to the south of the Pilot?

22    A.    South of the Pilot, yes, ma'am.

23    Q.    Did you nevertheless seize that surveillance video?

24    A.    I believe we did, yes, ma'am.

25    Q.    And did you and other law enforcement agents that you

252

1   worked with review it?

2   A.    We did.

3   Q.    Did you find anything of value for that?

4   A.    Absolutely nothing.

5   Q.    Okay.  What about where Mr. Montoya was killed, the red

6   pin that is near the intersection or -- excuse me -- the

7   entrance to Savannah Pines Mobile Home Park; is that correct?

8   A.    Slightly north of it.  It's just a little bit away from

9   it, but, yes, it's near the front entrance.

10  Q.    The yellow line that I'm drawing, that is a line from Old

11  Dean Forest Road from where Mr. Montoya was shot turning then

12  onto Village Drive, the road for Savannah Pines Mobile Home

13  Park?

14  A.    It is, yes, ma'am.

15  Q.    That would ultimately lead down to where his home was

16  located?

17  A.    Correct.

18  Q.    And where the yellow line is kind of making a little U

19  there, is that the entrance to Savannah Pines Mobile Home Park?

20  A.    It is, yes, ma'am.

21  Q.    And did you contact Savannah Pines Mobile Home Park to see

22  if they had any surveillance footage?

23  A.    We actually physically observed a camera that was on a

24  post directly on the front of the property.  However, their

25  camera was not operable at the time so it did not record

253

1    anything.

2    Q.    Okay.  Pulling up Exhibit 20, 20, please, 20-1, do you

3    recognize that?

4    A.    Yes, ma'am, I do.

5    Q.    And what is depicted in this photograph, sir?

6    A.    That is Dean Forest Road just before Airport Park Drive.

7    Q.    Is this the street view as if you were on Dean Forest Road

8    heading north about to turn right onto the unusual intersection

9    that you talked about of Airport Park Road and then Old Dean

10   Forest Road?

11   A.    Yes, ma'am.

12   Q.    And Exhibit 20-2, can you describe for the jury what are

13   we looking at in 20-2.

14   A.    This is just you made the right-hand turn onto Airport

15   Park Drive and then made another right onto Old Dean Forest Road

16   so that is the intersection of Old Dean Forest Road and Airport

17   Park Drive, and then that is -- directly in front of it at that

18   intersection is the IBEW.

19   Q.    So the road to the -- so now this is basically slightly to

20   the right of the last photograph that we looked at but facing

21   north?

22   A.    North, yes, ma'am.

23   Q.    So this would be on the street view, if you were on Old

24   Dean Forest Road where I'm making the yellow line?

25   A.    Correct.

254

1   Q.   And this road to the left is Dean Forest Road?

2   A.   Correct.

3   Q.   And then this little intersection by the stop sign, is

4   that the Airport Park Drive?

5   A.   Yes, ma'am.

6   Q.   And then this building right here, is this the IBEW?

7   A.   Yes, ma'am.

8   Q.   What does that stand for, IBEW?

9   A.   International Brothers of Electrical Workers.

10  Q.   And they had surveillance footage?

11  A.   They did have surveillance footage, yes, ma'am.

12  Q.   And this is the footage you collected for the day before

13  the murder, August the 18th of 2017, and the day of the murder,

14  August 19th of 2017?

15  A.   Yes, ma'am.

16  Q.   Now, Exhibit 20-3 describing this area in more detail, can

17  you describe for the jury what are we looking at in this

18  photograph?  What is our point of view?

19  A.   I believe that's the exact same view that we just saw;

20  however, now we're facing towards the south.

21  Q.   So on Old Dean Forest Road?

22  A.   We're on Old Dean Forest Road heading towards Savannah

23  Pines.

24          THE COURT:  Is IBEW to our backs?

25          THE WITNESS:  It's directly behind us, yes, ma'am.

255

1  Q.    (By Ms. Groover)  And Exhibit 20-4, what is our view in

2  20-4?

3  A.    That's the intersection of Old Dean Forest Road and

4  Village Drive.  That right there towards the left is the front

5  entrance, the only entrance to Savannah Pines Mobile Home Park.

6  Q.    And as you described the only entrance, I was making a

7  yellow line on the screen.  Is that Village Drive, the only

8  entrance?

9  A.    The only entrance onto the mobile home community, yes,

10 ma'am.

11 Q.    And is this the area where they had their surveillance

12 camera that was not working?

13 A.    Yes, ma'am.

14 Q.    And Exhibit 20-5, describe for the jury what are we

15 looking at in 20-5?

16 A.    That is we're standing near the front entrance of Savannah

17 Pines Mobile Home Park.

18 Q.    Now is this a Google image from 2016 --

19 A.    Yes, ma'am.

20 Q.    -- of the vantage point from Old Dean Forest Road having

21 just passed, looking south on Old Dean Forest Road having just

22 passed Savannah Pines Mobile Home Park?

23 A.    Correct.

24 Q.    Ad in the photograph do you see Mr. Montoya's tree truck

25 depicted?

256

1  A.    The tree truck is parked there directly in front, yes,

2  ma'am.

3  Q.    And did you come to learn through your investigation, was

4  that common for him to park that truck there?

5  A.    Yes, ma'am.  They did not allow that actual truck in the

6  actual property itself, so he would just park it outside.

7  Q.    Does this picture also depict the foliage and the trees

8  and the bushes around that area?

9  A.    Yes, ma'am.

10 Q.    And although this is a Google image from 2016, was this a

11 fair and accurate representation of generally what the, you

12 know, the grass and the trees looked like on August the 19th of

13 2017?

14 A.    Correct.  There was no significant change between '16 and

15 '17.

16 Q.    Going back to the surveillance video that you were able to

17 pull, the IBEW, did you have a chance to review that footage

18 both the day before and the day of the murder?

19 A.    Yes, ma'am.

20 Q.    Did you notice anything unusual?

21 A.    We did, yes, ma'am.

22 Q.    And prior to today, did you have an opportunity to view

23 Government's Exhibit 29, 29 being the surveillance video from

24 the IBEW that captured August the 18th of 2017, the day before

25 the murder?

257

1   A.    I did, yes, ma'am.

2   Q.    And prior -- are Exhibits 29A through 29H, are they clips

3   or snippets of the surveillance video from the day before the

4   murder on August the 18th of 2017?

5   A.    Yes, ma'am.

6   Q.    And are those clips depicting some of that unusual

7   activity that you observed?

8   A.    Correct.

9   Q.    And prior to today did you have a opportunity to view

10  Government's Exhibit 29A through 29H, those clips?

11  A.    Yes, ma'am.

12        THE COURT:  Ms. Groover, just planning our break, is now

13  a natural break in your direct?

14        MS. GROOVER:  It is, Your Honor.

15        THE COURT:  So before we review those clips, ladies and

16  gentlemen, it is time for our mid-morning break, so it's 10:30.

17  We will break until about 10:45.

18        Detective, although you're allowed to take a break, get

19  a sip of water and walk around, it will be a lonely break for

20  you because you are to consider yourself still on the stand.

21        With that, let's rise for the jury.

22        (The jury exits the courtroom.)

23        THE COURT:  Counsel, we will be in recess for 15

24  minutes.

25        (Recess from 10:31 a.m. to 10:49 a.m.)

258

1          THE COURT:  All right, let's bring in the jury.

2          (The jury enters the courtroom.)

3          THE COURT:  Detective Rodriguez, when we initiated our

4    break, you were under oath, sworn to tell the truth.  Do you

5    reaffirm that oath for the balance of your testimony?

6          THE WITNESS:  I do.

7          THE COURT:  Proceed.

8    Q.    (By Ms. Groover)  Thank you, Your Honor.

9          Sir, prior to our break we were discussing surveillance

10   videos that you obtained from the IBEW?

11   A.    Yes, ma'am.

12   Q.    Do you recall that?

13   A.    Yes, ma'am.

14   Q.    The day before and the day after the murder; correct?

15   A.    Correct.

16   Q.    Excuse me, the day before and the day of the murder?

17   A.    Correct.

18   Q.    And noticed some unusual activity?

19   A.    We did.

20   Q.    If you will view Exhibit 29A, and does this start from

21   Exhibit 29 at 12 o'clock 32 minutes and 43 seconds?

22   A.    It does, yes, ma'am.

23   Q.    Please play the clip, and describe for us what you

24   observed on this video that caught your attention.

25         Will you play the clip again, please.  Do you notice the

259

1   vehicle turning onto Airport Park Drive?

2   A.    White in color GMC, I'm sorry, the white-in-color Cadillac

3   Escalade.

4   Q.    It was turning from Old Dean Forest -- excuse me, turning

5   from Dean Forest onto Old Dean Forest Road?

6   A.    Yes, I did, yes, ma'am.

7   Q.    And Exhibit 29B, does this start at 12:36 and 36 seconds

8   for the record and tell us what caught your attention in this

9   clip?

10  A.    A few moments later that same white-in-color, it appears

11  that same white-in-color Cadillac Escalade is leaving the

12  property.

13  Q.    And turning --

14  A.    Turning onto Dean Forest Road.

15  Q.    And Exhibit 29C at the 12:46:31 mark, can you please

16  describe what is depicted that catches your attention in this

17  video?

18  A.    It appears to be the same Cadillac Escalade turning back

19  onto Old Dean Forest Road onto Dean Forest Road.

20  Q.    Then Exhibit 29D, a few minutes later, 12:53:57 mark, can

21  you describe what catches your attention in this clip?

22  A.    There is a white van with a ladder on the roof that turns

23  from Dean Forest Road onto Old Dean Forest Road.

24  Q.    And Exhibit 29E at the 12:54:56 mark, describe what

25  catches your attention in this clip?

260

1    A.    That white Cadillac Escalade is seen leaving Old Dean

2    Forest Road and turning down, making a right onto Airport Park

3    Drive, which is a dead-end road.

4    Q.    And then less than a minute later, Exhibit 29F, at the

5    12:56:19 mark, describe what catches your attention in this

6    clip?

7    A.    That same Cadillac Escalade is going back out towards the

8    intersection of Dean Forest Road and Airport Park Drive, so the

9    vehicle just went to the back of the U-turn and it's now going

10   back towards Dean Forest Road.

11   Q.    It ultimately turns right on Dean Forest Road?

12   A.    Yes.

13   Q.    On Exhibit 29G, just a few minutes later, can you please

14   describe what catches your attention in this clip beginning at

15   the 12:59:45 mark?

16   A.    The white van with the ladder and looks like a black mark

17   on the side is leaving the area.

18   Q.    Comes out of Old Dean Forest Road?

19   A.    Leaves Old Dean Forest Road and is turning onto Dean

20   Forest Road, same direction the Cadillac Escalade just went.

21   Q.    And approximately three to four minutes later in Exhibit

22   29H at the 1:03:28 mark, can you please describe what catches

23   your attention in this clip?

24   A.    The white van appears to be going on Dean Forest Road past

25   Airport Park Drive.

261

1  Q.   So in the scheme of approximately 30 minutes between

2  12:32:43 and 1:03:28, do you see two vehicles coming in and out

3  multiple times?

4  A.   Correct.

5  Q.   A white van?

6  A.   The white van and --

7  Q.   And a white Cadillac Escalade?

8  A.   Yes, ma'am.

9  Q.   And these again clips were on August the 18th, 2017?

10 A.   Yes, ma'am.

11 Q.   The day before; is that correct?

12 A.   The day before the murder, yes, ma'am.

13 Q.   And then do you review video from the day of the murder on

14 August the 19th of 2017?

15 A.   Yes, ma'am.

16 Q.   And do you again notice a vehicle that catches your

17 attention?

18 A.   Correct.

19 Q.   Exhibit 30A beginning at the 9:03:17 mark, can you

20 describe for the jury what catches your attention?

21 A.   The same white van from the night before is seen leaving

22 Old Dean Forest Road, making a right onto Airport Park Drive,

23 which is a dead-end road.

24 Q.   And Saturday morning, is this an industrial area?

25 A.   It is industrial area, yes, ma'am.

1    Q.    Are Saturday morning these businesses, again, we're at the

2    IBEW facing the intersection; correct?

3    A.    Correct.

4    Q.    Is that typically closed on Saturday morning?

5    A.    Yes.  That being industrial business, they are more

6    commercial grade.  They usually don't open up.  They usually are

7    throughout the week 8:00 to 5:00 for industrial purposes.

8    Q.    A little while later, Exhibit 30B, at the 9:57:58 mark,

9    what do you notice that catches your attention?

10   A.    Roughly 50 minutes later, that white van with the black

11   line on the side with the same ladder on the rack of the roof is

12   seen leaving Airport Park Drive and making a right onto what

13   appears to be Dean Forest Road.

14   Q.    From your review of that surveillance video, does that van

15   appear to sit down there on a dead-end road for almost -- over

16   50 minutes?

17   A.    Over 50 minutes, yes, ma'am.

18   Q.    And Exhibit 30C at the 10:37:39 mark, describe for the

19   jury what catches your attention in this clip.

20   A.    Actually in the same clip we're on, the vehicle, puts the

21   vehicle in reverse and does a U-turn and turns into the -- the

22   vehicle that we were just at, not this, the vehicle does a

23   U-turn and goes into the actual trailer park.

24   Q.    Thank you for catching that.  Let's view Exhibit 30B again

25   at the 9:57 mark, 58, excuse me.  Describe for the jury again

263

1   what is happening.

2   A.    The vehicle, for over 50 minutes is parked at a dead end.

3   It approaches the stop sign.  He appears he's going to be making

4   a right onto Dean Forest Road from Airport Park Drive; however,

5   the vehicle is stopped for several seconds.  The vehicle is now

6   in reverse and makes a -- almost a U-turn style turn and turns

7   into Old Dean Forest Road.

8   Q.    Down where Savannah Pines is?

9   A.    Correct.

10  Q.    And a little less than an hour later, Exhibit 30C at

11  10:37:38 mark, describe for the jury what is depicted in Exhibit

12  30C.

13  A.    That same van with the black line with a ladder rack on

14  the roof is approaching the intersection of Old Dean Forest

15  Road, Airport Park Drive, makes another right on Airport Park

16  Drive going towards a dead-end road.

17  Q.    And a little while later, D, excuse me, Exhibit 30D at the

18  11:12:41 mark, again are these timestamps on the video that

19  we're referring to?

20  A.    Yes, ma'am.

21  Q.    For the time of day?

22  A.    Yes, ma'am.  Roughly almost 45 minutes later that same van

23  is coming from the dead end, same black line on the side, same

24  ladder rack on the roof approaching the stop sign of Dean Forest

25  Road from Airport Park Drive.  The vehicle then makes a left

264

1    onto Dean Forest Road from Airport Park Drive.

2    Q.    And then a few minutes later, 30E, Exhibit 30E at the

3    11:15:55 mark, what do you notice in this video?

4    A.    Less than two minutes later the same van with the black

5    line with the same roof rack is seen turning from Dean Forest

6    Road back onto Airport Park Drive, then makes a -- some weird

7    turn to go back onto Dean Forest Road, so makes a slight turn

8    from Dean Forest Road onto Airport Park Drive and eventually

9    goes back the same way it was coming from, makes a left onto

10   Dean Forest Road.

11   Q.    And then about 15 minutes later or so, Exhibit 30F at the

12   11:34:27 mark, what do you notice in this video?

13   A.    See a silver, what appears to be a silver Toyota Camry

14   turning from Dean Forest Road onto Old Dean Forest Road, and I

15   see the white van again traveling -- what appears to be that

16   same white van traveling on Dean Forest Road.

17   Q.    And that silver vehicle, do you later learn who the driver

18   is of that?

19   A.    Yes.

20   Q.    And have an opportunity to speak with that individual?

21   A.    Yes, ma'am.

22   Q.    Did you learn his name?

23   A.    I don't remember off the top of my head, but he was Mr.

24   Montoya's pastor.

25   Q.    And Exhibit 30G, a couple minutes later at the 11:36:05

265

1    mark, can you describe what's depicted in this clip?

2    A.    That same van appears to be at the stop sign of Airport

3    Park Drive and Dean Forest Road.  The vehicle then makes a left

4    onto Dean Forest Road.

5    Q.    And then about four minutes or so later in Exhibit 30H at

6    the 11:40:59 mark, can you describe for the jury what's

7    depicted?

8    A.    That same van appears to be traveling on Dean Forest Road

9    and bypasses the Airport Park and continues driving down Dean

10    Forest Road.

11    Q.    And then finally Exhibit 30I, at the 11:42:11 mark, what

12    do you notice in Exhibit 30I?

13    A.    The same guy appears to go the opposite way on Dean Forest

14    Road going towards I-16.

15    Q.    As part of your investigation, do you attempt to identify

16    the vehicles that were depicted in Exhibits 29A through H and

17    30A through I?

18    A.    Correct.  Yes, ma'am, having reviewed two days' worth of

19    pulled video, it was the only vehicles that was of any notoriety

20    whatsoever in the investigation.  It should also be noted that

21    is the absolutely only entry way into and out of Savannah Pines.

22    You physically have to drive down that road.

23    Q.    So to get to the entrance of where Mr. Montoya was shot,

24    you have to go through that intersection?

25    A.    You've got to drive through that entrance, yes, ma'am.

266

1  Q.    And part of the investigation, do you partner with agents

2  from Homeland Security Investigation as well as the auditors

3  with the United States Attorney's Office?

4  A.    Yes, ma'am.

5  Q.    And through that investigation, do you obtain and review

6  bank records from Pablo Rangel-Rubio as well as Juan

7  Rangel-Rubio?

8  A.    We do, yes, ma'am.

9  Q.    Exhibit 31, and from a review of Pablo's Bank of America

10  account, do you find anything that caught your attention?

11  A.    Yes, ma'am, we do.

12  Q.    Can you please identify what are we looking at in Exhibit

13  31?

14  A.    We are seeing a check that was dated May the 4th.  It's

15  Pablo's Bank of America account, going to Higinio Perez for

16  $6,000.00.

17  Q.    In further review of some of Pablo's bank records, Exhibit

18  32, do you identify at the bottom of Page 32 a wire transfer?

19  A.    Correct.

20  Q.    From Pablo to Higinio Perez-Bravo?

21  A.    Correct, for $20,000.00.

22  Q.    Then do you begin to conduct an investigation into Higinio

23  Perez-Bravo, the defendant?

24  A.    So the telephone communications search warrant were done

25  when the phones were seized.  We did investigations on the

267

1    actual numbers that were called to and from at the time of the

2    murder as well as prior to the murder, the 18th and the 19th.

3    In doing so, the name Higinio Perez-Bravo was brought up to

4    light at that time.

5    Q.    As phone numbers that Pablo Rangel-Rubio was contacting?

6    A.    More specifically, it was Juan Rangel that was contacting

7    Mr. Higinio Perez, so we began, coupled with the phone numbers

8    and the checks, we began looking into Mr. Higinio Perez.

9    Q.    So beginning looking into the defendant, did you learn

10   where he lives?

11   A.    We did, yes, ma'am.

12   Q.    And exactly where is that?

13   A.    1717 Grove Point Road in Savannah, Georgia.

14   Q.    And do you learn where he works?

15   A.    I believe he is -- I believe he's self-employed.  I don't

16   remember exactly what he did, but I believe he was

17   self-employed.

18   Q.    And does law enforcement identify the vehicles that he

19   has?

20   A.    We do, yes, ma'am.

21   Q.    And turning your attention to Exhibit 35, you obtained

22   records from South Carolina DMV?

23   A.    Correct.

24   Q.    And learned that the defendant owns a Chevy white van?

25   A.    2007 Chevrolet Express van white in color.

268

1   Q.   That appear to be the same type of vehicle, the white van,

2   that you observed on the clips from IBEW?

3   A.   It does, yes, ma'am.

4   Q.   Turning your attention to Exhibit 36, further identify

5   records from South Carolina DMV indicating that the defendant

6   owns another vehicle?

7   A.   2006 white-in-color Cadillac Escalade.

8   Q.   Is that also the similar type, style vehicle that you

9   observed in the clips of the IBEW video?

10  A.   Yes, ma'am.

11  Q.   Did law enforcement conduct surveillance of the defendant

12  to try to photograph his vehicles?

13  A.   Yes, ma'am.

14  Q.   Exhibit 33, do you recognize this?

15  A.   We do.  I do, yes, ma'am.

16  Q.   What is this?

17  A.   This is Higinio's van, which is identical to what was seen

18  on the surveillance video.

19  Q.   And at the top right of this van, do you see there appears

20  to be a sign?

21  A.   Yes, ma'am.  It was a sign for a business with a telephone

22  number on the sign itself.  It is magnetable.  It is a magnet

23  and it is removable.

24  Q.   And do you notice anything unusual about this white van on

25  the side door?

269

1   A.    We do, yes, ma'am.

2   Q.    What exactly is that?

3   A.    It's got the same black line as seen on surveillance

4   video.

5   Q.    What about what I'm circling?

6   A.    Yes, a -- I guess a black -- I don't know how to describe

7   that but it's a black item on the actual vehicle itself like a

8   damage.

9   Q.    The ladder, do you notice the number of rows?

10  A.    Correct, there's three of them.

11  Q.    Is that similar to the number of rows on the video that

12  you observed?

13  A.    Yes, ma'am.

14  Q.    Exhibit 35-2, what are we looking at in this photograph,

15  sir?  Excuse me, 33-2, I apologize.  What are we looking at?

16  A.    That is a more detailed picture of the vehicle itself, the

17  white-in-color van.

18  Q.    And Exhibit 33-3, what is depicted in this photograph,

19  sir?

20  A.    Picture above is behind the vehicle, photographing the

21  vehicle from the rear.

22  Q.    Defendant's van?

23  A.    Correct, yes, ma'am.

24  Q.    And the plates match up with the records produced by

25  the --

270

1    A.    Correct, by the Department of Motor Vehicles, yes, ma'am.

2    Q.    And Exhibit 33-4, scrolling through 33-5 and 33-6, can you

3    tell us as it scrolls what is depicted in those photos?

4    A.    It's the right side of the vehicle with the same black

5    line on the side of the truck with the magnetable -- with the

6    magnet-removable item with the business name and the telephone

7    number associated to the business.  That is a more -- it's got

8    the tag as well as the black line as well on this picture.

9    You're able to tell that this is Higinio Perez's vehicle.

10   Q.    And the magnetic sign says Chiapas?

11   A.    Yes.

12   Q.    Did you learn that is where the defendant is from in

13   Mexico?

14   A.    Correct, yes, ma'am.

15   Q.    It has a phone number depicted on there; do you see that?

16   A.    Yes, ma'am.

17   Q.    What is that phone number?

18   A.    That number comes back to Mr. Higinio Perez.

19   Q.    Did you learn it's an AT&T phone number?

20   A.    Yes, ma'am.

21   Q.    You obtained subscriber information for that phone number?

22   A.    Yes.

23   Q.    And subscribed to the defendant's name?

24   A.    Correct, Higinio Perez.

25   Q.    Exhibit 34, what is depicted in Exhibits 34?

271

1    A.    That is a white Cadillac Escalade parked in front of Mr.

2    Perez's residence.

3    Q.    Consistent with the Cadillac Escalade that is registered

4    to him from the South Carolina DMV records?

5    A.    Correct, yes, ma'am.

6    Q.    Is it also similar to one of the vehicles you identified

7    as unusual activity in the IBEW video?

8    A.    Correct, yes, ma'am.

9    Q.    When you were searching Pablo Rangel-Rubio's residence,

10   you indicated you had a phone number that was associated with

11   him; isn't that correct?

12   A.    Correct.

13   Q.    You seized a phone from him?

14   A.    From Pablo?  Yes, ma'am.

15   Q.    And did you later search that phone?

16   A.    We did, yes, ma'am.

17   Q.    And from that phone did you determine a phone number

18   associated with the phone that Pablo typically carried?

19   A.    Correct.

20   Q.    And is that a (912) 313-6350 number?

21   A.    313-6350.  Yes, ma'am.

22   Q.    Did you also identify a phone that belonged to Juan when

23   you executed the search warrant?

24   A.    We did, yes, ma'am.

25   Q.    And did you later then search that phone?

272

1    A.    Yes, ma'am.

2    Q.    And did obtain a phone number associated with the phone

3    seized from Juan Rangel-Rubio, Pablo's brother?

4    A.    We did, yes, ma'am.

5    Q.    And was that phone number (912) 677-2816?

6    A.    Yes, ma'am, it was.

7    Q.    Again this phone was located on the dashboard of his car

8    as he was trying to leave?

9    A.    Correct.

10   Q.    Having phone numbers now for Pablo, Juan and the

11   defendant, then do you obtain cell site records for these phone

12   numbers?

13   A.    We do, yes, ma'am.

14   Q.    And prior to today, did you review records produced by

15   Verizon pertaining -- well, did you learn that Pablo and Juan's

16   numbers had Verizon carrier?

17   A.    Correct, yes, ma'am.

18   Q.    In Exhibit 37, are those all the records produced by

19   Verizon pertaining to cell site records for Pablo and Juan's

20   phone numbers, Government's Exhibit 37, which are these boxes in

21   front of you, some of the cell phone records?

22   A.    Yes, ma'am.

23   Q.    And did you notice anything about their phone activity

24   that caught your attention the day before or the day after the

25   murder?

273

1    A.    We did, ma'am.

2    Q.    Can you please just tell that the jury?

3    A.    We observed on the 18th there was numerous phone calls

4    between Higinio Perez-Bravo and Mr. Juan Rangel.

5    Q.    Defendant and Juan are communicating the day before the

6    murder?

7    A.    Correct.

8    Q.    What about the day of the murder?  Do you notice anything

9    unusual?

10   A.    There was also communication between Mr. Higinio

11   Perez-Bravo and Mr. Juan Rangel as well the day of the murder.

12   Q.    Based on the phone call communications, the van and the

13   bank records of the wire and the check, do you secure an arrest

14   warrant for the defendant?

15   A.    We do, yes, ma'am.

16         MS. GROOVER:  May I have just a moment, Your Honor?

17         THE COURT:  You may.

18         MS. GROOVER:  No further questions for this witness,

19   Your Honor.

20         THE COURT:  Cross-examination, Mr. Phillips.

21         MR. PHILLIPS:  Thank you.

22                         CROSS-EXAMINATION

23   BY MR. PHILLIPS:

24   Q.    Detective Rodriguez, I'm Bobby Phillips and I represent

25   the defendant.  I think we've met before.

274

1   A.    Yes, sir.

2   Q.    How long have you been a homicide detective?

3   A.    Eight-plus years.

4   Q.    And all of that's been with Garden City Police Department?

5   A.    Yes, sir.

6   Q.    And the murder occurred on August the 19th of 2017?

7   A.    Correct.

8   Q.    Is that correct?

9   A.    Yes, sir.

10  Q.    And when you found the packet of the EEOC documents, from

11  your experience as homicide investigator, you drew an inference,

12  did you not, that would be a murder or a motive for murder?

13  A.    Yes, we did, yes, sir.

14  Q.    At that point, you I presume immediately suspected Pablo

15  Rangel-Rubio?

16  A.    Was involved in some way, yes, sir.

17  Q.    Now, how many of the employees of Wolf Tree did you

18  interview?

19  A.    Lots of them.  I couldn't give you the specific number.

20  It was north of ten.  We interviewed more than ten employees of

21  the business.

22  Q.    Is it true that many of them didn't want to talk?

23  A.    I don't remember -- I don't recall off the top of my head.

24  We did interview several people in reference to this

25  investigation.  I don't know, I can't remember the exact content

275

1    or whether they wanted to cooperate or not.

2    Q.    And they were mostly undocumented immigrants?

3    A.    For the most part, yes, sir.

4    Q.    From Mexico?

5    A.    Correct.

6    Q.    How many of those undocumented immigrants actually lived

7    on the compound in Effingham County?

8    A.    From what I can tell, that worked for the business, four

9    to seven maybe.

10   Q.    How many employee did Pablo have at that time?

11   A.    I don't know the specific number.  It was quite a few

12   because there was at least ten that I interviewed plus we're

13   talking about Mr. Rangel himself, his brother.  The other -- so

14   my guess would be over 20.

15   Q.    In the photographs of the interior of Pablo's home, there

16   was looked like a copy machine/printer?

17   A.    Yes, sir.

18   Q.    And it looked like there were documents like social

19   security cards, driver's license and things like that.  Was he

20   manufacturing fake ID's at that location, could you tell?

21   A.    I do not believe there, no, sir.

22   Q.    Did you later find out that he was producing false

23   identifications for these workers?

24   A.    Yes, I did.

25   Q.    Now you told me or you told the jury that Pablo's house

276

1    looked like it had recent work on it?

2    A.   It appeared to be a brand-new house.  I wouldn't say

3    brand-new.  I would say it was manufactured within a few years

4    prior.

5    Q.   So two years prior, you're talking about your

6    investigation with him began in 2017, so back in 2015, you

7    think?

8    A.   Again, I don't know -- I don't know the specifics.

9    Everything inside the house for the most part appeared to be a

10   brand-new home.

11   Q.   What about the exterior or the wood part on the framing

12   and the bannister going around the front, was that new also?

13   A.   It appeared to be new, yes, sir.

14   Q.   Wasn't there other -- can you bring up my exhibits, 1

15   through 6, I believe, start with 1.

16        So you took a look at the whole property, did you not?

17   A.   I did, yes, sir.

18   Q.   Did you see this building, for lack of a better term on

19   the property?

20   A.   I did, yes, sir.

21   Q.   And did you make any determination about how long that had

22   been there?

23   A.   I did not, no, sir.

24   Q.   And how about at Defendant's Exhibit 2, please.  Can you

25   identify that photograph?

277

1    A.    I do, yes, sir.

2    Q.    What is that?

3    A.    That is I guess a carport.

4    Q.    And that's on the property which I think has been referred

5    to as the ranch or the farm or the compound.  That's where the

6    search took place and that's where you apprehended Mr.

7    Rangel-Rubio?

8    A.    Yes, sir.

9    Q.    And that's where he lives?

10   A.    That's where he lives.

11   Q.    Exhibit 3, Defendant's Exhibit 3, is that also a picture

12   of the property?

13   A.    That is also a picture of the property.

14   Q.    Did it have a pond or a lake?

15   A.    It did have a rather large pond, yes, sir.

16   Q.    And is this part of the same piece of property, same

17   building as Defendant's 1 and 2, the first two pictures?

18   A.    Correct, yes, sir.

19   Q.    Now if you move to Defendant's 4, what is that?

20   A.    That appears to be the front entrance to the residence of

21   Mr. Pablo Rangel.

22   Q.    Now he had a mobile home, did he not?

23   A.    It was a mobile home, yes, sir.

24   Q.    And the bricking did not come with the mobile home, I

25   wouldn't presume?

278

1   A.   I'm not specific if they built the mobile home around it.

2   I don't know.

3   Q.   One way or the other?

4   A.   Correct.

5   Q.   The same thing for the porch that's been affixed there?

6   A.   Correct.

7   Q.   And if I could have Defendant's 5, please.  And is this

8   another view of that porch?

9   A.   I believe so, yes, sir.

10   Q.   And actually you can see the aluminum portion of the -- I

11   believe that's aluminum -- they may use a different -- but you

12   can see the paneling for the mobile home itself, that brown?

13   A.   We can, yes, sir.

14   Q.   I'm sorry, that's all -- and so those were the

15   improvements, appeared to be improvements to that mobile home,

16   did it not?

17   A.   I could not tell if they were improvements or if they were

18   existing but they were on the property, yes, sir.

19   Q.   And the $6,000.00 check that was identified, that was

20   written on May 4th of 2017, was it not?

21   A.   I believe so, yes, sir.

22   Q.   And on May 5th, you learned that my client cashed that

23   check, did you not?

24   A.   I believe so, yes, sir.

25   Q.   And the $20,000.00 that was wired to my client's account

279

1   was wired on June 6th, 2017?

2   A.    I don't know the specific date, but I know it was sometime

3   in June.

4   Q.    In June prior to the August homicide?

5   A.    Correct.

6   Q.    When you interviewed -- did you personally interview the

7   workers for Wolf Tree Company?

8   A.    I interviewed a significant amount with Special Agent Tony

9   Miranda.

10  Q.    Did any of them express any fear of Pablo?

11  A.    I don't remember a single person expressing any fear for

12  him.  In fact, when the question was asked of one of the

13  employees if they thought that Pablo could have killed Mr.

14  Montoya the response was "No, but he might know people that

15  could."

16  Q.    And did they express any fear of Juan, his brother?

17  A.    I don't remember asking specifics about Juan.

18  Q.    Did you interview a Mr. -- pronounce his first name,

19  Lopez, Mr. Lopez, did you at some point -- is it Emmer,

20  E-m-m-e-r Lopez, did you interview him?

21  A.    I believe it's Iner Lopez.

22  Q.    Iner Lopez, did you interview him?

23  A.    I did.  Yes, sir.

24  Q.    Isn't it true that you came to the conclusion that he was

25  the one who actually killed Mr. Montoya early on in the

280

1   investigation?

2   A.   No, sir.

3   Q.   Didn't you confront him with that accusation?

4   A.   We received a -- what I will refer to as a tip to speak to

5   him in reference to possibly being involved, but we were able to

6   quickly eliminate him as a person of interest.

7   Q.   How long, did you interview him at first on August 22nd?

8   A.   I did.

9   Q.   And how long was that interview?

10  A.   It was not long at all from what I remember.

11  Q.   Are you aware that Agent Snipes and Miranda interviewed

12  him on August 23rd?

13  A.   I'm not aware of the specifics, no, sir.  I am aware that

14  they did reinterview a lot of the employees as well.

15  Q.   So you don't know anything about the interview of August

16  the 23rd, that specific?

17  A.   No, sir.

18       MR. PHILLIPS:  I don't have any further questions.

19  Thank you.

20       THE COURT:  Any brief redirect?

21       MS. GROOVER:  Briefly, Your Honor.

22                    REDIRECT EXAMINATION

23  BY MS. GROOVER:

24  Q.   Sir, can I direct your attention to Exhibit 31, please.

25  This is the $6,000.00 from Pablo to the defendant?

281

1   A.    Yes, ma'am, it is.

2   Q.    Will you highlight the memo portion of this check and does

3   it say what it's for?

4   A.    No, ma'am.

5   Q.    It is blank?

6   A.    It is blank.

7   Q.    You indicated you quickly eliminated an individual by the

8   name of Iner Lopez as being involved in the homicide; correct?

9   A.    Correct.

10  Q.    Why?

11  A.    He provided information of where he was at the time of the

12  murder.  We interviewed the people that he advised he was with,

13  and as far as the telephone records validated his statements.

14  He had two witnesses and his cell phone eliminated him as a

15  person of interest.

16        MS. GROOVER:  Thank you.  No further questions, Your

17  Honor.

18        THE COURT:  Any objection to this witness being excused?

19  Hearing none, you may be excused.  Thank you.

20        Ms. Groover, Mr. Howard, call your next witness.

21        MS. GROOVER:  The Government calls Special Agent Anthony

22  Miranda to the stand.

23        Your Honor, for planning purposes -- I do know it's

24  almost 11:30 -- the Government does anticipate this witness to

25  be rather long.

282

1          THE COURT:  We will get into his testimony and break at

2   the appropriate time.

3          MS. GROOVER:  Thank you, Your Honor.

4                    SPECIAL AGENT ANTHONY MIRANDA,

5   having been first duly sworn, was examined and testified as

6   follows:

7          THE CLERK:  Thank you.  Please be seated, and if you

8   will please state your full name, spell your last name, state

9   your occupation and your business address.

10          THE WITNESS:  My name is Anthony Miranda.  Last name is

11   M-i-r-a-n-d-a.  I'm a supervisor/special agent with Homeland

12   Security Investigations.  My business address is 15 -- I just --

13   I just moved.  15411 Montana Avenue, El Paso, Texas 79936.

14                    DIRECT EXAMINATION

15   BY MS. GROOVER:

16   Q.   How long have you been a group supervisor special agent

17   with HSI?

18   A.   Since December.

19   Q.   And before -- December of 2021?

20   A.   I was a special agent with HSI.

21   Q.   Here in Savannah?

22   A.   Here in Savannah, yes.

23   Q.   In the Savannah area?

24   A.   Yes.

25   Q.   And you indicated you had just moved?

283

1  A.    Yes.

2  Q.    You recently moved from Savannah to Texas?

3  A.    Yes, El Paso.

4  Q.    And how long have you been a special agent with Homeland

5  Security, sir?

6  A.    Since 2009, so approximately 15, almost going on 14 years.

7  Q.    Can you describe where all you've been with your career

8  since 2009?

9  A.    I started out in El Paso, Texas.  I was there for six

10  years before transferring to Savannah where I was here for also

11  about six years.

12  Q.    And before becoming a special agent with Homeland

13  Security, where were you employed at, sir?

14  A.    I was a US border patrol agent.

15  Q.    And for how long were you a border patrol agent?

16  A.    Approximately four years.

17  Q.    And what were your duties as a border patrol agent?

18  A.    They varied.  I started off as a line-of-watch agent

19  patrolling the border and just your typical line-of-watch, which

20  kind of puts you to sleep.

21         MR. HOWARD:  Your Honor, I apologize for interjecting.

22  I wonder if the witness could move the microphone a little bit

23  closer so everyone can hear him.

24         THE WITNESS:  Okay.

25  Q.    (By Ms. Groover)  What were your duties as a border patrol

284

1  agent, sir?

2  A.    They just varied.  I started off typical line-of-watch

3  agent patrolling the border.  I was also a field training

4  officer for a couple of years, and then I did -- I was an ATV,

5  all-terrain vehicle agent, patrolling on ATV's, and right before

6  I left, I was what's called the secured border initiative.  We

7  overwatched development projects of the border like the fence,

8  the roads they use to patrol the border and just upgrades to

9  help agents patrol the border.

10 Q.    Do you also speak Spanish, sir?

11 A.    Yes, I do.

12 Q.    Are you fluent in Spanish?

13 A.    Yes, I am.

14 Q.    Do you read and write Spanish as well?

15 A.    Yes, I am.

16 Q.    How did you learn to speak Spanish?

17 A.    It's my native language.  My parents didn't speak English.

18 I was born and raised in El Paso, so I started out speaking

19 Spanish and eventually learned English.

20 Q.    Can you describe your background for the jury?

21 A.    My background is ...

22 Q.    Well, what's your education level?

23 A.    So I went to school in El Paso, graduated from high school

24 in El Paso.  Then I joined the army.  I was in the army for

25 seven years approximately, and once I left the army, I started

285

1    going to -- I started attending El Paso Community College where

2    I got my associate's degree, and then from there, I transferred

3    to the University of Texas at El Paso where I got my bachelor's

4    degree in multi-disciplinary studies with a focus in criminal

5    justice, Spanish language and liberal arts.

6    Q.    And do you have family that still lives in Mexico, sir?

7    A.    I do, distant family, not close family anymore.

8    Q.    Is it fair to say you've been speaking Spanish your entire

9    life?

10   A.    Yes, it is.

11   Q.    Do you also visit Mexico?

12   A.    Not as frequent as I used to.  I mean, due to my job, I

13   don't feel as safe traveling to Mexico as I used to.

14   Q.    So based on your training and experience, are you familiar

15   with the culture and the laws in Mexico?

16   A.    Yes, I am.

17   Q.    And as a border patrol agent, did you encounter people who

18   spoke Spanish as their primary and only language?

19   A.    Yes, I did.

20   Q.    Did you encounter people who were entering the United

21   States lawfully as a border patrol agent?

22   A.    Yes.

23   Q.    Did you also encounter people who were trying to

24   unlawfully enter the United States?

25   A.    Yes.

286

1   Q.   Did you speak with them in Spanish when you encountered

2   them?

3   A.   Yes.

4   Q.   Would you obtain their background information, such as

5   their family information and their education level?

6   A.   Yes.

7   Q.   Did the people that you encountered, did many of them have

8   a formal education or not?

9   A.   Not -- no, not regularly, no.

10  Q.   But, nevertheless, were you able to communicate with them

11  in Spanish?

12  A.   Yes, I was.

13  Q.   And did you have experience in advising them of their

14  constitutional or their Miranda rights?

15  A.   Yes.

16  Q.   In Spanish?

17  A.   I do.

18  Q.   How do you typically do that, sir?

19  A.   I make sure I take my time and make sure they understand.

20  Being a border patrol agent, I learned that there are certain

21  legal processes.  Somebody who isn't familiar with the laws in

22  the US, they will tend to agree probably because of my position

23  in life.  The culture tends to respect as you go up, teachers

24  and education, so they will respect, and a lot of times they

25  will be more amenable to what we suggest.

1          So I make sure to break them down and make sure they

2     understand certain rights to where even if they decide to speak

3     to me at that moment, I make sure they understand that any time

4     they don't like a question I ask, they can stop.  There's a

5     right to that, and so I make sure that they understand that even

6     if they do want to talk right now, one moment they don't like a

7     question, they don't want to answer it, they can just say "I

8     don't want to talk to you anymore."

9          Like I say, I've noticed that they tend to just be

10    amenable.  One reason I do that is I remember when I would be

11    processing prior, previously deported non-citizens, they

12    would -- they had been previously deported and the initial

13    deportation is usually for five years, so they were under the

14    assumption that after five, if they entered illegally again,

15    that that deportation no longer counted, but the deportation

16    counts as long as they don't ask for permission, so it could be

17    20 years, and if they never ask for permission to come back in,

18    that deportation gets reinstated which deports them for an even

19    longer time and puts them -- makes them an actual criminal again

20    and puts them in jail.

21         So what I did when I initiated reinstatement or

22    deportation proceedings, I would make sure they understood that

23    that five years was still good after five years.  You couldn't

24    come back illegally after five years and expect that deportation

25    to be cleared.

288

1        So when I noticed that, I decided -- I knew that when

2   reading something legal to some people who is not from here in

3   Spanish, I had to take my time and make sure they understood.

4   Q.   So based on your experience, you are careful to ensure

5   that someone who is not from the United States, does not know

6   our laws, do understand it when you encounter them and speak

7   with them?

8   A.   Yes, that is correct.

9   Q.   And have you had an opportunity as an HSI agent to speak

10  with people in Spanish and advise them of their, you know,

11  rights?

12  A.   Yes, I have.

13  Q.   And do you take the same care and detail that you did as a

14  border patrol agent to ensure people understand their rights?

15  A.   Yes, I do.

16  Q.   Approximately how many people have you interviewed in

17  Spanish and advised them of their rights?

18  A.   I couldn't say.  It's anywhere from hundreds to thousands.

19  Q.   Throughout your entire career?

20  A.   Throughout, yes, my entire career.

21  Q.   And throughout those hundreds of thousands of people that

22  you have interviewed in Spanish and advised them of their

23  rights, did you ever have an opportunity -- did you find someone

24  who didn't understand what you were trying to tell them about

25  their rights here in the United States?

289

1    A.    I have encountered that where you just have to break it
2    down further.  They -- sometimes they will have a question about
3    a specific right, and, I mean, I have had people ask for an
4    attorney after -- after they -- I have explained their rights,
5    so yes.
6    Q.    And you're careful then to further make sure they
7    understand?
8    A.    Yes, yes.
9    Q.    And why do you do that?
10   A.    Well, integrity of the investigation, I mean.
11   Q.    Protects the case as well as the defendant?
12   A.    Yes, it protects the case, yes.  It protects me.
13   Protects -- it's a protection for me, a protection for the
14   person being interviewed and a protection for the investigation.
15   Q.    Now, as a special agent with Homeland Security
16   Investigations, are you familiar with the various ways foreign
17   nationals can lawfully enter the United States and immigrate to
18   America?
19   A.    I have, yes, I do have some knowledge of that.
20   Q.    For example, they can come on a work permit if the United
21   States grants that?
22   A.    That is correct.
23   Q.    And a visa?
24   A.    Yes.
25   Q.    Or a permanent resident card, such as a green card?

290

1    A.    Yes.

2    Q.    And someone can even become a naturalized United States

3    citizen; is that correct?

4    A.    That's correct.

5    Q.    In Exhibit 3, is this the naturalized citizenship

6    certificate for Mr. Eliud Montoya?

7    A.    Yes, it is.

8    Q.    Indicating he was from Mexico and went through the lawful

9    process of becoming a United States citizen?

10   A.    That is correct.

11   Q.    Despite these lawful ways to enter the United States, do

12   foreign nationals still unlawfully enter the United States?

13   A.    Yes, they do.

14   Q.    And when that happens, are they generally referred to as

15   an illegal alien?

16   A.    Yes.

17   Q.    Did you assist in the investigation of the murder of Eliud

18   Montoya?

19   A.    I did.

20   Q.    As part of this investigation, did you assist in the

21   search warrant of Pablo and Juan's residence?

22   A.    I did.

23   Q.    How generally did you assist?

24   A.    I was called to assist with Spanish, my knowledge of

25   Spanish language, and with the possible finding, identification

291

1    of possible trafficking victims is what I was told when I was

2    called to respond to there may be trafficking, labor trafficking

3    victims in the property and also possibly illegal aliens and

4    non-English speakers or Spanish speakers, so I assisted with --

5    initially I assisted with rights, reading them -- reading people

6    their rights and also determining their alienage when

7    encountered.

8    Q.    Now did you encounter Pablo Rangel-Rubio?

9    A.    Yes, I did.

10   Q.    And did you advise Pablo of his rights?

11   A.    I did.

12   Q.    And did Pablo agree to speak with you?

13   A.    Yes, he did.

14   Q.    And did he admit to being from Mexico and an illegal

15   alien?

16   A.    Yes, he did.

17   Q.    Exhibit 53, please.  And is this a document that the

18   United States Government has indicating that Pablo Rangel-Rubio

19   is an illegal alien?

20   A.    Yes.  Yes, it is.

21   Q.    Did you also encounter Pablo's brother, Juan Rangel-Rubio,

22   during the search of their residence?

23   A.    Yes, I did.

24   Q.    And did you advise Juan of his rights?

25   A.    Yes, I did.

292

1   Q.    And did Juan agree to speak with you?

2   A.    He did.

3   Q.    Did he also admit to being from Mexico and an illegal

4   alien?

5   A.    Yes, he did.

6   Q.    Exhibit 54, what is this document?

7   A.    That's his I213.

8   Q.    You called it an I213 --

9   A.    213, yes.

10  Q.    -- document for Juan Rangel-Rubio.  Again is this a

11  document that the United States Government has indicating that

12  Juan is, in fact, an illegal alien?

13  A.    Yes, it is.

14  Q.    And as part of your investigation, did you interview

15  Higinio Perez-Bravo, the defendant?

16  A.    I did.

17  Q.    And why did you interview him?

18  A.    We interviewed him about the investigation, ongoing

19  investigation, into the murder of Eliud.

20  Q.    As part of the murder investigation, did the State of

21  Georgia issue an arrest warrant in connection with the murder of

22  Eliud Montoya?

23  A.    Yes, they did.

24  Q.    An arrest warrant for the defendant?

25  A.    Yes.

293

1  Q.   And on July the 30th of 2018, was the defendant arrested

2  on that state arrest warrant?

3  A.   Yes, he was.

4  Q.   In connection with the murder of Mr. Montoya?

5  A.   Yes.

6  Q.   Was he arrested after a traffic stop at the Chatham County

7  Police Department?

8  A.   Yes, he was.

9  Q.   Were you familiar with that traffic stop and his arrest?

10  A.   I was, yes.

11  Q.   And approximately what time of day was this?

12  A.   It was early in the morning.  I don't remember the actual

13  time.  I just know it was really early in the morning.

14  Q.   Did the arresting officers take him to the Garden City

15  Police Department for a formal interview after his arrest?

16  A.   Yes, they did.

17  Q.   Did they place him in an interview room?

18  A.   Yes, they did.

19  Q.   Was an interview room equipped with a recording system to

20  audio- and video-record the interview?

21  A.   Yes, it was.

22  Q.   Approximately how long was the entire encounter with the

23  defendant?

24  A.   I mean, the entire encounter, it was approximately four

25  hours, I believe.

294

1   Q.    And do you believe he was placed in the interview room
2   around 8:30 in the morning?
3   A.    Yes.
4   Q.    And it lasted until about 1:15 in the afternoon?
5   A.    Yes.
6   Q.    Approximately four hours and 41 minutes?
7   A.    Yes.
8   Q.    Does that sound right?
9   A.    That sounds about right.
10  Q.    Was the entire interview audio- and video-recorded?
11  A.    Part of the interview was both and I believe at some point
12  we lose video but we continue with the audio and we continued
13  with the audio recording.
14  Q.    So was the entire encounter about four hours and 41
15  minutes, that is audio-recorded?
16  A.    Yeah, the entire is audio.
17  Q.    So you can hear everything?
18  A.    Yes.
19  Q.    But part of the video cuts out at a certain point?
20  A.    Yes.
21  Q.    Do you know why the video cuts out?
22  A.    I do not know why.
23  Q.    Does the video have -- prior -- it was recorded, the
24  entire interview, and have you reviewed it prior to today?
25  A.    Yes, I have.

1   Q.    And do you recall that the audio and video at about an

2   hour and 20 minutes is where the video cuts out but still is

3   being recorded with what's said; you just can't see it?

4   A.    Yes.

5   Q.    Prior to today, did you have the opportunity to watch and

6   listen to the entire interview?

7   A.    Yes.

8   Q.    Was the interview conducted in Spanish?

9   A.    Yes, it was.

10  Q.    And after the interview, did contractors of the HSI

11  provide a transcript of that interview that took place that you

12  did with the defendant on July 30th of 2018?

13  A.    Yes.

14  Q.    Exhibit 59, if we pull that up, is that a transcript of

15  the interview?

16  A.    That's it.  That's the transcript.

17  Q.    Is that the first page of the transcript?

18  A.    Yes.

19  Q.    And is the transcript 141 pages long?

20  A.    Yes, it is.

21  Q.    And is this generally on the left side, turning to Page

22  59-2, the format of this transcript, is the left side the

23  Spanish language used that was recorded for the entire interview

24  and on the right side the English translation?

25  A.    That is correct.

296

1  Q.    And prior to today did you have the opportunity to listen

2  to the recorded interview in Spanish and follow along with the

3  English and Spanish transcript that is in Exhibit 59?

4  A.    Yes, I did.

5  Q.    And is Exhibit 59 a true and accurate English and Spanish

6  translation of your entire Spanish interview with the defendant

7  on July the 30th, 2018?

8  A.    Yes, it is.

9  Q.    If we could please pull up Exhibit 58, please.  And is

10  Exhibit 58 the actual recording of your interview, sir?

11  A.    Yes, it is.  Yes, it is.

12  Q.    Hit "play," please, initially and hit "pause," please.

13  What are we looking at on your screen?  You see two side-by-side

14  images.  Can you tell the jury what we're looking at?

15  A.    The left side we are looking at the recording of the

16  interview room where we did the interview.  On the right side

17  we're looking at the actual transcript that was provided.

18  Q.    So this room where the defendant was interviewed, can you

19  describe it for us?

20  A.    So there's -- there's a table, two chairs and a third

21  chair.  One chair is for the defendant and the other two chairs

22  are for myself and another investigator, Agent Snipes.  So

23  approximately 24 -- 24-by-24.  I don't know the exact size of

24  the room.

25  Q.    And when the defendant is brought in for the interview, is

297

1    he placed, placed in one of the chairs?

2    A.    Yes, he is.  He's placed in the chair highest on the

3    screen.

4    Q.    In Exhibit 58 at the two-minute-and-20-second mark into

5    the recording, is this when the defendant is brought into the

6    interview room?  Give us just a moment to pull up Exhibit 58.

7    Hit "play" on Exhibit 58 and who is that standing there in the

8    room that enters?

9    A.    That's Detective Rodriguez.

10   Q.    Did he just say, "Can you hear that?"

11   A.    Yes, he did.

12   Q.    Is that depicted on the transcript on the right at the top

13   of the page of 59-2?

14   A.    Yes.

15   Q.    When he snaps his fingers and says, "Can you hear that?"

16   A.    Yes, it is.

17   Q.    And fast-forwarding the Exhibit 58 to the two-minute-and-

18   20-second mark, playing from the two-minute mark at this time.

19           THE COURT:  And if you will hit "pause," before we get

20   to the verbiage, members of the jury, Exhibit 59 has been

21   identified as a typewritten transcript and translation from

22   Spanish into English of the oral conversation that you're about

23   to hear on the tape recording received in evidence as Exhibit

24   58.

25           The transcript also purports to identify the speakers

298

1    engaged in the conversation you're about to hear.  I have

2    admitted the transcript for the limited and secondary purpose of

3    helping you follow the content of the conversation as you listen

4    to the tape recording, particularly those portions spoken in

5    Spanish, and also to identify the speakers, but you are

6    specifically instructed that whether the transcript correctly

7    reflects the content of the conversation or the identity of the

8    speakers is entirely for you to decide based on your evaluation

9    of the testimony you've heard about the preparation of the

10   transcript and from your own examination of the transcript in

11   relation to hearing the tape recording itself as the primary

12   evidence of its own contents.  If you determine that the

13   transcript is in any respect incorrect or unreliable, you should

14   disregard it.

15        Continue.

16        MS. GROOVER:  Thank you, Your Honor, and with that, the

17   United States did prepare copies of the transcript for all

18   members of the jury and we would request permission to pass

19   those out.

20        THE COURT:  Proceed.

21        MS. GROOVER:  In those transcripts, I would also note

22   by each -- each juror will be given a binder and there are two

23   transcripts.  One is Exhibit 58, or excuse me, 59, the audio

24   that we were discussing now, and there is also Exhibit 61, which

25   has also been admitted, which is a jail phone call, Your Honor,

299

1    translation.

2            THE COURT:  And the Defense has copies of that?

3            MS. GROOVER:  Yes, Your Honor.

4            I would note for purposes of the record that all members

5    of the jury appears to have a binder with transcript of Exhibit

6    59 as well as Exhibit 61.

7            THE COURT:  The record will so reflect.

8    Q.    (By Ms. Groover)  Please press "play" of Exhibit 58.

9    We're now at the two-minute-and-16-second mark, and please

10   describe what's happening.

11           (Video played.)

12   Q.    (By Ms. Groover)  Can you press "pause" for just a moment

13   of.  That gentlemen who just walked in and out, do you recognize

14   him?

15   A.    Yes, I do.

16   Q.    And who is that?

17   A.    That's the defendant, Higinio Perez.

18   Q.    Or who walked in the room and is sitting down?

19   A.    That's the defendant.

20   Q.    And who is the gentleman that walked him in and exited the

21   room?

22   A.    That's Detective Rodriguez.

23   Q.    Okay, yes, can you please hit "play."

24           (Video played.)

25   Q.    (By Ms. Groover)  And is he in handcuffs in this moment?

300

1   A.    Yes, he is.

2   Q.    And can you describe his demeanor just right now as you're

3   observing it as he sits there with handcuffs on?

4   A.    Yeah, his demeanor, he's just kind of sheltered.

5        MR. PHILLIPS:  I'm going to object to that, Your Honor.

6   The jury can draw their own conclusions about his demeanor.  I

7   think it's an improper question.

8        THE COURT:  Overruled.  Based on his observation he can

9   testify as to what he observes so the objection is overruled.

10  Proceed.

11  Q.    (By Ms. Groover)  Can you please describe his demeanor?

12  A.    Yeah, he's closed up, sheltered, just like typical

13  demeanor of somebody who is trying not to -- not to share too

14  much information with you.

15  Q.    And at approximately four minutes and 29 seconds into the

16  interview, now still on Page 59-2, does Detective Rodriguez

17  enter back the room and offer him anything?  If we can

18  fast-forward to the four-minute-and-29-second mark, please, or

19  approximate.

20       Let's stop for a moment.  At some point, does Detective

21  Rodriguez come back in and offer him a doughnut?

22  A.    Yes.

23  Q.    He offered him a coffee, cream and sugar?

24  A.    Coffee.

25  Q.    And at another time, does he then come in and remove the

301

1    handcuffs so he could eat and drink?

2    A.    Yes.  He does remove the handcuffs so he can eat and

3    drink.

4    Q.    And offers coffee and water and bathroom breaks?

5    A.    Yes.

6    Q.    Did he explain, "Just knock on the door if you need

7    anything at all"?

8    A.    Yes, he does do that.

9    Q.    Is all of that, now on Page 59-3 of the transcript, which

10   is approximately 29 minutes and 25 seconds into the interview,

11   does Detective Rodriguez enter again -- if we could

12   fast-forward, please, to the 29:25 mark.

13        And for the record we're begin playing at the 28:29-minute

14   mark, and you see, what do you see from this visual that the

15   defendant has?

16   A.    He still has the same demeanor, closed off, like the

17   crossing of the arms.

18        MR. PHILLIPS:  Same objection, please, Your Honor.

19        THE COURT:  Overruled.

20        (Video played.)

21   Q.    (By Ms. Groover)  Do you see did he have a plate and

22   doughnut and coffee?

23   A.    Yes, he does have a doughnut and coffee, which he had --

24   he gave him sugar and he put -- prepared his coffee and

25   doughnut.

1    Q.    The handcuffs are removed as well?

2    A.    Yes.

3    Q.    Can you please describe what is taking place?  Again,

4    we're at the 25:20:1 mark?

5    A.    He's returning his money to him, or counting it out.

6    Q.    Describe that.

7    A.    That was his money, money he had on him.  He later goes on

8    to say in the interview that that was work-related money.

9    Q.    Can you pause the video, please.  So this was money that

10   was collected off the defendant when he was arrested?

11   A.    Yes.

12   Q.    And Detective Rodriguez is counting it back in front of

13   him; is that correct?

14   A.    That's correct.

15   Q.    And during this encounter, do you see, does his demeanor

16   change at all?  Does he appear smiling and --

17          MR. PHILLIPS:  I would like to have continuous

18   objections, Your Honor, please, to questions about his demeanor.

19          THE COURT:  I will allow you to have a continuous

20   objection in that regard.

21   Q.    (By Ms. Groover)  If you could please play the video from

22    the 29-mark and describe his demeanor.

23          (Video played.)

24   Q.    (By Ms. Groover)  Please pause the video, and for purposes

25   of this sequence of the questioning and answering, is the video

303

1    that's being played up on the left, is it matching up with the

2    page and what's being translated on 59 to the right?  For

3    example, in the middle of 59-3, does it explain the translation

4    of Detective Rodriguez counting back the money?  Do you see

5    that, Special Agent Miranda?

6    A.    Yes.  Yes, it does.

7    Q.    So for purposes of the record, the page of the translation

8    will be up on the right hand while the audio is taking place on

9    the left hand?

10   A.    Yes.

11   Q.    Exhibit 59 -- sticking to Exhibit Page 59-3 and

12   approximately 32 minutes and 40 seconds into the interview, if

13   you could please pull up that moment.

14        (Video played.)

15   Q.    (By Ms. Groover)  And press "pause," please.  And can you

16   please describe for the jury what is occurring at this moment?

17   A.    Myself and Agent Snipes are entering the room and

18   introducing ourselves to the defendant.

19   Q.    And is this depicted on the bottom of Exhibit 59-3 in the

20   transcript?

21   A.    Yes, it is.

22   Q.    Please play Exhibit 58 and narrate for us what you're

23   observing.

24        (Video played.)

25        THE WITNESS:  Right there we're just identifying

304

```
 1    ourselves, as agents.
 2    Q.     (By Ms. Groover)   And then are we moving to Page 59-4 of
 3    the transcript.
 4    A.     We're going to question him about his immigration status.
 5    Q.     Press "pause," please.
 6           So at this moment, you and Special Agent Snipes enter the
 7    room to begin to interview the defendant; correct?
 8    A.     That's correct.
 9    Q.     And this interview from this moment on then lasts
10    approximately four hours; is that correct?
11    A.     That's correct.
12    Q.     And are there intermittent breaks throughout these four
13    hours while you're speaking with the defendant?
14    A.     Yes, yes, there are.
15    Q.     So throughout this four-hour period, there are times where
16    you step out or when Special Agent Snipes steps out of the room?
17    A.     That's correct.
18    Q.     Are there also times when you both step out of the room
19    together, leaving the defendant alone for a moment?
20    A.     That's correct.
21    Q.     Were some of these breaks long?
22    A.     Some of them were, yes.
23    Q.     Approximately how many breaks were there, if you recall?
24    A.     I don't recall.  There was multiple, though.
25    Q.     And you identified yourself and Special Agent Snipes.  You
```

305

1    showed your credentials; is that correct?

2    A.    That's correct.

3    Q.    And how are you dressed for this interview, sir?

4    A.    I'm wearing a T-shirt, ball cap, jeans.

5    Q.    And how is -- and you are in the middle?

6    A.    I'm the one in the black T-shirt, yes, in the middle.

7    Q.    And Special Agent Snipes, how is he dressed?

8    A.    He's wearing some khaki pants, polo shirt and hat.

9    Q.    Did you have a firearm on you, sir?

10   A.    Probably -- not -- not there.

11   Q.    Did you have a firearm that was visible?

12   A.    No, I did not.

13   Q.    And what about Special Agent Snipes?

14   A.    No.

15   Q.    Did he have a visible firearm?

16   A.    No, he did not.

17   Q.    When you began your questions of the defendant, did you

18   ask how he was doing?

19   A.    Yes.

20   Q.    And he said he was doing good?

21   A.    Yes.

22   Q.    Did you learn throughout this interview that he spoke a

23   little bit of English?

24   A.    Yes, we -- yes, I did.

25   Q.    But the entire interview is mainly conducted in Spanish;

306

1    is that correct?

2    A.    Yes, yes.  There were a couple of times when Agent Snipes

3    would ask a question in English and before I could translate it

4    he would answer.

5    Q.    And throughout the entire time that you communicated with

6    him, did you have any difficulty communicating and speaking with

7    him?

8    A.    No, no, none at all.

9    Q.    Any difficulty understanding each other?

10   A.    No, none at all.

11   Q.    At any time did you need to have another Spanish-speaking

12   agent in the room to help you communicate with the defendant?

13   A.    No.

14   Q.    Were his answers appropriate to your questions?

15   A.    Yes, they were.  Yes, they were.

16   Q.    Giving rational responses?

17   A.    Yes.

18   Q.    Indicating he understood the question you were asking and

19   gave an appropriate response?

20   A.    Yes.

21   Q.    Any confusion or rambling on the part of the defendant?

22   A.    No.

23   Q.    Describe his speech, his diction, his enunciation for the

24   jury.  Did he have any slurred words?

25   A.    No, he enunciates fine.  He spoke fine.  He has no problem

307

1  speaking.

2  Q.    Did he have any inaudible responses that caused you

3  concern?

4  A.    No.

5  Q.    Did he appear to be under the influences of any drugs or

6  alcohol?

7  A.    No.

8  Q.    And you touched on this a little bit at the beginning of

9  the interview, but could you describe overall his demeanor

10  during your encounter?

11  A.    It just -- it just varied.  In the beginning, he was very

12  closed off and just very sheltered and then as -- and he was

13  very quiet, very soft-spoken.

14        As the interview progressed and he felt more comfortable,

15  his voice, his voice was louder.  He -- he became more animated,

16  and he just seemed to flow more with the conversation.

17  Q.    What was his physical appearance like?

18  A.    He seemed fine.  He didn't seem -- I mean, he seemed like

19  somebody just having a conversation with another person.

20  Q.    Appropriately dressed?

21  A.    Yes.

22  Q.    Did not seem disheveled and out of place?

23  A.    No, he did not.

24  Q.    At any time, did the defendant exhibit any signs of

25  physical discomfort while you were speaking with him?

308

```
1    A.    No, he did not.
2    Q.    For example, did he ever appear to get sick?
3    A.    No.
4    Q.    Did he ever start profusely sweating and be acting with
5    the shakes?
6    A.    No, he did not.
7    Q.    Appear to have any kind of symptoms of going through drug
8    withdrawal or anything like that, that nature?
9    A.    No, he did not.
10   Q.    The interview took place, you indicated, in the morning?
11   A.    Yes.
12   Q.    Approximately eight o'clock or 8:30 in the morning?
13   A.    Yes.
14   Q.    Until about 1:00 or 1:15 in the afternoon?
15   A.    That's correct.
16   Q.    Any indicating that he was deprived of sleep --
17   A.    No.
18   Q.    -- at the beginning of the interview at all?
19   A.    No.
20   Q.    Or throughout the interview?
21   A.    No.
22   Q.    And he was offered doughnut and some coffee and water;
23   correct?
24   A.    Yes, that's correct.
25   Q.    Any indication that he was deprived of food and was very
```

309

1    hungry and needed to address those needs?

2    A.    No.

3    Q.    So ...  and he ate a doughnut at the beginning of the

4    interview in the morning and it concluded right after lunchtime;

5    is that correct?

6    A.    That's correct.

7    Q.    With multiple breaks?

8    A.    Yes.

9    Q.    At any time did he ask to use the restroom or the

10   bathroom?

11   A.    No.  I can't remember.  I don't think he did.

12   Q.    We will go through it, but as you sit here right now, do

13   you recall if he ever asked to use the restroom?

14   A.    No.

15   Q.    Any signs, did you observe any sign that he was suffering

16   from depression?

17   A.    No, I did not.

18   Q.    Any sign that he was suffering from any kind of trauma or

19   head injury that would -- making him difficult to communicate

20   and understand?

21   A.    No, not at all.

22   Q.    At any time did you just need to simplify your question to

23   speak with him?

24   A.    No.

25   Q.    At any time did you have to -- did he ask you to stop and

310

1  find a term because he didn't understand?

2  A.    No.

3  Q.    At any time did you feel the need to stop and define a

4  term to ensure that he understood you?

5  A.    Yes.  There was a time when we asked about a sign, the

6  sign, the magnetic signs that go on the --

7  Q.    On his vehicle?

8  A.    On his vehicle and I just can't remember the word for it

9  and Agent Snipes helped me out with that one, so that's the only

10  time I can think of.

11  Q.    But that was you trying to recall the word in Spanish?

12  A.    Yes, yes, me trying to recall the word in Spanish to make

13  sure I used the right, correct word.

14  Q.    It did not have to do with your communication of the

15  defendant?

16  A.    No, no.

17  Q.    Did you ever have to repeat your instructions for the

18  defendant like he wasn't tracking and following you along?

19  A.    No.

20  Q.    Any indication to you that he was low functioning or had

21  some sort of a low IQ that you observed?

22  A.    No, not at all.

23  Q.    And what was his process time between your questions and

24  answers?

25  A.    It depend -- to me it depend on what he was answering.  If

1    it was something that he felt comfortable answering, it was --

2    it was quick and he would remember it quickly.  If it was a more

3    difficult question, he seemed to be more forgetful and trying to

4    find -- find -- but time to give the answer that he thought we

5    wanted him to hear, that he thought it would be helpful to him.

6    Q.    You said the processing time varied depending on the types

7    of questions you were answering -- you were asking; is that fair

8    to say?

9    A.    Yes, that's fair to say.

10    Q.    For example, when you say a difficult question, you mean

11    with respect to the murder of Mr. Montoya?

12    A.    That's correct.

13    Q.    Versus questions about his family and his background?

14    A.    Yes, that's correct.

15    Q.    So when he was answering questions with respect to his

16    family and background information, his response time was quick

17    and natural as if to easily communicate?

18    A.    That's correct.

19    Q.    And then with respect to questions about Mr. Montoya's

20    murder, pressed pause a bit before answering?

21    A.    Yes, that's initially, and then once we -- once he felt

22    more comfortable with the -- with the interview, he seemed to be

23    more responsive and then his response time, once he started

24    speaking the truth, his responses became quicker.

25          MR. PHILLIPS:  I'm going to object to that, Your Honor.

312

1    He cannot categorize my client's testimony other than what was

2    actually said, and "speaking the truth," I think that's

3    objectionable.

4         THE COURT:  Sustained.

5    Q.   (By Ms. Groover)  Please rephrase the answer, sir.

6    A.   Once he felt comfortable with the questions he was

7    answering, his responses were much quicker.

8    Q.   Did it appear that you were ever talking too fast for him

9    to listen and understand your questions?

10   A.   No.

11   Q.   Did you notice any sign that he was having trouble keeping

12   up with the pace of your questions?

13   A.   No.

14   Q.   Did he ever ask you to slow down and go slower?

15   A.   No, he did not.

16   Q.   Did he ever ask you to rephrase your question as if he did

17   not understand or if it was too complex to track?

18   A.   No.

19   Q.   Were there any type of discussions about if you speak with

20   me now you will still go to jail but for less time than if you

21   don't talk, any kinds of questions like that?

22   A.   No, no.

23   Q.   Any promises in exchange?

24   A.   No promises, absolutely no promises.

25   Q.   And before speaking with him, did you advise him of his

313

1    Miranda rights, his constitutional rights?

2    A.    Yes, I did.

3    Q.    We will discuss it in more detail in a moment, but did he

4    ever assess any of his rights during the interview?

5    A.    No, he did not.

6    Q.    At any time during the interview did you make any promises

7    about what would happen if he spoke with you?

8    A.    No, I did not.

9    Q.    At any time during the interview, did you explain that if

10    he spoke with you he would go to jail for less or he would get

11    out, anything along those lines?

12    A.    No.

13    Q.    At any time did you ever put your hands on him and provide

14    physical force to him?

15    A.    No.

16    Q.    At any time did Special Agent Snipes provide any kind of

17    physical force?

18    A.    No.

19    Q.    At any time did Detective Rodriguez enter the room and

20    provide any kind of physical force?

21    A.    No.

22    Q.    Throughout the entire interview was what was depicted on

23    the screen, is this generally the setup of where everyone sat

24    during the discussions?

25    A.    Yes.   That's pretty much the way we were the whole time

1  except whenever I got up or anybody got up and left the room.

2  Q.   Now on Exhibit 59-4 at approximately 32 minutes and 53

3  seconds into the interview, let's discuss the interview and how

4  it begins.

5       And did you begin by learning his background information?

6  A.   Yes.

7           (Video played.)

8  Q.   (By Ms. Groover)  And do you learn that he's from Chiapas?

9  A.   Yes, we do.

10 Q.   And learn his family in Mexico, he has family in the

11 Mexico and in the United States?

12 A.   Yes, that's correct.

13 Q.   And on Exhibit 59-5, which is approximately 34 minutes and

14 23 seconds into the interview, does he describe how he entered

15 the United States?

16 A.   Yes, he does.

17 Q.   And does he indicate that he's been in the United States

18 for approximately 20 years?

19 A.   That's correct, 20 years.

20 Q.   And at the time he was about 50 years old?

21 A.   Yes, that's correct.

22 Q.   And he had been in the United States for about half of his

23 life?

24 A.   That's correct.

25           (Video played.)

315

1  Q.    (By Ms. Groover)  And on Exhibit Page 59-6 at

2  approximately 35 minutes and 28 seconds into the interview, do

3  you have immigration questions for the defendant --

4  A.    Yes.

5  Q.    -- at this portion of the interview.  Does he have any

6  issues remembering or recalling facts about his immigration

7  process?

8  A.    No, he does not.

9  Q.    Does he indicate he did not cross with a guide?

10 A.    Yes.

11 Q.    So he easily recalls facts 20 years ago entering the

12 United States?

13 A.    That's correct.

14 Q.    Exhibit 59-7 at approximately 36 minutes and 48 seconds

15 into the interview --

16        (Video played.)

17 Q.    (By Ms. Groover)  At this portion of the interview, are

18 you discussing questions about his family?

19 A.    Yes, we are.

20 Q.    And does his demeanor or his body language change at all

21 when he started to answer questions about his family?

22 A.    It does.  He opens up a lot more and he actually uncrosses

23 his arms and is more animated, makes more gestures with his

24 hands.

25        (Video played.)

1   Q.    (By Ms. Groover)  Do you see at this point he's starting

2   to move his arms a little more?

3   A.    Yes.

4   Q.    And on Page 59-8 at approximately 38 minutes and 12

5   seconds into the interview, do you begin discussing his

6   employment?

7   A.    Yes.

8         (Video played.)

9   Q.    (By Ms. Groover)  Does he explain that he's employed at

10  Lanier Realty and has been working there approximately ten years

11  performing remodeling work?

12  A.    Yes.

13  Q.    So during this background information that you are

14  gathering from the defendant, can you describe to the jury what

15  your overall impression of his demeanor was?

16  A.    Well, whenever he spoke of something that he was sure

17  about, he was quick to answer.  He opened up a lot more, and he

18  was just very -- very quick to respond to us.

19  Q.    For the most part, is he sitting with his arms crossed

20  sitting back in the chair during his background information?

21  A.    Yes.

22  Q.    And at times he would open up briefly with his arms when

23  he was saying something about his family or something but then

24  go back to his position?

25  A.    That's correct.  He would open up when he was speaking

317

1    about family, especially about the kids.

2    Q.    And then 59-9 at approximately 39 minutes and 50 seconds

3    into the interview, does he explain that he speaks a little bit

4    of English?

5    A.    Yes, he does.  That's the first time that he responds to

6    Agent Snipes' question without me translating.

7    Q.    Moving on to Page 59-10, which is approximately 41 minutes

8    and 22 seconds into the interview --

9             (Video played.)

10   Q.    (By Ms. Groover)  Can you please pause it right here.  Is

11   this the portion of the interview where you advise of his

12   Miranda rights or his constitutional rights?

13   A.    Yes.

14   Q.    And tell the jury, in general terms, how did you advise

15   him of his rights?

16   A.    I read -- I gave him a copy of his form and read him his

17   rights and asked him to follow along with me, and I just read

18   them and then broke down the parts I thought he needed more

19   explanation on.

20   Q.    Did you actually read the form to him?

21   A.    Yes, I read the form to him.

22   Q.    Word for word?

23   A.    Word for word.

24   Q.    And did you also have him read it while you are reading it

25   to him?

318

1  A.    Yes.

2  Q.    And the portion where you are advising him of his rights,

3  does that take place on Pages Exhibit 59-9 through 14,

4  specifically Pages 9 through 14, is that the portion of the

5  interview that's documented in the transcript where you're

6  discussing his Miranda rights?

7  A.    Yes.

8  Q.    And does that correspond to times of Exhibit 58 of 40

9  minutes and 30 seconds of the interview through 49 minutes and

10 15 seconds of the interview?

11 A.    Yes.

12 Q.    And so prior to today, you took notes with respect to the

13 pages of the transcript and the time portions of the audio; is

14 that correct?

15 A.    I did.

16 Q.    While you reviewed it to pull up these pages; is that

17 correct, sir?

18 A.    That's correct.

19 Q.    Describe for the jury his demeanor while you are

20 explaining his rights that is depicted on Pages 9 through 14 of

21 Exhibit 59?

22 A.    Well, almost, has almost like a probing demeanor, like he

23 wants to figure out why we're -- why we're there and he kind of

24 wants to know if there's a motive for him to actually speak to

25 us, if there's a reason for him -- like if -- to me it feels

1   like he's trying to find out how it would benefit him to speak

2   to us.

3            THE COURT:  Just to be clear, ladies and gentlemen of

4   the jury, you will have all of these exhibits back with you

5   including the video in the jury room.  It's going to be for you

6   to evaluate any demeanor and for you to draw your own

7   conclusions.

8            MS. GROOVER:  Thank you, Your Honor.

9   Q.   (By Ms. Groover)  What is he physically doing during this

10  portion?  Does he sit back with his arms crossed while

11  listening to his rights?

12  A.   He does that throughout, sits back and crosses his arms.

13  Q.   At times does he lean forward and -- to listen at times

14  while you're advising him of his rights?

15  A.   Yes, he does.

16  Q.   And on Page 59-10 as the 41-37-second mark, do you

17  actually tell him to have him follow along and read the Spanish

18  Miranda form?  If we could pull up Exhibit 59-10 and 42 minutes

19  and 28 seconds, excuse me, 41 minute and 37 seconds.  Push

20  "play," please.

21            (Video played.)

22  Q.   (By Ms. Groover)  Does he actually pick up the paper and

23  read along with you?

24  A.   Yes.

25  Q.   Appears to be carefully following along?

320

1   A.    Yes.

2   Q.    See if you can stop it right there.  And do you ask him if

3   he appears -- do you ask him if he understands these rights?

4   A.    I do.

5   Q.    And he indicates that, yes, he did at that time?

6   A.    Yes.

7   Q.    Do you then ask him if he has any questions?

8   A.    Yes.

9   Q.    And does he have a response?  What is his response to your

10  question if he has questions about his rights and if we can,

11  referring to Page 59-10, the bottom of the page, which is

12  approximately 42 minutes and 41 seconds into the interview?

13  A.    Yes, he -- he says that, his question is "What's the

14  reason for" ...

15  Q.    And what do you say in response, the bottom of Page 59-10?

16  You say, "That's why we want to continue with this before we

17  start the interview"?

18  A.    That's correct, yes, just continue, get the rights.

19  Q.    Why do you say that?

20  A.    Because I don't want him -- I don't want there to be any

21  confusion between -- if he makes an incriminating statement I

22  don't want it to seem like it would be preMiranda, so I just try

23  to limit what he says prior to either agreeing to speak to us or

24  ask for representation of an attorney.

25  Q.    You want to stop him before he starts making statements

321

1    and make sure you get through the Miranda warnings?

2    A.    Yes, that's correct.

3    Q.    And, again, at the bottom of Page 59-10, you ask him, "Do

4    you understand these rights?"  Do you see that, sir, the very

5    bottom?

6    A.    Yes.

7    Q.    At the top of Page 59-11, his answer is?

8    A.    "Yes."

9    Q.    The second acknowledgement that he understands his rights

10    to you?

11    A.    That's correct.

12    Q.    The Page 59-11, which is the 43-minute-and-12-second mark

13    into the interview, do you also read the -- also ask him if he

14    has read the waiver?

15    A.    Yes.  Before he signs the form, I want to make sure he

16    reads the waiver and understands that he's waiving the rights by

17    signing the form.

18         MS. GROOVER:  And if we could play that portion at 43

19    minutes and 12 seconds?  That's fine for the 42:33.

20         (Video played.)

21    Q.    (By Ms. Groover)  Stop.  And so it was right before that

22    is when you told him he had to specifically read it; is that

23    correct?

24    A.    Yes.

25    Q.    And why do you make sure he actually reads the waiver?

322

1    Why do you stop him?

2    A.    Well, it's an important part.  I want him to understand

3    that I'm not just giving him a form to sign.  I want him to

4    actually read what's on it and understand what's on it because I

5    could easily say "Sign here and here" and he -- most -- most --

6    my experience, most people that come in illegally or are here

7    illegally, they will just sign without actually reading it.  And

8    that waiver is important because he's actually waiving his

9    rights to representation and I want to make sure he understands

10   if he does that, then we're going to pursue questions, and if he

11   doesn't, then the interview is over.

12   Q.    So you take the time to tell him to read it?

13   A.    Yes, I actually say it.  Say -- ask him if he -- "Have you

14   read" -- say to read it.  Ask him if he read it also, the actual

15   waiver.

16   Q.    And then on Page 59-11 still, the 44-minute mark and two

17   seconds, you explain, "If you choose, you don't have to sign

18   it."  Why did you say this?

19   A.    Well, because he -- he doesn't have to if he doesn't want

20   to.  I mean, I -- I just really -- how to say this?  I really

21   want him to understand.  I don't -- I try not to -- I try not

22   to -- what's the word I'm looking for? -- deceive anybody.

23        I try not to deceive them by, you know, just partially

24   showing them or just saying "Hey, just sign here."

25        I mean, I know, in my experience, like I said, with

1    illegal aliens, if you just tell them to sign here, most of the

2    time they will just sign due to the authority figure, like I

3    said, and then I have a signed waiver form.

4         I want to make sure that he understands and he knows what

5    he's doing and he's actually doing it out of his own free will

6    and not because he got tricked into it.

7         I actually tell them that "I'm not here to trick you or

8    mislead you in any way."  Just the way I've always operated.

9    Q.    After you said that if you choose, you don't have to sign

10   it, his answer on Page 59-11 about the middle of the page, in

11   blue, says "Well, here it only says what you guys are telling

12   me"; is that correct?

13   A.    Yes.

14   Q.    And how do you respond?

15   A.    I tell him, "These are your rights; you have rights; here

16   in the United States, you have rights; it means the rights apply

17   to you," and I want him to understand that, you know, those

18   rights are his rights.  I want to make sure that he knows that

19   he has those rights.

20   Q.    Regardless of his status?

21   A.    Yes.

22   Q.    And on Page 59-12, which is at the 45-minute-and-24-second

23   mark, he asks his first question; is that correct?  And what is

24   that, sir?

25   A.    He asks if he doesn't answer, if he doesn't talk to us

324

1    what are his options.

2    Q.    And your answer is?

3    A.    I ask him what he means.  I informed him that there's

4    still an arrest warrant and that he will still be detained, and

5    if he doesn't want to talk to us, I mean, we arrest him with a

6    warrant so he's still going to jail.

7    Q.    Okay.  So you explained that he has the option but he's

8    still going to jail?

9    A.    Yes.

10   Q.    And then Page 59-13, approximately 47 minutes and nine

11   seconds, does he start to make a statement and then do you stop

12   him, sir?

13   A.    Yes.

14   Q.    Why do you stop him?

15   A.    Because we haven't -- he hasn't agreed to speak to us yet

16   without an attorney present.  So before he starts to make the

17   statements and, like I said, once again, make an incriminating

18   statement, I stop him and make sure that he understands and

19   agrees to talk to us without an attorney being present.

20   Q.    So in your mind, you have not finished reviewing those

21   rights and you wanted to stop it?

22   A.    Yes.

23   Q.    And, again, you explain -- excuse me.  And after you

24   explain his rights at 48 minutes and 47 seconds, which is on

25   Page 59-14, after you finish explaining those rights to him,

325

1   again how does he respond, the top of Page --

2   A.   He says that's fine, that he will answer the questions we

3   need.

4   Q.   You explain okay, are you willing -- okay, so it's for you

5   to write your name or you don't want to sign, and what is his

6   response, again the top of Page 14?

7   A.   He says he doesn't want to sign, and then he says he

8   doesn't take any offense to the question we want to ask and that

9   he says he hasn't done anything.

10  Q.   And so he's willing to speak with you but doesn't want to

11  sign the paper; is that correct?

12  A.   That's correct.  He agrees to speak to us but he doesn't

13  want to sign anything.

14  Q.   So he is exercising some sort of a right at that moment;

15  is that correct?

16  A.   That's correct.

17  Q.   Choosing not to sign a form?

18  A.   That's correct.

19       MR. PHILLIPS:  Objection, leading questions.

20       THE COURT:  Sustained.

21       MR. PHILLIPS:  Some, I -- thank you.

22  Q.   (By Ms. Groover)  Now, on Page 59-14 which is 49 minutes

23  and 15 seconds into the interview, for the fourth time, you ask

24  him if he understands his rights and he responds.  How does he

25  respond, sir?  Again that's Exhibit 59-14.

326

1   A.    At the bottom he says he agrees.

2   Q.    He agrees?

3   A.    Yeah.  He says he agrees that he understands his rights.

4   Q.    And so did you tell him multiple times that you cannot

5   force him to speak with you?

6   A.    I did.

7   Q.    And that was his alone decision to make?

8   A.    Yes, it was.

9   Q.    And did you tell him multiple times that he could stop

10  speaking with you at any time?

11  A.    Yes, I did.

12  Q.    And after the defendant admitted at least three times to

13  you that he understood his rights and agrees to speak with you,

14  did you then begin to question him about the investigation of

15  Mr. Montoya's murder?

16  A.    That's correct.

17  Q.    And what in general did he tell you?  We won't be getting

18  into the specifics of the transcript.  Just generally at the

19  beginning, what was his memory like and his behavior when he was

20  asking -- when you were asking questions?

21  A.    He didn't remember specifics like names of people.  He --

22  Q.    For example, did he appear to avoid implicating and using

23  the names of Pablo and Juan?

24  A.    Yes, he did.

25  Q.    By not naming them or saying that he did not remember

327

1    their names?

2    A.    Yes.

3    Q.    And at first, did he deny getting paid by a check from

4    Pablo?

5    A.    Yes, he did.  He denied getting paid by a check.

6    Q.    And at first, at the beginning of the conversation, did he

7    deny he had been communicating with Pablo and Juan on the phone?

8    A.    Yes.

9    Q.    And at first did he deny any kind of an electronic payment

10   such as a wire from Pablo?

11   A.    Yes.  Yes, he did.

12   Q.    And again, at first, did he even deny giving his phone

13   number to a woman by the name -- Pablo's girl -- that he

14   believed to be Pablo's girlfriend?

15   A.    Yes.

16   Q.    And after that initial denial, did you then confront him

17   with evidence?

18   A.    Yes, we did.

19   Q.    Such as photographs and checks and phone records and video

20   surveillance?

21   A.    Yes.

22   Q.    Talking to him about those, that kind of evidence?

23   A.    Yes.

24   Q.    Did he then change his statements about important

25   information?

328

1    A.    Yes, he did.

2    Q.    Such as did he -- he admitted that Pablo did pay him by

3    check?

4    A.    Yes.  He remembered a check later on in the con -- in the

5    interview.

6    Q.    After you explained about the check, he admitted there was

7    a check?

8    A.    It seems like after the multiple times of us asking him,

9    "Are you sure you didn't get a check, are you sure" and like

10   he -- it clicked or he remembered, he said, "Oh, there was a

11   time I got a check after that."

12   Q.    And then again after being confronted with evidence, did

13   he admit that Pablo gave him $20,000.00 for the use of his

14   vehicles?

15   A.    Yes.

16   Q.    Did he admit that Pablo asked for his help to eliminate a

17   problem employee?

18   A.    Yes.

19   Q.    Did he admit that Pablo was going to kill the employee?

20   A.    Yes.

21   Q.    Did he admit that he drove Juan to kill the employee?

22   A.    Yes.

23   Q.    And did he admit that after Pablo was arrested, Pablo's

24   girlfriend went to his home to get a phone number to communicate

25   with Pablo to get the money back?

329

1    A.    Yes.

2    Q.    And did he explain that that lady, meaning Pablo's

3    girlfriend, led him or coached him what to say?

4    A.    Yes, he did.

5    Q.    And was this -- was he referring to a jail phone call?

6    A.    Yes.

7    Q.    As part of -- when inmates are arrested at certain

8    detention facilities, are their telephone calls recorded?

9    A.    Yes, all inmate calls are recorded.

10   Q.    At the time when Pablo was arrested back in 2017, was he

11   being detained at the Chatham County Detention Facility?

12   A.    Yes, he was.

13   Q.    Are all phone calls made by inmates of the Chatham County

14   Detention Facility recorded?

15   A.    Yes, they are.

16   Q.    And near the phones is it posted that the recording --

17   that phone calls are recorded?

18   A.    Near the phones and I also believe there is a prompt

19   before the call is completed that lets you know that the phone

20   is being recorded.

21   Q.    And monitored by law enforcement, not just recorded but

22   monitored; correct?

23   A.    Yes.  It says the phone call is subjected to recording and

24   monitoring.

25   Q.    And then it comes on after you call the person that you're

330

1  going to talk to to let them know as well it's being recorded;

2  correct?

3  A.    Yes, before the call is connected.

4  Q.    And so the defendant indicated that, at a jail phone call

5  when he spoke with Pablo, he was told what to say by this woman?

6  A.    Yes.

7  Q.    Trying to get money back from a job?

8  A.    Yes.

9  Q.    And did he also admit after being confronted with the

10  evidence that he negated some stuff at the beginning?

11  A.    Yes.

12  Q.    At any time in the interview, did you believe that the

13  defendant had a low IQ, low education and trouble understanding

14  you?

15  A.    No.

16  Q.    Any time believe he had trouble communicating?

17  A.    No.

18  Q.    Believed he understood the significance of speaking with

19  you?

20  A.    Yes.  Yes.

21  Q.    If he had additional questions about his rights, what

22  would you have done?

23  A.    I would have explained them and I would have made sure I

24  met his concerns, made sure he completely understood what was

25  going on.

331

1   Q.   Again if you felt he didn't understand, not just

2   additional questions, what would you have done?

3   A.   I would have -- I would have ended the interview.

4   Q.   And any time did he attempt to invoke any of his rights?

5   A.   No.

6   Q.   Now moving back into the transcript to get some specific

7   questions, Exhibit 59-58, which is approximately one hour 49

8   minutes and 30 seconds into the interview, after he had some

9   denials that caused you some concern, did you confront him with

10  some of those discrepancies?

11  A.   Yes, we did.

12  Q.   About halfway in the page of Page 58, do you explain that,

13  "This is your opportunity if you know something about the

14  investigation"?

15  A.   Yes.

16  Q.   Do you see that portion of the transcript?

17  A.   Yes, I do.

18  Q.   And you bring up the discrepancies such as at the bottom

19  of the page, the phone locations, where the phone was made --

20  when a call was made?

21  A.   Yes.

22  Q.   And then moving on to Page 59-61, which is one hour 53

23  minutes and 25 seconds into the transcript, after you go through

24  several pages of confronting him with this discrepancy, does he

25  then talk about a $20,000.00 wire at the top of Page 61?

1   A.   Oh, 61.

2   Q.   Do you explain, "Look, there's more, there's more, more

3   money that the gentleman paid you in the past"?

4   A.   Yes.

5   Q.   "And there's calls between you and guys after what you're

6   saying and that job you said, okay, the phones" and he responds

7   "more there" and you respond, "You said you didn't," and then he

8   says, "Yes, I worked more," and you say, "But, see, look, look."

9   He said "No," and then finally he says, "but the largest job" to

10   which a $20,000.00 payment is brought up.

11   A.   Yes.

12   Q.   And what is his response?  Does he say that was for

13   bricks?

14   A.   That was for bricks, yeah.  He says, "That was for the

15   bricks."

16   Q.   And so at this portion of the transcript, are you

17   confronting him with statements that he made in the past saying

18   that he had performed work at the ranch for Pablo?

19   A.   Yes.  Yes.  I tell him, remind him about what he said

20   before, beforehand as far as it pertained to work and the work

21   he had done and the payments he had received.

22      Never did he mention what he's mentioning here and now

23   his -- his statement is changing to try to cover up for the lack

24   of --

25       MR. PHILLIPS:  Objection as to "trying to cover up,"

333

1    Your Honor.  I believe that's a question for the jury as well.

2         THE COURT:  Sustained.

3    Q.    (By Ms. Groover)  So leading up to this portion in the

4    transcript in general, does he explain that he's -- he did work

5    at Pablo's ranch and he was always paid in cash; is that

6    correct?

7    A.    That's correct.

8    Q.    And then at one point he is confronted with a check and

9    then finally remembers that he was paid with a check; is that

10   correct?

11   A.    That's correct.

12   Q.    And then do you confront him, was he ever paid in addition

13   besides this check and cash?

14   A.    Yes.

15   Q.    And is that this portion of the transcript where we're

16   getting to the $20,000.00?

17   A.    Yes.

18   Q.    And his initial response about what the $20,000.00 --

19   A.    Was for another -- more jobs at the -- at Pablo's ranch,

20   bricks.

21   Q.    He says $20,000.00 is for bricks, for work he performed,

22   and do you continue to question him about any type of different

23   jobs?

24   A.    Yes.

25   Q.    And moving on to Page 59-62, does the defendant state,

334

1    "The other, the other job that was -- that we did was also to

2    replace in his house"?

3    A.    Yes.

4    Q.    And what do you respond to that?  When he's talking about

5    jobs he would have performed at Pablo's ranch, what do you

6    respond?

7    A.    At this point in time we're not talking about the

8    construction jobs.

9    Q.    "We're not talking about those jobs"?

10   A.    Yeah.

11   Q.    And prior to that moment, did you ever bring up any type

12   of, any other jobs or any other, driving a vehicle?

13   A.    No.

14   Q.    Or help with a problem employee?

15   A.    No, we did not.

16   Q.    It was just what kind of job and work are you doing?

17   A.    Yes.

18   Q.    And general terms like that?

19   A.    Yes.

20   Q.    And is he confronted in the middle of 62, "the job there

21   in the Savannah Pines"?

22   A.    Yes, he is.

23   Q.    And the defendant responds "in Savannah Pines" with a

24   question mark?

25   A.    Yes.

335

1   Q.    And his answer is "No, I've never worked in Savannah

2   Pines"; is that correct?

3   A.    That's correct.

4   Q.    And do you confront him with the fact that he was in the

5   Savannah Pines at that point?

6   A.    Yes.

7   Q.    And then what did he say?

8   A.    He says, "I worked there, too, sometimes."  He changes it.

9   Q.    "That I've done work"?

10  A.    "I've done work."

11  Q.    And then does Special Agent Snipes indicate that his phone

12  was there and both of his vehicles were there during the days

13  that he was working?

14  A.    Yes.

15  Q.    And he says, "Oh, no," then "no."  Does he then go on to

16  say "both vehicles," like asks a question?

17  A.    Yes.

18  Q.    And do you continue to confront him with evidence at the

19  bottom of Page 62, "And your phones as well as the other man's

20  phone when the other man was there," moving on to Page 63, and

21  then explaining at the top of Page 63 that there's a video?

22  A.    Yes.  Yeah, I tell him we have facts.  We have the video.

23  Q.    And then is he confronted about a lady, Pablo's

24  girlfriend?

25  A.    Yes.

336

1    Q.    And that you explain at one point she goes to his house to

2    get a number so he could talk to Pablo on the phone?

3    A.    That's correct.

4    Q.    So after confronting him with the vehicles and his phone

5    and this lady going to his house, what does he then explain to

6    you at the top -- excuse me, at the middle of Page 63 when he

7    says "okay"?

8    A.    He says he's going to explain that to us how that

9    happened.

10   Q.    And what does he continue to say?

11   A.    He says he doesn't remember the lady well.  Then he says

12   he doesn't remember one of these, but --

13   Q.    He brings up a name of Victor; correct?

14   A.    Yes.

15   Q.    And he says, "But I was working there and a lady came in

16   looking for me."  Do you have any idea what he's talking about

17   when he starts saying the name Victor?

18   A.    No.

19   Q.    And then he goes on and says, "And I didn't call her; I

20   don't know her," and then at the bottom of 63, he says, "She

21   came in asking me, asking me if I knew someone for -- because

22   Pablo was detained; she was the one that explained it to me and

23   I asked her why."

24   A.    That's correct.

25   Q.    Is here he explaining that a lady came to him because

337

1   Pablo was detained?

2   A.    Yes.

3   Q.    And at the top of Page 64, does he go on to state in his

4   words that "She with her own phone, she wanted, that Pablo

5   wanted me to give that lady money"?

6   A.    Yes.

7   Q.    And he says, "How was I going to give that lady money if I

8   don't know her?  How would I give that money," and then the

9   question is asked, "Do you owe Pablo money" and how does he

10  respond?

11  A.    "I don't owe him anything."

12  Q.    And then he continues to say, "Yes, yes, I'm remembering

13  now that you told me about the lady."

14  A.    That's correct.

15  Q.    And so are these kind of examples where he's being a bit

16  confusing but not really remembering --

17  A.    Yes.

18  Q.    -- about when we're talking about a lady coming to talk

19  with him?

20  A.    Yes.  Yes; that's correct.  His answers don't -- don't

21  come as quickly.  Like I said, bide his time think of the

22  answer.  It just doesn't flow like some of the -- when he's

23  talking about something that he's sure what he's answering.

24  Q.    And then on the -- on Page -- bottom of Page 64, does he

25  explain that "she," again referring to this lady that came to

338

1   his house, "she told me that Pablo had already been in jail

2   for" -- and at the top of Page 65 -- "about a month"?

3   A.   That's correct.

4   Q.   And then you confront him for a moment, and then again

5   about -- it's still the top of Page 65, it says "I don't -- I

6   don't remember, for example, I tell you.  I'm not interested in

7   other people's lives; that's why I'm not interested, so if you

8   ask me something I will tell you; if I have a chance to help

9   you, I will do it," and then what do you ask him?

10  A.   I ask him --

11  Q.   Do you --

12  A.   I ask him why he was with Pablo's brother.

13  Q.   And do you ask him what Pablo's brother name is?

14  A.   Yes.

15  Q.   And prior to that moment, did you ever tell him the name

16  of Pablo's brother?

17  A.   No.

18  Q.   Did he have difficulty remembering --

19  A.   Yeah.  He -- he actually said he didn't know his name.

20  Q.   Early on in the interview?

21  A.   Yes.  He said he didn't know his name.  Not even to -- he

22  didn't know it, and then he -- when I asked him again, after he

23  knows more than he thought, he said -- he says his name, Juan.

24  Q.   Was that "his name is Juan"?

25  A.   Yes.

339

1    Q.    And then further down, the bottom of Page 65, he says "I

2    was with him in Savannah Pines because he said he was going to

3    do a project with the house there"?

4    A.    That's correct.

5    Q.    And he says, continuing, he says, "That's Juan," referring

6    to Juan doing some sort of work or something; correct?

7    A.    That's correct.

8    Q.    Again, and then Page 66, conversations still about his

9    cars and Savannah Pines and the job, just trying to get him to

10   talk about what was going on with Savannah Pines and the job; is

11   that correct?

12   A.    That's correct.

13   Q.    And again at no point prior to this encounter did you say

14   anything about an employee?

15   A.    No.

16   Q.    Or what exactly the job you're referring to, just

17   generally being vague?

18   A.    Yes.

19   Q.    With the defendant?

20   A.    That's correct.

21   Q.    Trying to get him to answer questions?

22   A.    Yes.

23   Q.    And he was vague with you; correct?

24   A.    Correct.

25   Q.    But finally on Page 69, at the top, does he indicate --

340

 1   well, excuse me, the bottom -- and I apologize, Page 69, towards

 2   the top, does Perez-Bravo say, "Because Pablo told me about a

 3   problem that he has with -- with his workers."

 4   A.    Yes.

 5   Q.    Do you see that?  And that is about two hours and three

 6   minutes and 21 seconds into the interview?

 7   A.    That's correct.

 8   Q.    Prior to that statement, do you ever bring up the word

 9   "workers"?

10   A.    No.

11   Q.    And at this moment, he is telling you that Pablo had a

12   problem with a worker?

13   A.    Yes.

14   Q.    Your question is, "How do you know that it's anything to

15   do with a problem," and his answer is "Pablo has problems with

16   one of his employees"?

17   A.    That's -- that's correct.

18   Q.    And he explained that he had a problem with his workers

19   but he never explained that the problem, and then he goes on,

20   "And why did they pay you?  How much did they wire you," and he

21   says, "Not to me; that money, that money, that 20,000 pesos was

22   from some work that I had done for him; he had paid me."

23   A.    That's correct.

24   Q.    And so he is connecting the $20,000.00 with this problem

25   employee but still distancing himself from the use of the money;

341

1    is that correct?

2    A.    That's correct.

3    Q.    And on Page 70 of the transcript -- and this is about two

4    hours and four minutes and 38 seconds into the interview, do you

5    again confront him with his vague answers that are confusing,

6    that aren't really making sense?

7    A.    Yes, I do.

8    Q.    And Page 71, at the top of the page, do you bring up to

9    him, "Why did you mention the worker?  Why did you mention the

10   workmen?  I never mentioned anything about a worker."

11   A.    Yes, I did ask him that.

12   Q.    And at the bottom of Page 71 he says, "I'm going to -- I'm

13   going to tell you"?

14   A.    Yes, he does.

15   Q.    All of this confusion about this worker, and then at the

16   top of Page 72, he says -- which is two hours and seven minutes

17   and two seconds into the interview, "I'm going to tell you what

18   it is about me lending the cars; Pablo promised me the 20,000

19   pesos for the car, the car movements," and your response?

20   A.    "Oh, what were -- what were they doing with the cars?

21   Why?  What were they doing with the cars?"  I wanted to know

22   why.

23   Q.    And what does he respond to you at the bottom of Page 72?

24   A.    He says he gave them the cars but he wasn't there, but he

25   says -- "But I wasn't there; he went by himself; the other time

342

```
 1    he went in the Escalade and he went by himself."
 2         He says he wasn't -- meaning that he wasn't with him in
 3    the cars, that they just took his cars.
 4    Q.    And your question is "What was he doing"?
 5    A.    What Pablo -- "What was he doing," and he says, "Well,
 6    Pablo, when he explained to me the day we were there, he told me
 7    that he was going to eliminate the person."
 8    Q.    And you asked?
 9    A.    I asked him, "What does 'eliminate' mean," what he means
10    by "eliminate," and then I ask him, "kill him" and he says,
11    "Exactly."
12    Q.    So then you rephrase, "Okay, so Pablo told you that he was
13    going to," and what does Perez-Bravo, the defendant, do?
14    A.    He says "uh-huh."
15    Q.    Like acknowledging that his understanding?
16    A.    Acknowledging, yes.
17    Q.    And your question is "The worker that was giving him
18    problems" --
19    A.    Yes.
20    Q.    -- "do you know his name," and his answer?
21    A.    "The person that died?  I honestly don't know -- know
22    that."
23    Q.    And your question is?
24    A.    "So -- so you do know that a person died?"
25    Q.    And his answer is?
```

1    A.    "He did -- he did die because he said that he was going --

2    going to kill him," referring to Pablo.

3    Q.    And on the top of Page 73, which is two hours and eight

4    minutes and one second into the interview, do you say, "Pablo

5    said he was going to kill him," and what is his response?

6    A.    "I mean, I mean, the only thing."

7    Q.    And then you say "Pablo" and what does he respond?

8    A.    "The only thing I provided was my cars was so they could

9    move and we were -- the day that I went to drop off the brother

10   there I was with him because I dropped him off at the gas

11   station."

12   Q.    And you asked, "The same worker that had problems with

13   Pablo, right?"  And what does he respond?

14   A.    He goes, "I think so because, because, because he said he

15   was going to eliminate the" --

16   Q.    And then you say?

17   A.    "When he told you that he was going to eliminate him, was

18   that in person or on the phone?  What did he say?"

19   Q.    How does the defendant respond?

20   A.    He said, "No, he told me that -- no, Pablo never -- we

21   never talked on the phone.  He would -- he would actually go to

22   my house."

23   Q.    And then you asked the question?

24   A.    "So Pablo went to his house."  That's --

25   Q.    And had conversation there?

344

```
 1   A.    "And had conversation."

 2   Q.    And the defendant --

 3   A.    He says, he acknowledges, "Yes, uh-huh."

 4   Q.    And you continue your question, which is?

 5   A.    "He said he was going to kill the person that he was

 6   having a problem with," and he responds with "I -- I actually --

 7   I actually -- I -- I want to be honest with you guys since

 8   you're telling me maybe I have denied some stuff because I don't

 9   want to --"

10   Q.    And then what do you say in response to that?

11   A.    I tell him, "Look, it's natural, it is because" and he

12   goes, "Yes, yes, I know, I know."  And then, "The day today --

13   the day you took" --

14   Q.    Continuing onto Page 74.

15   A.    And then he asks "Juan" and I said "Juan."

16         I respond "Juan" and he says "uh-huh."

17         "The day you took him, you took him in your van," and he

18   says, "Yes," and then --

19   Q.    And what do you say?

20   A.    I go, I asked him, "What day, is that the day that they

21   killed him?"  He goes "I think it was that day because he didn't

22   tell me.  Juan, he didn't tell me that he was going to kill

23   him."

24   Q.    And your response?

25   A.    I go, "He didn't tell you?
```

1        He was all "No, he didn't say anything."

2        I go "What did he say?"

3        He say, "He just asked me to come pick him up."

4        "And he didn't say it's done," I asked him.

5        And he says, "No, no."  He goes he didn't -- he didn't ask

6    the job is done and he says, "No, nothing; he just went to pick

7    me up but he just -- he went to pick me up but I saw -- I saw --

8    I saw he was very -- I saw he was very," and I asked him

9    "Agitated?"

10       And he says, "Yes, like very like scared, something like

11   that."  Uh-huh.

12   Q.   And then what do you ask him?

13   A.   I said, "No, let me ask you," and then -- and then Agent

14   Snipes says "Pablo paid him $20,000.00 to use the vehicles," and

15   he says, "To borrow my two vehicles because I lent them my cars

16   two times."

17   Q.   And then you asked him?

18   A.   Then I asked, "Because he lent" -- no, I explained, I

19   translate, and then I asked him, "Because they were going to use

20   the vehicles to eliminate someone," and he says, "Exactly," and

21   then --

22   Q.   And that was his word initially, "to eliminate"; correct?

23   A.   Yes, that was his word.

24   Q.   And then he responds "uh-huh"?

25   A.   Yes.

346

1    Q.    And then at the top of Page 75, he says, "No, you can ask

2    me," and then you continued asking him what?

3    A.    "Juan -- Juan was nervous now," and then I asked, "Was

4    there blood, do you know if he had" -- he says, "I only saw" and

5    then I just asked did he ever see a gun and before I can

6    translate, he says, "He never -- just got, got there, got into

7    my van and his feet were wet, his shoes," and I go -- I say,

8    "His shoes were wet," and he says, "And that was -- that was

9    it."

10        And I go, "You didn't see -- you didn't see a gun," I go,

11   "Nothing?"  He goes "Nothing, nothing," and then I say, "Okay,"

12   and then he says, "I really didn't see anything at all," he

13   goes, "because I just dropped him off at the gas station," and

14   he says, "And when -- when you lent him the cars, when you lent

15   him the cars and made the deal for" -- he goes, "No, when he --

16   when he asked me for the cars, Pablo never mentioned the money."

17   Q.    And then you asked him?

18   A.    I go, "But he told you that they were going to eliminate."

19   Q.    And he responds?

20   A.    "Afterwards, no, no.  Afterwards he told me, 'Chiapas, I'm

21   going to give you this because you did me a favor'."

22   Q.    Now Pablo is calling the defendant Chiapas?

23   A.    Yes.

24   Q.    That's where he's from?

25   A.    That's where he is from.

347

1   Q.   And does he go on to explain the favor, at the bottom of

2   Page 75?

3   A.   Yes, he says, "Because you lent me the cars," he said.

4   Q.   And you asked, top of Page 76?

5   A.   "And it was him?"

6   Q.   And the defendant responds?

7   A.   "He deposited to my account himself, and when -- when he

8   did, he tell me" -- "when he" -- "when did he tell you that they

9   were going to eliminate the" --

10       "Oh, that, that happened, when he -- when he -- he told me

11  about that problem when -- the date it says on the check, the

12  day that I went to pick up the check, the day he told me about

13  the problem."

14       So when he picked up the check, the physical check, that's

15  when he told him he had a problem with the workers.

16  Q.   The initial check for $6,000.00?

17  A.   Yes.

18  Q.   That at first he denied ever getting paid with?

19  A.   Yes.

20  Q.   But then you told him you had a check.  He then remembered

21  he had a check; correct?

22  A.   That's correct.  He remembered he had a check.

23  Q.   And so at the top of Page 76, he is now explaining to you

24  that he went to Pablo to pick up this check?

25  A.   Yes.

348

1    Q.    Is that correct?  And at the time that he's picking up the

2    check in person, what does Pablo tell him?

3    A.    He explains to him he has a problem employee and that he

4    needs to take care of that; he has a problem with this employee.

5    Q.    And exactly, he says, "The day," at the top of Page 76,

6    "The day that I went to pick up the check, the day he told me

7    about that problem," and your question was?

8    A.    "But did he tell you that they were going to use your cars

9    to eliminate the" --

10    Q.    And Agent Snipes interrupts and says, "In May, is that the

11    date of the check"?

12    A.    Yes, the check was in May.

13    Q.    And then you say, "To eliminate the" --

14    A.    Yes.

15    Q.    And what does the defendant say?

16    A.    He says, "I think so.  I don't know but it says the date

17    on the check."

18    Q.    He wasn't sure of the date, but whatever the date is on

19    the check is when he went to -- it was when Pablo told him about

20    the problem?

21    A.    That's correct.

22    Q.    And then you respond with your question?

23    A.    "And he said that they were going to use your cars to help

24    eliminate him?"

25    Q.    And what does the defendant say?

349

1    A.    "He told me, that that he couldn't use his -- his cars

2    because he didn't want to have that problem."

3    Q.    And your question is?

4    A.    "So you knew that they used them to eliminate the" --

5          He says, "No, he told me afterwards; he told me afterwards

6    when he told me that the -- he," so ...

7    Q.    And then did you ask him directly, "What did he tell you,

8    that they used them to eliminate the" -- and he stops you and

9    says what?

10   A.    "No, he just told me that -- he just told me for the favor

11   that you -- for your car, for your cars, he said, I'm going to

12   give you 20,000" dol -- 20,000 he says "pesos" but it's

13   $20,000.00.

14   Q.    The bank records show $20,000.00?

15   A.    Uh-huh.

16   Q.    And then you respond, "Okay, now, when -- that was

17   after -- after you took," and what does the defendant say bottom

18   of Page 76?

19   A.    "They hadn't eliminated him when he gave me" --

20   Q.    And at the top of Page 27?

21   A.    -- "when he gave me the money."

22   Q.    And your question was, "They hadn't killed him when

23   they" --

24   A.    He said, "Not yet."  He goes --

25   Q.    You finish your question, "the $20,000.00"?

350

```
 1  A.    20,000, uh-huh.

 2  Q.    And what does the defendant say?

 3  A.    He says, "Uh-huh, that money -- that money he gave me,

 4  that one, when I went -- when I lent them the cars."

 5  Q.    And then so you asked him point blank about this

 6  $20,000.00.  It wasn't to pay other work that he had previously

 7  said it was for?

 8  A.    Yes.

 9  Q.    And what does he say?

10  A.    And he says, "No, no."

11  Q.    Or he -- yes, go on, sorry.

12  A.    He says, "No, no, that was to -- that was for the favor."

13  Q.    And then your question, "And then they eliminated him

14  after that"?

15  A.    "Yes."  He says, "Exactly, a lot -- a lot of time went by

16  when Juan went, went to the house; he came and I took him so I

17  could drive him around there, but we just went up to the

18  mailbox.  He didn't go all the way in.  He went like that.  We

19  went in, and since there's a lot of stops, he turned around

20  there.  They are up ahead and he got out and told me to drop him

21  off at the gas station."

22  Q.    Okay, let's stop for just a moment.  So in the last few

23  pages, he had changed his statement from what he previously told

24  you early on in the interview; correct?

25  A.    That's correct.  Yes.
```

351

1   Q.    And he is now saying that Pablo gave him a check for

2   $6,000.00 and he picked up that check in person; is that

3   correct?

4   A.    That's correct.

5   Q.    And that was in May approximately, the date of the check;

6   is that correct?

7   A.    Yes.  That's correct.

8   Q.    And at that time Pablo told him that he had a problem

9   employee; correct?

10  A.    Correct.

11  Q.    And then he later said that then after that check, Pablo

12  gives him 20,000 pesos but it's dollars from the bank records;

13  is that correct?

14  A.    That's correct.

15  Q.    And from review of the bank records, does that occur in

16  June?

17  A.    Yes.

18  Q.    So a few weeks after the check, and does he explain that

19  at that time when he was given the $20,000.00, they had not yet

20  eliminated the problem employee; is that correct?

21  A.    Yes, he does say that.

22  Q.    And it was still to come but the $20,000.00 was for the

23  use of the vehicles?

24  A.    Yes.

25  Q.    And then in the middle of Page 77, does he then go into,

1    you asked him, "And then did you see the gentleman that they

2    were going to eliminate," ask him if he ever saw Mr. Montoya and

3    what does he respond, the bottom --

4    A.    He says, "No no, I really didn't see him.  I'm being

5    honest that I really didn't see him."

6    Q.    And your question is?

7    A.    "But you did know they were going to eliminate him that

8    day?  And he said --

9    Q.    And the answer?

10   A.    "Pablo hadn't told me."

11   Q.    Your question?

12   A.    "But they were going to eliminate him that day?"  He says,

13   "No, he hadn't told me that day but he told me that."  And

14   then --

15   Q.    And your question is?

16   A.    -- "they were going to eliminate him."

17         And then, "That they were going to eliminate him?"

18         He confirms.

19   Q.    So he explains kind of about -- he's confused about what

20   day he told him, but he does admit that they were going to

21   eliminate him?

22   A.    Yes, he does.

23   Q.    At some point in the future.

24         On Page 78 of Exhibit 59, which is approximately two hours

25   and 13 minutes and 27 seconds into the interview, do you again

353

1    go back into the -- circles to this check and ask him, "When he

2    gave you the check, that's when he told you about the problem

3    with the worker," and what does the defendant respond?

4    A.    He says, "Yes, but that was in person; I went up to his

5    ranch."

6    Q.    So he goes to the ranch to get the check and Pablo tells

7    him about this problem with the worker; correct?

8    A.    That's correct.

9    Q.    And then you ask, "Later he got" -- or Agent Snipes asks,

10   "Later he got the money," referring to the $20,000.00?

11   A.    That's correct.

12   Q.    And you asked the defendant --

13   A.    "And when he gave you the money to borrow -- to borrow the

14   cars," and he says, "But he wasn't here; he was on the border."

15   Q.    And you asked?

16   A.    "Who?"  And he says, "Pablo."

17         "When they eliminate -- when they eliminated him," I

18   asked, and he says, "No, when -- when they -- no, they deposited

19   the money."

20   Q.    So he tells you that Pablo is on the border when he's

21   giving him the $20,000.00 into his bank account?

22   A.    That's correct.

23   Q.    And Special Agent Snipes says, "Yeah, and then later is

24   the day when they borrowed the cars?"

25         And you say "And later, later, they used the cars?"

1     And then defendant says?

2  A.   "He asked me for the cars."  He says, "I -- I think so.  I

3  don't know because I don't" -- he goes "I think that when he

4  borrowed the cars, I think he was looking for the guy that he

5  wanted."

6  Q.   And you clarify or you then translate for someone or

7  Special Agent Snipes, "He thinks that when -- when they borrowed

8  the cars they were looking for the guy that he wanted," and the

9  defendant says, on the top of Page 79?

10  A.   Says, "That's what I think because if he asked me for the

11  car it was because they didn't know the other car," and he says,

12  "Uh-huh, but when he told me that he was going to give me the

13  20,000" -- he says -- "pesos for the favor he did by lending him

14  the cars."  "I did by lending him the cars."

15  Q.   And you start to ask, "You knew," and he responds?

16  A.   He goes "No, actually he had mentioned to me that he was

17  going to eliminate someone."

18  Q.   You said, "Uh-huh," and what did the defendant say?

19  A.   "But what he didn't -- he didn't tell me when he wanted to

20  do it, at what time, at what date."

21  Q.   And you say, "So that was the one" -- "that" -- "so the

22  one that eliminated him was Juan," and the defendant says?

23  A.   "It was Juan because Juan was the one I dropped off at the

24  gas station."

25  Q.   And you say?

355

A.    "And they eliminated him that day and they never said

anything, nothing was within -- nothing was heard, heard within

the Latin community," and he says, "I at the moment, it didn't

occur to me.  It occurred to me that he was going to kill that

person.  It never occurred to me and I never thought that -- I

never thought the guy would do something like that."

     I say, Uh-huh," and he says, "I never, never thought that.

When they, a week later, they told me that a guy there had died,

had been murdered," and then I asked him, "That's when you

realized?"

     He said, "When I realized who it was just" --

     I asked if it was Juan.

Q.    And so let me stop you for just a moment.  So at this,

he's saying that he knew he was going to eliminate.  He just

didn't know what time.

A.    Yes.

Q.    That's when he's telling you when he got the $20,000.00.

Is that a fair summary of this conversation?

A.    That's correct.

Q.    And then he does indicate that it was Juan who is the one

that actually killed him?

A.    Yes, he does.

Q.    And he explains that he dropped Juan off at the gas

station?

A.    Yes.

1  Q.    And he believes that's when Juan killed the man; is that

2  correct?

3  A.    That's correct.

4  Q.    And in the next part of the interview, do you get into the

5  route that the defendant took when was driving?

6          THE COURT:  Let me stop you there, Ms. Groover.  It is

7  time for our lunch break, so we will end with that transition.

8  It's one o'clock.  We will be in recess until two o'clock.

9          Special Agent, you need to consider yourself still on

10  the stand so you can leave and eat and take a break, but you're

11  not to discuss your testimony with anyone.

12          THE WITNESS:  Yes, ma'am.

13          THE COURT:  Recall as we leave the courthouse for the

14  break the familiar admonitions:  Don't discuss the case, keep an

15  open mind, don't do any research, don't consume any type of

16  media on this case.

17          Let's rise for this jury.

18          (The jury exits the courtroom.)

19          THE COURT:  Counsel, we will be in recess until two

20  o'clock.

21          (Recess from 1:03 p.m. to 2:02 p.m.)

22          THE COURT:  All right, let's bring the jury in.

23          (The jury enters the courtroom.)

24          THE COURT:  Special Agent Miranda, when we broke for

25  lunch, you were under oath, sworn the tell the truth.  Do you

357

1    reaffirm that oath for the balance of your testimony?

2         THE WITNESS:  I do.

3         THE COURT:  Ms. Groover, continue.

4    Q.   (By Ms. Groover)  Before lunch, remind you we were at the

5    portion of the interview where the defendant had explained that

6    Pablo had given him $20,000.00 for the use of the vehicles, was

7    going to eliminate a problem employee but said he did not know

8    when it --

9         MR. PHILLIPS:  I'm going to object to the form of the

10   question.  She's summarizing the evidence.

11        THE COURT:  Sustained.

12   Q.   (By Ms. Groover)  Picking up where we left off before

13   lunch discussing the route that was taken, directing your

14   attention to 59-80 or, excuse me, the bottom of the Page 59-79,

15   which is approximately two hours and 14 minutes and 26 seconds

16   into the interview, and just as a reminder, this is the

17   portion, this is part of the interview where the video is no

18   longer recording; correct?

19   A.   Correct.

20   Q.   So that's why we just have the transcript up; correct?

21   A.   That's correct.

22   Q.   At the bottom of Page 79, does the defendant explain "It

23   was Juan" and he says where he dropped him off at?

24   A.   Yes.  He says he dropped him off at the Pilot.

25   Q.   And at the top of Page 80, does he say what does he do

1    after he dropped him off at the Pilot?

2    A.    He says that he went to eat after he drops him off.

3    Q.    And do you ask him exactly where he goes to eat at?

4    A.    Yes, I do.  I ask him about a specific restaurant that I

5    know is kind of in the area that he mentioned, and he says,

6    "It's the one next to the store La Tapatia."

7    Q.    So at the top of Page 80, you're directing him to a

8    particular restaurant location, a Mexican restaurant in the

9    area?

10    A.    Yes.

11    Q.    And he acknowledges that's the restaurant he went to eat

12    at?

13    A.    He acknowledges it's the one by the store, by La Tapatia.

14    Q.    And do you ask him what he does next and what does the

15    defendant explain?

16    A.    He said he picked him up where the highway is.

17    Q.    Before explaining that he picked him up, does he

18    indicate -- do you ask him if Juan called him to pick him up?

19    The top of Page 80, you explain "and then Pablo -- and then Juan

20    called him to pick him up; where did you pick him up," and he

21    answers?

22    A.    He answers that he picked him up where the highway is.

23    Q.    And then do you clarify, "The Chatham Parkway?"  And what

24    does he answer?

25    A.    He says, "The 307, the 307 is here; right?"  And he asks.

359

1   Q.    And does Special Agent Snipes, "Is it the same street
2   where Savannah Pines is, the 307"?
3   A.    Yes.
4   Q.    And what does the defendant explain?
5   A.    He says, "No, this is 307, this isn't" -- we're going over
6   a map at the time, and then he -- because -- then I say,
7   "Because Savannah Pines," and he says, "Yes, yes, it was -- it
8   was here; this is the gas station passing I-16."
9   Q.    And then he further explains, "Okay, when I left him there
10  at the gas station, I came and I went over there"; is that what
11  he says?
12  A.    Yes.
13  Q.    And you say, "Okay," and he explains what he did was to --
14  A.    "To eat."
15  Q.    And you say, "Okay," and then what does he explain?
16  A.    He says he was eating without knowing anything, if he was
17  going -- and Juan was going to call him back.
18  Q.    And then he further explains at the bottom of Page 80?
19  A.    He says that he called him all of a sudden and then the
20  defendant went to pick him up.
21  Q.    At the top of Page 81, does he explain where he goes to
22  pick up Juan?
23  A.    Yeah, he says, "Towards I-16," and he says, "Past the
24  bridge that's there, passing the bridge he was there" is what he
25  says.

360

1   Q.    And you asked, "He was just standing there"?

2   A.    Yes, and he says, "He was standing there at the side of

3   the road" is what he says.

4   Q.    And Special Agent Snipes asked, "He walked," and you

5   explained, "He walked over there; he walked, he walked from the

6   gas station," and what does the defendant respond?

7   A.    He says, "I think he walked from there to there," and he

8   says, "But just there but he never crossed my mind that he

9   was -- that he was -- his intention to go; Pablo was the one

10  that mentioned it," referring to the elimination.

11  Q.    And moving on, on the bottom of Page 82 of the transcript,

12  does Special Agent Snipes indicate that his cell phone was there

13  in the morning until after they killed him, Mr. Montoya was

14  killed?

15  A.    Yes, he does.

16  Q.    And then does Special Agent Snipes further explain to the

17  defendant at the bottom of Page 82 that his vehicle was at the

18  entrance 16 times?

19  A.    Yes.

20  Q.    Was that referring to the entrance of Savannah Pines?

21  A.    Savannah Pines, yes.

22  Q.    And that his cell phone was also there?

23  A.    Yes.

24  Q.    And at the top of Page 83, Special Agent Snipes continues

25  that "Your van and your cell phone and you told us that you were

361

1   driving."  He had previously said he was driving the van; is

2   that correct?

3   A.    Yes, he did.

4   Q.    What does defendant say in response?

5   A.    He agrees.  He says, "Yes, yes."

6   Q.    And then about the middle of Page 83, does he further

7   explain that, "Yes, I was there with him," referring to Juan;

8   correct?

9   A.    Yes, that's correct.

10  Q.    "I'm telling you, I was there with him.  I dropped him off

11  at the gas station.  I went to eat.  When he called me, I picked

12  him up at the part where I told you?"

13  A.    Yes, that's correct.

14  Q.    And Special Agent Snipes says, "And you didn't go to the

15  entrance of Savannah Pines," and what does the defendant

16  respond?

17  A.    He says, "Oh, yes, I did go in."

18  Q.    And Special Agent Snipes asked him how many times and what

19  did he respond?

20  A.    He says he doesn't remember how many times but he went

21  there.

22  Q.    Now, you indicated that you had a map with you while you

23  were speaking with the defendant; is that correct?  Or you were

24  referring to a map?

25  A.    We were referring to a map, yes.

362

1   Q.   And I'd like to direct your attention to Exhibit 86.   If

2   we could pull up 86 on the screen, I'm sorry, 56, I apologize.

3        Now is this a map that depicts some of the locations on

4   the route that the defendant was just explaining to you about?

5   A.   Yes, it does.

6   Q.   If your touch screen is on, could you please use the touch

7   screen and show us the route that the defendant told you he took

8   with respect to Juan?

9   A.   So here is the Pilot.  The defendant dropped him off

10  there.  Then he drove to eat.

11  Q.   Is this driving on 307?

12  A.   307, and he went to a restaurant that is more or less in

13  this area.

14  Q.   You're familiar with that restaurant and it's located down

15  here?

16  A.   Yes, I am.  I'm familiar with the restaurant and it's down

17  there, and the store, I've actually been in the store that he

18  mentioned.

19  Q.   Then what does he tell you what happened?

20  A.   From there, he says -- he mentions going to Chatham

21  Parkway to pick him up.

22  Q.   After Juan had called him?

23  A.   Yes, so he drove this way.  Here is Chatham Parkway, and

24  he comes back this way and he picks him up.

25  Q.   Does he explain where he picks up Juan?

363

1    A.    He says -- he says, he explained it was on the on-ramp

2    getting back on I-16, so it would be right about right here, and

3    then he says they continue on.  He can drop him off at the

4    Kroger, which is down here, excuse me.

5    Q.    Later on in the interview he further explains --

6    A.    Yes, he further explains and the rest of the route that he

7    does, he says that they go this way and he misses his turnoff so

8    they keep going and he explains that --

9    Q.    This is west on I-16?

10   A.    Yes.  He explains that they miss a turnoff, and he goes

11   all the way to Pooler Parkway, where he turns onto Pooler

12   Parkway, which turns into Quacco Road -- they are not on the

13   map, though, and then he takes Quacco Road all the way back to

14   Ogeechee or Highway 17, and then he comes back on Ogeechee to

15   the Kroger that's right here.

16   Q.    And then does it pick up on the map that you --

17   A.    Yes.  That's when he -- he drops him up.

18   Q.    Can you show us on the map where it picks up after the

19   Pooler Parkway wrong turn?

20   A.    Where he --

21   Q.    At Quacco Road?

22   A.    Yeah, it's down here -- well, Quacco Road isn't here on so

23   I can't show Quacco Road, but it goes right here at 16.  It's

24   actually Pooler Parkway where it intersects with 16 and then it

25   turns into Quacco Road.  Once, when you turn left, it -- it

364

1    turns into a two-lane highway and changes to Quacco Road.

2    Q.    Now there is also portions of the interview where you

3    discuss the lady coming to see him, referring to Pablo's

4    girlfriend?

5    A.    Yes.

6    Q.    Do you recall those moments?  And did you have an

7    opportunity to pull the jail phone call that you're referring to

8    in that interview?

9    A.    Yes.

10   Q.    And is your Exhibit 58, is that the actual recording of

11   the jail phone call on October the 1st of 2017 with Pablo, his

12   girlfriend by the name of Sunilda Brito, and the defendant?

13   A.    Yes.

14   Q.    And is that a jail phone call that is in Spanish?

15   A.    Yes, it is.

16   Q.    And after law enforcement obtained the audio recording of

17   the jail phone call, did contractors with his prepare a

18   transcript of the jail phone call that occurred on October the

19   1st of 2017?

20   A.    Yes, they did.

21   Q.    And is that transcript depicted in Exhibit 61 if we could

22   pull up Exhibit 61, please?

23   A.    Yes, that's it.

24         MS. GROOVER:  And Your Honor, the Government would like

25   to note that the jurors do have Exhibit 61 in their binders as

365

1  well.

2  Q.    (By Ms. Groover)   And is this transcript approximately

3  eight pages?

4  A.    Yes.

5  Q.    And again, like Exhibit 59, the left side is Spanish

6  language used and the right side is English translation?

7  A.    That's correct.

8  Q.    And prior to today, did you have an opportunity to listen

9  to the recorded jail phone call in Spanish and follow along with

10  the prepared English transcript?

11  A.    Yes.

12  Q.    And is Exhibit 61 a true and accurate English transcript

13  of the jail phone call recording with Pablo, Sunilda Brito and

14  the defendant on October the 1st of 2017?

15  A.    Yes, it is.

16  Q.    You're also one of the investigators on this case in

17  addition to just interviewing the defendant; correct?

18  A.    I was.

19  Q.    And did the investigation determine who exactly Sunilda

20  Brito was?

21  A.    Yes, it did.

22  Q.    Who was she?

23  A.    She was Pablo's girlfriend, lover, I guess.

24  Q.    Not his wife?

25  A.    Not his wife, no.

366

1   Q.   In addition to reviewing this jail phone call, are there

2   approximately eight other jail phone calls between Pablo and

3   Sunilda discussing locating the defendant?

4   A.   Yes.

5   Q.   And generally in those other calls, Pablo is asking

6   Sunilda to locate the defendant so Sunilda can connect the

7   defendant and Pablo; is that correct?

8   A.   Yes.

9   Q.   Using her phone?

10  A.   That's correct.

11  Q.   And we've testified earlier that the jail phone calls of

12  the inmates at Chatham County jail are, in fact, recorded and

13  monitored; correct?

14  A.   That's correct.

15  Q.   And based on your training and experience, do inmates

16  sometimes use coded languages or other people's phones to try to

17  avoid detection while they're communicating on recorded jail

18  phone calls?

19  A.   Yes, they do.

20  Q.   Did you find that was something that was similar to what

21  was going on with Pablo in these situations?

22  A.   Yes.

23  Q.   Trying to using somebody else's cell phone to communicate

24  with the defendant?

25  A.   Yes.

1   Q.    Namely Sunilda's cell phone?

2   A.    That's correct.

3   Q.    So the recording would be between Pablo and Sunilda but

4   then later pick up the defendant?

5   A.    Yes.

6   Q.    Now, in Exhibit 61, there is a -- there's a discussion

7   about the kitchen job.  Is this the kitchen job that at points,

8   at parts of the interview you refer to with the defendant?

9   A.    Yes.

10  Q.    And is this also the call that you were discussing with

11  the defendant where he admits that a lady led him and told him

12  what to say?

13  A.    That's the exact same call.

14          THE COURT:  Let me pause you for a minute, Ms. Groover.

15          Ladies and gentlemen, as I previously instructed you

16  with regard to Exhibits 58 and 59, the same instruction holds

17  for Exhibits 61.  I have admitted Exhibit 61 into evidence.

18  It's identified as a typewritten transcript and translation from

19  Spanish into English of an oral telephone call that has been

20  received into evidence as Exhibit 60.

21          The transcript also purports to identify the speakers

22  that are engaged in the telephone call.  I have admitted the

23  transcript for the limited and secondary purpose of helping you

24  follow the content of the conversation as you listen to the tape

25  recording, particularly the portions in Spanish and also to help

368

1   you identify the speakers, but you are specifically instructed

2   that whether the transcript correctly reflects the content of

3   that phone call and the identities of the speakers is entirely

4   for you to decide based on your own evaluation of the testimony

5   that will be available for you to hear in its entirety and from

6   your own examination of the transcript in relation to hearing

7   the transcript.

8          If you determine that the transcript is in any respect

9   incorrect or unreliable, you should disregard it to that extent.

10         MS. GROOVER:  Thank you, Your Honor.

11         THE COURT:  Yes.

12  Q.   (By Ms. Groover)  Then throughout the interview of the

13  defendant, are you able to put together a timeline of events of

14  what -- of the events that occurred between Pablo, the

15  defendant and Juan with respect to Mr. Montoya's murder?

16  A.   Yes.

17  Q.   And beginning with the check in May, would you describe

18  for the jury the timeline as set forth by the defendant

19  throughout this interview with you?

20  A.   Yes.  So in May is when he goes and picks up the check,

21  and he -- that's when Pablo tells him about the problem

22  employee, and then he says two weeks later is when he asked him

23  for a favor to borrow his vehicles, and then in June is when he

24  calls him and tells him, calls him and asks for him his -- his

25  account number, and then he deposits, tells him he's going to

369

1   make a deposit for him for making -- doing the favor of

2   borrowing the cars and then he deposits the money, and then a

3   few months later, he goes over to his house and tells him, "I

4   need another favor; we're going to take care of the problem;

5   we're going to eliminate him," and he needs him to drive his

6   brother Juan to do it.

7   Q.    And does the defendant in this interview explain that when

8   Pablo comes to his house and says to drive his brother, does he

9   explain that he's in his work tree truck?

10  A.    Yes, he does.  He said he's in a work truck during the

11  interview.

12  Q.    Turning your attention to Exhibit 55, if we could pull up

13  55.  Do you recognize Exhibit 55?

14  A.    Yes, it's a 213.

15  Q.    Is this the document that the US Government has indicating

16  that the defendant is an illegal alien?

17  A.    Yes.

18  Q.    In fact, he told you that during the interview?

19  A.    Yes, he did.

20  Q.    Exhibit 83, Exhibit 83, please.  What are we looking at in

21  Exhibit 83?

22  A.    That's the defendant.

23  Q.    And is the man that you interviewed present in the

24  courtroom today?

25  A.    Yes, he is.

370

1    Q.    Can you please identify him by where he's sitting and what

2    he's wearing?

3    A.    He's sitting to the left of defense counsel.

4    Q.    What is he wearing?

5    A.    It's a pink shirt with looks like a burgundy tie and gray

6    coat.

7          MS. GROOVER:  Let the record reflect the witness has

8    identified the defendant.

9          THE COURT:  It will so reflect.

10         MS. GROOVER:  Your Honor, may I have just a moment,

11   please?

12         THE COURT:  Yes.

13         MS. GROOVER:  No further questions, Your Honor.

14         THE COURT:  Cross-examination, Mr. Phillips.

15         MR. PHILLIPS:  Thank you.

16                       CROSS-EXAMINATION

17   BY MR. PHILLIPS:

18   Q.    I think we've met, Officer Miranda.  I'm Bobby Phillips

19   and I represent the defendant.

20         Isn't it true that the purpose of interrogation of a

21   defendant is to get a confession?

22   A.    No.

23   Q.    Okay.

24   A.    It's to collect facts.

25   Q.    Which you hope will lead to a confession?

371

1   A.    The purpose of the interrogation is to collect facts about

2   the crime at hand.  The facts that come forward during the

3   interview, those are the facts.

4   Q.    You heard one of the prospective jurors who worked over at

5   FLETC -- I don't know, maybe you didn't -- you weren't in the

6   courtroom?

7   A.    I was not.

8   Q.    Let me rephrase the question then.  I'm presuming that to

9   become an agent, you have to go through significant amount of

10  training?

11  A.    That's correct.

12  Q.    And you have training, like the prospective juror talked

13  about, use-of-force training, where officers are taught when and

14  where and how to use force under the correct circumstances?

15  A.    That's correct.

16  Q.    And you have other types of training, including how to

17  properly interview and interrogate suspects and witnesses; is

18  that correct?

19  A.    Well, correct.  I was never taught to interrogate.  I was

20  taught to interview.

21  Q.    And when you were taught to interview, do you remember

22  what kind of textbooks you used?

23  A.    The training manuals provided by FLETC.

24  Q.    Have you ever heard of John Reid's techniques?

25  A.    Yes, I have.

372

1   Q.   That's a nine-step process; right?

2   A.   Yes.

3   Q.   And how much training have you gotten in that nine-step

4   process?

5   A.   I did take a retraining probably in 2010, so I probably --

6   I can't remember how many days it was, but I have had a few days

7   of training.

8   Q.   Are you familiar with his book, *Criminal Interrogation and*

9   *Confessions*?

10  A.   It doesn't look familiar.

11  Q.   Are you required to take refresher courses in interviews?

12  A.   We're not required, but I have attended several training

13  on different type of interviewing.  I've had visa security

14  training which in itself has a -- has a two-day block, I

15  believe, of interview training other than the Reid.

16       Occasionally trainings pop up.  Sometimes I attend

17  conferences where -- where one portion of that conference where

18  you're free to attend whatever portion you want might be on

19  interview training.  I've done those, so I've had various

20  training on various techniques.  Ultimately I feel like I've

21  developed my own technique over the many interviews I've done

22  over the years.

23  Q.   You agree with this statement that a vital aspect of

24  working as an investigator is skill as an interviewer?

25  A.   Yes.

1   Q.    And I think you've done it, but in your profession, there

2   is a clear difference between an interview and interrogation;

3   right?

4   A.    That's correct.

5   Q.    Are you telling this jury that that four-hour time that

6   you spent with Mr. Perez-Bravo never turned into an

7   interrogation?

8   A.    I mean, ultimately it was an interview, questions and

9   answers, and that's -- that's what we did.  We interviewed him

10  for four and a half hours.

11  Q.    Did you utilize any of the Reid techniques during your

12  interview?

13  A.    I did.  Part of it is reading his body language.

14  Q.    Another part of it is putting a suspect in an interview

15  room and leaving that suspect alone at the very beginning of the

16  interview, isn't it?

17  A.    That's not why we did it.  That's --

18  Q.    That's not the question.  Part of the Reid technique is to

19  put a suspect in the interview room and leave him alone so that

20  he can reflect on his situation?

21  A.    That is part of it.

22  Q.    And that's what was done with Mr. Perez-Bravo at the

23  beginning?  He was placed in a room and left alone a few

24  minutes?

25  A.    He was left alone, yes.

374

1   Q.   Now, when did you get involved in this case for the

2   purpose of interviewing Mr. Perez-Bravo?

3   A.   For the purpose -- well, as soon as they identified him, I

4   worked on the surveillance.  I'm one of the -- at the time I was

5   the main Spanish speaker in the office, so any Spanish

6   interviews were primarily going to go through me.  So I think I

7   was pretty much determined to be the one to interview him from

8   the git-go.

9   Q.   Didn't Agent -- Officer Reyes, didn't he say he spoke

10  Spanish as well?

11  A.   Yes.  He -- it's -- for that part of the investigation.

12  Our part of the investigation, it was going to be me, anything

13  through Homeland Security.  If you go back to the initial

14  interviews with Juan and Ippolito, Detective Reyes did his own

15  interviews.  Then I came in and did followup interviews

16  afterwards.

17  Q.   You mentioned that you observed my client's demeanor?

18  A.   Yes.

19  Q.   Isn't it true that the interview stage involves behavioral

20  analysis?

21  A.   Yes.

22  Q.   And you try to develop a rapport and establish the

23  baseline behaviors of the suspect?

24  A.   I try to be a good human being to everybody I interview.

25  Q.   But you're looking for certain visual and verbal clues,

1    aren't you, that are normal for a person so that once he -- you

2    want to be free and easy with him in the beginning, so he

3    relaxes with you and then you can see what his normal behaviors

4    are; correct?

5    A.    It's -- you develop a baseline, yes.

6    Q.    And would you agree that your process focuses on active

7    persuasion where you actively attempt to persuade the suspect

8    into a certain form of answering questions?

9    A.    No.  I try to just get him to tell the truth and share the

10    facts of the case that he knows.

11    Q.    Now, when you first entered the room, when you and -- who

12    was in there with you, Snipes?

13    A.    Yes, Agent Snipes --

14    Q.    Agent Snipes?

15    A.    -- was in there with me.

16    Q.    You told my client that you were there to talk to him

17    about his immigration status, didn't you?

18    A.    No, I told him that initially we were going to talk about

19    the immigration status, that we're going to talk about his

20    immigration status.  That's what we started with.

21    Q.    That's what I said.  You said no, but, in fact, that's

22    what you did say?

23    A.    Yes.

24    Q.    Now, you worked in immigration for a while?

25    A.    Yes.

376

1   Q.    And isn't it true that when you interview or -- interview

2   someone who is in this country illegally and they know that

3   you're with Homeland Security -- is that who you're with,

4   Homeland Security?

5   A.    Homeland Security Investigations.

6   Q.    They know that, so they know that there's a good

7   possibility they are going to be deported; correct?

8   A.    That's correct.

9   Q.    And you've seen those people become very nervous and upset

10  as you start your interview process, haven't you?

11  A.    It varies.  Not everybody is the same.  Some people become

12  nervous and upset.  Some people understand their situation.

13  Some people cry.  It just varies on -- on the individual.

14  Q.    And if a person had been living in this country for 20

15  years, you would presume that he's put down some sort of roots,

16  wouldn't you?

17  A.    Yes.

18  Q.    And you would presume that that person would have a strong

19  desire to stay where he's put down his roots the prior 20 years?

20  A.    That would be any human, I think.

21  Q.    I think so, and you would also presume that that person

22  might become very upset and afraid if he thinks all of a sudden

23  he's going to be taken away from his home, turned over to ICE

24  and sent back to Mexico, wouldn't you?

25  A.    Yes.

377

1    Q.   And that was the position my client was in at the

2    beginning of this interview, that he's here illegally, you know

3    he's here illegally and in his mind he fears that you're going

4    to send him back to Mexico; isn't that true?

5    A.   He didn't demonstrate any fear.

6    Q.   That's your clinical observation?

7    A.   I've interviewed -- I've interviewed people that are

8    afraid to be deported and he did not demonstrate any of those

9    behaviors.

10    Q.   Do you remember the very end of this interview he asked

11    you, "Can I leave now?"

12    A.   At the very end?

13    Q.   Pretty close to the end, after about -- at least say three

14    hours.

15    A.   I don't -- I don't remember exactly when.

16    Q.   Now another part of the Reid technique is to interrupt a

17    suspect when you're interviewing him, isn't it?

18    A.   I can't remember.  It's been years since I went to that

19    training.

20    Q.   And another aspect of the Reid technique is to cut them

21    off if they try to make a denial of guilt, isn't it?

22    A.   I can't remember.

23    Q.   You told him -- well, he asked you what this was all

24    about, didn't he?

25    A.   He asked the reason.

378

1   Q.    Yes.

2   A.    Uh-huh.

3   Q.    And he told you he hadn't done anything.  "Honestly, I

4   haven't done anything; I've just lived here and worked for the

5   past ten years in this area"?

6   A.    He did say that.

7   Q.    And he says, "I've been working" and that's when you cut

8   him off to remind him of his Miranda rights when he's trying to

9   tell you that he's been working for the past ten years.  Do you

10  remember that?

11  A.    Yes, I remember that.

12  Q.    So he didn't get to finish telling you that he had been

13  working for Lanier, been earning money and been doing everything

14  the way he should have been doing it?

15  A.    Not everything.

16  Q.    Well, that's why we're here.  And many times, many times

17  both you and Agent Snipes told my client that you weren't there

18  to lie to him.  You were only there to tell him the truth;

19  right?

20  A.    That's correct.

21  Q.    Was that the truth?

22  A.    That's the truth.

23  Q.    And at various times, beginning on Page 13 and going

24  throughout the -- throughout the whole 140-some-odd pages you

25  reminded him that you can't make any promises to him?

379

1   A.    That's correct.

2   Q.    And no games and no tricks, that "We can't make any

3   promises to you; we just want you to tell us the truth"?

4   A.    That's why we were there is for facts.

5   Q.    So then when he told you that he was paid the 65,

6   $6,000.00 for the construction, you didn't believe that?

7   A.    Because we were there for -- because we went in there with

8   the facts already.  We didn't go in there blind.  It wasn't a

9   blind interview.  We had collected facts.  We knew about the

10  investigation.  We -- we had other facts that led us to believe

11  that wasn't the truth.

12  Q.    Did you go to the Pablo's property in Effingham County?

13  A.    Yes, I did.

14  Q.    And you saw the mobile home that Pablo lived in?

15  A.    Yes.

16  Q.    Did you see the exterior woodwork and the brick that was

17  around that mobile home?

18  A.    I saw it.

19  Q.    Do you agree that that looked like to have been a fairly

20  recent construction?

21  A.    I couldn't -- I couldn't say.

22  Q.    So you don't disagree?

23  A.    I don't agree.

24  Q.    You don't disagree or you don't agree?

25  A.    Neither one.  I don't agree or disagree.

380

1   Q.    And you saw the giant parking lot or whatever they had?

2   They had a flat concrete place that looked either could have

3   been a -- down at Tybee, if you are familiar with Tybee, they've

4   got the picnic park where you go --

5   A.    Like a big -- big roof without walls.

6   Q.    Yes.  You saw that?

7   A.    I did see that.  I sat under it.

8   Q.    And you know that my client told you at various stages of

9   this interview that he did that kind of work and he did that

10  kind of work for Pablo?  Didn't he tell you?

11  A.    He actually just said he did one job for him.

12  Q.    Did he tell you, though, he also was supposed to have done

13  a second job, a kitchen job?

14  A.    No, he did not say anything about a second job.  He said

15  one job, and then he actually said at some point that the

16  payment from the check was apart from any actual construction

17  work he had done for Pablo.

18  Q.    That's right.  He said that.  We've heard that?

19  A.    Uh-huh.

20  Q.    But he only said that after the interview -- after you

21  rejected his explanation of what the check was for and what the

22  wire transfer was for?

23  A.    No.  After we confronted him with the facts that we had is

24  when he said that.

25  Q.    How long have you been with immigration and customs, '09?

381

1    A.    I started with border patrol in 2005, border patrol/

2    immigration also since 2005.

3    Q.    And you said how many persons have you interviewed?

4    A.    At border patrol we interviewed -- and even to this day,

5    I'm a supervisor of human smuggling group so it continues.  I

6    still help my agents do interviews because I have agents that

7    don't speak Spanish, so I'll sit down and do interviews with

8    them still so it's hundreds to thousands.  I really couldn't

9    tell you.  It's several.

10   Q.    That was the question I had.  I thought maybe that Ms.

11   Groover said hundred thousands?

12   A.    No, no, no, hundreds to thousands.

13   Q.    Hundreds or thousands?

14   A.    Hundreds or thousands.  Yes.  I can tell you this.  In a

15   recent case, we interviewed at least -- somewhere close to a

16   hundred victims, so that's one case, in Spanish.

17   Q.    You used a term that I used in my opening, and I wasn't

18   really sure that it was appropriate but what Pablo was doing was

19   sort of a form of human trafficking, wasn't it?

20   A.    I mean, he was -- it's hard -- I can't say yes for sure.

21   I mean, I --

22   Q.    It's not like the kind that we normally think of?

23   A.    If it would, it would be under labor trafficking, not sex

24   trafficking, labor trafficking, but I don't know all the -- that

25   didn't become the focus of -- my investigation initiated with

382

1   possible trafficking victims.  I was a subject matter expert in

2   human trafficking here in Savannah so that's why I was called

3   out.  But that, with my Spanish skills.  That's why I was called

4   out that day.

5   Q.   Are you familiar with people who exploit other human

6   beings?

7   A.   I am.

8   Q.   And do those people tend to be manipulative and

9   controlling?

10  A.   They do.

11  Q.   Just that's the nature of the business, isn't it?

12  A.   It is.

13  Q.   Because you've got to manipulate and you've got to control

14  those people that you're exploiting?

15  A.   That's correct.

16  Q.   Do you know how many employees Pablo had over at the Wolf

17  Tree or Davey Tree, Wolf Tree, whatever you use, Davey Tree

18  Company?

19  A.   Not exact numbers.  No, I don't.

20  Q.   In the twenties, though, wasn't it?

21  A.   Yeah, it was around there, maybe give or take a few.

22  Q.   Did you interview any of those employees?

23  A.   It's been so long.  I can't remember any specific

24  interviews.  I know that I did go with Agent Snipes to do

25  interviews, but -- yes, I did.  I did.  I did interview some of

383

1    those.  I was -- I was in the interviews but I was more, in more

2    of a translator in some of those because of my Spanish skills,

3    but, yes, I was in some of those interviews.

4    Q.    When you went to interview on the day that you went to

5    interview my client, you had an arrest warrant -- did you have

6    an arrest warrant for him?

7    A.    I did not.

8    Q.    So they had the arrest warrant through the Garden City

9    Police Department for the murder?

10   A.    That's correct.  I don't know what the warrant was for but

11   they had one.

12   Q.    But that was the warrant he was arrested on; correct?

13   A.    Yes, that's correct.

14   Q.    Did you ever serve him with a warrant for being here

15   illegally?

16   A.    We don't have warrants for illegal entry.

17   Q.    What do you do, just pick them up?

18   A.    Yeah.  It's probable cause usually.  If I believe that

19   he's -- I have reason to believe that he's here and

20   undocumented.  Reasonable belief, I can approach him and do a

21   consensual and ask him questions.

22        If he talks to me and lets me know -- I do have to

23   identify myself as an immigration officer, and if he lets me

24   know that he's here illegally, then I can arrest him at that

25   point.

384

1    Q.    So when you came in, Garden City had the arrest warrant

2    for what we could be able to presume was for the murder?

3    A.    Yes.

4    Q.    The one that he eventually got indicted actually in this

5    case and you were there to assist in that criminal investigation

6    for the murder?

7    A.    I was there to assist with any which way I was asked.

8    Q.    Well, were you asked to come over for the murder case?

9    A.    I was asked to assist with the arrest of Mr. Perez by

10   Agent Snipes and I said, "Yes, I will come out and help."

11   Whatever they wanted, if they wanted me to do surveillance, if

12   they wanted me to do the interview, if they wanted me to collect

13   evidence.

14   Q.    And are you able to do that through your employment

15   because he's here illegally?

16   A.    Assist on Garden City's warrant?

17   Q.    Yes.

18   A.    I'm allowed to do it because of my employment, yes.  I'm

19   allowed to assist.

20   Q.    I guess my question was:  Suppose he would have been a US

21   citizen, non-Hispanic?

22   A.    I can still assist.

23   Q.    That's what I was trying to get to?

24   A.    Yeah, I can still assist.

25   Q.    Now my client told you he had been here about 20 years?

1   A.    Yes.

2   Q.    He told you that he had walked from Mexico into Arizona?

3   A.    He said Arizona.

4   Q.    How long a walk would that have been, do you think?

5   A.    It depends on where he came through.  There's border towns

6   all across the border.  It could be anywhere from we like to go

7   from seconds to minutes, minutes to hours, hours to days, so it

8   all depends on where he came in.

9         Considering he didn't come in with a guide, it's probably

10  through a town.  In my experience, you're not go to walk through

11  the desert without a guide that knows where he is going, so if

12  he didn't come in with a guide, it was probably near one of the

13  border towns in Arizona.

14  Q.    And he told you how long he had been here?

15  A.    Yes.

16  Q.    And where he had been?

17  A.    Yes.

18  Q.    Did you examine his criminal history?

19  A.    No, I did not personally, no.

20  Q.    Are you aware of whether or not anyone had looked for a

21  criminal history on him?

22  A.    I'm -- yes, I'm sure somebody did.

23  Q.    To your knowledge, he had no criminal history, did he?

24  A.    To my knowledge, no.

25  Q.    Now, is it true that when these undocumented immigrants

386

1    come to a community that they tend to congregate and live in the

2    same general area and form little communities?

3    A.    It depends.  On the border it's not like that because they

4    can -- it's pretty more -- pretty much a Hispanic community so

5    there's no need to congregate, but when they go into the

6    interior, yes, it tends to be more of a congregated community.

7    Q.    Was Savannah Pines a Hispanic community primarily?

8    A.    Yes, to my knowledge, it is.

9    Q.    And we have a number of those throughout Chatham County

10   and I presume Glynn County as well, wouldn't you think?

11   A.    I don't -- I don't know about other counties but Chatham

12   County, yes.  You have other communities throughout Georgia

13   because of the farming communities.  It's predominantly

14   Hispanic.  I know in Atlanta there's a few communities like

15   that.

16   Q.    Now, when my client was taken into custody he said that

17   the cell phone and the money belonged to the company he was

18   working for.  Did you verify that he was working for another

19   company?

20   A.    I did not personally.

21   Q.    But you became aware that he was?

22   A.    Yes.

23   Q.    And that was Lanier Property Management?

24   A.    Yes.

25   Q.    Did you ever speak to Jody Lanier, the owner?

387

1    A.    I did not.

2    Q.    Do you know if anybody did?

3    A.    I do not know.

4    Q.    You are aware that the Government has obtained his bank

5    records and his pay stubs and all that?

6    A.    Yes.

7    Q.    You've reviewed that?

8    A.    I've reviewed some of it, yes.

9    Q.    And you saw that he was actually making money at Lanier

10   Property Management?

11   A.    Yes.  He also -- he also did side jobs on his own.

12   Q.    And that's not uncommon, is it, in the Hispanic community?

13   A.    No.

14   Q.    Because they have the reputation really for being pretty

15   good workers; is that true?

16   A.    Yes.

17   Q.    And my client told you he was a carpenter.  Did he tell

18   you that?

19   A.    He said he worked in construction.

20   Q.    And remodeling?

21   A.    Yes, remodeling.  He said buy a house and he will remodel

22   it for you is what he said.

23   Q.    Did he tell you that's what he did for Pablo?

24   A.    I'm trying to remember.  This is all -- I know he did --

25   he said he did the one job which was the big roof without walls.

388

1    Q.    And what about the bricking?

2    A.    He said -- he never said the bricking to us.  He never

3    mentioned that job.

4    Q.    But he did tell you that 20,000.00 was for the bricking?

5    A.    No.  He said it was for bricks.  He never said it was for

6    a bricking job.  He said it was for bricks, and he kind of went

7    away from that after we approached him with more facts.

8    Q.    You can't do a bricking job without bricks?

9    A.    He just said it was for bricks, and then he also said that

10   the money Pablo paid him was only for labor and Pablo bought all

11   the supplies, so I mean, if he's buying bricks with that

12   $20,000.00, that goes against what he was saying anyway.

13   Q.    Your timeline that you gave Ms. Groover, doesn't it make a

14   lot of presumptions, making a lot of presumptions?

15   A.    Those are -- those are based off statements he made.  That

16   was based off statements he made, so it's not really

17   presumptions.  It's just what he said to us.

18   Q.    Well, we know -- and the evidence shows that the first

19   check that, that the check, the $6,000.00 check, was written on

20   May 4th, 2017.  You would agree with me on that?

21   A.    Yes.

22   Q.    And it appears from my client's bank records that he

23   actually cashed that check on the day after it was written, on

24   May 5th.  Do you remember that?

25   A.    No, I don't remember that.

389

1    Q.   But you know the Government got his bank records.   And

2    then on June 6th of 2017, it's in evidence and undisputed that

3    Pablo wired the $20,000.00 --

4    A.   That's correct.

5    Q.   -- to my client's bank account?

6    A.   That's correct.

7    Q.   Did you ever see where the money came out?

8    A.   I did not.   I did hear someone mention the deposit was

9    made in Texas.

10   Q.   And it wasn't until August 17th that Mr. Montoya reported,

11   submitted his written report to the EEOC; is that correct?

12   A.   That's correct.

13   Q.   When my client told you he was not offended by your

14   questions, what do you think he meant by that?

15   A.   In my experience, I think he felt he --

16        MS. GROOVER:   Objection, Your Honor, calls for

17   speculation.

18        THE COURT:   Sustained.

19   Q.   (By Mr. Phillips)   What was his body language showing you

20   when he made that statement?

21   A.   He was close up.

22   Q.   He's not a very big man, is he?

23   A.   He's not.

24   Q.   Not an intimidating person in the least to look at?

25   A.   Not -- no.

390

1   Q.    When he told you that he was not offended, he also told

2   you he hadn't done anything.  Do you remember that?

3   A.    Yes.

4   Q.    And meaning he hadn't done anything criminal in nature?

5   A.    That's what I assumed.

6   Q.    And he also told you, you asked him if he had read the

7   waiver.  He told you no?

8   A.    I don't remember that.  Yeah, the waiver.  Yes, I'm sorry,

9   he did tell me that, and I tell him read it and then he gets the

10  paper and he reads it.

11  Q.    Is it your custom to continue to interrogate suspects if

12  they refuse to sign the rights waiver?

13  A.    If he agrees to talk.  The perfect example, if we do a

14  street interview, interview somebody on the street and we feel

15  it's going to be incriminating, I'll read him his rights.  I

16  won't have a signed waiver but I will read him his rights and

17  make sure he knows his rights, so, yes, it's not uncommon.  It's

18  not preferred but it's not uncommon.

19  Q.    Now, I think we've heard testimony about the vehicles.

20  The van was a 2007 vehicle; do you remember that?

21  A.    Yes.

22  Q.    And he also had that Escalade that was a 2006?

23  A.    Yes.

24  Q.    So when he was arrested in 2018, the van would have been

25  about 11 years old and the Escalade would have been about

391

1    12 years old so these were not new vehicles is my point?

2    A.    No.

3    Q.    And his wife also had a 1993 Honda?

4    A.    Yes.

5    Q.    So he had not spent a lot of money on cars, obviously?

6    A.    No.

7    Q.    And it's not unusual for somebody in the Savannah-Chatham

8    County area to purchase a car in South Carolina and have a South

9    Carolina license, tag on it when you purchase it, is it?

10          MS. GROOVER:  Objection, calls for speculation.

11          THE COURT:  Overruled.  If you know.

12          THE WITNESS:  Question again?

13   Q.    (By Mr. Phillips)  It's not unusual for somebody in

14   Chatham County to go to South Carolina and purchase a car that

15   would have a South Carolina tag on it?

16   A.    I don't know.

17   Q.    He was not wearing any bling, for lack of a better word,

18   when you arrested him?

19   A.    By bling ...

20   Q.    I mean the necklaces and the jewelry?

21   A.    No, he wasn't wearing any jewelry, not that I saw.  I

22   mean, if he was it would have been removed before he was in the

23   interview room.

24   Q.    Do you know whether or not he was sending any money back

25   to Mexico?

392

1   A.    I do not know.

2   Q.    And you said some money was deposited in Texas?

3   A.    That's what my understanding is.  Well, he says that Pablo

4   was in Texas.

5   Q.    On the border?

6   A.    On the border.

7   Q.    When he wired the money?

8   A.    When he wired the money.

9   Q.    So was the money then sent back to Pablo?

10  A.    No.

11  Q.    But you're saying some of the $20,000.00 was deposited in

12  Texas?  Is that what you understand?

13  A.    That's what I understand.  The money was deposited into

14  his account from Texas.

15  Q.    Oh, from Texas?

16  A.    From Texas.

17  Q.    I misunderstood.  I thought you said it was sent back to

18  Texas?

19  A.    No, no.

20  Q.    Now he also told you that he rented, that my client rented

21  the houses that he had lived in from his employer, Lanier

22  Property Management?

23  A.    Yes, I remember him saying that.

24  Q.    Did you verify that information?

25  A.    I did not.

393

1    Q.    Did he tell you that he met Pablo by buying chickens up

2    there?

3    A.    He said that that's -- I'm trying to remember if that's --

4    I know that that's one of the ways that he got to know him by

5    going up there to buy chickens.

6    Q.    He and his wife would go there?

7    A.    He and his wife would go there.

8    Q.    There was one point in his interview that he continued to

9    be concerned about Pablo and his wife, Iris.  Do you remember

10   that he was asking if they were going to get in trouble?

11   A.    Yes.  I remember him asking that.

12   Q.    Did he seem to be genuinely -- he seemed to like Iris the

13   way I read that.  Did you get that impression?

14   A.    He mentioned her a couple of times.  I didn't really get

15   the impression that he liked her.  But I got the impression that

16   that was one name that was safe for him to say he knew.

17   Q.    Did you attempt to find any building permits or licenses

18   for the construction work that my client did in Effingham

19   County?

20   A.    I did not.

21   Q.    Do you know if anybody in the actual investigation did?

22   A.    I do not know.

23   Q.    Is it likely that because it was in a very isolated area

24   that they might have done the work without getting permitted?

25   A.    It's -- it's possible.  I mean, it's possible.  I mean ...

394

1   Q.    At one occasion during the interview you told my client

2   that you had enough facts to get a warrant on him.  Do you

3   remember saying that?

4   A.    I don't remember saying that.

5   Q.    Would you pull up Page 59, Exhibit 59 Page 59, I'm sorry.

6         Looking at the top of that page, the first block that

7   carries over from the preceding page and then you say, "We're

8   here, we got here because we have enough facts to get a warrant

9   for arrest for you, okay?  And that's why you are arrested

10  today.  Not because you're in the country illegally.  That's

11  administrative and not criminal."

12        You see that?

13  A.    In the beginning where it crosses over?

14  Q.    Where you first see "Perez" and your name right under it?

15  A.    Okay.

16  Q.    Do you see that?  Is this the first time that you advised

17  him that you had this criminal arrest warrant?

18  A.    I don't know if it's the first point but that is when we

19  do it.

20  Q.    And then, once again, right under that is when you tell

21  him, "We can't make you any promises but you want us to be true

22  truthful to us"; is that right?

23  A.    That's correct.

24  Q.    I know it's been a while that you've been on the stand.

25  In the very beginning of your direct examination, you were asked

1    about his demeanor and you would talk about when he was talking

2    about things that were normal he would answer quickly, and then

3    you said, "But if it was a difficult question, he would seem to

4    be trying to find an answer, what we wanted to hear?"

5         Do you remember using those words?

6    A.   Yes.

7    Q.   "What we wanted to hear" would mean that he wants to

8    respond favorably to your questions?

9    A.   No.  What it means is that he wants to give us -- he wants

10   to give us what we want to hear without -- and minimizing

11   himself at the same time, minimizing his role at the same time,

12   so he would give us enough of an answer to maybe satisfy what we

13   were looking for but not incriminate himself.

14   Q.   And wouldn't that be totally typical of someone who is in

15   a very uncomfortable situation and very concerned about his

16   situation?

17   A.    No.  It would be typical of somebody who is trying to hide

18   the truth and minimize their role in a criminal event.

19   Q.   Now, you know that Pablo had taken or skimmed off more

20   than two and a half million dollars?

21   A.   I know it was up there.  I couldn't give you the exact

22   numbers, but I know it was a lot of money.

23   Q.   Of that money, Juan had gotten quite a bit, maybe

24   $500,000.00 if you look at the indictment?

25   A.    Okay.

396

1  Q.    And you also know that Pablo wired money through Mr.

2  Lopez, don't you?  Didn't he wire $15,000.00 to Mexico?

3  A.    Yes.

4  Q.    And didn't you or somebody think that Mr. Lopez was a

5  prime suspect in part because of the wire transfer?

6  A.    Yes.

7  Q.    And the other part of him might being a suspect is he was

8  one of the ones that got upset at the meeting back in May of

9  2017, late April or May when Pablo read Montoya's EEOC

10  complaint?

11  A.    I don't know about him specifically but I know several

12  people did.

13  Q.    There were threats by those people and they were upset

14  because they were going to lose their jobs potentially?

15  A.    Potentially.

16  Q.    Probably did since that business has been closed down, the

17  Davey Tree business?

18  A.    Probably.

19  Q.    You have not kept up with the undocumented immigrants that

20  were working for Davey Tree since this case came out?

21  A.    I personally have not, no.

22  Q.    Did you get reassigned to El Paso?

23  A.    Yes.

24  Q.    That is kind of going home for you?

25  A.    That is -- that is going home for me.

397

1  Q.   Now, at the end of the interview, do you recall him

2  telling you that it never occurred to him that the Rangel-Rubio

3  brothers would really kill Montoya?

4  A.   He also said that, but he also said they were going to and

5  they did it because they said they were going to.

6  Q.   So he told you a lot of different things?

7  A.   He did.  Yes, he did.

8       MR. PHILLIPS:  Your Honor, I don't believe I have any

9  more questions for the witness.  Thank you.

10       THE COURT:  Brief redirect.

11       MS. GROOVER:  Yes, Your Honor, very briefly.

12                      REDIRECT EXAMINATION

13  BY MS. GROOVER:

14  Q.   Defense counsel asked you, commented on this "what you

15  wanted to hear," thinking the defendant would tell you things

16  that he thought you wanted him to say; correct?

17  A.   Correct.

18  Q.   But in the interview who was the very first person to

19  mention the word "worker"?

20  A.   He was, the defendant.

21  Q.   And in the interview who was the first person to mention

22  that Pablo was going to eliminate a person?

23  A.   The defendant.

24  Q.   And in the interview, who was the very first person to say

25  the words "the plan was to eliminate him"?

398

1    A.    The defendant was.

2    Q.    And in the interview, who was the first person to say that

3    a person died?

4    A.    The defendant.

5    Q.    And then in the interview, who was the first person to say

6    that the problem employee was dead?

7    A.    The defendant.

8    Q.    And he had about four and a half hours to say anything he

9    wanted; correct?

10    A.    Correct.

11         MS. GROOVER:  No further questions.

12         THE COURT:  Any objection to this witness being excused?

13         MR. PHILLIPS:  No, ma'am.

14         THE COURT:  Hearing none, you may be excused.

15         Ms. Groover, call your next witness.

16         MR. HOWARD:  Your Honor, the Government calls Gerardo

17    Hernandez.  Your Honor, while he's coming up if I can retrieve

18    some exhibits that may still be up there.

19         THE COURT:  Yes, if you will help him get those from the

20    side.

21         MS. GROOVER:  Your Honor, may I step outside to

22    determine the issue?

23         Your Honor, I apologize, he's on his way now.  He was on

24    the third floor.

25         THE CLERK:  If before you're seated --

399

1          MR. HOWARD:  We will need an interpreter.

2                    GERARDO HERNANDEZ ANDRADE,

3     having been first duly sworn, was examined and testified

4     through the interpreter as follows:

5          THE CLERK:  Thank you.  You may be seated, and if you

6     will please state your full name for the record.

7          THE WITNESS:  Gerardo Hernandez Andrade.

8          MR. HOWARD:  Your Honor, may I proceed?

9          THE COURT:  You may.

10                    DIRECT EXAMINATION

11    BY MR. HOWARD:

12    Q.   Good afternoon, Mr. Hernandez.

13         Could we pull up Government's Exhibit 2 on that screen in

14    front of you.  I want you to look at Government's Exhibit 2.  Do

15    you recognize that individual?

16    A.   Uh-huh, yes.

17    Q.   Who is that?

18    A.   Eliud.

19    Q.   Is that Eliud Montoya?

20    A.   Yes.

21    Q.   How do you know Mr. Montoya?

22    A.   I met him after 2007 at his house.

23    Q.   Did you live near Mr. Montoya?

24    A.   No.

25    Q.   In 2017 did you live near Mr. Montoya?

400

1    A.    I did in 2007, 2017.

2          INTERPRETER GIERSBERG:   Interpreter correction, 2017.

3    Q.    (By Mr. Howard)  Thank you.  I'd like to talk about the

4    last time you saw that man alive; okay?

5    A.    Okay.

6    Q.    So let's go back to August 2017.  Where did you live?

7    A.    130 Village Drive.

8    Q.    Was that in Garden City, Georgia?

9    A.    Uh-huh, yes.

10   Q.    Was that in Savannah Pines Mobile Home Park?

11   A.    Yes.

12   Q.    Will you pull up Government's Exhibit 18, and if we could

13   zoom in on that area.  Sir, looking on the screen in front of

14   you on Government's Exhibit 18, do you recognize what's depicted

15   there?

16   A.    Uh-huh, yes.

17   Q.    Is that an overhead view of Savannah Pines Mobile Home

18   Park?

19   A.    Uh-huh, yes.

20   Q.    And you mentioned that you lived at 130 Village Drive;

21   correct?

22   A.    Correct.

23   Q.    Looking at the screen in front of you, did I just circle

24   130 Village Drive where you lived?

25   A.    Yes.

401

1   Q.   And right down the street was 59 Village Drive; correct?

2   A.   Correct.

3   Q.   Who lived there?

4   A.   Eliud.

5   Q.   When you went to and from your house each day, would you

6   pass by Mr. Montoya's house?

7   A.   Yes.

8   Q.   I want to take you back to a Saturday in August, okay,

9   specifically Saturday, August 19th, 2017; okay?

10  A.   Okay.

11  Q.   I want you to make sure and answer out loud so the court

12  reporter can take down everything that you say; okay?

13  A.   Okay, that's fine.

14  Q.   Do you remember that specific day, August 19th, 2017?

15  A.   Yes.

16  Q.   Let's start in the morning.  Did you leave your house?

17  A.   Yes.

18  Q.   Where did you go?

19  A.   I went to my church.

20  Q.   When did you return home?

21  A.   Like after -- around 11:30.

22  Q.   When you returned home, did you pass by Mr. Montoya's

23  house?

24  A.   Yes.

25  Q.   When you passed by Mr. Montoya's house, what did you see?

402

1   A.    I saw him outside and he was perhaps working in his car.

2   Q.    When you say "him," are you referring to Eliud Montoya?

3   A.    Yes.

4   Q.    What type of vehicle were you driving on August 19th,

5   2017?

6   A.    A Toyota Camry.

7   Q.    What color was it?

8   A.    Silver.

9   Q.    If we could pull up Government's Exhibit 19.  Sir, looking

10  at the screen in front of you, I'm showing you a still image

11  with the timestamp in the top left-hand corner.  Do you see

12  that?

13  A.    Uh-huh, yes.

14  Q.    Do you recognize what's depicted in this image?

15  A.    Yes.

16  Q.    What time does it say in the top left-hand corner?

17  A.    11:34.

18  Q.    And describe for the jury the area that we're looking at

19  in relation to where you lived.

20  A.    That area is when you go into -- about to go into the

21  mobile homes.

22  Q.    Do you see a silver car in that image?

23  A.    Yes.

24  Q.    If we could zoom in on that silver car.  Do you recognize

25  that car?

403

```
 1    A.    Yes.

 2    Q.    What do you recognize it to be?

 3    A.    Like it's mine.

 4    Q.    How long did it take to get from this area that we're

 5    looking at to your home?

 6    A.    A couple of minutes, maybe two, three minutes.

 7    Q.    So is it fair to say that around 11:34, 11:35, 11:36 a.m.

 8    that you saw Eliud Montoya alive?

 9    A.    Yes.

10    Q.    And that happened Saturday, August 19th; correct?

11    A.    Correct.

12    Q.    I want to talk about the day before that Saturday; okay?

13    A.    Uh-huh, that's fine.

14    Q.    Specifically Friday, August 18th.

15    A.    Okay.

16    Q.    Did you see Mr. Montoya at your house on that day?

17    A.    In my house?

18    Q.    Did you see Mr. Montoya on Friday, August 18th?

19    A.    Yes.

20    Q.    Where did you see him?

21    A.    At my house.

22    Q.    For how long was he at your house on Friday, August 18th?

23    A.    A few hours.

24          MR. HOWARD:  No further questions for this witness, Your

25    Honor.
```

404

1          MR. PHILLIPS:  No cross.

2          THE COURT:  Any objection to this witness being excused?

3     All right, you may step down.  Thank you, sir.

4          Ladies and gentlemen, it is just about time for our

5     afternoon break, so we will break.  It's 3:20.  We will be in

6     recess for approximately 15 minutes.  Let's rise for this jury.

7          (The jury exits the courtroom.)

8          THE COURT:  Counsel, we will be in recess for 15

9     minutes.

10          (Recess from 3:22 p.m. to 3:39 p.m.)

11          THE COURT:  All right, let's bring in the jury.

12          (The jury enters the courtroom.)

13          THE COURT:  Welcome back, members of the jury.

14          Mr. Howard, Ms. Groover, call your next witness.

15          MR. HOWARD:  Your Honor, the Government calls Chad

16     Fitzgerald.

17                    CHAD FITZGERALD,

18     having been first duly sworn, was examined and testified as

19     follows:

20          THE CLERK:  And if you will please state your full name

21     and spell your last.

22          THE WITNESS:  Chad Fitzgerald, F-i-t-z-g-e-r-a-l-d.

23          MR. HOWARD:  Your Honor, may I proceed?

24          THE COURT:  You may.

25                    DIRECT EXAMINATION

405

BY MR. HOWARD:

Q.    Sir, what do you do for a living?

A.    I currently work at the Federal Bureau of Investigation out of Washington, DC as a senior systems engineer.

Q.    What is a senior systems engineer?

A.    A retired FBI that got hired in the same unit.

Q.    How long have you worked for the FBI?

A.    So 25 years.

Q.    What do you do for the FBI?

A.    I am assigned to a Cellular Analysis Survey Team or CAST and our primary responsibility is basically to be the interpreter between the telecommunication providers like the Verizons, AT&T's, Sprints and T-Mobiles and everything from investigators to juries.

Q.    How long has CAST been around?

A.    I helped start the unit back in 2009, 2010.

Q.    And you talked a little bit about the purpose of CAST. Can you tell the jury a bit more about what CAST does?

A.    So we were born out of a group of guys kind of ad hoc utilizing records generated by the cellular providers to help find fugitives, help assist in robbery investigations or violent crime incidents, and from that, we became an official unit, and we go around and train different people on how they can utilize those types of records but our primary responsibility within the FBI is for terror-related incidents, and the bulk of our work is

406

1    dealing with crimes against children, child abductions, active

2    child abductions and murder cases that we help out with the

3    state.

4    Q.    Yesterday there was a mass shooting in New York at a

5    subway station.  Are you working on that case?

6    A.    Our unit is, yes.  We have -- I think we sent three to

7    five people to it yesterday right when it happened, and we had

8    some other people augment it with early hours this morning.

9    Q.    Have you worked on some other notable cases?

10   A.    Yes, over time.  Yes.

11   Q.    Like what?

12   A.    I've -- pretty much any major time that something has

13   exploded in the United States, either our unit or myself I got

14   deployed out to the Boston Marathon bombing.  I've been to at

15   least one other incident in New York City.  I've been to

16   other -- I mean, we've -- everything from school shootings, you

17   know, in Florida, to the Pulse Club shooting, the Las Vegas

18   shooting.  We pretty much get involved with quite a few things

19   that you would be familiar with on TV.

20   Q.    Let's talk about your use of cellular technology.  Can you

21   explain to the jury how you use cellular technology to

22   investigate some of the crimes that you just discussed?

23   A.    So with every subscriber in their network, as a matter of

24   record, just for you to be able to utilize a phone and keep

25   utilizing that phone, every provider has to keep some set of

407

1  records on every user, so that record has details in it that we

2  can utilize, and basically they all boil down to three things:

3  The who, like what two phone numbers are in contact with each

4  other; the when, which is the time the event occurred as well as

5  the duration; and then the where.

6       And so the where we can get a general geographic area of

7  where the user was when that record was generated, whether it

8  was an incoming call or text or an outgoing call or text or a

9  data session.

10      Like your, you know, your phone is connecting to some kind

11 of data whether you're watching video or, you know, checking

12 e-mail or anything like that and we can exploit that to get

13 general geographic area of where a user could be when they are

14 utilizing that phone.

15 Q.   And when you talk about that who, the what and the where,

16 are we talking about historical cell site analysis?

17 A.   Yes.

18 Q.   Can you talk to the jury a bit about your background, your

19 training and your experience with respect to cellular analysis

20 and cell tower analysis?

21 A.   Well, going back to college, I received a master's in

22 electrical engineering specializing in telecommunication

23 systems.  I worked in the engineering field before getting hired

24 with the FBI doing communications-related work, and once I was

25 hired, you know, naturally once I was in the FBI, I utilized my

408

1   background to help, you know, with these records I knew existed

2   back in, even going back to the nineties.

3   Q.    Have you had specialized training regarding historical

4   cell site analysis?

5   A.    I have.

6   Q.    Are you able to approximate the number of cases involving

7   cell site analysis in which you have worked?

8   A.    Well, when I was employed as an agent, it was -- I mean,

9   it was my daily duty to work on phone records, so it was

10   multiple cases, typically at least multiple sets of records

11   every single day.

12        Having become a contractor since then, I still work with

13   records but not to the same level.  I'm more in charge of

14   research and development and maintaining our platforms that we

15   utilize to analyze that data.

16   Q.    Have you trained others in the field of cell site

17   analysis?

18   A.    I have.

19   Q.    Has cell site analysis been tested in the scientific

20   community?

21   A.    It has.

22   Q.    Subjected to peer review?

23   A.    Yes, and we -- all our reports that we present have been

24   peer-reviewed.

25   Q.    You talked about some of the notable cases in which you

409

1    worked and you mentioned the Boston bombing case.  Did you, in

2    fact, testify as an expert witness in that case?

3    A.    Multiple times.  So there were, including the main trial

4    of the suspect that survived, who was convicted, I also -- there

5    were some other associates related to him that I also testified

6    in.

7    Q.    That's not the only time you've testified as an expert in

8    cell site analysis, is it?

9    A.    No, I've testified all across the United States in both

10   local and federal courts.

11   Q.    Indeed, in a couple hours you're going to get on a plane

12   and fly where?

13   A.    To New Orleans.  I have to do, testify tomorrow in New

14   Orleans.

15   Q.    How many times have you testified as an expert witness as

16   to cellular historical cell site analysis?

17   A.    I've never kept track of it, but just going off the top of

18   my head, I mean, it's definitely more than 75.  I would guess

19   it's more than a hundred.

20         MR. HOWARD:  Your Honor, at this time I would move to

21   have the witness qualified as an expert in historical cell site

22   analysis.

23         THE COURT:  Mr. Phillips, any voir dire regarding

24   qualifications?

25         MR. PHILLIPS:  No, ma'am.

1           THE COURT:  Ladies and gentlemen, when scientific,

2    technical or other specialized knowledge might be helpful, a

3    person who has special training or experience in that field is

4    allowed to state an opinion about the matter.

5           Mr. Fitzgerald here has been qualified as an expert in

6    the field of historical cell site analysis.  It doesn't mean you

7    must accept the witness' opinion.  As with any other witness'

8    testimony, you must decide for yourself whether to rely upon the

9    opinion or not.

10          MR. HOWARD:  Thank you, Your Honor.

11   Q.   (By Mr. Howard)  Sir, I would like to talk about the who,

12    the when and the where as to this specific case; okay?

13   A.   Okay.

14   Q.   Were you asked to examine cellular telephone records in

15   connection with a murder that occurred on August 19th, 2017 near

16   Old Dean Forest Road in Garden City?

17   A.   No.

18   Q.   To be clear, you were not the case agent or investigator

19   on that case; right?

20   A.   I was not.

21   Q.   Your role is merely to look at the phone records; correct?

22   A.   Correct.  We're usually given a date and time and a

23   location of an incident and given the records that were lawfully

24   obtained and we do our analysis.

25   Q.   If we could pull up Government's Exhibit 86?

411

1          Looking at what appears to be a blue screen in front of

2     you, is it blue on your end?

3     A.    Yes.

4     Q.    Looking at that screen in front of you, there are four

5     phone numbers listed.  Do you see those four numbers?

6     A.    Yes.

7     Q.    Now, were you provided telephone records for those four

8     numbers?

9     A.    I was.

10    Q.    Specifically a Verizon number ending in 6350?

11    A.    Yes.

12    Q.    A Verizon number ending in 2816?

13    A.    That's correct.

14    Q.    An AT&T number ending in 4590?

15    A.    Yes.

16    Q.    And a T-Mobile number ending in 9133; correct?

17    A.    Yes.

18    Q.    For what period of time did you review those records, if

19    you recall?

20    A.    It was just like the beginning of August to the day of the

21    crime, August the 19th.

22    Q.    So we're talking about a little over a two-week period in

23    August 2017?

24    A.    Correct.

25    Q.    Ending on the day of the murder, August 19th, 2017;

412

1  correct?

2  A.   That's correct.

3  Q.   Now to be clear, did those records that you were provided,

4  did they tell you what was said on the calls?

5  A.   No.  I can't tell you the -- what the content of the call

6  or the text message and I can't tell you who that was there.  I

7  just have a phone number with some, you know, information

8  regarding that actual piece of equipment.

9  Q.   And you mentioned that when you're talking about your

10 inability to tell who, you don't know physically who was on the

11 phone; correct?

12 A.   I do not.

13 Q.   The records don't show that; right?

14 A.   Correct.

15 Q.   In the course of the investigation, though, this summary

16 was made by the investigators, the analysts, the agents working

17 on this case; correct?

18 A.   Correct.

19 Q.   Showing the associated person to those four numbers that

20 were provided to you?

21 A.   That's correct.

22 Q.   But to be clear, you weren't able to make that connection

23 because you didn't have the underlying facts, did you?

24 A.   It's just phone numbers to me.  You know, I'm provided

25 names.  But I have no knowledge outside of being provided that.

413

1   Q.    In addition to the telephone numbers, you were also

2   provided with some addresses relevant to the investigation as

3   well; correct?

4   A.    That's correct.

5   Q.    Your analysis, it has some limitations when we talk about

6   the historical cell site analysis; right?

7   A.    Correct, yes.

8   Q.    You can't, for instance, provide the pinpoint exact

9   precise location of the phones associated with those four

10  numbers?

11  A.    Right.  It's not like you see on "Mission Impossible" or

12  anything where we can see the user of the phone traveling from

13  the kitchen to the bedroom or even out of the house and, you

14  know, down the driveway.  We can't do that.

15        But it does in relative terms -- you know, it's all a

16  frame-of-reference precision.  It definitely tells us what side

17  of Savannah or, you know, what, where in the world, the general

18  geographic area where in the world it is, but it's not so

19  precise that you can see people walking down the sidewalk or

20  phones traveling down the sidewalk or anything.

21  Q.    So not "Mission Impossible" in terms of its precision, but

22  it is possible in terms of the general location of that phone;

23  correct?

24  A.    Correct.  Like you can tell what part of, you know, a town

25  the user was in.

414

1  Q.    Now, Mr. Fitzgerald, did you create a PowerPoint

2  presentation that helps explains your analysis of these records?

3  A.    I hope so.

4  Q.    As do I.  Pull up Exhibit 62.  And perhaps you will

5  recognize that.  Looking at the first page of Exhibit 62, do you

6  recognize that?

7  A.    I do.

8  Q.    What do you recognize that to be?

9  A.    That's the cover page to my presentation.

10  Q.    This is a multiple-page exhibit; is that correct?

11  A.    That's correct.

12  Q.    You prepared this?

13  A.    I did.

14  Q.    Would it help the jury better understand your testimony

15  and the cell site analysis you conducted in this case?

16  A.    I hope so, yes.

17  Q.    Your Honor, I apologize, but if we could go to Exhibit or

18  rather Page 2 of this exhibit, looking at Page 2 of Government's

19  Exhibit 62.  What is that?

20  A.    It's just a high-level overview of the methodology which

21  was used, which basically lists the phone numbers and the time

22  period and just saying we were able to marry it up to the

23  general geographic location on a map.

24  Q.    If we could go to Page 3 of Government's Exhibit 62.  What

25  does this show?

415

A.   This is just a picture of, you know, a fairly standard tower especially back in 2017.  They are slowly going away from this model, but it's just a picture I took of a tower up in the Gwinnett County area, and as you can see, the -- on the right half of the screen is just zoomed into the top part of that entire tower structure, and mainly I wanted to show you can see there are different levels of these kind of triangular pieces, you know, these metal pieces, and on those triangular mounts, you will see like different antennae mounted, and they are pointing in a certain direction.  So there's even some equipment down here that's, you know, doesn't use that same triangular piece.

When you're looking at how the cell phone network is designed, you can think of each one of these towers as just think of an imaginary man at the top of that tower and he has multiple spotlights, and wherever he points each spotlight, wherever it illuminates on earth is where the coverage for that particular tower, and then each spotlight would be called a -- like a, excuse me, a sector so each of those spotlights are pointed strategically in a direction from this tower structure to provide, you know, that light or that coverage down on earth.

So they point it down towards earth to provide that coverage, and they tune it based on where the other towers are located, where the other sectors are and I can go through how a cell phone works.

416

1   Q.    Absolutely.  Let's do it?

2   A.    So each of those spotlights are coming out from the

3   structure.  My phone, as it sits in my pocket, your phone,

4   wherever it is, it's programmed to speak a certain language, so

5   whether you have an AT&T phone, a Verizon phone or T-Mobile

6   phone, it's programmed to speak that language.

7        It's like I'm only monolingual.  I only know English, so I

8   only can communicate with English speakers, you know, versus my

9   phone, if it's T-Mobile, it only speaks to T-Mobile towers, so

10  each one of these spotlights is putting out a signal that that

11  phone is listening for, and my T-Mobile phone is looking for

12  that T-Mobile information.

13       So on this particular tower, there could be multiple

14  companies mounted on this one tower at the different levels.

15  You can see the multiple antennae.  It's multiple different

16  companies that lease space off of that particular tower.

17       Same thing happens all over the United States, and as my

18  phone listens, whenever I pull my phone out of my pocket, it's

19  looking for all these signals and it's looking for that

20  strongest, clearest signal, and so it may see signals from

21  multiple towers in the area, you know, that speak that language

22  but it's ranking them.  This is the best one to the worst one I

23  see, and when I pull my phone out of my pocket, dial a number,

24  hit the green button, my phone is just like a, you know, very

25  mindful student in a classroom.  If you think of the tower being

417

1    the teacher, the phone being the student, my phone is going to

2    raise its hand and request services when the teacher calls on

3    it.

4         So the tower is going to ask, "What do you want to do?"

5    The phone is going to say "I want to make a phone call."  You

6    can go make your phone call over here.  It's going to grant

7    resources to my phone, and when that happens, a record gets

8    generated and they have to keep that record for every subscriber

9    not only to maintain your calls so they can deliver calls to

10   you, keep your call connected because it's a mobile phone.  We

11   don't go to bottom of these towers and plug in a cord or

12   anything like that.  We want to be mobile.

13        So they have to maintain that record and know generally

14   where you are, and at the end of the day, they have to have some

15   kind of record for the resources you're using so that they can

16   appropriately bill you or slow your data down if you are using

17   too much data or whatever your contract or your agreement is

18   with the company.

19   Q.   Go to Page 4 of Government's Exhibit 62.  What does that

20   show?

21   A.   Oh, thank you.  So, like I said, your phone is only seeing

22   the towers that speak its language, so if you are out in the

23   parking lot and you see a tower and you're wondering why you

24   don't have service, maybe that tower doesn't have, you know, the

25   language your phone speaks.  T-Mobile, maybe it doesn't have

418

1    T-Mobile equipment at the top of that tower, so that tower does

2    not exist in your phone's world.

3        So it doesn't -- just because you see one doesn't mean

4    that's the one your phone is communicating with and just because

5    you don't see one doesn't mean there isn't one, you know,

6    disguised on the side of a building or as a cactus or a tree

7    with one limb on it or anything else that you've seen if you've

8    been driving behind an area, or there could be one behind you, a

9    street over from you, so just because you don't see one doesn't

10   mean there isn't one providing service to your phone, and just

11   because you do see one doesn't mean that's the one it's

12   communicating with, so with that, we have to -- cell phone

13   providers have to maintain a cell site table or tower list or

14   cell site almanac where they list all their towers, their

15   locations and which direction each one or those spotlights is

16   pointing.

17   Q.   Go to Page 5 of Government's Exhibit 62?

18   A.   So this is just --

19   Q.   What do we see in Page 5 of Exhibit 62, Mr. Fitzgerald?

20   A.   Sorry.  Getting ahead of myself.  So this is just a random

21   area kind of in northern Georgia near the Cartersville area that

22   I picked just to show just a more rural type setting where the

23   towers are spaced apart.  You can see there is no -- all those

24   dots represent a tower in the area.  I've also highlighted three

25   of those dots with yellow boxes and numbers on top of them.

1       So these yellow boxes are covering up each of the

2   towers -- the dots that are underneath them, and you can see

3   they are not equally spaced.  They're kind of what would appear

4   almost random, but they are based on, you know, exactly where

5   the provider needs to provide coverage, so that's typically

6   where people are located.

7       As people are more densely populated, the towers are going

8   to be closer together.  Less densely populated, they can be

9   further apart to provide that service for a little bit longer

10  range.

11      And each of those towers is divided into sectors and the

12  most common one is a three-sector tower, so take 360 degrees,

13  divide it by 3, you get 120.  So we have 120-degree sectors so

14  that there's a spotlight that's that antennae for this tower,

15  425, there's going to be one pointing in this direction and a

16  spotlight pointing in this direction and another spotlight

17  pointing in that direction providing coverage, you know, in that

18  general area from that tower, and then there's going to be, you

19  know, some overlap from sector to sector, tower to tower,

20  because if I'm standing right here, remember, my phone is

21  looking for that strongest, clearest signal.

22      The biggest indicator rule of thumb of where that

23  strongest, clearest indicator is is line of sight or how close I

24  am to it, so if I was standing right on top of this white box

25  that says Sector 1, my phone, I dial a number, hit green button,

420

1    my phone is going to request services from Tower 425, Sector 1.

2    Record gets generated.

3        Once I'm connected, the network now takes over control,

4    and my phone just reports what it sees back, so if I were to

5    start moving in a clockwise direction, as I get close to this

6    sector boundary, Sector 2, the signal level on Sector 1 is going

7    to degrade.  Sector 2 is going to get stronger.

8        And at some prescribed point the network is going to

9    switch me or hand me off to Sector 2, so as I travel clockwise

10   around this tower and get closer to the border of Sector 3, once

11   again, Sector 2 is going to get weaker.  Sector 3 is going to

12   get stronger.  They are going to be equal at some point.

13       Then slowly Sector 3 is going to start getting stronger

14   and the network is going to hand me off, so then I can just keep

15   going around in circles being handed off from sector to sector,

16   or -- I forget how to clear this screen, but, if I, you know,

17   were to start up here and travel and just travel on the road,

18   I'm going to be handed off sector to sector and tower and tower,

19   and if the engineers have designed the network correctly and

20   have some overlap between each of those sectors, I'm just going

21   to be handed off because there is signal available for me to be

22   handed off to, and to me, it's going to be seamless, and I can

23   be mobile with my mobile phone.

24   Q.   How do you, in the course of your analysis, determine

25   which tower and which sector those calls are connecting to?

1  A.    So, there's a record that can -- that is generated like I

2  mentioned.  We can ask the carriers for those records for a

3  particular target phone number.  You know, it requires most law

4  enforcement to get a search warrant nowadays, to get that, so

5  you have to, you know, show why you need that, and you can get

6  that information from the carriers.

7  Q.    And in this case for those four pertinent numbers, the

8  records were obtained from the telephone providers; correct?

9  A.    That's correct.

10  Q.    If we could go to Government's Exhibit 62-6.  Okay, Mr.

11  Fitzgerald, what are we looking at, Page 6 of Government's

12  Exhibit 62?

13  A.    So I just took, back on April 1st, I took a snapshot of

14  the AT&T towers in the Savannah area, and each one of these blue

15  dots represents a tower for AT&T at that time in 2017, and so --

16  and I also depicted where, I put a red marker -- it comes up

17  black on my screen -- but red marker where the crime scene that

18  was provided, the information on the crime scene that was

19  provided to me, so just to show that you can see, as you get

20  more rural out here, the towers are further apart because there

21  is less people most likely just traveling back and forth, the

22  people on the highway, and then as you get to downtown Savannah,

23  you can see the towers are very close together because,

24  obviously, like I mentioned, more people, more population

25  density, so we go to a place like New York City, LA, the towers

422

1   are very, very close together, just like in downtown Savannah

2   they are very close together.

3   Q.    And this shows all the AT&T towers in that Savannah area?

4   A.    That's correct, yes.

5   Q.    And you were provided the address of where that murder

6   occurred; correct?

7   A.    That's correct, yes.

8   Q.    If we could go to Page 7 of Government's Exhibit 62.

9   Looking at Page 7 of Government's Exhibit 62, Mr. Fitzgerald.  A

10  lot of text there.  Big picture, let's start there and then we

11  will break it down?

12  A.    So I was asked to show if this particular phone number,

13  (912) 313-6350, was ever in the area near the crime scene, and

14  also I was provided an address of 59 Village Drive, which is

15  right around the corner from the crime scene.

16        So I searched from August 2nd to August 17th, and this is

17  the summary of all the activity on that phone that was in that

18  particular area.  It's not necessarily all the activity for that

19  phone.  It's just in this particular area utilizing a tower that

20  is right next to where the crime scene is, and then there

21  were -- that particular phone in that two-week time period

22  utilized all three sectors at various times during that two-week

23  period.

24  Q.    In terms of the sort of pertinence of this 6350 number, if

25  we could pull up in sort of tandem Government's Exhibit 86 so we

423

1  can see that 6350 number.  Looking at that 6350 number, is that

2  the number associated with Pablo Rangel-Rubio?

3  A.   It is.

4  Q.   If we could get rid of Government's Exhibit 86 and again

5  make 62-7 nice and big.  And so looking at that one tower,

6  looking at the sectors, we see some shading.  Can you tell the

7  jury what the shading represents?

8  A.   So you can see kind of on this side as well as the top

9  side the shading is a little bit darker than this third side,

10  and that just means there, if you think of that color just kind

11  of getting stacked on top of each other, that just means there's

12  more activity on that side or from that spotlight or that sector

13  than the other lighter shaded area.

14  Q.   And the time period in which this is covered, all of these

15  calls between August 2nd to August 17th, correct, a little over

16  two weeks?

17  A.   That's correct, yes.

18  Q.   And that includes more than 60 calls in about that

19  two-week span; correct?

20  A.   Correct.  I have the dates listed, so you can see it

21  spans -- it's not every day consecutively.  There are -- there

22  is a day or two I think that skips, like maybe between the 3rd

23  and the 8th, but I also give the time range so you can see it's

24  various different times, morning, evening on different days,

25  sometimes starts, you know, 9:45 and goes all the way to 10:35,

424

1   so there's -- there's kind of random -- randomness to it on each

2   day and with the days.

3   Q.   And we see some calls, it's as many as 19 calls in a

4   specific day; correct?  For instance, on August 10th?

5   A.   Oh, yeah.  Right here, so there's 13 -- yes, so there's

6   quite a few there on that day.

7   Q.   If we could zoom in on that box.  The whole box would be

8   great.  Perfect.  Thank you?

9        So you talked about different times of day so, for

10  instance, would this be inconsistent with somebody who is going

11  to work at a certain time passing that tower and then coming

12  home at a certain time passing that same tower?

13  A.   If they had a normal work schedule, I think it would be

14  fairly consistent on both ends of it, but as you can see,

15  there's as early as 8:15 a.m. and as late as 10:35 I think is

16  the latest.

17  Q.   And that the tower depicted there is the tower closest to

18  the murder scene for that telephone provider; correct?

19  A.   That's correct.

20  Q.   If we could go to Page 8 of Government's Exhibit 62.  What

21  does this show?

22  A.   So this is specific to -- kind of in the same vein as the

23  earlier slide.  It's on August 18th, 2017, just showing that

24  there were three phones of the four that I was provided that

25  were in the immediate area of the crime scene and 59 Village

425

1    Drive.

2    Q.    And there's three numbers that are listed here that are

3    sort of highlighted; correct?

4    A.    Correct.

5    Q.    We have the 2816 that's in gray; is that right?

6    A.    That's correct.

7    Q.    If we could pull up Government's Exhibit 86 to look at

8    side by side for these numbers.  So looking at the 2816, to whom

9    is that number associated with?

10   A.    Juan Rangel-Rubio.

11   Q.    And if we could go back to Exhibit 62, that page, and the

12   other numbers.  We also see there calls for a 9133; correct?

13   A.    That's correct.

14   Q.    And in looking back at Exhibit 86, the 9133 is associated

15   with whom?

16   A.    Juan Rangel-Rubio.

17   Q.    And the third number on that exhibit is a 4590 number and

18   to whom is that number associated?

19   A.    Perez.

20   Q.    If we could go back to Exhibit 62 with that frame of

21   reference, we will look again at this Page 8 of Government's

22   Exhibit 62, and again, this is looking at calls on August 18th,

23   2017; correct?

24   A.    That's correct.

25   Q.    And showing the three phones in that area, the timeframe

1  that we're looking at these calls, is it from 12:49 in the

2  afternoon to approximately 3:54 in the afternoon?

3  A.    It is.

4  Q.    So about a three-hour time period in the afternoon of

5  August 18th; correct?

6  A.    That's correct, yes.

7  Q.    What, if anything, do you know about the frequency of

8  calls among those numbers during that timeframe?

9  A.    Well, you can see the 2816 number has eight records in

10 that time period.  9133 number has three records, and then the

11 4590 phone has two records, but interestingly enough, the --

12 while here in this same area, the 4590 number at 12:55 and 12:58

13 for the two records in this area were in contact with the 2816

14 number, which is in the same area.

15 Q.    Not only in contact but looking at the location that you

16 were able to determine for those phones, let me ask you:  Do you

17 see where it says 59 Village Drive there?

18 A.    Yes.

19 Q.    And zooming in a little bit to the left, but I'm going to

20 circle the area.  Were you informed that the murder occurred in

21 the area which I just circled?

22 A.    Yes.  I think it moved a little but, yes, right in that

23 Old Dean Forest Road.

24 Q.    Right there.  Mr. Fitzgerald, would you expect a user near

25 that area that I just identified to be within the tower and the

427

1    sector of those calls which are reflected there?

2    A.    Absolutely, yes.

3    Q.    No, again, we talk about the shading.  Some of those are a

4    darker color.  For instance, it appears to be a darker color

5    gray black.  There also appears to be a darker color purple

6    maroon.  What does the shading reflect?

7    A.    So I tried to color it to -- so kind of the darker gray is

8    associated with the 2816 number, but the darker shading, once

9    again, is where there is more activity on that side, in that

10   sector.

11        The other two is little bit harder because it's two

12   different phone numbers.  One is T-Mobile and the other one is

13   Verizon or, I'm sorry, AT&T.  They share the same tower, so one

14   has its spotlight, they are slightly off from each other, the

15   way the spotlights are oriented or the antennas are oriented, so

16   one sector looks like this for the 9133 number and the other one

17   is more in this shape, so the shading comes off -- you know, one

18   is shaded in purple and one is shaded in kind of a more

19   yellowish green I guess, so when you put them on top of each

20   other the shading looks a little off but ...

21   Q.    And, again, this is August 18th, the day before the

22   murder; correct?

23   A.    That's correct, yes.

24   Q.    Now, we look at Page 9 of Government's Exhibit 62.  Are we

25   now at the date of the murder, August 19th, 2017?

428

1    A.    That's correct, yes.

2    Q.    What does this show?

3    A.    So, it's the same two towers and sectors.  Once again, we

4    have the 2816, we have a record for it at 8:34 in the morning,

5    and we have another record for the 4590 at 10:25 in the morning

6    of the murder.

7    Q.    4590, again, without referencing back that pertinent phone

8    number list, but that was the one for Mr. Perez?

9    A.    Yes.

10   Q.    The 2816, that was the one for Mr. Juan Rangel-Rubio;

11   correct?

12   A.    I believe so, yes.

13   Q.    And these calls, when we're looking at the one which I've

14   circled, that's a call placed at 8:34 in the morning; correct?

15   A.    That's correct.

16   Q.    And would you expect a user on that phone call to be

17   within the tower and sector of where that murder took place?

18   A.    It's in the general geographic area.  I can't say that,

19   going back to our kind of "Mission Impossible," you know, little

20   anecdote is I don't know that they are at the actual crime

21   scene, but they are definitely in this general geographic area

22   which includes the crime scene.

23   Q.    Looking, then, at the call for the 4590 number at 10:25

24   a.m., again, when we talk about the general proximity, what can

25   you tell us about that call?

429

1    A.    It's the same -- same story.  It's a different provider on

2    that phone so it's using a different tower.  You know, these two

3    towers don't belong to the same provider so don't think that

4    they're on the -- you know, they're -- they're the same

5    provider, so the one phone doesn't see the other tower, so ...

6    and -- but they are in the same area providing -- in that same

7    general geographic area at 10:25 to generate that record.

8    Q.    I want to keep your attention on that call at 10:25 that I

9    have circled there, and we're going to go to the next page,

10   which is Page 10 of Government's Exhibit 62, and now we're

11   staying on that August 19th date; correct?

12   A.    Correct.

13   Q.    So what does that show?

14   A.    So I've depicted where the crime scene was located, and

15   then it's just looking at the 9133 number.  We have a series of

16   five calls from 12:17 to 12:34, three of which are in

17   communication with one of the other phone numbers that we've

18   talked about, with the 4590 phone, and the first four records

19   that are listed in the box are on this sector that points to the

20   east.  The last one is on the one that points to the west.

21   Q.    And these calls are beginning at 12:17 p.m. again on

22   August 19th; correct?

23   A.    That's correct.

24   Q.    Same tower, but in a different sector from the earlier

25   call in the previous slide; is that right?

430

1    A.    That's correct.  Yes, different provider.

2    Q.    And looking at Page 11 of Government's Exhibit 62, what

3    does this show?

4    A.    So this is showing the activity around the same time with

5    the 4590 phone.  These are where that phone was on those three

6    calls where they are in contact with each other.

7         The first one is occurring kind of on the far left and

8    bottom of the map, which is over here, down here.  The next one,

9    that was at 12:18.  The next one is at 12:16, which is utilizing

10   this tower here, and then the last one I've depicted is at

11   12:30, and it's utilizing a tower here.

12   Q.    And, again, this is the 4590 number, which corresponds to

13   Mr. Perez; correct?

14   A.    That's correct.

15   Q.    I know you sort of went through it chronologically, but I

16   want to make sure we go through each of these.  If we could zoom

17   on the phone call the bottom left and this the first phone call

18   that's depicted on this; correct?

19   A.    That's correct.

20   Q.    It's a phone call at 12:18 and this is in the area of

21   where 307 interacts with Highway 17; correct?  If we could, I

22   guess, zoom out a little bit to be able to see the intersection

23   of the road?

24   A.    Yes, so this is 307 right here and then 17.

25   Q.    Correct.  Now that call at 12:18, and looking on this

431

1   same, if we could zoom out from that, looking on this same one,

2   what is the next call after that 12:18?

3   A.   It's just to the east of that or to the right.

4   Q.   At 12:26, so about eight minutes later now, it's hitting a

5   tower to the east; correct?

6   A.   That's correct.

7   Q.   And after that 12:26 call, then at 12:30, there's a 12:30

8   call; correct?

9   A.   Yes.

10  Q.   Mr. Fitzgerald, what is this suggesting to you the fact

11  that this phone is hitting these towers in this order?

12  A.   I would say the user of the phone traveled from kind of

13  the bottom, the furthest west area on this map to toward -- in

14  an eastbound direction and then went north.

15  Q.   And indeed it would be, I guess, towards west to get to

16  that crime scene; correct?  That would be the direction to the

17  crime scene?

18  A.   Everything is east of the -- well, the last call is to the

19  east of the crime scene.  The crime scene would definitely be to

20  the west or, you know --

21  Q.   Looking at Page 12 of Government's Exhibit 62, what does

22  this show?

23  A.   So this is going back to those last two calls, two slides

24  ago from the 9133 number.  If you remember, I said the first --

25  the first series of calls occurred on this sector to the east.

1    The next one at 12:34 was on the sector that points to the west,

2    and then I was told that the users of these two phones were

3    potentially together or the same person, and so I have another

4    phone, 2816, and it's utilizing -- it's on a different provider,

5    but it's utilizing a tower that's even further -- or, I'm sorry,

6    I hit the wrong -- even further to the west from those two

7    locations.

8    Q.   When we talk about which phone is depicted here, it's

9    the -- the one over here, which I've circled to the right side,

10   those are calls from the 9133 number; correct?

11   A.   That's correct.

12   Q.   Which are associated with Juan Rangel-Rubio; right?

13   A.   Yes.

14   Q.   And then at 12:35, after that, is a call hitting the tower

15   with a number of 2816, the other number associated with Juan

16   Rangel-Rubio; correct?

17   A.   That's correct.  Yes.

18   Q.   Let me ask you:  Would it be consistent, based on your

19   training, based on your experience, based on your analysis for a

20   user to have two phones to be traveling in tandem as reflected

21   in what we're looking at on Page 12 of Government's Exhibit 62?

22   A.   Yeah, based on the next side, too, it shows a little bit

23   more of the picture, and, yes, it is consistent.

24   Q.   Let's go there.  If we could look at Page 13 of

25   Government's Exhibit 62?

433

1          All right, so before we zoom in, Mr. Fitzgerald, can you

2     sort of lay this out what we're looking at, Page 13 of

3     Government's Exhibit 62?

4     A.    So this is just zooming a little bit further out on the

5     map.  I still have listed where the crime scene was and just

6     that last call that we were just talking about near the

7     intersection of 95 and 16, maybe, it's utilizing that tower just

8     to the south of that at 12:35 and then it's utilizing a tower

9     north of that tower location at 12:40.

10    Q.    And the first call depicted here is on that 12:35 on the

11    bottom; correct?

12    A.    That's correct.

13    Q.    And then minutes later at 12:40, suggesting to you

14    traveling north?

15    A.    Yes; correct.

16    Q.    Away from that crime scene; is that right?

17    A.    That's correct.

18    Q.    If we could look at Page 14 of Government's Exhibit 62.

19    It's a very busy page, Mr. Fitzgerald.  We will get into it, but

20    again, big picture, what are we looking at?

21    A.    Just showing kind of the different phones as they relate

22    to the crime scene.  Start at 1:13, I have the 2816 phone is

23    traveling.  Just in a series of calls you have, you know, a call

24    here and you just keep going further north, and then I also

25    included the 9133, which kind of marries in there the location

434

1    of that record, marries in there with the next call from the

2    2816 number, so, yeah, 1:13, 1:19, 1:26, 1:32, 1:36 and then

3    1:46 and 2:05 utilizing the tower all the way up in Springfield,

4    Georgia.

5         Conversely, the number ending in 4590 actually utilized a

6    tower down here in Georgetown from 1:23 to 1:26 and then another

7    tower a little bit further east from 2:32 to 2:46.

8    Q.   You mentioned conversely.  Does it appear that that 4590

9    number is splitting or departing, traveling separate from that

10   2816 and 9133 numbers?

11   A.   Yes, because you can see as -- at 2:05, this particular

12   number, the 2816, is all the way up in Springfield and 2:30,

13   1 -- between 1:30 and 2:30, the other phone is down much further

14   south.

15   Q.   And, again, going back to which numbers relate to or are

16   associated with which persons, we're looking at 2816 on the left

17   side of the screen heading north and that number being

18   associated with Juan Rangel-Rubio.  We're looking at the 9133

19   also associated with Mr. Juan Rangel-Rubio.

20        Let me ask you, Mr. Fitzgerald:  Do those phones appear to

21   be traveling consistent with one another?

22   A.   Yeah, they are.  You can see the -- the tower that was

23   utilized with one phone was at 1:19 and you have 1:26 and 1:32

24   so they are all kind of in line with each other the same

25   chronologically.

435

1  Q.    Whereas the number 4590 associated with Mr. Perez is, as

2  you mentioned, traveling away east in a different direction at

3  this point; correct?

4  A.    That's correct.

5  Q.    And in terms of the time, the date and time that we're

6  talking about, we're still on that August 19th; right?

7  A.    Yes.

8  Q.    And now this is all the way 1:00 to 2:45 p.m. in the

9  afternoon?

10  A.    That's correct.

11  Q.    As we started that day, August 19th, both of those phones

12  in the vicinity of that murder scene; correct?

13  A.    That's correct.  Yes.

14  Q.    And that 4590 number associated with Mr. Perez went down

15  and came around and came back; correct?

16  A.    Yes.  It left.  I mean, it was -- there was a series of

17  calls that kind of went from eastbound, then northbound.

18  Q.    And now later in the afternoon, the splitting of those

19  numbers; is that right?

20  A.    That's correct.

21          MR. HOWARD:  I have no further questions for this

22  witness, Your Honor.

23          THE COURT:  Cross-examination, Mr. Phillips.

24          MR. PHILLIPS:  I don't have any cross-examination, Your

25  Honor.

436

1        THE COURT:  Any objection to this witness being excused?

2        MR. HOWARD:  No, Your Honor.

3        THE COURT:  You may step down.

4        THE WITNESS:  Thank you.

5        THE COURT:  Mr. Howard, call your next witness.

6        MR. HOWARD:  Your Honor, the Government calls Oscar

7   Cruz.

8        THE CLERK:  Mr. Howard, do we need the interpreter for

9   this?

10       MR. HOWARD:  No.

11                       OSCAR CRUZ,

12   having first duly affirmed, was examined and testified as

13   follows:

14       THE CLERK:  Thank you.  You may be seated, and, sir, if

15   you will please state your full name and spell your last name.

16       THE WITNESS:  Oscar Cruz, C-r-u-z.

17       MR. HOWARD:  Your Honor, may I proceed?

18       THE COURT:  You may.

19                     DIRECT EXAMINATION

20   BY MR. HOWARD:

21   Q.   Mr. Cruz, what do you do for a living?

22   A.   I work for a tree company in South Carolina.

23   Q.   You are a US citizen; is that correct?

24   A.   Yes.

25   Q.   Born in the United States?

437

```
 1    A.    Yes.
 2    Q.    Did you previously work for a company called Wolf Tree?
 3    A.    Yes.
 4    Q.    What year did you start working at Wolf Tree?
 5    A.    2013.
 6    Q.    Now, did Wolf Tree later become a subsidiary of Davey
 7    Tree?
 8    A.    Yes.
 9    Q.    How did you first get the job at Wolf Tree?
10    A.    I came down in 2013 to meet my sister-in-law's son, went
11    to a bar that night and I met Pablo's son at a bar and we
12    exchanged phone numbers.
13    Q.    Did Pablo's son tell you to apply?
14    A.    No.  Went back to North Carolina, and when things didn't
15    go right over there, I give him a call and he said there was a
16    position available and he gave me Pablo's number to contact him.
17    Q.    And you were ultimately hired at Wolf Tree?
18    A.    Yes.
19    Q.    Who hired you?
20    A.    Pablo.
21    Q.    We talked about Pablo.  If we could pull up Government's
22    Exhibit 7, do you recognize who's depicted in Government's
23    Exhibit 7?
24    A.    Pablo.
25    Q.    Is it Pablo Rangel-Rubio?
```

438

1   A.    Yes.

2   Q.    Did you just know him as Pablo?

3   A.    Pablo Rangel.

4   Q.    When you first started at Wolf Tree, can you tell the jury

5   about what your job duties were?

6   A.    Yes.  I started as a groundsman.  My first -- my first day

7   was working at the ports of Savannah with Mr. Eliud Montoya.  I

8   was pretty much dragging brush to the trucks to be chipped up,

9   helping the trimmers.

10  Q.    You said a groundsman.  What does a groundsman do?

11  A.    Help the trimmer drag brush, clear underground brush, ask

12  customer's permissions to go onto properties.

13  Q.    You mentioned that you were working with Mr. Montoya?

14  A.    On my first day, yes.

15  Q.    What was Mr. Montoya's job at Wolf Tree when you first

16  started?

17  A.    Trimmer.

18  Q.    If we could pull up Government's Exhibit 2.  Do you

19  recognize the individual depicted in Government's Exhibit 2?

20  A.    Yes.

21  Q.    Who is that?

22  A.    Eliud Montoya.

23  Q.    You mentioned that he was a trimmer.  What does a trimmer

24  do?

25  A.    Goes up in the bucket truck, scissor lift and we were

439

1    working for the power company and we will trim the trees away

2    from the power lines.

3    Q.    So he would trim the trees; you were dragging them away?

4    A.    Yes.

5    Q.    Hard work?

6    A.    Yes.

7    Q.    Did you work with Mr. Montoya at Wolf Tree for several

8    years?

9    A.    Yes.

10   Q.    Now, outside of work, were there times and were there

11   instances where Eliud Montoya helped you?

12   A.    Yes.

13   Q.    Can you tell the jury a little bit about that?

14   A.    Yes.  He helped me arrange to get a cell phone at Verizon

15   due to my credit wasn't that great.  He did -- also was a

16   cosigner for a vehicle.

17   Q.    Did he help you with your taxes as well?

18   A.    Yes.

19   Q.    Now, while working at Wolf Tree, Mr. Cruz, did you come to

20   learn that there were individuals working there who were not in

21   the United States legally?

22   A.    Yes.

23   Q.    How did you learn that?

24   A.    Well, when I started working at Wolf Tree, the workers I

25   was working with, they knew by one name and then on their social

440

1    media they had a different name, and then later time, we met

2    up -- met up everybody and they had nicknames and they had

3    different names.

4    Q.    You were able to determine that people were working under

5    names that were not their real names; is that right?

6    A.    Yes.

7    Q.    Now, over the years, did you get various promotions at

8    Wolf Tree?

9    A.    Yes.

10   Q.    And around 2015, did you get a promotion to become an

11   assistant supervisor?

12   A.    Yes.

13   Q.    Who were you assisting in that job?

14   A.    Pablo Rangel.

15   Q.    Were you sort of his right-hand man?

16   A.    Yes.

17   Q.    What were some of your duties and responsibilities as an

18   assistant supervisor?

19   A.    Go around and set up door hangers, customers' houses where

20   we were going to do some work, fill out time sheets for storm

21   work, take care of customer complaints, make sure everybody had

22   their equipment on their trucks.

23   Q.    You mentioned filling out worker time sheets.  When you

24   filled out those time sheets, did you use everyone's real names?

25   A.    No.

441

1   Q.    Why not?

2   A.    Because some of them were not -- were not working with

3   their real names.  Some of them were and some of them were not.

4   Q.    Did someone tell you to complete time sheets that way?

5   A.    Yes.

6   Q.    Who?

7   A.    Pablo.

8   Q.    How would you know what names to use?

9   A.    There was a roster that which it was provided by the

10  company, and by that time I knew who was who using what name,

11  and the people that I didn't know what name they were using, I

12  would ask Pablo.

13  Q.    If we could pull up as an example of one of these time

14  sheets Exhibit 6.  It's going to be a one-page document.  It

15  should be on front of the screen in front of you.  Do you

16  recognize that?

17  A.    Yes.

18  Q.    What I would like to do so we can see it is zoom in on the

19  names on the left-hand column of that screen.  Thank you.

20  Looking at those names, I want to go through those names; okay?

21  A.    Okay.

22  Q.    And does that sort of, before we talk about those names,

23  that document itself, that worksheet, does that fairly and

24  accurately depict an example of time sheets that were used at

25  Wolf Tree?

442

```
 1   A.   Yes.
 2   Q.   I think that particular one is for the week ending June of
 3   2017; is that right?
 4   A.   I'm not looking at it completely.
 5   Q.   Let's zoom out, make sure.  I think if we could zoom in on
 6   the top part, do you see where it says week ending June 3rd,
 7   2017?
 8   A.   Yes.
 9   Q.   Looking back at the names, does that name show about 19
10   individuals and the amount of hours that they worked?
11        THE COURT:  That's a question to you.
12        THE WITNESS:  Oh, sorry about that, can you please
13   repeat?
14   Q.   (By Mr. Howard)  Absolutely.  Looking at the screen in
15   front of you, does that time sheet show about 19 people's names
16   along with the number of hours that they worked?
17   A.   Yes.
18   Q.   Do you recognize some of those names?
19   A.   Yes.
20   Q.   Indeed your name is listed there; correct?
21   A.   Correct.
22   Q.   Does the list of employees contain some of the assumed
23   identities that people were using?
24   A.   Yes.
25   Q.   Let's go through that.  At the bottom of the list, there
```

443

1    is a Stanley Turner there.  Do you see that?

2    A.    Yes.

3    Q.    Was there a Stanley Turner that was really working at Wolf

4    Tree in Savannah?

5    A.    No.

6    Q.    Who was working under that name?

7    A.    Jonathan Rangel.

8    Q.    And who is Jonathan Rangel's father?

9    A.    Juan Rangel.

10   Q.    And who is Juan's brother?

11   A.    Pablo Rangel.

12   Q.    So Jonathan is Pablo's nephew and he is Juan's son;

13   correct?

14   A.    Correct.

15   Q.    If we could pull up Government's Exhibit 8.  Do you

16   recognize that individual?

17   A.    Yes.

18   Q.    Who is that?

19   A.    Juan Rangel.

20   Q.    Did he work at Wolf Tree?

21   A.    Yes.

22   Q.    What type of work did he do at Wolf Tree?

23   A.    He was operating mechanical trimmers, last draft.

24   Q.    Did he work at Wolf Tree for several years while you were

25   there?

444

1    A.    Yes.

2    Q.    Was there a time that he asked you to get a cell phone for

3    him?

4    A.    Yes.

5    Q.    Do you know why he couldn't just go to a cell phone

6    company and get a phone?

7    A.    I assumed he was not able to get a phone.

8    Q.    Because why?

9    A.    Being illegal.

10   Q.    Were there other members of Pablo Rangel's family who

11   worked at Wolf Tree while you were working there?

12   A.    Yes.

13   Q.    Do you know how many?

14   A.    There were like five or six, probably.

15   Q.    Several?

16   A.    Several.

17   Q.    Were they employed under their actual names?

18   A.    No.

19   Q.    If we could go back to the time sheet that was

20   Government's Exhibit 6.  Looking at those names, are there

21   several names there that don't match the employees actually

22   doing the work?

23   A.    Yes.

24   Q.    For instance, Luciano Rodriguez, was that really an

25   employee there?

445

```
 1   A.    No.

 2   Q.    Juan Amaya, really an employee?

 3   A.    No.

 4   Q.    Same question for Fernando Soto?

 5   A.    No.

 6   Q.    Giovanni Martinez?

 7   A.    No.

 8   Q.    Going down the line, is it fair to say that looking at

 9   this list the vast majority of names here do not correspond to

10   the actual people working at Wolf Tree?

11   A.    Correct.

12   Q.    I'm going get to why people were working under other

13   names.  Was it your understanding that people worked under

14   assumed names because they could not legally work in the United

15   States?

16   A.    Correct.

17   Q.    Were there also times in which you left the employee names

18   blank?

19   A.    Yes.

20   Q.    When you filled out a time sheet, you left the employee's

21   names blank?

22   A.    Yes.

23   Q.    Why?

24   A.    I was told by Pablo to leave them blank.

25   Q.    Why?
```

446

1    A.    Because he was going to add someone else's name.

2    Q.    Once you were done with the time sheets, leaving entries

3    blank, what would you do with those time sheets?  Where would

4    they go?

5    A.    e-mail them to Pablo.

6    Q.    And it was your understanding that he would add in

7    people's names?

8    A.    Yes.

9    Q.    Are you familiar with the term "ghost employees"?

10   A.    Yes.

11   Q.    What do you understand that to mean?

12   A.    Employee not working?

13   Q.    Just basically padding the hours with people who weren't

14   really working; correct?

15   A.    Correct.

16   Q.    Let's move away from the time sheets now and talk about

17   the hiring at Wolf Tree; okay.

18         During your time at Wolf Tree, did you become familiar

19   with how Wolf Tree employees were hired in the Savannah area?

20   A.    Yes.

21   Q.    Who handled most of the hiring?

22   A.    Pablo.

23   Q.    For the hiring, was there a little bit different process

24   for those who were legally in the United States and those who

25   weren't?

447

1    A.    Yes.

2    Q.    Can you tell the jury a little bit about the process for

3    somebody who was legally in the United States who came to work

4    at Wolf Tree?

5    A.    Yes.  They would be employees that were -- were illegally.

6    They couldn't work here, so, for example, there was a guy that

7    came.  He asked there was availability to work and told him to

8    speak with Pablo, and then Pablo will talk to them about that.

9    Q.    So for the individuals who were lawfully in the United

10   States, would you help with their hiring?

11   A.    Yes.

12   Q.    But the individuals who were not lawful, those who were

13   illegally in the United States, who would they go to to be

14   hired?

15   A.    Pablo.

16   Q.    What about when employees or individuals needed to use

17   someone else's information to work for Wolf Tree, who would

18   handle their hiring?

19   A.    Pablo.

20   Q.    Was he involved in assigning them a name to work under?

21   A.    Yes.

22   Q.    Let's talk about employees being paid.  How would those

23   who were illegally in the United States working under Pablo, how

24   would they be paid?

25   A.    Some of them would receive cash, checks, direct deposits.

448

1  Q.    Were those who received cash, how would they receive that
2  cash?
3  A.    Pablo would hand me the envelope and I would hand it to
4  those guys.
5  Q.    So you were handling, was the cash in envelopes?
6  A.    Yes.
7  Q.    You were handing envelopes of cash to employees?
8  A.    Yes.
9  Q.    And for those who were receiving checks, would they
10 receive checks in their real name?
11 A.    No.
12 Q.    What name would the checks be in?
13 A.    The name that it was on the roster.
14 Q.    How would the employees who received those checks in
15 someone else's name, do you know how they would be able to
16 deposit or cash those checks?
17 A.    No.
18 Q.    Did you ever cash checks for employee?
19 A.    Yes.
20 Q.    For whom?
21 A.    Joel Reyes.
22 Q.    Were you ever paid in checks made out to other people?
23 A.    Yes.
24 Q.    And, again, you, as a United States citizen, you didn't
25 work under someone else's name; right?

449

1    A.    Correct.

2    Q.    We saw on the time sheet you were working under your own

3    name; right?

4    A.    Yes.

5    Q.    I want to talk about those checks that you were paid in

6    someone else's name; okay?

7    A.    Okay.

8    Q.    Can you explain to the jury what led you to receiving some

9    checks in name of other people?

10   A.    Yes.  Started back in 2016 when we had the storm that hit

11   Savannah.  I was working really hard honestly, and then when the

12   storm was almost over, Pablo came and hand me a check and he

13   said, "To help yourself out," and he said, "Deposit in your

14   account" and that's what I did.  Then later on, I just keep

15   doing my work and working hard, and he start handing me checks

16   with somebody else's name.

17   Q.    And these were checks on top of what you were being paid

18   by Wolf Tree in your name; right?

19   A.    Yes.

20   Q.    What would you do with the checks after Pablo gave them to

21   you?

22   A.    I would deposit them into my account.

23   Q.    Did you have accounts at Wells-Fargo Bank?

24   A.    Yes.

25   Q.    In a sense, these were almost like bonus checks; correct?

450

1    A.    Yes.

2    Q.    Just in somebody else's name; right?

3    A.    Yes.

4    Q.    Now, Mr. Cruz, in total did you receive and deposit

5    approximately 35 checks totaling more than $15,000.00 in the

6    name of other people?

7    A.    Yes.

8           MR. HOWARD:  Your Honor, may I approach?

9           THE COURT:  You may.

10   Q.    (By Mr. Howard)  Mr. Cruz, I've handed you two folders of

11   exhibits, Exhibit 9 and Exhibit 11.  I want to start with

12   Exhibit 9.  If you would open that blue folder and if you would

13   take a look at a 36-page exhibit that I've shown you.

14         Once you've had a chance to look through it, we will pull

15   it up on the screen.

16         Have you had an opportunity to review Government's Exhibit

17   9?

18   A.    Yes.

19   Q.    Does that contain more than 30 checks deposited into your

20   Wells-Fargo accounts?

21   A.    Yes.

22   Q.    Checks in the names of other people; correct?

23   A.    Yes.

24   Q.    Was a summary prepared of those checks?

25   A.    Yes.

451

1    Q.    Does that first page of that exhibit contain a summary?

2    A.    Yes.

3    Q.    If we could pull up Government's Exhibit 9 and let's first

4    look at Page 2 of Exhibit 9.  Looking at Page 2, is this one of

5    the checks that was deposited into your account?

6    A.    Yes.

7    Q.    In the name, this one is in the name, if we can zoom in on

8    the name, Jerad Brown?

9    A.    Yes.

10    Q.    If we could go to Page 1 of Government's Exhibit 9, does

11    this reflect the summary of all of those checks in that exhibit?

12    A.    Yes.

13    Q.    Does that show that for the name Jerad Brown there are 25

14    checks deposited into your account totaling more than $9,000.00

15    in that individual's name?

16    A.    Correct.

17    Q.    Do you know a Jerad Brown?

18    A.    No.

19    Q.    Was there really a Jerad Brown working at Wolf Tree?

20    A.    No.

21    Q.    How about Luciano Rodriguez?

22    A.    No.

23    Q.    You received a check in his name.  You also received a

24    check in the name of Rufino Rodriguez?

25    A.    Yes.

452

```
 1   Q.    Is that a real individual working at Wolf Tree?
 2   A.    No.
 3   Q.    You received eight checks in the name of Mario Vega.  Is
 4   that an individual working at Wolf Tree?
 5   A.    No.
 6   Q.    This totals 35 checks of $15,395.00 given to you; correct?
 7   A.    Yes.
 8   Q.    Now, did you ask Pablo why people were working under
 9   different names?
10   A.    No.
11   Q.    Did you ask him why you were getting checks made out to
12   other people?
13   A.    No.
14   Q.    Mr. Cruz, is it fair to say you were turning a blind eye?
15   A.    Yes.
16   Q.    You profited from the hiring of illegal aliens; correct?
17   A.    Yes.
18   Q.    Let's talk about Mr. Montoya.  You mentioned early on that
19   you worked with Mr. Montoya at Wolf Tree; is that right?
20   A.    Yes.
21   Q.    In your discussions with Mr. Montoya, did he ever bring up
22   the issue of the hiring of illegal aliens at Wolf Tree?
23   A.    Yes.
24   Q.    Did he complain about it?
25   A.    Yes.
```

453

1   Q.   Did he ask you to write a letter?

2   A.   Can you repeat the question?

3   Q.   Sure.  Did Mr. Montoya even ask you to write a letter?

4   A.   Yes.

5   Q.   Explain your understanding of what Mr. Montoya was asking

6   when he asked you to write a letter?

7   A.   He wanted me to help him write a letter.  He said he was

8   going to send it to the company, the power company, and to

9   immigration that there were illegal aliens working in the

10  Savannah area.

11  Q.   Did you write a letter?

12  A.   No.

13  Q.   Why not?

14  A.   I just kept putting it off.

15  Q.   Did Mr. Montoya alert you that he was going to make a

16  complaint against Pablo relating to hiring and mistreating of

17  illegal aliens?

18  A.   Yes.

19  Q.   What was your reaction?

20  A.   I told him he can do whatever.  I didn't want to get

21  involved with any --

22  Q.   Why did you not want to get involved?

23  A.   Because I didn't want to get in any trouble.

24  Q.   Later on, did you come to learn that Mr. Montoya filed a

25  complaint with the company about his supervisor, Pablo?

454

1   A.    Yes.

2   Q.    How did you learn come to learn that?

3   A.    Our regional -- our manager, he came to pick up the

4   complaint from Mr. Montoya.

5   Q.    And what was the name of that regional manager?

6   A.    Chris Branch.

7   Q.    And did Mr. Branch show you the letter?

8   A.    Yes.

9   Q.    The letter that Mr. Montoya had submitted?

10  A.    Yes.

11  Q.    If we could pull up Government's Exhibit 2 -- I'm sorry,

12  Government's Exhibit 10.  Looking at Government's Exhibit 10, a

13  two-page document, if we could zoom in on the top half of that

14  document.  Mr. Cruz, I'm going to ask you if you recognize

15  Government's Exhibit 10?

16  A.    Yes.

17  Q.    What is this?

18  A.    The letter that Mr. Montoya filed.

19  Q.    Is it the letter that he filed and that Chris Branch, that

20  regional manager at Wolf Tree, showed you?

21  A.    Yes.

22  Q.    This is dated April 24th, 2017; is that correct?

23  A.    Yes.

24  Q.    And it begins, "My name is Eliud Montoya"?

25  A.    Yes.

455

1    Q.    And in that letter, he makes a series of complaints,

2    doesn't he?

3    A.    Yes.

4    Q.    Did you tell Chris Branch that Pablo was hiring illegal

5    aliens?

6    A.    No.

7    Q.    Why not?

8    A.    Just -- I just didn't.

9    Q.    Did you not want to get in trouble?

10   A.    I didn't -- yeah, correct.

11   Q.    Later on, did you learn that Pablo got a copy of Mr.

12   Montoya's complaint letter?

13   A.    Yes.

14   Q.    How do you know that Pablo got a copy of that letter?

15   A.    It -- I don't know how he -- he got it, but he confronted

16   Mr. Montoya in a meeting that he -- he asked me to organize.

17   Q.    I want to talk about that meeting.  Were you present for

18   that meeting?

19   A.    Yes.

20   Q.    He asked you to organize it.  What do you mean by that?

21   A.    To gather everybody in -- in the showup area.

22   Q.    Who attended that meeting or rather did the bulk of the

23   Savannah area employees attend that meeting?

24   A.    Yes, but one employee that I forgot to let him know.

25   Q.    Was Mr. Montoya at that meeting?

456

1   A.   Yes.

2   Q.   And Pablo asked you to call that meeting; correct?

3   A.   Correct.

4   Q.   What occurred at that meeting?

5   A.   It started as everything, what was going on with the job,

6   job area, and then Pablo showed up and then started confronting

7   Mr. Montoya about, about the complaint.

8   Q.   Pablo confronted Mr. Montoya about the complaint?

9   A.   Correct.

10  Q.   In front of all the employees?

11  A.   Yes.

12  Q.   Did Pablo discuss that letter?

13  A.   Yes.

14  Q.   Did Pablo ask Mr. Montoya why he put the complaint in?

15  A.   Yes.

16  Q.   Was that letter read out loud by an employee?

17  A.   Yes.

18  Q.   And Mr. Montoya was present for all of this; correct?

19  A.   Correct.

20  Q.   Now, after filing that complaint, did there come a time

21  where Mr. Montoya was actually suspended from Wolf Tree?

22  A.   Yes.

23  Q.   Why was he suspended?

24  A.   He broke a safety rule.

25  Q.   And did he contest that suspension?

457

1   A.   Yes.

2   Q.   He disputed whether he actually broke that rule; correct?

3   A.   Correct.

4   Q.   Now, Mr. Cruz, as to you, you were fired from Wolf Tree;

5   correct?

6   A.   Correct.

7   Q.   Why were you fired?

8   A.   Because I told the vice president of Wolf Tree that I

9   received checks, and I cashed them.

10   Q.   In addition to being fired from your work, you were also

11   charged federally; correct?

12   A.   Correct.

13   Q.   You were federally charged with conspiring to conceal,

14   harbor and shield illegal aliens; correct?

15   A.   Correct.

16   Q.   Did you plead guilty or not guilty to that offense?

17   A.   Guilty.

18   Q.   As part of your guilty plea, did you enter into a plea

19   agreement with the United States?

20   A.   Yes.

21   Q.   Are you testifying today as part of a plea agreement you

22   have with the United States?

23   A.   Yes.

24   Q.   I've handed you a 14-page document in a folder marked as

25   Government's Exhibit 11.  Please review that.  And while you do,

458

1   we can pull up the first page of Government's Exhibit 11 on the

2   screen.

3        Have you had an opportunity to review Government's Exhibit

4   11?

5   A.    Yes.

6   Q.    Is this the plea agreement that you entered into with the

7   United States?

8   A.    Yes.

9   Q.    If we could go to the Page 4 of Government's Exhibit 11

10  and look specifically at Paragraph Number 7.  Paragraph Number

11  7, which begins on the bottom of Page 4 and goes into Page 5,

12  does that set forth your agreement to provide complete and

13  truthful cooperation to the United States?

14  A.    Yes.

15  Q.    Are you required to truthfully disclose your knowledge of

16  the offense?

17  A.    Yes.

18  Q.    Are you required to truthfully answer any question put to

19  you by law enforcement?

20  A.    Yes.

21  Q.    Do you get any benefit at all in this plea agreement if

22  you are not truthful?

23  A.    Can you repeat the question?

24  Q.    Yes.  If you are not truthful, do you get any benefit at

25  all in this plea agreement?

459

1   A.    No.

2   Q.    Are you hoping that by cooperating with law enforcement,

3   it will result in a reduced sentence for you?

4   A.    Yes.

5   Q.    Because as you sit here today, you're awaiting sentencing;

6   correct?

7   A.    Correct.

8   Q.    Have you been promised any particular sentence?

9   A.    No.

10  Q.    Who will ultimately decide what sentence you get?

11  A.    The Judge.

12  Q.    Now, Mr. Cruz, we've talked about Pablo.  We've talked

13  about Juan.  Directing your attention to the defendant sitting

14  in a pink shirt in a suit and a red tie, do you recognize that

15  individual?

16  A.    No.

17  Q.    Do you recognize the name Higinio Perez-Bravo?

18  A.    No.

19        MR. HOWARD:  No further questions for this witness, Your

20  Honor.

21        THE COURT:  Cross-examination, Mr. Phillips.

22        MR. PHILLIPS:  I have no cross-examination.

23        THE COURT:  Any objection to this witness being excused?

24        MR. HOWARD:  None from the Government.

25        THE WITNESS:  Thank you.

1      THE COURT:  It is five o'clock, and it's time to adjourn

2  for the day, so we will be in recess.  Please do just like you

3  did today and arrive in your jury room in time for us to begin

4  promptly at 9:00 a.m. tomorrow.

5      We're making progress as expected, and as we adjourn for

6  the evening, recall the familiar directions:  Don't discuss the

7  case, don't make up your mind, don't do any research, don't

8  consume any media.

9      With that, let's rise for this jury.

10      (The jury exits the courtroom.)

11      THE COURT:  All right, counsel, first of all, Mr.

12  Phillips, I will look for a response from you with regard to the

13  motion that was filed.

14      MR. PHILLIPS:  Okay.

15      THE COURT:  And directed to the Government, without

16  holding you to it, just a ballpark figure, do you anticipate

17  calling all of the remainder of your witnesses?

18      MS. GROOVER:  We do, Your Honor, five more.

19      THE COURT:  Then, counsel, we will be in recess until

20  9:00 a.m. tomorrow.

21      (Proceeding concluded at 4:57 p.m.)

22

23

24

25

461

1                           CERTIFICATION

2

3          I certify that the foregoing is a true and correct

4    transcript of the stenographic record of the above-mentioned

5    matter.

6

7          _Debra D Gilbert_

9    _____        05/01/2022

10   Debra Gilbert, Court Reporter            Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25