1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | CASE NOS. |
| | ) | 4:18-CR-00274-LGW-BWC-3 |
| HIGINIO PEREZ-BRAVO, | ) | |
| | ) | |
| _____Defendant._____ | ) | |


RULE 11 PROCEEDING
BEFORE THE HONORABLE LISA GODBEY WOOD
April 14, 2022; 9:57 a.m.
Brunswick, Georgia

APPEARANCES:

For the Government:        TANIA D. GROOVER, Esq.
                          CHRISTOPHER HOWARD, Esq.
                          U. S. Attorney's Office
                          P. O. Box 8970
                          Savannah, Georgia  31412
                          (912) 201-2552
                          tania.groover@usdoj.gov
                          christopher.howard@usdoj.gov


For the Defendant:         ROBERT P. PHILLIPS, III, Esq.
                          Phillips, Carson & Phillips
                          420 West Broughton Street
                          2nd Floor
                          Savannah, Georgia 31401
                          (912) 232-0081
                          bplaw@msn.com


Reported by:               Debbie Gilbert, RPR, CCR
                          Official Court Reporter
                          801 Gloucester Street
                          Post Office Box 1894
                          Brunswick, GA 31521-1894
                          (912) 262-2608 or (912) 266-6006
                          debra_gilbert@gas.uscourts.gov
                              - - -

2

1              P R O C E E D I N G S

2           (Call to order at 9:57 a.m.)

3        THE COURT:  All right, Ms. Sharp, call the case for Rule

4    11 purposes.

5        THE CLERK:  Case Number 4:18-CR-274, United States of

6    America versus Higinio Perez-Bravo, Christopher Howard, Tania

7    Groover for the Government, Bobby Phillips for the Defense.

8        MS. GROOVER:  The United States of America is ready to

9    proceed.

10        MR. PHILLIPS:  We're ready to proceed, Your Honor.

11        THE COURT:  Mr. Phillips, approach with your client, Mr.

12    Perez-Bravo and let's have our interpreter come forward, whoever

13    will be performing that service, and Ms. Sharp, if you will

14    swear in our interpreter for Rule 11 purposes.

15           (Interpreter Elizabeth Giersberg sworn.)

16        THE CLERK:  Thank you.  Please state your name for the

17    record.

18        INTERPRETER GIERSBERG:  Elizabeth Giersberg.

19        THE COURT:  All right, Mr. Perez-Bravo, we're here

20    because the United States Attorney and your own attorney say you

21    want to change your plea from not guilty to guilty to this one

22    count that's pending against you in this federal criminal felony

23    indictment; is that correct?

24        THE DEFENDANT:  Uh-huh, yes.

25        THE COURT:  The purpose of this proceeding is going to

3

1   be for me to make sure you understand the case as it's presently

2   pending against you.  I also want to make sure you understand

3   all the rights that you waive or give up if I decide to accept

4   your plea.  I want to decide whether there's a factual basis for

5   a plea of guilty to this one count and that this is really what

6   you want to do after you have apparently discussed it with your

7   attorney.

8           There will be other things that we take up as we go

9   along this morning.  I just want you to understand right from

10  the beginning this is an important step in your life.  It's not

11  something to take lightly; understand?

12          THE DEFENDANT:  Yeah.

13          THE COURT:  Also know in just a moment I'm going to have

14  you put under oath, sworn to tell the truth.  If you don't tell

15  the truth while under oath, the Government could prosecute you

16  for perjury; understand?

17          THE DEFENDANT:  Yeah.

18          THE COURT:  Now, is anybody making you, pushing you, or

19  leaning on you to come in here and plead guilty?

20          THE DEFENDANT:  No.

21          THE COURT:  This is how you wish to proceed?

22          THE DEFENDANT:  Yes.

23          THE COURT:  Swear in Mr. Perez-Bravo.

24                      HIGINIO PEREZ-BRAVO,

25  having been first duly sworn, was examined and testified as

4

1   follows:

2          THE CLERK:  Thank you.  Please state your full name.

3          THE DEFENDANT:  Higinio Perez-Bravo.

4          THE COURT:  Do you have a social security number?

5          THE DEFENDANT:  No.

6          THE COURT:  How old are you?

7          THE DEFENDANT:  54.

8          THE COURT:  Are you married?

9          THE DEFENDANT:  Yes.

10         THE COURT:  Do you have any children?

11         THE DEFENDANT:  Yes.

12         THE COURT:  How old are they?

13         THE DEFENDANT:  28 and 24.

14         THE COURT:  You have two children?

15         THE DEFENDANT:  Yes.

16         THE COURT:  Where were you born?

17         THE DEFENDANT:  In Mexico.

18         THE COURT:  In Chiapas?

19         THE DEFENDANT:  Yeah.

20         THE COURT:  Where were you living at the time of this

21  arrest?

22         THE DEFENDANT:  At 1717 Ground Point --

23         INTERPRETER GIERSBERG:  I don't know.

24         MR. PHILLIPS:  Grove Point.

25         THE DEFENDANT:  In Savannah.

5

1          THE COURT:  Approximately how many years have you lived

2     in the United States?

3          THE DEFENDANT:  20 years.

4          THE COURT:  How far did you go in school?

5          THE DEFENDANT:  Middle school.

6          THE COURT:  About the eighth grade?

7          THE DEFENDANT:  Yes.

8          THE COURT:  I understand that you are not fluent in

9     English, but with the help of an interpreter, have you been able

10    to discuss your case with Mr. Phillips and Mr. Martin?

11         THE DEFENDANT:  Yes.

12         THE COURT:  And with the help of interpreter to

13    interpret and translate for you, have you been able to

14    understand all the proceedings that we've had and understand the

15    documents involved?

16         THE DEFENDANT:  Yes.

17         THE COURT:  Tell me what jobs you've performed.  What

18    work do you do?

19         THE DEFENDANT:  Home remodeling.

20         THE COURT:  Do you have your own business or do you work

21    for someone?

22         THE DEFENDANT:  I worked on my own on weekends and I was

23    working for a company.

24         THE COURT:  Is that Lanier?

25         THE DEFENDANT:  Yes.

6

1      THE COURT:  Have you ever been diagnosed with any mental

2  or physical disabilities of any kind?

3      THE DEFENDANT:  I don't remember well, but, yes, I had

4  memory problems when I was a child.

5      THE COURT:  Do you take any medications?

6      THE DEFENDANT:  No.  At that time my family was not

7  wealthy.

8      THE COURT:  What about now; do you take any medicine of

9  any kind?

10      THE DEFENDANT:  No.

11      THE COURT:  In the last two days, have you had any drugs

12  or alcohol?

13      THE DEFENDANT:  No.

14      THE COURT:  Mr. Perez-Bravo, as you stand before me

15  right now you're presumed innocent.  What that means is the

16  Government is your accuser.  As such, they have to prove that

17  you're guilty and they have got to do that by bringing forth

18  proof of guilt beyond a reasonable doubt.  You as a defendant

19  don't have to prove anything; understand?

20      THE DEFENDANT:  Yes.

21      THE COURT:  Also know the indictment that was brought

22  against you, that document that sets forth the charge, that's

23  not evidence.  That's simply what the grand jury and the US

24  Attorney accuse you of having done but it's not evidence;

25  understand?

7

1          THE DEFENDANT:  Yes.

2          THE COURT:  And Mr. Phillips, I understand you're

3    appointed in this case; is that correct?

4          MR. PHILLIPS:  Yes, ma'am, I am, along with Mr. Martin.

5          THE COURT:  And Mr. Perez-Bravo, you've explained you

6    didn't have the kind of money to pay a lawyer to defend you so

7    Mr. Phillips has been appointed to represent you at no charge to

8    you; is that correct?

9          THE DEFENDANT:  Yes.

10          THE COURT:  And I do want you to understand you have the

11    right to his representation at no charge to you throughout this

12    and every other phase of your case; understand?

13          THE DEFENDANT:  Yes.

14          THE COURT:  Also know you don't have to plead guilty.

15    If you want to persist in a plea of not guilty, you're entitled

16    to do that.  If you were to persist in a plea of not guilty, you

17    would be entitled to a public and speedy trial by jury.  During

18    that jury trial a number of rights would belong to you, as

19    you've seen over the course of this week.  You would have the

20    right to see, hear, confront and cross-examine any witness the

21    Government might call in your case.  You would have the right to

22    see all their evidence.

23          For your own part you would have the right to put up

24    evidence if you wanted.  You would have the right to call

25    witnesses and use subpoenas from the court to make them appear.

8

1   You would have the right to take the stand and testify, subject

2   yourself to cross-examination by the US Attorney, but you would

3   also have the right to go to trial and remain silent, and if you

4   decided to proceed in that fashion, nobody could say anything

5   negative about your silence in front of the jury.  It is after

6   all a constitutional right; understand?

7           THE DEFENDANT:  Yes.

8           THE COURT:  Do you understand that if I accept your plea

9   of guilty and you decide to enter that plea of guilty, then you

10  will have waived, that is, given up any rights associated with a

11  trial by jury?  In fact, if you plead guilty and I accept your

12  plea of guilty, we will excuse the jurors from any further

13  service, stop the trial and you will have been adjudicated

14  guilty; understand?

15          THE DEFENDANT:  Yes.

16          THE COURT:  You will have waived all the rights

17  associated with a jury trial; understand?

18          THE DEFENDANT:  Uh-huh, yes.

19          THE COURT:  Do you have any questions about the waiver

20  of those rights?

21          THE DEFENDANT:  No.

22          THE COURT:  Well, have you and Mr. Phillips discussed

23  the facts and the law as they pertain to your case with help of

24  an interpreter?

25          THE DEFENDANT:  Yes.

9

1          THE COURT:  With the help of a translator, has Mr.

2    Phillips gone over the indictment filed against you with you?

3          THE DEFENDANT:  Yes.

4          THE COURT:  Has Mr. Phillips with the help of an

5    interpreter discussed the plea agreement you're proposing this

6    morning?

7          THE DEFENDANT:  Yes.

8          THE COURT:  And has that plea agreement been translated

9    for you in Spanish?

10          THE DEFENDANT:  Yes.

11          THE COURT:  Has Mr. Phillips discussed at least in

12    general terms the federal sentencing guidelines with you?

13          THE DEFENDANT:  Yes.

14          THE COURT:  Are you satisfied with his representation?

15          THE DEFENDANT:  Yes.

16          THE COURT:  Do you have any complaints about it

17    whatsoever?

18          THE DEFENDANT:  No.

19          THE COURT:  Although I understand that you and Mr.

20    Phillips have gone through the indictment together and, in fact,

21    it has been a focal point of the trial that we began,

22    nevertheless, I want to make sure you understand what you're

23    charged with in this indictment.

24          As I said at the outset, it is a multi-count

25    multi-defendant federal felony criminal indictment.  You,

10

1   however, are charged only in one of the counts.  You're charged

2   in Count 8.  Count 8 alleges that you and Pablo Rangel-Rubio

3   conspired to commit murder for hire in violation of 18 USC

4   Section 1958(a).  The indictment alleges that beginning around

5   May of 2017 continuing through about August 19 of 2017 in

6   Chatham County and Effingham County, which are in the Southern

7   District of Georgia, you and Pablo Rangel-Rubio conspired to

8   knowingly and willfully cause or cause another to use facilities

9   of interstate commerce for the purpose of murdering Eliud

10  Montoya for money and the promise of money in violation of the

11  laws of the United States of America and the State of Georgia.

12  The indictment alleges that that conspiracy resulted in the

13  death of Eliud Montoya.

14          Count 8 of the indictment goes on to specify the object

15  of the conspiracy and the manner and means of the conspiracy and

16  lists a number of overt acts that were taken in furtherance of

17  the conspiracy, all done, the indictment alleges, in violation

18  of Title 18 USC Sections 1958(a) and (2).

19          And my question to you is:  Do you understand that

20  that's what's alleged against you in this indictment?

21          THE DEFENDANT:  Yes.

22          THE COURT:  And has that indictment been translated for

23  you?

24          THE DEFENDANT:  Yes.

25          THE COURT:  In order for you to be found guilty of Count

1  8, the Government would have to prove beyond a reasonable doubt

2  what are called the essential elements of that offense, and the

3  essential elements of conspiracy to commit murder for hire are

4  three-fold.

5        So the Government would have to prove beyond a

6  reasonable doubt first that two or more persons in some way

7  agreed to try to accomplish a shared and unlawful plan to commit

8  murder for hire; second, that you knew the unlawful purpose of

9  the plan and willfully joined in it; and third, that death

10  resulted from the conspiracy.

11        The offense of murder for hire requires three elements:

12  First, the use or causing another to use any facility of

13  interstate or foreign commerce; second, the intent that a murder

14  be committed in violation of the laws of any state of the United

15  States; and finally that a promise or agreement to pay anything

16  of pecuniary value as consideration for committing the murder.

17  Do you understand all of those essential elements?

18        THE DEFENDANT:  Yes.

19        THE COURT:  Do you understand that by pleading guilty

20  you admit that they are all satisfied?

21        THE DEFENDANT:  Yes.

22        THE COURT:  Now, the maximum possible penalty that I

23  could ever impose for a violation of Count 8 is life

24  imprisonment, a term of supervised release up to life, a

25  $250,000.00 fine, restitution as may be ordered to be paid by

12

1    you to the victims and forfeiture of any forfeitable assets.

2    There's also a $100.00 special assessment.

3          Because death resulted in the case -- and I understand

4    the Defense is admitting that death resulted; is that correct,

5    Mr. Phillips?

6          MR. PHILLIPS:  Yes, ma'am.

7          THE COURT:  And that's your understanding as well, Ms.

8    Groover?

9          MS. GROOVER:  Yes, Your Honor.

10         THE COURT:  Because death resulted, there is a mandatory

11   minimum penalty of life in prison; is that your understanding,

12   Mr. Phillips?

13         MR. PHILLIPS:  Yes, ma'am.

14         THE COURT:  And yours, Ms. Groover?

15         MS. GROOVER:  Yes, Your Honor.

16         THE COURT:  You understand that if you plead guilty and

17   I accept your plea, I must sentence you to life in prison;

18   understand?

19         THE DEFENDANT:  Uh-huh.

20         THE COURT:  Do you have any questions about that?

21         THE DEFENDANT:  No.

22         THE COURT:  I want you to understand how sentence is

23   performed in federal court.  First of all, that phrase

24   "supervised release" that means after any period of federal

25   incarceration, should you be released from prison, you would

1  have to follow the rules that I set forth for a given number of

2  years.  Those rules might include a requirement that you get a

3  job, that you comply with any immigration and customs

4  requirements, and if you were to fail to live up to the terms of

5  supervised release, you could wind up back in prison;

6  understand?

7          THE DEFENDANT:  Yes.

8          THE COURT:  I also want you to be familiar with those

9  federal sentencing guidelines that I mentioned earlier.  They

10 are not mandatory.  They are advisory but it's still my duty to

11 calculate what the advisory guideline range is going to be in

12 your case and to consider that range along with possible

13 departures under the guidelines themselves and then to consider

14 all our sentencing factors that are set forth in our federal

15 sentencing statute, 18 USC Section 3553.

16         Once I have considered all of that, it's going to result

17 in me imposing a punishment on you that's either within that

18 advisory guideline range, could be below it; it could be above

19 it.

20         Now some of the major factors that go into figuring all

21 that out are your criminal history or lack thereof, your actual

22 role in the offense, what it was you did and whether you came

23 here and told the truth and accepted responsibility for your

24 actions.  Those are some of the major factors that go into it.

25 There's others.  Do you understand all of that?

14

1          THE DEFENDANT:  Yes.

2          THE COURT:  Do you have any questions about any of it?

3          THE DEFENDANT:  No.

4          THE COURT:  Well, in representing you, Mr. Phillips has

5    apparently negotiated with the US Attorney's Office trying to

6    reach a plea agreement in your case.  Did he have your

7    permission to do that?

8          THE DEFENDANT:  Yes.

9          THE COURT:  We will take that agreement up.  Ms.

10   Groover, if you will stand and summarize its provisions.

11         MS. GROOVER:  We have reached a plea agreement in this

12   case that calls for the defendant pleading guilty to Count 8 of

13   the superseding indictment, and, Your Honor, I would note on my

14   copy of the summary it says Count 1.  It should be Count 8.

15         In exchange for pleading guilty to Count 8 of the

16   superseding indictment, the Government agrees not to oppose

17   Defendant's request that he receive a two-level mitigating role

18   reduction under Section 3B1.2(b) of the sentencing guidelines.

19         Defendant agrees to pay restitution for the full loss

20   caused by his total criminal conduct, which is not limited to

21   the specific counts to which defendant is pleading guilty.

22         If Defendant elects to cooperate, he agrees to provide

23   full, complete, candid and truthful cooperation to the

24   Government and the Government in its sole discretion will decide

25   whether that cooperation qualifies as substantial assistance

15

1  that warrants the filing of a motion for downward departure or

2  reduction in sentence.

3        Defendant does waive his right to appeal on any ground

4  with only three exceptions that are outlined in the plea

5  agreement.  The defendant also waives entirely his right to

6  collaterally attack Defendant's conviction and sentence on any

7  ground and any method including but not limited to a Title 28

8  USC Section 2255 motion.

9        The only exception being that the defendant may

10 collaterally attack his conviction and sentence based on a claim

11 of ineffective assistance.

12       The defendant also waives all rights to request

13 information about the investigation and prosecution of his case

14 under the Freedom of Information Act or the Privacy Act.

15       And, finally, Defendant waives protections of Rule 11(f)

16 of the Federal Rules of Criminal Procedure and Rule 410 of the

17 Federal Rules of Evidence, and if he later withdraws his plea or

18 fails to enter his plea, all statements made by him shall be

19 admissible for any and all purposes.

20       That is a summary of the plea agreement we have reached,

21 Your Honor.  The plea agreement document itself is 11 pages.  On

22 Page 10 bears my signature and Mr. Howard's signature on behalf

23 of the United States.

24       Would you like me to verify the remaining signatures?

25       THE COURT:  Yes, and also if you will strike through on

16

1   the plea summary where it says "Count 1" and put "Count 8" and

2   you initial it and have Mr. Phillips and Mr. Perez-Bravo initial

3   it as well.

4            MS. GROOVER:  Your Honor, to be clear, that was on the

5   summary document of the plea.

6            THE COURT:  Right, not the plea, but if you will

7   nevertheless correct that scrivener's error.

8            MS. GROOVER:  Of course, Your Honor.

9            Mr. Phillips, is this your signature on Page 11 of the

10  plea agreement?

11           MR. PHILLIPS:  It is.

12           THE COURT:  Mr. Perez-Bravo, is this your signature on

13  Page 11 of the plea agreement?

14           THE DEFENDANT:  (Nods head).

15           MS. GROOVER:  If we could please correct the statute

16  charged and the statute pleading on the summary, Page 8, and if

17  you could please initial that.

18           Your Honor, Mr. Phillips and I have made the corrections

19  on the summary to be Count 8, pleading to Count 8, and that is a

20  plea agreement that we have reached that we submit to you for

21  consideration.

22           THE COURT:  Thank you, Ms. Groover.

23           Mr. Phillips, is that summary consistent with the

24  agreement you negotiated?

25           MR. PHILLIPS:  It is, Your Honor, and the only thing,

17

1    make sure my client understands, he understands he is getting a

2    life sentence but he intends to cooperate and he's looking in

3    hopes of getting a positive recommendation under the 5K

4    provision.  I've explained that to him.  I've explained the

5    possible likelihood of that happening, and he understands that

6    he is facing mandatory life but with the hopes of getting the

7    sentence reduced.

8              THE COURT:  All right.

9              MR. PHILLIPS:  Is that correct?

10             THE DEFENDANT:  Yes.

11             THE COURT:  And Mr. Perez-Bravo, you've heard Ms.

12   Groover summarize the provisions of the plea agreement.  Was her

13   summary consistent with the agreement that you signed?

14             THE DEFENDANT:  Yes.

15             THE COURT:  And was that agreement translated for you

16   before you signed it?

17             THE DEFENDANT:  Yes.

18             THE COURT:  Other than the provisions set forth in that

19   plea agreement, has anyone made you any promises about the

20   outcome of your case?

21             THE DEFENDANT:  No.

22             THE COURT:  I do want to pick back up on one point that

23   Ms. Groover made, and that is contained in the agreement is a

24   waiver of certain appeal rights.  It states, "Defendant entirely

25   waives his right to a direct appeal of his conviction and

1    sentence on any ground."

2         Now, there are three exceptions to that waiver.  That

3    means if but only if one of these three things were to occur

4    would you get a direct appeal right pursuant to this agreement:

5    Number 1, if I sentenced you above the statutory maximum, you

6    could appeal that directly; Number 2, if I sentence you above

7    the advisory guideline range as found by me, you could appeal

8    that directly; or Number 3, if the Government were to file a

9    direct appeal then you could file one as well.  Otherwise,

10   pursuant to this plea agreement, you waive all other direct

11   appeal rights; understand?

12        THE DEFENDANT:  Yes.

13        THE COURT:  Any questions about that waiver?

14        THE DEFENDANT:  No.

15        THE COURT:  Also contained in the agreement is a waiver

16   of certain collateral attack rights.  It states, "Defendant

17   entirely waives his right to collaterally attack his sentence

18   and conviction on any ground and by any method including but not

19   limited to a 28 USC Section 2255 motion."

20        Now there is one exception to that waiver contained in

21   the agreement, and that is pursuant to this agreement, you

22   retain the right to collaterally attack based on a claim of

23   ineffective assistance of counsel.  But otherwise, pursuant to

24   this plea agreement, you waive all other collateral attack

25   rights; understand?

19

1          THE DEFENDANT:  Yes.

2          THE COURT:  Any questions about that waiver?

3          THE DEFENDANT:  No.

4          THE COURT:  Well, Mr. Phillips, as an officer of The

5     Court, are you aware of any impropriety on the part of the

6     Government in handling this case?

7          MR. PHILLIPS:  No, ma'am.

8          THE COURT:  Ms. Groover, are you aware of any

9     impropriety on anyone's part in handling this case?

10          MS. GROOVER:  No, Your Honor.

11          THE COURT:  Well, Mr. Perez-Bravo, do you still want to

12     plead guilty to Count 8 of this indictment?

13          THE DEFENDANT:  Yes.

14          THE COURT:  Do you want to plead guilty to Count 8

15     because you are, in fact, guilty of it?

16          THE DEFENDANT:  Yes.

17          THE COURT:  Do you understand all the rights and

18     privileges that you waive or give up if I accept your plea of

19     guilty?

20          THE DEFENDANT:  Yes.

21          THE COURT:  You understand that you may have had

22     defenses to this charge that you give up if you plead guilty and

23     I accept your plea?  Understand?

24          THE DEFENDANT:  Yes.

25          THE COURT:  Let the record reflect that Mr. Higinio

1    Perez-Bravo is 54 years old.  He's married and has two children.

2    He was born in Mexico.  He was living in Savannah, had been in

3    the United States about 20 years.  He has a middle school

4    education and has performed work remodeling homes.  He relates

5    that as a child he had memory problems.  He's not suffering or

6    laboring under any other disabilities.  He doesn't take any

7    medication.  He's not under the influence of any drugs or

8    alcohol.

9         He's had the services of an excellent defense lawyer,

10   two, for the better part of this case.  They have gone over all

11   the requisite pleadings with him and discussed all the important

12   concepts with him.  He's had the services of an interpreter and

13   translator.  He understands the nature of the case against him.

14   He understands the essential elements of that charge.  He

15   understands the possible penalties.

16        I find that Mr. Perez-Bravo's offer to plead guilty to

17   Count 8 is knowing.  I also find that it's voluntary; is that

18   correct, Mr. Perez-Bravo?

19             THE DEFENDANT:  Yes.

20             THE COURT:  I also want you to understand, Mr.

21   Perez-Bravo, that it's my understanding that you are not a

22   citizen of the United States and this is a serious felony that

23   you're pleading guilty to and you may be removed from the United

24   States, denied citizenship and denied admission back into the

25   United States in the future.  Do you understand that?

21

1          THE DEFENDANT:  Yes.

2          THE COURT:  And have you discussed that with Mr.

3    Phillips?

4          THE DEFENDANT:  Yes.

5          THE COURT:  All right, then I will approve of the plea

6    agreement.  Let me call on Ms. Groover for a factual basis, and

7    you three may have a seat while she does so.

8          MS. GROOVER:  Thank you, Your Honor.  The United States

9    calls Karen Hartley to the stand.

10                              KAREN HARTLEY,

11   having been first duly sworn, was examined and testified as

12   follows:

13         THE CLERK:  Thank you.  You may be seated, and if you

14   will please state your full name, spell your last, state your

15   occupation and your business address.

16         THE WITNESS:  Karen Hartley, H-a-r-t-l-e-y.  I'm an

17   investigative analyst with the US Attorney's Office in Savannah

18   at 22 Barnard Street.

19                              EXAMINATION

20   BY MS. GROOVER:

21   Q.   How long have you been with the US Attorney's Office,

22   ma'am?

23   A.   A few months short of 14 years.

24   Q.   And in general, what are your duties?

25   A.   I do a number of things to include analyzing documents,

1   phone records, bank records, all kinds of things, including

2   interviewing witnesses or subjects.

3   Q.   Did you assist in the murder investigation of Eliud

4   Montoya?

5   A.   Yes.

6   Q.   And did you learn that Mr. Montoya was shot and killed on

7   August the 19th of 2017 near his home in Garden City, which is

8   in Chatham County here within the Southern District of Georgia?

9   A.   Yes.

10   Q.   Did you learn that he was shot and killed at sometime

11   between 11:34 a.m. and 1:39 p.m.?

12   A.   Yes.

13   Q.   And prior to his death, was Mr. Montoya employed at Wolf

14   Tree in the Savannah cost center?

15   A.   Yes, he was.

16   Q.   And did you learn that Mr. Montoya's boss was Pablo

17   Rangel-Rubio?

18   A.   Yes.

19   Q.   And was Mr. Montoya a naturalized United States citizen?

20   A.   Yes.

21   Q.   Was his boss an illegal alien?

22   A.   That's correct.

23   Q.   Did the investigation reveal that Pablo Rangel-Rubio was

24   employing other illegal aliens to work for Wolf Tree?

25   A.   Yes.

23

1   Q.    Including his brother, Juan Rangel-Rubio?

2   A.    Yes.

3   Q.    And did Mr. Montoya learn that Pablo was employing other

4   illegal aliens?

5   A.    Yes, he knew that.

6   Q.    Did Mr. Montoya also learn that Pablo was providing false

7   or assumed identities for the illegal aliens to work at Wolf

8   Tree?

9   A.    Yes.

10  Q.    Did Mr. Montoya also learn that Pablo was not paying the

11  illegal aliens as required for all of the time that they worked?

12  A.    Yes.

13  Q.    And instead of paying them by paycheck under their assumed

14  or false identity, he was paying them in cash?

15  A.    That's right.

16  Q.    And not allowing them certain vacation time?

17  A.    That's correct.

18  Q.    Or not paying certain overtime?

19  A.    Right.

20  Q.    And basically not providing them all of the money that

21  they were due?

22  A.    That's right.

23  Q.    For the hours that they had worked?

24  A.    Yes.

25  Q.    Did Mr. Montoya, using his status as a citizen, contact

24

1   various levels of government officials and companies trying to

2   resolve this problem?

3   A.    Yes.

4   Q.    Did he try to speak up on behalf of the illegal alien

5   workers who could not speak up for themselves?

6   A.    Yes, he did.

7   Q.    On April 24th of 2017, did Mr. Montoya provide Wolf Tree a

8   two-page written complaint outlining the situation?

9   A.    Yes.

10  Q.    Did a representative of Wolf Tree give that complaint to

11  Pablo Rangel-Rubio on August 24th of 2017?

12  A.    Yes.

13  Q.    After receiving the complaint did Pablo call a meeting

14  with all of the Savannah employees to discuss Mr. Montoya's

15  complaint?

16  A.    Yes, he did.

17  Q.    And at that meeting, did Pablo Rangel-Rubio basically make

18  a mockery of the complaint explaining that nothing would happen

19  of Mr. Montoya's complaint?

20  A.    Yes.

21  Q.    And on August the 16th of 2017, was Mr. Montoya suspended

22  from work?

23  A.    Yes.

24  Q.    And why was he suspended?

25  A.    It was a safety violation.

25

1    Q.    Did Mr. Montoya agree with the suspension?

2    A.    No, he did not.

3    Q.    And how do you know that?

4    A.    He -- he spoke against it -- I actually cannot remember

5    exactly.

6    Q.    Did he refuse to sign the paperwork?

7    A.    Yes, he did refuse to sign the paperwork.

8    Q.    The next day on August the 17th of 2017, did Mr. Montoya

9    file a charge against Wolf Tree and Pablo with the United States

10   Equal Employment Opportunity Commission?

11   A.    Yes, he did.

12   Q.    And in his charge did he outline the complaint that he had

13   previously reported to the company?

14   A.    Yes, he did.

15   Q.    And on August the 19th, he was found murdered?

16   A.    That's correct.

17   Q.    Did the investigation identify Pablo as an initial

18   suspect?

19   A.    Yes.

20   Q.    And then identify his brother, Juan Rangel-Rubio, as

21   another suspect in the case?

22   A.    Yes.

23   Q.    And then as part of your duties did you review certain

24   records and documents to continue identifying anyone possibly

25   involved in this case?

26

1  A.    Yes.

2  Q.    Can you please describe to The Court what you did next,

3  what you did then?

4  A.    I was reviewing phone records, bank records.  I also was

5  viewing video among other things, and we were having a team

6  meeting.  I had discovered a significant wire and a check made

7  payable to Higinio Perez, and so I brought it up to the

8  detectives and the agents if they were familiar with this name

9  and they weren't familiar with it at that point, and I had been

10 going through phone records trying to identify all the phone

11 numbers on the specific dates to see who was making phone calls,

12 and I went back to the phone report of Juan Rangel and saw that

13 there was phone calls from Higinio Perez on August 18th, 2017

14 and August 19th, 2017, so I informed the investigative team

15 about that, and they went out and identified where Mr. Perez was

16 living and what kind of vehicles he was driving.

17 Q.    What happened next in the investigation?

18 A.    And then I had been recording every vehicle, we had

19 surveillance video from IBEW, and I had been recording every

20 vehicle going in and out when they -- we had pictures of his

21 vehicles, and I went back to the report and there was a lot of

22 white vans, and so I went back and started identifying what

23 these white vans looked like and it looked just like Mr. Perez's

24 van.

25 Q.    And so you reviewed all of the surveillance video that law

27

1    enforcement obtained in this case to identify his van?

2    A.    Yes.

3    Q.    And what did you do next?

4    A.    We -- we were looking at both the van and the -- we went

5    back on the 18th and we also found the Escalade and the van on

6    the 18th.  At that time we knew that Juan Rangel's phone had hit

7    in the area of the murder on the 18th and the 19th.  We obtained

8    Mr. Perez's phone records, and I could see that his phone was

9    also in the area on the 18th and 19th of the murder.

10   Q.    So you identified his vehicles at the location of the

11   murder as well as his phone at the location of the murder?

12   A.    That's correct.

13   Q.    Both the day before and the day of the murder?

14   A.    That's correct.

15   Q.    During the timeframe that Mr. Montoya would have been

16   killed?

17   A.    Yes.

18   Q.    Based on that information did law enforcement then

19   interview Mr. Perez-Bravo?

20   A.    Yes.

21   Q.    And in general, did he admit to providing his vehicles to

22   Pablo Rangel-Rubio to conduct surveillance of this employee?

23   A.    Yes, he did.

24   Q.    And did he also admit to receiving $20,000.00 wires for

25   the use of these vehicles?

28

1   A.    Yes, he did.

2   Q.    Did he also admit to driving Juan Rangel-Rubio to actually

3   shoot Mr. Montoya?

4   A.    Yes.

5   Q.    And you indicated that you had identified a check.  Was

6   that in May of 2017 that check was issued?

7   A.    Yes.

8   Q.    Was that from Pablo Rangel-Rubio to the defendant?

9   A.    Yes, $6,000.00 check.

10  Q.    And you also indicated a significant wire.  Was that a

11  $20,000.00 wire?

12  A.    $20,000.00 wire, I believe June 6th, 2017.

13        MS. GROOVER:  Your Honor, those are all the questions I

14  have.

15        THE COURT:  Mr. Phillips, any questions?

16        MR. PHILLIPS:  Don't have any questions, Judge.

17        THE COURT:  You may step down.  Thank you.

18        Mr. Phillips, Mr. Perez-Bravo, reapproach.  Mr.

19  Perez-Bravo, do you dispute any of the testimony given by Ms.

20  Hartley this morning in your case?

21        THE DEFENDANT:  No.

22        THE COURT:  Do you admit the truth of her testimony?

23        THE DEFENDANT:  Yes.

24        THE COURT:  All right, based on the record made at this

25  proceeding I'm satisfied there's a factual basis for a plea of

29

1    guilty to Count 8.  Ms. Sharp, has that been entered?

2         THE CLERK:  Your Honor, if I may retrieve the change of

3    plea?

4         MR. PHILLIPS:  I'm sorry.  Thank you.

5         THE CLERK:  Thank you, and, Your Honor, the plea of

6    guilty has been entered.

7         THE COURT:  All right, and Mr. Perez-Bravo, do you

8    remember signing that plea of guilty?

9         THE DEFENDANT:  Yes.

10        THE COURT:  And was it translated for you before you

11   signed it?

12        THE DEFENDANT:  Yes.

13        THE COURT:  And Mr. Phillips, did he do so in your

14   presence?

15        MR. PHILLIPS:  Yes, ma'am.

16        THE COURT:  Then the plea of guilty is accepted, and I

17   now adjudge you guilty of Count 8.  The probation officer will

18   conduct a presentence investigation.  They will issue a report.

19   That report will be given to the Defense and to the Government

20   and we will thereafter schedule your sentencing hearing.

21        Now, in just a moment I'm going to have the jury return

22   so that I can excuse them and announce what has occurred, and

23   once we're in recess, then Mr. Perez-Bravo, I will remand you

24   back to the custody of the US Marshal.

25        (Proceeding concluded at 10:40 a.m.)

30

1                        CERTIFICATION

2

3        I certify that the foregoing is a true and correct

4   transcript of the stenographic record of the above-mentioned

5   matter.

6

7

8   _____    05/03/2022

9   Debra Gilbert, Court Reporter         Date

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25